Ashley Gorski*
agorski@aclu.org
Scarlet Kim*
scarletk@aclu.org
Sarah Taitz*
staitz@aclu.org
American Civil Liberties Union Foundation
125 Broad Street, Floor 18
New York, NY 10004
Tel: (212) 549-2500

*Attorneys for Plaintiffs*
(Additional counsel continued on next page)

## UNITED STATES DISTRICT COURT
## FOR THE CENTRAL DISTRICT OF CALIFORNIA

ABDIRAHMAN ADEN KARIYE,
MOHAMAD MOUSLLI, and
HAMEEM SHAH,

     *Plaintiffs*,

          v.

ALEJANDRO MAYORKAS,
Secretary of the U.S. Department of
Homeland Security, in his official
capacity; MARK MORGAN,
Commissioner of U.S. Customs and
Border Protection, in his official
capacity; TAE D. JOHNSON, Acting
Director of U.S. Immigration and
Customs Enforcement, in his official
capacity; and STEVE K. FRANCIS,
Acting Executive Associate Director,
Homeland Security Investigations, in
his official capacity,

     *Defendants*.

**COMPLAINT FOR INJUNCTIVE
AND DECLARATORY RELIEF**

No.  2:22-CV-01916

Mohammad Tajsar (SBN 280152)
mtajsar@aclusocal.org
ACLU Foundation of Southern California
1313 West 8th Street
Los Angeles, CA 90017
Tel: (213) 977-9500

Daniel Mach*
dmach@aclu.org
Heather L. Weaver (SBN 226853)
hweaver@aclu.org
American Civil Liberties Union Foundation
915 15th St., NW Ste. 600
Washington, DC 20005
Tel: (202) 675-2330

Teresa Nelson*
tnelson@aclu-mn.org
American Civil Liberties Union of Minnesota
P.O. Box 14720
Minneapolis, MN 55415
Tel: (651) 645-4097

*Motion for pro hac vice admission to be filed

**INTRODUCTION**

1. "How often do you pray?" "Do you attend mosque?" "Which mosque do you attend?" "Are you Sunni or Shi'a?" These are just some of the deeply personal and religiously intrusive questions that federal border officers ask Plaintiffs—three Muslim U.S. citizens—when they return home to the United States from international travel. Border officers ask these questions pursuant to a broader policy and/or practice by U.S. Customs and Border Protection ("CBP") and Homeland Security Investigations ("HSI") of targeting Muslim American travelers for questioning about their religious beliefs, practices, and associations, and retaining the answers in a law enforcement database for up to 75 years.

2. Religious questioning such as this violates the U.S. Constitution. It furthers no valid—let alone compelling—government interest, and it is an affront to the First Amendment freedoms of religion and association. Moreover, because Defendants specifically target Muslim Americans for such questioning, they also violate the First and Fifth Amendments' protections against unequal treatment on the basis of religion. Just as border officers may not single out Christian Americans to ask what denomination they are, which church they attend, and how regularly they pray, singling out Muslim Americans for similar questions is unconstitutional. Plaintiffs are entitled to full and equal membership in American society. By targeting Plaintiffs for religious questioning merely because they are Muslim, Defendants' border officers stigmatize them for adhering to a particular faith and condemn their religion as subject to suspicion and distrust.

3. This practice also violates the Religious Freedom Restoration Act ("RFRA"), 42 U.S.C. § 2000bb *et seq*. It imposes substantial pressure on Plaintiffs to modify or abandon certain religious practices and expression while traveling, contrary to their religious beliefs, in an effort to avoid calling further attention to their Muslim faith and incurring additional intrusive questioning.

4. Through this lawsuit, Plaintiffs seek a declaratory judgment that the

religious questioning of them, and the policy and/or practice of religious questioning by the U.S. Department of Homeland Security ("DHS") and CBP, violates the First and Fifth Amendments and RFRA. Plaintiffs also seek an injunction prohibiting DHS and CBP from questioning them at ports of entry about their religious beliefs, practices, and associations. Finally, Plaintiffs seek an injunction requiring Defendants to expunge records containing information unlawfully obtained through their religious questioning of Plaintiffs.

## JURISDICTION AND VENUE

5.    This Court has subject matter jurisdiction over Plaintiffs' claims under 28 U.S.C. § 1331.

6.    This Court has authority to issue declaratory and injunctive relief pursuant to 28 U.S.C. §§ 2201–02, Rule 57 of the Federal Rules of Civil Procedure, and its inherent equitable powers.

7.    Venue is proper in this Court pursuant to 28 U.S.C. § 1391(e). A substantial part of the events giving rise to Plaintiffs' claims occurred in this Court's judicial district, and Defendants are officers of the United States sued in their official capacities.

## PARTIES

### *Plaintiffs*

8.    Plaintiff Imam Abdirahman Aden Kariye is a U.S. citizen who lives in Bloomington, Minnesota. He is Muslim and serves as an imam at a local mosque.

9.    Plaintiff Mohamad Mouslli is a U.S. citizen who lives in Gilbert, Arizona, with his wife and three children. He is Muslim and works in commercial real estate.

10.    Plaintiff Hameem Shah is a U.S. citizen who lives in Plano, Texas. He is Muslim and works in financial services.

### *Defendants*

11.    Defendants, who are responsible for the challenged religious

questioning and retention of information, are the heads of the DHS and its agencies: CBP and U.S. Immigration and Customs Enforcement ("ICE"), of which HSI is a subcomponent.

12.    Defendant Alejandro Mayorkas is the Secretary of DHS. He has authority over all DHS policies and practices, including those challenged in this lawsuit. Plaintiffs sue him in his official capacity.

13.    Defendant Chris Magnus is the Commissioner of CBP. He has authority over all CBP policies and practices, including those challenged in this lawsuit. Plaintiffs sue him in his official capacity.

14.    Defendant Tae Johnson is Acting Director of ICE. He has authority over all ICE policies and practices, including those challenged in this lawsuit. Plaintiffs sue him in his official capacity.

15.    Defendant Steve K. Francis is the Acting Executive Associate Director of HSI. He has authority over all HSI policies and practices, including those challenged in this lawsuit. Plaintiffs sue him in his official capacity.

## FACTUAL BACKGROUND

### *Religious Questioning of Muslim Americans at the U.S. Border*

16.    At border crossings and international airports in the United States, Defendants' border officers frequently subject travelers who are Muslim, or whom they perceive to be Muslim, to questioning about their religion.

17.    In May 2011, after the American Civil Liberties Union ("ACLU") and other organizations submitted complaints to DHS describing border questioning of Muslim Americans about their religious beliefs and practices, the DHS Office for Civil Rights and Civil Liberties ("CRCL") disclosed that it had opened an investigation into CBP questioning "of U.S. citizens and legal residents who are Muslim, or appear to be Muslim, about their religious and political beliefs, associations, and religious practices and charitable activities protected by the First Amendment and Federal law." In a letter to the ACLU dated May 3, 2011, CRCL

stated that it had received "a number of complaints like yours, alleging that U.S. Customs and Border Protection (CBP) officers have engaged in inappropriate questioning about religious affiliation and practices during border screening."

18.    In a memorandum dated May 3, 2011 ("May 3 Memorandum"), CRCL informed the CBP Commissioner that it had received "numerous accounts from American citizens, legal permanent residents, and visitors who are Arab and/or Muslim, alleging that officials from U.S. Customs and Border Protection (CBP) repeatedly question them and other members of their communities about their religious practices or other First Amendment protected activities, in violation of their civil rights or civil liberties."

19.    The May 3 Memorandum included detailed descriptions of border officers' questioning of Muslims about their religious beliefs and practices— including whether the travelers were Muslim, whether they attended a mosque, how frequently they prayed, and whether they were Sunni or Shi'a—at various ports of entry across the United States, including in Boston, Buffalo, Miami, Seattle, Detroit, Atlanta, and New York City.

20.    In July 2012, CRCL informed the ACLU and other organizations that it had suspended its investigation into border questioning about religious beliefs and practices because individuals had filed a lawsuit challenging the practice. That litigation is pending.

21.    On information and belief, CRCL never resumed its investigation or issued findings about whether border questioning about religious beliefs and practices complies with federal law.

22.    Religious questioning of Muslim Americans at ports of entry continues today, as Plaintiffs' experiences demonstrate.

23.    Far from prohibiting this unconstitutional and unlawful conduct, Defendants' written policies permit border officers to question Americans about their religious beliefs, practices, and associations. For example, ICE requires its

officers who work at ports of entry to carry with them a sample questionnaire to guide their interrogations of travelers, which includes intrusive questions about a traveler's religious beliefs, practices, and associations. CBP has a policy that allows it to collect and maintain information about an individual's religious beliefs, practices, and associations in numerous circumstances. On information and belief, CBP views the collection and retention of Plaintiffs' responses to the religious questioning described herein as authorized by its policy.

24.    But Defendants' border officers do not direct these intrusive questions to all travelers. Rather, Defendants have a policy and/or practice of intentionally targeting selected Muslims (or individuals perceived to be Muslim) for religious questioning. While Defendants' border officers routinely and intentionally single out Muslim Americans to demand answers to religious questions, travelers perceived as practicing faiths other than Islam are not routinely subjected to similarly intrusive questioning about their religious beliefs, practices, and associations.

25.    This religious questioning of Muslims typically takes place in the context of "secondary inspection," a procedure by which CBP detains, questions, and searches certain travelers before they are permitted to enter the country.

26.    The secondary inspection environment is inherently coercive:

      a. Border officers carry weapons, typically identify themselves as border officers or wear government uniforms, and command travelers to enter and remain in the secondary inspection areas.

      b. Travelers are not free to leave those areas until officers give them permission.

      c. Secondary inspection areas are separated from the public areas of airports or other ports of entry.

      d. During the secondary inspection process, border officers typically take possession of travelers' passports and routinely conduct physical searches and/or searches of travelers' belongings, including

their electronic devices. Border officers use the coercive nature of the secondary inspection environment to compel Muslim American travelers to answer intrusive questions about their religious beliefs, practices, and associations.

27.    Because of the coercive nature of secondary inspections, Muslim American travelers singled out for religious questioning during this process have no meaningful choice but to disclose their First Amendment-protected beliefs and activity in response to border officers' inquiries.

28.    CBP officers are required to create a record of every secondary inspection at an airport or land crossing. As part of this record, they routinely document travelers' responses to questions asked during secondary inspections, including Muslim Americans' coerced responses to questions about their religious beliefs, practices, and associations. When HSI agents are involved in or otherwise present during secondary inspection, they also routinely create and maintain records of the secondary inspection, including Muslim Americans' coerced responses to questions about their religious beliefs, practices, and associations.

29.    Border officers input the records of secondary inspections into DHS databases, including a DHS database called TECS, which is the updated and modified version of the former Treasury Enforcement Communications System. TECS functions as a repository for the sharing of information among tens of thousands of federal, state, local, tribal, and foreign law enforcement, counterterrorism, and border security agencies.

   a. TECS users include personnel from CBP, ICE, the Federal Bureau of Investigation, Department of Defense, Transportation Security Administration, U.S. Citizenship and Immigration Services, U.S. Drug Enforcement Administration, and Department of State.

   b. TECS data is also accessible to officers from over 45,000 state and local police departments.

c.  Data is retained in TECS for up to 75 years.

30.     Being Muslim and practicing Islam are protected religious belief and activity. Religious belief and practice do not indicate that an individual has or is engaged in any immigration or customs-related crime within CBP's enforcement mandate. Nor does being Muslim or practicing Islam indicate that an individual has or is engaged in any other unlawful activity. Accordingly, Muslim travelers' personal religious information is not germane to any legitimate purpose that Defendants may assert.

## RELIGIOUS QUESTIONING OF PLAINTIFFS BY DEFENDANTS' BORDER OFFICERS

### Abdirahman Aden Kariye

31.     Imam Abdirahman Aden Kariye is a U.S. citizen and an imam at a mosque in Bloomington, Minnesota. He is a prominent member of the local Muslim and interfaith communities, as well as an active participant in civic life and charitable endeavors.

32.     CBP officers have questioned Imam Kariye about his Muslim faith on at least five occasions. On each occasion, the environment was coercive: CBP officers wearing uniforms and carrying weapons commanded Imam Kariye to enter and remain in an area separated from other travelers, usually a windowless room. They took Imam Kariye's belongings from him, searched his electronic devices, and questioned him at length.

### *First Religious Questioning Incident: September 12, 2017*

33.     On September 12, 2017, Imam Kariye arrived home to the United States from Saudi Arabia, where he had participated in the Hajj. The Hajj is a sacred religious pilgrimage to Mecca, the holiest city for Muslims.

34.     Upon his arrival at the Seattle-Tacoma International Airport, Imam Kariye was detained for secondary inspection by CBP in a small, windowless room.

1  Two CBP officers were present during the detention, which lasted for approximately
2  two hours.

3      35.    During the detention, a CBP officer questioned Imam Kariye about his
4  religious beliefs, practices, and associations, including questions about which
5  mosque he attends and whether he had been on the Hajj before.

6      36.    Imam Kariye answered these questions because he was not free to leave
7  without the permission of a CBP officer and reasonably felt that he had no choice
8  but to answer, based on the coercive circumstances of his detention.

9      37.    A CBP officer took notes during Imam Kariye's detention, including
10  while Imam Kariye responded to CBP's questions about his religious beliefs,
11  practices, and associations.

12              ***Second Religious Questioning Incident: February 6, 2019***

13      38.    On February 6, 2019, CBP again subjected Imam Kariye to religious
14  questioning during secondary inspection at the Peace Arch Border Crossing near
15  Blaine, Washington. Imam Kariye was returning to the United States by car from a
16  trip to Vancouver, where he had been on a vacation with friends. Two CBP officers
17  detained Imam Kariye for approximately three hours. The officers told Imam Kariye
18  that he would not be free to leave unless he answered their questions.

19      39.    During the detention, a CBP officer questioned Imam Kariye about his
20  religious beliefs, practices, and associations, including questions about Imam
21  Kariye's involvement with a charitable organization affiliated with Muslim
22  communities, how he fundraised for this charity, and whether his fundraising
23  involved visiting mosques. The obligation to provide charity and assistance to the
24  needy, or *zakat*, is a central tenet of Islam.

25      40.    Imam Kariye answered the CBP officer's questions about his religious
26  charitable beliefs and activities because he was not free to leave without the
27  permission of a CBP officer and reasonably felt that he had no choice but to answer,
28  based on the coercive circumstances of his detention.

41.   A CBP officer took notes during Imam Kariye's detention, including while Imam Kariye responded to CBP's questions about his religious beliefs, practices, and associations.

### Third Religious Questioning Incident: November 24, 2019

42.   On November 24, 2019, CBP again subjected Imam Kariye to religious questioning during secondary inspection in a CBP preclearance area at Ottawa International Airport in Canada. CBP officers are posted at Ottawa International Airport and conduct inspections there for travelers headed to the United States. Imam Kariye was returning to the United States after attending a wedding in Canada. He was flying to Detroit, Michigan, and then to Seattle, Washington. A CBP officer detained Imam Kariye for approximately one hour in a small, windowless room.

43.   During the detention, the CBP officer questioned Imam Kariye about his religious associations. In particular, the officer questioned Imam Kariye about a youth sports league that he helped to run. Although Imam Kariye had not informed the officer that he was Muslim, the officer asked whether the sports league was "for black and white kids, or is it just for Muslim kids?" Imam Kariye understood the question as an acknowledgment of his Islamic faith and an attempt to ascertain what kinds of religious activities he participated in.

44.   Imam Kariye answered the questions because he was not free to leave without the permission of a CBP officer and reasonably felt that he had no choice but to answer, based on the coercive circumstances of his detention.

45.   The CBP officer took notes during Imam Kariye's detention, including while Imam Kariye responded to CBP's questioning about his religious beliefs and associations.

### Fourth Religious Questioning Incident: August 16, 2020

46.   On August 16, 2020, CBP officers again subjected Imam Kariye to religious questioning during secondary inspection at the Seattle-Tacoma International Airport. Imam Kariye was returning to the United States from a

vacation with a friend. He had traveled from Turkey to Seattle, Washington, via the Netherlands. CBP officers had photographs of Imam Kariye that they used to identify him when he came off the jet bridge. Multiple CBP officers detained him for several hours in a small, windowless room. To the best of Imam Kariye's recollection, one of the officers, a supervisor, was named "Abdullah Shafaz" or something close to it.

47.    During the detention, CBP officers questioned Imam Kariye about his religious beliefs, practices, and associations. These questions included:

        a.  What type of Muslim are you?

        b.  Are you Sunni or Shi'a?

        c.  Are you Salafi or Sufi?

        d.  What type of Islamic lectures do you give?

        e.  Where did you study Islam?

        f.  How is knowledge transmitted in Islam?

        g.  Do you listen to music?

        h.  What kind of music do you listen do?

        i.  What are your views on Ibn Taymiyyah?

48.    Imam Kariye understood the questions regarding music (religious opinions about which can vary among Muslims) and his views on Ibn Taymiyyah, a medieval Muslim scholar, as designed to elicit information about the nature and strength of his religious beliefs and practices.

49.    During the detention, a CBP officer threatened Imam Kariye multiple times with retaliation. The officer said that, if Imam Kariye did not cooperate, CBP would make things harder for him. The officer also said that Imam Kariye was welcome to challenge the legality of the detention, but if he did so publicly or went to the media, CBP would make things harder for him during his future travels.

50.    Imam Kariye answered the CBP officers' questions because he was not free to leave without the permission of a CBP officer and reasonably felt that he had

no choice but to answer, based on the coercive circumstances of his detention.

51.    A CBP officer took notes during Imam Kariye's detention, including while Imam Kariye responded to CBP's questions about his religious beliefs, practices, and associations.

52.    After several hours of detention, two of the CBP officers who had detained Imam Kariye escorted him to a separate room, where they performed a thorough, full-body pat-down search, which included touching his buttocks and groin. The CBP officers had no basis to suspect Imam Kariye of carrying contraband or weapons, and they had already been in close proximity to him during his lengthy detention. After the pat-down, the officers finally permitted Imam Kariye to leave.

### *Fifth Religious Questioning Incident: January 1, 2022*

53.    On January 1, 2022, a plainclothes CBP officer subjected Imam Kariye to religious questioning during secondary inspection at the Minneapolis-Saint Paul Airport. Imam Kariye was returning to the United States from a trip to Somalia, Kenya, and the United Arab Emirates, where he had traveled for vacation and to visit family. The officer detained Imam Kariye for approximately an hour and a half.

54.    During the detention, the CBP officer questioned Imam Kariye about his religious beliefs, practices, and associations, including whether he had met a particular friend at a mosque. The officer then said, "I assume you're a Muslim, aren't you?"

55.    Imam Kariye answered these questions because he was not free to leave without the permission of a CBP officer and reasonably felt that he had no choice but to answer, based on the coercive circumstances of his detention.

56.    A CBP officer took notes during Imam Kariye's detention, including while Imam Kariye responded to CBP's questions about his religious beliefs, practices, and associations.

57.    During each of these five religious questioning incidents, Imam Kariye's travel and identification documents were valid, and he was not transporting

contraband.

***CBP's religious questioning of Imam Kariye is substantially likely to recur.***

58.     On information and belief, Imam Kariye has been placed on a U.S. government watchlist, and he will continue to be subject to detention, searches, and questioning, including religious questioning, each time he returns to the United States from international travel.

59.     For years, Imam Kariye has experienced travel issues consistent with placement on a U.S. government watchlist. Frequently between 2013 and 2019, and persistently from 2020 to the present, Imam Kariye has been unable to print his boarding passes for domestic or international flights from the internet or self-service kiosks at the airport, and airline agents must receive clearance from a supervisor or government agency before providing Imam Kariye with his boarding pass. That process typically takes approximately an hour and has taken up to two hours. Whenever Imam Kariye takes a domestic or international flight, his boarding pass is marked with "SSSS," which indicates "Secondary Security Screening Selection," and he is subject to additional screening. Placement on a watchlist consistently results in a traveler's boarding pass being stamped with "SSSS."

60.     Whenever Imam Kariye returns to the United States following international travel, whether by plane or by car, he is subject to secondary inspection. Whenever Imam Kariye returns to a U.S. airport following international travel, CBP officers are either waiting for him at the arrival gate or meet him at primary inspection. The officers then escort Imam Kariye to a secondary inspection area, where CBP officers detain and question him. Imam Kariye does not know why the U.S. government has placed him on a watchlist.

61.     Imam Kariye travels internationally frequently for leisure and to visit family abroad, including his father and other family who live in East Africa. He has also traveled internationally for religious pilgrimages. He intends to continue to travel internationally in the near future. When he does so, upon his return home to

the United States, he is at substantial risk of again being questioned by CBP officers about his religious beliefs, practices, and associations.

### *CBP's religious questioning causes Imam Kariye significant distress.*

62.    CBP officers ask Imam Kariye intrusive and personal questions about his religious beliefs, practices, and associations because he is a Muslim.

63.    Religious questioning by CBP harms Imam Kariye and impedes his religious practice.

64.    On information and belief, DHS and CBP maintain records pertaining to Imam Kariye's religious beliefs, practices, and associations, as a result of border officers' questioning of Imam Kariye about these topics. Defendants' unlawful retention of such information in government systems causes Imam Kariye ongoing, irreparable distress and harm for which he has no adequate remedy at law.

65.    CBP's invasive questions regarding Imam Kariye's religious beliefs, practices, and associations are insulting and humiliating to him. Border officers convey a message of official disapproval of Islam by (1) targeting Imam Kariye for religious questioning because he is a Muslim, (2) asking him specific questions about his Islamic religious beliefs, practices, and associations, and (3) retaining information about his religious beliefs, practices, and associations. In particular, CBP conveys the stigmatizing message that the U.S. government views adherence to Islamic religious beliefs and practices as inherently suspicious, and that Muslim Americans are not entitled to the full constitutional protections afforded to other Americans. Due to this official condemnation of his faith, Imam Kariye feels marginalized and like an outsider when coming home to his own country.

66.    CBP's religious questioning also imposes substantial pressure on Imam Kariye to modify or curb his religious expression and practices, contrary to his sincere religious beliefs. In particular, when traveling back to the United States from abroad, Imam Kariye modifies or eliminates certain religious practices to avoid calling attention to his faith and incurring additional scrutiny and religious

1   questioning by CBP. Because of CBP's scrutiny and religious questioning, Imam
2   Kariye cannot fully practice and express his faith in the way that he otherwise would
3   while traveling.

4        67.    For example, CBP's religious questioning imposes substantial pressure
5   on Imam Kariye to modify his religious dress while traveling back to the United
6   States. Imam Kariye typically wears a Muslim cap, known as a kufi, when he is in
7   public. Wearing a kufi is a common religious practice for many Muslim men. For
8   Imam Kariye, the kufi represents his Muslim identity. It emulates the dress of the
9   Prophet Mohammad, and it signifies love and reverence for him.

10       68.    Despite his sincerely held religious belief that he should wear his kufi
11  in public, Imam Kariye no longer wears his kufi at the airport or the border when
12  returning home to the United States from abroad, in order to avoid additional CBP
13  scrutiny and religious questioning.

14       69.    CBP's religious questioning also imposes substantial pressure on Imam
15  Kariye to modify his prayer practice while traveling back into the United States. As
16  a Muslim, Imam Kariye believes that he must pray at five specific times each day.
17  This prayer practice involves kneeling on the ground in a particular direction (toward
18  Mecca), bowing, and placing his forehead to the ground in prayer. However, to avoid
19  additional CBP scrutiny and religious questioning, Imam Kariye typically refrains
20  from these physical acts of prayer at the airport and the border, even though he would
21  ordinarily pray in this manner during the religiously designated prayer times.

22       70.    CBP's religious questioning also imposes substantial pressure on Imam
23  Kariye to avoid carrying religious texts while traveling back into the United States.
24  As a Muslim and an imam, Imam Kariye's religious duties require him to study a
25  variety of religious texts, such as the Quran, commentaries on the Quran, and Islamic
26  jurisprudence in matters relating to family law and the rules pertaining to charity.
27  However, to avoid additional CBP scrutiny and religious questioning, Imam Kariye
28  no longer carries physical copies of these texts with him when he travels home to

the United States from abroad, hindering his ability to study these texts while traveling.

71.    Imam Kariye is proud to be a Muslim. His sincere religious beliefs counsel him to wear a kufi in public, pray in a particular manner, and study various religious texts. It causes him distress to forgo wearing his kufi, modify his prayer practice, and avoid carrying religious texts as he travels. Nevertheless, because of CBP's practice of subjecting him to intrusive questions about his faith, he takes these protective measures when traveling back into the United States to avoid calling attention to his religion and incurring additional scrutiny and religious questioning by CBP.

72.    CBP's religious questioning has made and continues to make Imam Kariye feel anxious, humiliated, and stigmatized as a Muslim American. Imam Kariye experiences anxiety before traveling home due to CBP's religious questioning. In the weeks following each incident of religious questioning described above, the humiliation of CBP's intrusive demands for information about his faith has replayed in Imam Kariye's mind. CBP's scrutiny and religious questioning cause him to suffer acute distress, which has interfered with his daily life, including by distracting him from work and from his relationships with family members.

## **Mohamad Mouslli**

73.    Plaintiff Mohamad Mouslli is a U.S. citizen who is Muslim. He lives in Gilbert, Arizona, with his wife and three children, all U.S. citizens. Mr. Mouslli works in commercial real estate.

74.    On the last four occasions that Mr. Mouslli has traveled internationally, CBP officers have subjected him to religious questioning upon his return home to the United States. On each occasion, the environment was coercive: CBP officers wearing uniforms and carrying weapons commanded Mr. Mouslli to enter and remain in an area separated from other travelers. They took Mr. Mouslli's belongings from him, searched his electronic devices, and questioned him at length.

1

***First Religious Questioning Incident: August 9, 2018***

2       75.    On or about August 9, 2018, CBP officers subjected Mr. Mouslli to

3   religious questioning during secondary inspection at the border crossing near

4   Lukeville, Arizona. He was returning to the United States by car from a trip to

5   Mexico, where he had been on vacation with a friend.

6       76.    After CBP officers checked Mr. Mouslli's passport, several officers

7   surrounded the car. They forced Mr. Mouslli to remain in the car for approximately

8   30 minutes, after which the officers brought him into the station. In total, CBP

9   officers detained Mr. Mouslli for approximately six to seven hours.

10       77.    During the detention, CBP officers questioned Mr. Mouslli about his

11   religious beliefs, practices, and associations, including whether he is a Muslim and

12   whether he is Sunni or Shi'a.

13       78.    Mr. Mouslli answered these questions because he was not free to leave

14   without the permission of a CBP officer and reasonably felt that he had no choice

15   but to answer, based on the coercive circumstances of his detention.

16       79.    A CBP officer took notes during Mr. Mouslli's detention, including

17   while Mr. Mouslli responded to CBP's questions about his religious beliefs,

18   practices, and associations.

19   ***Second Religious Questioning Incident: August 19, 2019***

20       80.    On or about August 19, 2019, CBP officers again subjected Mr. Mouslli

21   to religious questioning during secondary inspection at Los Angeles International

22   Airport ("LAX"). He was returning to the United States from a trip to Dubai to visit

23   family and the Netherlands to visit his sister. The officers detained Mr. Mouslli for

24   approximately one-and-a-half to two hours, along with his minor son, who had

25   joined him for the trip.

26       81.    During the detention, the CBP officers questioned Mr. Mouslli about

27   his religious beliefs, practices, and associations, including whether he attends a

28   mosque and how many times a day he prays.

82.    Mr. Mouslli answered these questions because he and his son were not free to leave without the permission of a CBP officer, and he reasonably felt that he had no choice but to answer, based on the coercive circumstances of his detention. He was also worried about extending the detention, given the presence of his son.

83.    A CBP officer took notes during Mr. Mouslli's detention, including while Mr. Mouslli responded to CBP's questions about his religious beliefs, practices, and associations.

### Third Religious Questioning Incident: March 11, 2020

84.    On March 11, 2020, CBP officers subjected Mr. Mouslli to religious questioning during another secondary inspection at LAX. Mr. Mouslli was returning to the United States from a trip to Dubai to visit his parents. The officers detained Mr. Mouslli for approximately one-and-a-half to two hours.

85.    During the detention, the CBP officers questioned Mr. Mouslli about his religious beliefs, practices, and associations, once again demanding to know whether he attends a mosque and whether he is Sunni or Shi'a.

86.    Mr. Mouslli answered these questions because he was not free to leave without the permission of a CBP officer and reasonably felt that he had no choice but to answer, based on the coercive circumstances of his detention.

87.    A CBP officer took notes during Mr. Mouslli's detention, including while Mr. Mouslli responded to CBP's questions about his religious beliefs, practices, and associations.

88.    Because of the delay from the secondary inspection, including CBP's religious questioning, Mr. Mouslli missed his connecting flight from LAX to Phoenix, and he had to rent a car at additional expense to drive home to Arizona.

### Fourth Religious Questioning Incident: June 5, 2021

89.    On or about June 5, 2021, CBP officers again subjected Mr. Mouslli to religious questioning during secondary inspection at LAX. Mr. Mouslli was returning to the United States from a trip to Dubai to visit his parents. The officers

detained him for approximately one-and-a-half to two hours, along with his minor daughter, who had joined him for the trip.

90. During the detention, CBP officers questioned Mr. Mouslli about his religious beliefs, practices, and associations, including whether he goes to a mosque and whether he prays every day.

91. Mr. Mouslli answered these questions because he and his daughter were not free to leave without the permission of a CBP officer, and he reasonably felt that he had no choice but to answer, based on the coercive circumstances of his detention. He was also worried about extending the detention, given the presence of his daughter.

92. A CBP officer took notes during Mr. Mouslli's detention, including while Mr. Mouslli responded to CBP's questions about his religious beliefs, practices, and associations.

93. During each of these four religious questioning incidents, Mr. Mouslli's travel and identification documents were valid, and he was not transporting contraband.

### *CBP's religious questioning of Mr. Mouslli is substantially likely to recur and causes him significant distress.*

94. On information and belief, Mr. Mouslli has been placed on a U.S. government watchlist, and he will continue to be subject to detention, searches, and questioning, including religious questioning, each time he returns to the United States from international travel.

95. In late 2017, Mr. Mouslli began experiencing travel issues consistent with placement on a U.S. government watchlist. Since 2017, Mr. Mouslli has been unable to print his boarding passes for domestic or international flights from the internet or self-service kiosks at the airport, and airline agents must receive clearance from a supervisor or government agency before providing Mr. Mouslli with his boarding pass. Whenever Mr. Mouslli takes a domestic or international flight, his

boarding pass is marked with "SSSS," and he is subject to additional screening. Whenever Mr. Mouslli returns to the United States following international travel, whether by plane or by car, he is subject to secondary inspection. Whenever Mr. Mouslli returns to a U.S. airport following international travel, CBP officers are waiting for him at the arrival gate. The officers then escort Mr. Mouslli to a secondary inspection area, where CBP officers detain and question Mr. Mouslli. Mr. Mouslli does not know why the U.S. government has placed him on a watchlist.

96.    Mr. Mouslli considered taking a trip with his son to Dubai in February 2022 to visit his family. However, he decided that this particular trip would not be worth the difficulty, discomfort, and stigma of CBP scrutiny in secondary inspection, including CBP's religious questioning.

97.    While Mr. Mouslli intends to travel internationally in the near future to visit his mother, brother, and sister, who live in Dubai, and his sister, who lives in the Netherlands, he now weighs the necessity of every trip against the substantial likelihood of future detention and religious questioning by border officers.

98.    When Mr. Mouslli travels again internationally, he is at substantial risk of again being questioned by CBP officers upon his return home to the United States about his religious beliefs, practices, and associations.

99.    CBP officers ask Mr. Mouslli intrusive questions about his religious beliefs, practices, and associations because he is a Muslim.

100.    Religious questioning by CBP harms Mr. Mouslli and impedes his religious practice.

101.    On information and belief, DHS and CBP maintain records pertaining to Mr. Mouslli's religious beliefs, practices, and associations, as a result of border officers' questioning of Mr. Mouslli about these topics. Defendants' unlawful retention of such information in government systems causes Mr. Mouslli ongoing, irreparable distress and harm for which he has no adequate remedy at law.

102.    CBP's invasive questions regarding Mr. Mouslli's religious beliefs,

practices, and associations are insulting and humiliating to him. Border officers convey a message of official disapproval of Islam by (1) targeting Mr. Mouslli for religious questioning because he is a Muslim, (2) asking him specific questions about his Islamic religious beliefs, practices, and associations, and (3) retaining information about his religious beliefs, practices, and associations. In particular, CBP conveys the stigmatizing message that the U.S. government views adherence to Islamic religious beliefs and practices as inherently suspicious, and that Muslim Americans are not entitled to the full constitutional protections afforded to other Americans. Due to this official condemnation of his faith, Mr. Mouslli feels marginalized and like an outsider when coming home to his own country.

103.   CBP's religious questioning also imposes substantial pressure on Mr. Mouslli to modify his religious expression and practices, contrary to his sincere religious beliefs. In particular, when traveling back to the United States from abroad, Mr. Mouslli eliminates certain religious practices and expression to avoid calling attention to his faith and incurring additional scrutiny and religious questioning by CBP. Because of CBP's scrutiny and religious questioning, Mr. Mouslli cannot fully practice and express his faith in the way that he otherwise would while traveling.

104.   For example, CBP's religious questioning imposes substantial pressure on Mr. Mouslli to modify his prayer practice while traveling back into the United States. As a Muslim, Mr. Mouslli believes he must pray at five specific times each day. This prayer practice involves kneeling on the ground in a particular direction (toward Mecca), bowing, and placing his forehead to the ground in prayer. However, to avoid additional CBP scrutiny and religious questioning, Mr. Mouslli refrains from these physical acts of prayer at the airport and the border, even though he would ordinarily pray in this manner during the religiously designated prayer times.

105.   Mr. Mouslli is proud to be a Muslim. His sincere religious beliefs counsel him to pray in a particular way. It causes him distress to forgo physical acts of prayer at the airport and in secondary inspection. Nevertheless, because of CBP's

practice of subjecting him to intrusive questions about his faith, he takes these protective measures when traveling back into the United States to avoid calling attention to his religion and incurring additional scrutiny and religious questioning by CBP.

106. Religious questioning by CBP has made and continues to make Mr. Mouslli feel anxious and distressed, particularly because of the invasive and personal nature of religious questioning and the stigma of being targeted because he is Muslim.

**Hameem Shah**

107. Plaintiff Hameem Shah is a U.S. citizen and Muslim who works in financial services. Mr. Shah lives in Plano, Texas.

108. On May 7, 2019, CBP officers subjected Mr. Shah to religious questioning during secondary inspection at LAX. Mr. Shah was returning to the United States from a trip to Serbia and Bosnia for vacation.

109. After Mr. Shah passed through primary inspection without incident, a CBP officer ("Officer 1") stopped him in the baggage retrieval area and asked him to accompany him for a search. To the best of Mr. Shah's recollection, Officer 1's last name was "Esguerra" or something close to it.

110. Mr. Shah responded that he did not wish to be searched. Officer 1 replied that, because Mr. Shah was at the border, he did not have the option to refuse.

111. Officer 1 escorted Mr. Shah to a secondary inspection area. There, Officer 1 and a second officer ("Officer 2") began to search Mr. Shah's belongings. To the best of Mr. Shah's recollection, Officer 2's last name was "Gonzalez" or something close to it.

112. The environment was coercive: both officers were wearing uniforms and carrying weapons, and they commanded Mr. Shah to enter and remain in an area separated from travelers who were not subject to secondary inspection.

113. Officer 2 reviewed a notebook that Mr. Shah had been carrying in his

backpack—a personal journal that Mr. Shah had kept for years. Mr. Shah told Officer 2 that the notebook was a personal journal and asked him not to read it, but Officer 2 persisted.

114.   Officer 2 pointed out that many of the notes in Mr. Shah's journal were related to religion. He asked Mr. Shah why and where he had taken the notes and whether he had traveled in the Middle East. Officer 1 told Mr. Shah that they were trying to make sure Mr. Shah was a "safe person."

115.   Mr. Shah answered Officer 1's questions because he was not free to leave without the permission of a CBP officer and reasonably felt that he had no choice but to answer, based on the coercive circumstances of his detention.

116.   The officers then told Mr. Shah that they were going to search his phone and laptop. In response, Mr. Shah said that he did not consent to the search of his electronic devices and asked to see a supervisor. Officer 1 left to get the supervisor; Officer 2 stayed behind.

117.   While he and Mr. Shah were alone, Officer 2 asked Mr. Shah a series of questions about his religious beliefs, practices, and associations. The officer's questions included the following:

    a.  What religion are you?

    b.  How religious do you consider yourself? Your family?

    c.  What mosque do you attend?

    d.  Do you attend any other mosques?

    e.  Do you watch Islamic lectures online or on social media?

118.   When Mr. Shah asked Officer 2 why he was asking these questions, the officer responded, "I'm asking because of what we found in your journal."

119.   Mr. Shah answered Officer 2's questions because he was not free to leave without the permission of a CBP officer and reasonably felt that he had no choice but to answer, based on the coercive circumstances of his detention.

120.   Later, Officer 1 returned with the supervisor. To the best of Mr. Shah's

recollection, the supervisor's last name was "Lambrano," or something close to it. Mr. Shah told the supervisor that he did not consent to a search of his electronic devices. Mr. Shah stated that he wanted to stand up for his constitutional rights.

121.    The supervisor informed Mr. Shah that his reluctance to allow inspection of his devices had made the officers more suspicious of him.

122.    Mr. Shah asked to speak with an attorney immediately. Officer 1 responded by asking, "Why? You're not under arrest."

123.    Mr. Shah then told the supervisor that he no longer wished to enter the United States and wanted instead to return to the transit area so that he could leave the country and go back to Europe. The supervisor responded that Mr. Shah could not take his devices with him because they had been seized. The supervisor gave Mr. Shah two options: (1) unlock his phone, in which case the officers would inspect the device in Mr. Shah's presence; or (2) refuse to unlock his phone, in which case the officers would hold Mr. Shah's phone and laptop for further examination and return them to him at a later date.

124.    Mr. Shah reasonably felt that he had no meaningful choice, so he unlocked his phone. Officer 2 took the phone, wrote down the International Mobile Equipment Identity and serial numbers, and manually searched through the phone without letting Mr. Shah see the screen.

125.    Officer 1 told Mr. Shah he needed to continue looking through Mr. Shah's journal using a computer, and he left the secondary inspection area with the journal.

126.    Mr. Shah again objected to the search of his phone and his journal.

127.    About twenty to thirty minutes after Officer 1 had left, he returned with Mr. Shah's journal; he was accompanied by an officer or agent in plain clothes ("Officer 3"). To the best of Mr. Shah's recollection, Officer 3's name was "Ali," or something close to it. On information and belief, Officer 3 was an HSI agent.

128.    Officer 3 asked Mr. Shah about aspects of his religious associations that

1    Mr. Shah had recorded in his personal journal. Specifically, Officer 3 asked Mr.

2    Shah about the identity of a local imam in the Phoenix area.

3        129.    Mr. Shah answered Officer 3's questions about the imam because he

4    was not free to leave without the permission of a CBP officer and reasonably felt

5    that he had no choice but to answer, based on the coercive circumstances of his

6    detention.

7        130.    Approximately two hours after he was taken to secondary inspection,

8    the officers returned Mr. Shah's passport and allowed him to leave.

9        131.    After leaving secondary inspection, Mr. Shah opened his phone and

10   could see that Officer 2 had viewed private text messages, WhatsApp messages,

11   internal files, emails, call history, Google maps history, Google Chrome, Airbnb,

12   and photos of family members spanning ten years, some of which were stored in the

13   cloud but must have been cached on the device. Mr. Shah reasonably believes that

14   Officer 2 viewed these apps and files because Mr. Shah has a habit of closing apps

15   or files after he uses them, meaning Officer 2 must have viewed everything that was

16   open at the time he returned the phone to Mr. Shah.

17       132.    The fact that Officer 2 viewed this content, particularly photos of Mr.

18   Shah's   family   members,   made   Mr.   Shah   feel   extremely   distressed   and

19   uncomfortable.

20       133.    Mr. Shah's travel and identification documents were valid, and he was

21   not transporting contraband.

22       134.    In response to requests under the Freedom of Information Act and the

23   Privacy Act, CBP has provided Mr. Shah with a redacted document stating that his

24   detention and questioning was "Terrorist Related." This document is labeled "IOIL,"

25   which is a type of incident report entered into TECS. The document includes the

26   following description:

27           During examination of his belongings, subject was very
             cautious and focused on his journal that was found in
28

his hand carry. Subject demanded for us not to read his journal because he felt that it was an invasion of his privacy. [Redacted] Upon reading the journal, some notes regarding his work and religion were found. Subject stated he's self-employed working as a financial trader. Subject didn't want to elaborate on the type of work he does but just mentioned that he is able to work remotely. Subject's notes regarding his religion (Islam) seemed to be passages from an individual he calls [redacted]. Subject stated that he is the Imam at the Islamic Center of the North East Valley located in Scottsdale, AZ. Subject mentioned that he also goes to another mosque but refused to provide the name. Subject claimed he's a devote [sic] Sunni Muslim.

### *CBP's religious questioning of Mr. Shah is substantially likely to recur and causes him significant distress.*

135. Before the pandemic, Mr. Shah traveled internationally frequently for leisure and visits with family abroad. He intends to resume traveling internationally in the near future.

136. At primary inspection, CBP officers query TECS to identify a traveler's recent border crossings. Because CBP has a TECS entry stating that Mr. Shah's previous detention and questioning was "Terrorist Related," on information and belief, when Mr. Shah travels internationally again, he is at substantial risk of being referred to secondary inspection upon his return home to the United States and being questioned by CBP officers about his religious beliefs, practices, and associations.

137. CBP and HSI officers asked Mr. Shah intrusive questions about his religious beliefs, practices, and associations because he is a Muslim. In addition, CBP and HSI officers subjected Mr. Shah to retaliatory questioning and searches because he is Muslim, because of the Islamic religious content of his journal, and because he repeatedly invoked his constitutional rights.

138. Religious questioning by CBP and HSI harms Mr. Shah and impedes his religious practice.

139.    Defendants maintain records pertaining to Mr. Shah's religious beliefs, practices, and associations, as a result of border officers' questioning of Mr. Shah about these topics. In addition, on information and belief, Defendants maintain copies of the contents of his journal and phone, collected in retaliation for the religious contents of the journal and his invocation of his rights. Defendants' unlawful retention of such information in government systems causes Mr. Shah ongoing, irreparable distress and harm for which he has no adequate remedy at law.

140.    CBP's and HSI's invasive questions regarding Mr. Shah's religious beliefs, practices, and associations are insulting and humiliating to him. Border officers convey a message of official disapproval of Islam by (1) targeting Mr. Shah for religious questioning because he is a Muslim, (2) asking specific questions about his Islamic religious beliefs, practices, and associations, and (3) retaining information about his religious beliefs, practices, and associations. In particular, CBP and HSI convey the stigmatizing message that the U.S. government views adherence to Islamic religious beliefs and practices as inherently suspicious, and that Muslim Americans are not entitled to the full constitutional protection afforded to other Americans. Due to this official condemnation of his faith, Mr. Shah feels marginalized and like an outsider when coming home to his own country.

141.    CBP's and HSI's religious questioning of Mr. Shah also imposes substantial pressure on him to modify his religious practices, contrary to his sincere religious beliefs. As part of his religious practice, Mr. Shah regularly writes in a personal journal. These writings include expressions of his beliefs and devotion and other notes pertaining to his faith and religious practice. Mr. Shah's journal is a vital outlet for his religious expression. In meditating on religious questions or issues, he often revisits his previous entries and draws on them for spiritual inspiration. However, the next time Mr. Shah travels internationally, he intends to leave his journal at home to avoid having it become a basis for Defendants' practice of targeting Muslims for religious questioning. As a result, he will be unable to

document his religious expression and thoughts or consult previous entries while he is out of the country.

142.   Mr. Shah is proud to be a Muslim, and the prospect of leaving his journal at home when traveling internationally is distressing to him. Nevertheless, he intends to take this protective measure to avoid incurring additional religious questioning and retaliatory scrutiny by CBP and HSI.

143.   Mr. Shah feels violated and humiliated by the border officers' religious questioning and retaliatory searches. He remains extremely concerned about the private information Defendants retain from his journal and phone, as well as the information they retain about his personal religious beliefs, practices, and associations.

## CAUSES OF ACTION

### CLAIM I

### Violation of the First Amendment

### Establishment Clause

### (by all Plaintiffs against all Defendants)

144.   Plaintiffs herein incorporate by reference the allegations above.

145.   The "clearest command" of the Establishment Clause requires the government to adhere to a rigid "principle of denominational neutrality"—neither favoring nor disfavoring any particular religious sect. *Larson v. Valente*, 456 U.S. 228, 244–46 (1982). Where government action "discriminates *among* religions" in violation of this fundamental principle, strict scrutiny applies. *Id.*

146.   Defendants' border officers have subjected Plaintiffs to religious questioning on at least ten separate occasions, and Defendants retain Plaintiffs' responses to such questioning.

147.   Defendants engage in a policy and/or practice of singling out and targeting Muslims, including Plaintiffs, for religious questioning during secondary inspections because of their adherence to Islam. As part of this policy and/or practice

of religious questioning, Defendants retain records that reflect answers to religious questions and thus contain information about the religious beliefs, practices, and associations of Muslims, including Plaintiffs.

148. Defendants' conduct, as set forth above, violates the fundamental principle of denominational neutrality by targeting Muslims for religious questioning during secondary inspections. Americans who practice other faiths are not routinely subject to similar questioning about their beliefs and practices during secondary inspections.

149. Defendants' conduct, as set forth above, does not further any compelling government interest and is not narrowly tailored to achieve any such interest.

150. Defendants' conduct, as set forth above, also does not have a predominantly secular purpose. Rather, it has the predominant purpose and effect of inhibiting and conveying hostility toward Islam and its adherents, including Plaintiffs. It also fosters excessive government entanglement with religion.

151. Defendants' conduct, as set forth above, is also religiously coercive because it places substantial pressure on Muslims, including Plaintiffs, to hide, suppress, or otherwise alter their faith and religious practice.

152. Alternatively, even if Defendants do not engage in a policy and/or practice of singling out Muslims in particular for religious questioning, Defendants' border officers nevertheless subject Plaintiffs to intrusive religious questioning; Defendants retain records reflecting answers to such questioning; and Defendants have a policy and/or practice of subjecting travelers to religious questioning during secondary inspections. This policy and/or practice does not have a predominantly secular purpose. Its predominant purpose and effect are to inhibit and convey hostility toward religion by subjecting travelers to intrusive and personal questioning about their religious beliefs. It also fosters excessive government entanglement with religion. Moreover, subjecting travelers of any faith to religious questioning during

secondary inspection is religiously coercive because it places substantial pressure on people of faith, including Plaintiffs, to hide, suppress, or otherwise alter their faith and religious practice.

153.    As a result, Defendants have violated the Establishment Clause of the First Amendment to the U.S. Constitution and will continue to do so if Plaintiffs are not afforded the relief below.

**CLAIM II**

**Violation of the First Amendment**

**Free Exercise Clause**

**(by all Plaintiffs against all Defendants)**

154.    Plaintiffs herein incorporate by reference the allegations above.

155.    The Free Exercise Clause "protect[s] religious observers against unequal treatment" and "'guard[s] against the government's imposition of "special disabilities on the basis of religious views or religious status.'" *Trinity Lutheran Church of Columbia, Inc. v. Comer*, 137 S. Ct. 2012, 2019, 2021 (2017) (internal quotation marks and citations omitted). Government actions that treat individuals unequally based on their religious status are subject to the "strictest scrutiny." *Id.* at 2019.

156.    Defendants' border officers have subjected Plaintiffs to religious questioning on at least ten separate occasions, and Defendants retain Plaintiffs' responses to such questioning.

157.    Defendants engage in a policy and/or practice of singling out and targeting Muslims, including Plaintiffs, for religious questioning during secondary inspections because of their adherence to Islam. As part of this policy and/or practice of religious questioning, Defendants retain records that reflect answers to religious questions and thus contain information about the religious beliefs, practices, and associations of Muslims, including Plaintiffs.

158.    Defendants' conduct, as set forth above, is not religiously neutral or

generally applicable. It treats Muslims unequally vis-à-vis travelers of other faiths and, based on their religious status, imposes on Muslims special disabilities while traveling.

159.   Defendants' conduct, as set forth above, does not advance any compelling government interest and is not narrowly tailored to achieve any such interest.

160.   Alternatively, even if Defendants do not engage in a policy and/or practice of singling out Muslims in particular for religious questioning, Defendants' border officers nevertheless subject Plaintiffs to intrusive religious questioning; Defendants retain records reflecting answers to such questioning; and Defendants have a policy and/or practice of subjecting travelers to religious questioning during secondary inspections. This policy and/or practice targets people of faith based on their religious status and is thus subject to strict scrutiny. It does not advance any compelling government interest and is not narrowly tailored to achieve any such interest.

161.   As a result, Defendants have violated the Free Exercise Clause of the First Amendment to the U.S. Constitution and will continue to do so if Plaintiffs are not afforded the relief below.

## CLAIM III

## Violation of the First Amendment

## Right to Free Association

## (by all Plaintiffs against all Defendants)

162.   Plaintiffs herein incorporate by reference the allegations above.

163.   The Supreme Court has "long understood as implicit in the right to engage in activities protected by the First Amendment a right to associate with others," and has recognized "the vital relationship between freedom to associate and privacy in one's associations." *Americans for Prosperity Found. v. Bonta*, 141 S. Ct. 2373, 2382 (2021) (internal quotation marks and citations omitted). Government

actions compelling disclosure of one's associations are subject to exacting scrutiny. *Id.* at 2383–84.

164.    Defendants' border officers have repeatedly subjected Plaintiffs to questioning about their religious associations, and Defendants retain Plaintiffs' responses to such questioning.

165.    Defendants engage in a policy and/or practice of singling out and targeting Muslims, including Plaintiffs, for questioning about their religious associations during secondary inspections because of their adherence to Islam. As part of this policy and/or practice, Defendants retain records that reflect answers to religious questions and thus contain information about the religious associations of Muslims, including Plaintiffs.

166.    Defendants' border officers question Plaintiffs about their religious associations in inherently coercive environments, thereby compelling Plaintiffs to disclose information revealing constitutionally protected associational activities.

167.    There is no substantial relationship between Defendants' acquisition of this information and a sufficiently important government interest, and the acquisition is not narrowly tailored to achieve any such interest.

168.    There is no substantial relationship between Defendants' retention of this information and a sufficiently important government interest, and the retention is not narrowly tailored to achieve any such interest.

169.    Alternatively, even if Defendants do not engage in a policy and/or practice of singling out Muslims in particular for religious questioning, Defendants' border officers nevertheless subject Plaintiffs to intrusive religious questioning; Defendants retain records reflecting answers to such questioning; and Defendants have a policy and/or practice of subjecting travelers to religious questioning during secondary inspections. There is no substantial relationship between the acquisition or retention of this information and a sufficiently important government interest, and neither the acquisition nor retention is narrowly tailored to achieve any such interest.

170.   As a result, Defendants have violated Plaintiffs' right to free association under the First Amendment to the U.S. Constitution and will continue to do so if Plaintiffs are not afforded the relief below.

**CLAIM IV**

**Violation of the First Amendment**

**(Retaliation)**

**(by Mr. Shah against all Defendants)**

171.   Plaintiffs herein incorporate by reference the allegations above.

172.   Two CBP officers and one HSI officer violated Mr. Shah's First Amendment rights by retaliating against him for exercising his constitutionally protected rights to freedom of religion and freedom of speech. Mr. Shah engaged in constitutionally protected activities, including writing notes about his religious beliefs and practices in a journal that he carried during his travels, and stating to border officers that he did not wish to be searched, that he did not consent to a search of his electronic devices, and that he wanted to stand up for his constitutional rights.

173.   The officers' retaliatory adverse actions included prolonged detention; extensive questioning, including but not limited to additional religious questioning; a search of Mr. Shah's phone, including private messages, emails and photos; and a search of Mr. Shah's private journal.

174.   The officers' statements and behavior clearly indicated a substantial causal relationship between Mr. Shah's constitutionally protected activity and the retaliatory adverse actions. In particular, the officers' statements and behavior clearly indicated that they took these adverse actions as retaliation for Mr. Shah's religious beliefs reflected in his journal, as well as his statements to the officers invoking his rights.

175.   These adverse actions chill Mr. Shah from documenting his religious expression and thoughts while out of the country and from asserting his constitutional rights while in secondary inspection. These adverse actions would also

chill a person of ordinary firmness from continuing to engage in constitutionally protected activity.

176.   Defendants maintain records illegally obtained through the retaliatory searches and questioning.

## CLAIM V

## Violation of the Fifth Amendment

## Due Process Right to Equal Protection

## (by all Plaintiffs against all Defendants)

177.   Plaintiffs herein incorporate by reference the allegations above.

178.   The Due Process Clause of the Fifth Amendment to the U.S. Constitution provides that "[n]o person shall . . . be deprived of life, liberty, or property, without due process of law." The Due Process Clause contains an equal protection component. Under the right to equal protection, government action discriminating "along suspect lines like . . . religion" is subject to strict scrutiny. *Burlington Northern Railroad Co. v. Ford*, 504 U.S. 648, 651 (1992).

179.   Defendants' border officers have subjected Plaintiffs to religious questioning on at least ten separate occasions, and Defendants retain Plaintiffs' responses to such questioning.

180.   Defendants engage in a policy and/or practice of singling out and targeting Muslims, including Plaintiffs, for religious questioning during secondary inspections because of their adherence to Islam. As part of this policy and/or practice of religious questioning, Defendants retain records that reflect answers to religious questions and thus contain information about the religious beliefs, practices, and associations of Muslims, including Plaintiffs.

181.   Defendants' conduct, as set forth above, discriminates on the basis of religion, a suspect classification, and is thus subject to strict scrutiny.

182.   Defendants' conduct, as set forth above, is substantially motivated by an intent to discriminate against Muslims, on whom it has a disparate effect relative

to adherents of other faiths, because Defendants' border officers do not routinely subject travelers of other faiths to similar questioning about their religious beliefs and practices.

183.   Defendants' conduct, as set forth above, stigmatizes Plaintiffs as Muslims and condemns their religion as one that is the subject of intense suspicion and distrust, different from any other religion.

184.   Defendants' conduct, as set forth above, does not advance any compelling government interest and is not narrowly tailored to achieve any such interest.

185.   By discriminating against Plaintiffs in this manner, Defendants have violated the equal protection component of the Due Process Clause of the Fifth Amendment to the U.S. Constitution and will continue to do so if Plaintiffs are not afforded the relief below.

## CLAIM VI

### Violation of the Religious Freedom Restoration Act,

### 42 U.S.C. § 2000bb *et seq.*

### (by all Plaintiffs against all Defendants)

186.   Plaintiffs herein incorporate by reference the allegations above.

187.   Defendants' border officers have repeatedly subjected Plaintiffs to religious questioning during secondary inspections and have recorded Plaintiffs' responses in DHS databases, where Plaintiffs' personal religious information will be retained for up to three-quarters of a century and accessible to tens of thousands of law enforcement agencies.

188.   Defendants' conduct imposes a substantial burden on Plaintiffs' exercise of their sincerely held religious beliefs because it places on Plaintiffs substantial pressure to modify or eliminate certain religious practices and expression while traveling, in order to avoid calling attention to their religion and being subjected to additional intrusive questioning about it.

189.   This substantial burden is not imposed in furtherance of a compelling government interest, and is not the least restrictive means of furthering a compelling government interest.

## REQUEST FOR RELIEF

Wherefore, Plaintiffs respectfully request that this Court:

A.   *Declare* that the religious questioning of Plaintiffs, as well as the policies and practices of DHS and CBP described in the complaint, violate the First and Fifth Amendments to the U.S. Constitution and RFRA;

B.   *Enjoin* DHS and CBP and their agents, employees, successors, and all others acting in active concert with them from questioning Plaintiffs about their religious beliefs, practices, and First Amendment-protected religious associations during future border inspections;

C.   *Order* Defendants and their agents, employees, successors, and all others acting in active concert with them to expunge all records they have retained regarding the unlawful religious questioning of Plaintiffs, including records reflecting the substance of information that Plaintiffs were unlawfully compelled to disclose;

D.   *Order* Defendants and their agents, employees, successors, and all others acting in active concert with them to expunge all records that were collected as a result of retaliatory action against Mr. Shah;

E.   *Award* Plaintiffs' counsel reasonable attorneys' fees and litigation costs, including but not limited to fees, costs, and expenses pursuant to 28 U.S.C. § 2412; and

F.   *Grant* such other and further relief as the Court deems proper.

1

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

Dated:  March 24, 2022

Respectfully submitted,

AMERICAN CIVIL LIBERTIES UNION FOUNDATION

AMERICAN CIVIL LIBERTIES UNION OF MINNESOTA

ACLU FOUNDATION OF SOUTHERN CALIFORNIA

By:   */s/ Mohammad Tajsar*
        Mohammad Tajsar
        Attorney for Plaintiffs

COMPLAINT FOR INJUNCTIVE AND DECLARATORY RELIEF