BRIAN M. BOYNTON
Principal Deputy Assistant Attorney General
Civil Division

BRIGHAM J. BOWEN
Assistant Branch Director
Federal Programs Branch, Civil Division

LESLIE COOPER VIGEN
Trial Attorney (D.C. Bar No. 1019782)
Civil Division, Federal Programs Branch
United States Department of Justice
1100 L Street, NW, Washington, D.C. 20005
Telephone: (202) 305-0727
Email: leslie.vigen@usdoj.gov

*Counsel for Defendants*

## IN THE UNITED STATES DISTRICT COURT
## FOR THE CENTRAL DISTRICT OF CALIFORNIA

| | |
|---|---|
| ABDIRAHMAN ADEN KARIYE, *et al.*, | CASE NO. 2:22-CV-1916-FWS-GJS |
|              *Plaintiffs*, | |
|     v. | **MEMORANDUM OF POINTS AND AUTHORITIES IN SUPPORT OF DEFENDANTS' MOTION TO DISMISS THE COMPLAINT** |
| ALEJANDRO MAYORKAS, Secretary of the Department of Homeland Security, in his official capacity, *et al.*, | |
|              *Defendants*. | Honorable Fred W. Slaughter **United States District Judge** |

**TABLE OF CONTENTS**

INTRODUCTION ..................................................................................................1

STATUTORY AND REGULATORY FRAMEWORK .........................................3

A.    The Defendant Agencies ..........................................................................3

B.    Defendants' Policies Prohibiting Religious Targeting ..............................5

C.    U.S. Border Inspections ...........................................................................7

PLAINTIFFS' ALLEGATIONS ........................................................................10

LEGAL STANDARDS .....................................................................................13

A.    Standard of Review ................................................................................13

B.    The Federal Government's Authority at the Border ...............................14

ARGUMENT ....................................................................................................15

A.    Plaintiffs Have Not Plausibly Alleged a Policy or Practice of Targeting
      Muslims for Improper Religious Questioning .........................................15

B.    Plaintiffs Fail to State a Claim Under the Constitution or RFRA .............19

      1.    Plaintiffs do not plausibly allege an Establishment Clause violation
            (Count 1) .......................................................................................19

      2.    Plaintiffs do not plausibly allege a violation of their free exercise
            rights under the First Amendment (Count 2) or RFRA (Count 6) ....24

      3.    Plaintiffs do not plausibly allege a violation of the First Amendment
            right to freedom of association (Count 3) ........................................28

      4.    Plaintiff Shah does not plausibly allege retaliation in violation of his
            First Amendment rights (Count 4) ..................................................30

      5.    Plaintiffs do not plausibly allege an Equal Protection violation
            (Count 5) .......................................................................................33

CONCLUSION .................................................................................................35

i

# TABLE OF AUTHORITIES

**CASES**

*Al Haramain Islamic Found., Inc. v. U.S. Dep't of Treasury*,
    686 F.3d 965 (9th Cir. 2012) ................................................................27

*Am. Fam. Ass'n, Inc. v. City & Cnty. of S.F.*,
    277 F.3d 1114 (9th Cir. 2002) .................................................... *passim*

*Ams. for Prosperity Found. v. Bonta*,
    141 S. Ct. 2373 (2021) ........................................................ 28, 29, 30

*Ariz. Dream Act Coal. v. Brewer*,
    855 F.3d 957 (9th Cir. 2017) ................................................................34

*Armstrong v. Davis*,
    275 F.3d 849 (9th Cir. 2001), *overruled on other grounds by*
    *Johnson v. California*, 543 U.S. 499 (2005) ................................. 16, 17

*Ashcroft v. Iqbal*,
    556 U.S. 662 (2009) ...................................................................... 13, 14

*Ball v. Massanari*,
    254 F.3d 817 (9th Cir. 2001) ................................................................34

*Bell Atl. Corp. v. Twombly*,
    550 U.S. 544 (2007) ...................................................................... 13, 14

*Blair v. Bethel Sch. Dist.*,
    608 F.3d 540 (9th Cir. 2010) ................................................................31

*Blitz v. Napolitano*,
    700 F.3d 733 (4th Cir. 2012) ..................................................................7

*Burcham v. City of Los Angeles*,
    --- F. Supp. ----, 2022 WL 99863 (C.D. Cal. Jan. 7, 2022)...................4

*Cal. Parents for the Equalization of Educ. Materials v. Torlakson*,
    973 F.3d 1010 (9th Cir. 2020).......................................................... 24, 25

*Cath. League for Religious & Civ. Rts. v. City & Cnty. of S.F.*,
    567 F.3d 595 (9th Cir. 2009)............................................................ 21, 22

ii

*Cherri v. Mueller*,
   951 F. Supp. 2d 918 (E.D. Mich. 2013) ...................................................... 20, 24

*Cholla Ready Mix, Inc. v. Civish*,
   382 F.3d 969 (9th Cir. 2004) ...................................................................... 20, 22

*Church of the Lukumi Babalu Aye, Inc. v. City of Hialeah*,
   508 U.S. 520 (1993) ............................................................................................ 24

*City of Cleburne v. Cleburne Living Ctr.*,
   473 U.S. 432 (1985) ............................................................................................ 33

*Country Classic Dairies, Inc. v. State of Mont., Dep't of Com. Milk Control Bureau*,
   847 F.2d 593 (9th Cir. 1988) ............................................................................ 34

*Daniels-Hall v. Nat'l Educ. Ass'n*,
   629 F.3d 992 (9th Cir. 2010) ........................................................................ 5, 14

*Doe v. Reed*,
   561 U.S. 186 (2010) ............................................................................................ 29

*Dousa v. DHS*,
   2020 WL 434314 (S.D. Cal. Jan. 28, 2020) ...................................... 26, 27, 33

*Elhady v. Kable*,
   993 F.3d 208 (4th Cir. 2021) ............................................................................. 7

*Employment Div. v. Smith*,
   494 U.S. 872 (1990) ............................................................................................ 24

*Fazaga v. FBI*,
   965 F.3d 1015 (9th Cir. 2020), *reversed and remanded on other grounds*, 142 S. Ct. 1051 (2022) ....................................................... 24, 26

*Freedom From Religion Found., Inc. v. Chino Valley Unified Sch. Dist. Bd. of Educ.*,
   896 F.3d 1132 (9th Cir. 2018) ......................................................................... 20

*Haig v. Agee*,
   453 U.S. 280 (1981) ............................................................................................ 27

*Hartman v. Moore*,
  547 U.S. 250 (2006) .................................................................................31

*Holder v. Humanitarian Law Project*,
  561 U.S. 1 (2010) ....................................................................................27

*Honolulu Wkly., Inc. v. Harris*,
  298 F.3d 1037 (9th Cir. 2002).................................................................34

*In re Gilead Sciences Sec. Litig.*,
  536 F.3d 1049 (9th Cir. 2008).................................................................17

*Johnson v. Poway Unified Sch. Dist.*,
  658 F.3d 954 (9th Cir. 2011)....................................................................20

*Knievel v. ESPN*,
  393 F.3d 1068 (9th Cir. 2005)..................................................................14

*Kreisner v. City of San Diego*,
  1 F.3d 775 (9th Cir. 1993) ........................................................... 20, 21, 22

*Lacey v. Maricopa Cnty.*,
  693 F.3d 896 (9th Cir. 2012)....................................................................31

*Lemon v. Kurtzman*,
  403 U.S. 602 (1971) ..................................................................... 20, 21, 23

*Lynch v. Donnelly*,
  465 U.S. 668 (1984) .................................................................................20

*Mayfield v. United States*,
  599 F.3d 964 (9th Cir. 2010) .............................................................. 16, 17

*McCreary Cnty. v. ACLU of Ky.*,
  545 U.S. 844 (2005) .................................................................................21

*McLean v. Crabtree*,
  173 F.3d 1176 (9th Cir. 1999)..................................................................34

*Mir v. Little Co. of Mary Hosp.*,
  844 F.2d 646 (9th Cir. 1988).....................................................................5

*NAACP v. Alabama ex rel. Patterson,*
   357 U.S. 449 (1958) ........................................................................28

*Navajo Nation v. U.S. Forest Serv.,*
   535 F.3d 1058 (9th Cir. 2008) .....................................................25

*Nieves v. Bartlett,*
   139 S. Ct. 1715 (2019) ..................................................................31

*Roberts v. U.S. Jaycees,*
   468 U.S. 609 (1984) ........................................................................28

*Roy v. Barr,*
   960 F.3d 1175 (9th Cir. 2020) .....................................................34

*Stormans, Inc. v. Selecky,*
   586 F.3d 1109 (9th Cir. 2009) .....................................................24

*Tabbaa v. Chertoff,*
   509 F.3d 89 (2d Cir. 2007) .................................................. *passim*

*Trunk v. City of San Diego,*
   629 F.3d 1099 (9th Cir. 2011) .....................................................20

*United States v. Arnold,*
   533 F.3d 1003 (9th Cir. 2008) ............................................. 28, 33

*United States v. Cano,*
   934 F.3d 1002 (9th Cir. 2019) ............................................. 15, 32

*United States v. Cotterman,*
   709 F.3d 952 (9th Cir. 2013) ............................................... 15, 32

*United States v. Flores-Montano,*
   541 U.S. 149 (2004) ............................................................. *passim*

*United States v. Gering,*
   716 F.2d 615 (9th Cir. 1983) .......................................................30

*United States v. Hancock,*
   231 F.3d 557 (9th Cir. 2000) .......................................................34

*United States v. Mayer,*
    503 F.3d 740 (9th Cir. 2007) ........................................................ 29, 30

*United States v. Montoya de Hernandez,*
    473 U.S. 531 (1985) ...................................................................... 14

*United States v. Ramsey,*
    431 U.S. 606 (1977) ................................................................ 14, 15

*United States v. Rubio,*
    727 F.2d 786 (9th Cir. 1983) ...................................................... 28, 30

*Vasquez v. L.A. Cnty.*
    487 F.3d 1246 (9th Cir. 2007) ...................................................... 21

*Vernon v. City of L.A.,*
    27 F.3d 1385 (9th Cir. 1994) ................................................. *passim*

*Vil. of Arlington Heights v. Metro. Hous. Dev. Corp.,*
    429 U.S. 252 (1977) ...................................................................... 34

**STATUTES**

6 U.S.C. § 111 ...................................................................................... 4

6 U.S.C. § 202 ................................................................................. 4, 21

6 U.S.C. § 215 ...................................................................................... 4

6 U.S.C. § 251 ...................................................................................... 4

8 U.S.C. § 1225 ................................................................................. 4, 7

8 U.S.C. § 1357 .................................................................................... 4

19 U.S.C. § 482 ................................................................................... 4

19 U.S.C. § 1433 ................................................................................. 7

19 U.S.C. § 1459 ................................................................................. 7

19 U.S.C. § 1461 ................................................................................. 4

19 U.S.C. § 1496 ................................................................................. 4

19 U.S.C. § 1499 ..................................................................................4

19 U.S.C. § 1581 ..................................................................................4

19 U.S.C. § 1582 ..................................................................................4

42 U.S.C. § 2000bb-1 .........................................................................25

49 U.S.C. § 114 ...................................................................................7

**RULES**

Fed. R. Civ. P. 12 ...................................................................... 3, 13, 14

**REGULATIONS**

8 C.F.R. § 235.1 ..................................................................................7

8 C.F.R. § 287 .....................................................................................4

19 C.F.R. § 148.11 ..............................................................................7

19 C.F.R. pt. 162 .................................................................................4

**UNITED STATES CONSTITUTION**

U.S. Const. amend. I .................................................................... 20, 24

**OTHER AUTHORITIES**

Department of Homeland Security, Privacy Impact Assessment for the Watchlist
   Service, DHS Reference No. DHS/ALL/PIA-027(d) (July 10, 2020),
   https://perma.cc/6H9V-Y4BH ..........................................................7

Department of Homeland Security, U.S. Customs and Border Protection,
   CBP Directive 51735-013A (Mar. 13, 2012),
   https://perma.cc/2U8V-7VFS ............................................................6

Department of Homeland Security, U.S. Customs and Border Protection,
   CBP Directive 51735-013B (Dec. 9, 2020),
   https://perma.cc/83ZD-LE5P ..................................................... 6, 16

Department of Homeland Security Traveler Redress Inquiry Program,
https://www.dhs.gov/dhs-trip, *permanent link available at*
https://perma.cc/RN8P-XYUH.............................................................10

Memo. from Kevin K. McAleenan to All DHS Employees,
https://perma.cc/6ZN4-TAKB.................................................... *passim*

Privacy Impact Assessment Update for CBP Border Searches of Electronic
Devices (Jan. 4, 2018),
https://perma.cc/H456-2XH8 ................................................. 7, 8, 32

U.S. Customs and Border Protection, Inspection of Electronic Devices
Tear-Sheet,
https://perma.cc/JZ4W-7CYF ...................................................................8

U.S. Customs and Border Protection, Privacy Impact Assessment for the TECS
System: CBP Primary and Secondary Processing (Dec. 22, 2010),
https://perma.cc/4BDV-XNTS ................................................. 8, 9, 31

U.S. Immigration and Customs Enforcement, ICE's Mission,
https://www.ice.gov/mission, *permanent link available at*
https://perma.cc/5P3Y-QMZH .........................................................4, 5

U.S. Immigrations and Customs Enforcement, Who We Are,
https://www.ice.gov/about-ice, *permanent link available at*
https://perma.cc/RM3U-8EZW .....................................................5, 8

**INTRODUCTION**

Department of Homeland Security (DHS) policy states in no uncertain terms that the agency "does not profile, target, or discriminate against any individual for exercising his or her First Amendment rights"—including the right to freely exercise one's religion.  Memo. from Kevin K. McAleenan to All DHS Employees at 1, https://perma.cc/6ZN4-TAKB (McAleenan Memo); *see also* Compl. ¶ 23, ECF No. 1.  The same policy prohibits questioning and other information-gathering regarding First-Amendment-protected activities, except in specific, limited circumstances, including in furtherance of an authorized law enforcement activity.  Consistent with the agency's statutory mandate, such activity encompasses examining individuals to determine their admissibility into the country; inquiring about their purpose for international travel or items they seek to bring into the country; investigating potential violations of law; and protecting against threats to border security or national security.  These directives govern all of DHS, including DHS component agencies U.S. Customs and Border Protection (CBP), U.S. Immigration and Customs Enforcement (ICE), and ICE's subcomponent, Homeland Security Investigations (HSI).

Nonetheless, Plaintiffs assert that these agencies have a secret, unwritten policy or practice—which directly contradicts the public one—of targeting Muslim travelers at the U.S. border, because of their faith, for questioning about their religious practices, beliefs, and associations.  They lob these accusations based on three individual Muslim citizens' alleged isolated experiences, occurring during a handful of U.S. border crossings over the course of five years.  Two of these Plaintiffs believe they are stopped and questioned at the border because they are on U.S. government watchlists; the other alleges a single instance of questioning under unique circumstances, which took place over three years ago.

Plaintiffs fail to plausibly allege a policy or practice of targeting all Muslims

1

for questioning at the border because of religion based on these few alleged incidents.   Instead, at most, they allege discrete and circumstance-dependent instances of religious questioning, which do not plausibly demonstrate any violation of DHS's policy on religious profiling, targeting, or discrimination.   Viewed in context, the allegations instead suggest that the questioning related to CBP and HSI's law enforcement and border security missions.   Many of the alleged questions concern, among other things, travel history, the contents of a Plaintiff's baggage, and individuals that Plaintiffs associated with while abroad.   These types of inquiries are clearly proper at the border, even when they touch upon religion.

Plaintiffs also fail to state any plausible claim for relief under the First Amendment or the Religious Freedom Restoration Act (RFRA).   First, they have not stated an Establishment Clause violation (Count 1) because they do not plausibly allege that questioning at the border lacked a secular purpose or effect, or that a handful of questions about religious beliefs, practices, and associations demonstrate excessive entanglement with religion.   Second, Plaintiffs have not stated a free exercise violation under either the First Amendment (Count 2) or RFRA (Count 6) because they fail to allege that religious questioning during a few border crossings imposed a substantial burden upon their religious exercise.   At most, Plaintiffs allege that they voluntarily altered their religious expression while traveling; such allegations of "a subjective chilling effect on free exercise rights [are] not sufficient to constitute a substantial burden." *Am. Fam. Ass'n, Inc. v. City & Cnty. of S.F.*, 277 F.3d 1114, 1124 (9th Cir. 2002).   Third, Plaintiffs fail to plausibly allege a violation of their right to associational freedom (Count 3) where they assert no tangible burden—not even a chilling effect—on the associational activities they were allegedly compelled to disclose.   Moreover, even if Plaintiffs had properly alleged a substantial burden on their religious exercise or expressive association (and they have not), the questioning alleged here withstands First Amendment

2

scrutiny because it was narrowly tailored to achieve important governmental interests within the scope of DHS's statutory mandate, which includes securing the U.S. border, preventing terrorism, and investigating potential violations of law.

Plaintiff Hameem Shah alone alleges that he was retaliated against for exercising his First Amendment rights during a secondary inspection at the U.S. border (Count 4). He fails to plausibly allege such a claim where the allegations demonstrate that he experienced no retaliatory action that differed in any meaningful way from a typical routine inspection a traveler can expect to experience at secondary. In addition, he fails to demonstrate that any action was *caused* by his expressive activities, where his inspection began before officers learned of them.

Finally, Plaintiffs have not plausibly alleged an equal protection claim under the Due Process Clause of the Fifth Amendment (Count 6). They provide no concrete allegations that they were treated unequally as compared to a similarly situated group, or that such unequal treatment occurred because of religion. Nor do they advance any non-conclusory allegation of discriminatory animus. And even assuming Plaintiffs had plausibly alleged each of those elements—which they have not—any religious questioning still would not offend the Fifth Amendment because it was narrowly tailored to achieve a compelling governmental interest.

For all of these reasons, as explained further below, the complaint should be dismissed in its entirety pursuant to Federal Rule of Civil Procedure 12(b)(6).

## STATUTORY AND REGULATORY FRAMEWORK

### A.    The Defendant Agencies

Several different components of the federal government work together to protect the United States and its borders from violations of U.S. immigration laws, criminal activity, and terrorist threats. DHS is charged with ensuring compliance with federal laws at the border including those preventing contraband, other illegal goods, and inadmissible persons from entering or exiting the United States. DHS's

border authorities require the inspection of all persons entering the United States, and permit the examination and search of persons, vehicles, baggage, and merchandise to ensure compliance with any law or regulation enforced or administered by DHS and its components, and to determine if the merchandise is subject to duty or being introduced into the United States contrary to law. DHS is also charged with "prevent[ing] terrorist attacks within the United States," 6 U.S.C. § 111(b)(1)(A), and "reduc[ing] the vulnerability of the United States to terrorism," *id.* § 111(b)(1)(B); *see also id.* § 202(1) (charging DHS with "[p]reventing the entry of terrorists and the instruments of terrorism into the United States").

Within DHS, CBP serves as the nation's unified border protection agency. CBP's responsibilities include, among other things, "[p]reventing the entry of terrorists and instruments of terrorism into the United States"; "[s]ecuring the borders"; "[c]arrying out immigration enforcement functions"; and enforcing customs and agricultural laws, all while "ensuring the speedy, orderly, and efficient flow of lawful traffic and commerce." 6 U.S.C. § 202; *see* 6 U.S.C. §§ 111, 215, 251. To facilitate these functions, numerous statutes and regulations authorize CBP to inspect and search all persons, baggage, conveyances, and merchandise arriving in and departing from the United States. *See, e.g.*, 8 U.S.C. §§ 1225, 1357; 19 U.S.C. §§ 482, 1461, 1496, 1499, 1581, 1582; 8 C.F.R. § 287; 19 C.F.R. pt. 162.

Also within DHS, ICE is a law enforcement agency that focuses primarily on securing the borders of the United States and safeguarding the country's immigration system. *See* U.S. Immigration and Customs Enforcement, ICE's Mission, https://www.ice.gov/mission, *permanent link available at* https://perma.cc/5P3Y-QMZH.[1] It employs approximately 20,000 officers, agents,

---

[1] Courts may "take judicial notice of matters of public record outside the pleadings." *Burcham v. City of Los Angeles*, --- F. Supp. ----, 2022 WL 99863, at *3 (C.D. Cal.

analysts, and staff to support the nation's efforts to strengthen border security and prevent the illegal movement of people, goods, and funds into the United States. *See id.*  HSI is one of three directorates within ICE and serves as the principal investigative component of DHS.  *See* U.S Immigrations and Customs Enforcement, Who We Are, https://www.ice.gov/about-ice, *permanent link available at* https://perma.cc/RM3U-8EZW.  HSI is responsible for investigating, disrupting, and dismantling transnational criminal organizations and terrorist networks that threaten or seek to exploit the customs and immigrations laws of the United States. *See id.*  In furtherance of this mission, HSI conducts federal criminal investigations into the illegal cross-border movement of people, goods, money, technology, and other contraband.  *Id.*  Its investigations cover a wide range of transnational crime, including terrorism, narcotics smuggling, transnational gang activity, child exploitation, human trafficking and smuggling, and money laundering.  *Id.*

**B.    Defendants' Policies Prohibiting Religious Targeting**

DHS and its component agencies all have official policies prohibiting profiling, targeting, and discrimination on the basis of religion.  Most notably, in a May 2019 memorandum to all DHS employees (including all CBP and ICE employees), the then-Acting Secretary reiterated that "DHS does not profile, target, or discriminate against any individual for exercising his or her First Amendment rights"—including the free exercise of religion.  McAleenan Memo at 1; *see also* Compl. ¶ 23 (referencing "Defendants' written policies").  The memorandum instructs that "DHS personnel should not pursue by questioning, research or other

---

Jan. 7, 2022) (quoting *Mir v. Little Co. of Mary Hosp.*, 844 F.2d 646, 649 (9th Cir. 1988)).  This includes information contained on government websites.  *See Daniels-Hall v. Nat'l Educ. Ass'n*, 629 F.3d 992, 998–99 (9th Cir. 2010).  Should the Court wish, Defendants would be happy to separately provide copies of the materials from government websites referenced in this memorandum.

means, information relating to how an individual exercises his or her First Amendment rights" unless certain conditions, such as relevance to a "criminal, civil, or administrative activity relating to a law DHS enforces or administers," are present. *Id.* at 2. This directive expressly applies to "[i]nformation about an individual's religious beliefs and practices." *Id.* at 1. The memorandum points to examples of when "information about First Amendment protected activities is pertinent to, and within the scope of DHS's administration or enforcement of a statute, regulation, or executive order," which include when such information "relate[s] to an individual's occupation, purpose for international travel, or any merchandise he seeks to bring across the border," and when such information is used "to validate information supplied by an individual or determine whether potential civil, criminal, or administrative violations exist relating to the laws that DHS enforces or administers." *Id.* at 3.

The CBP Standards of Conduct also explicitly prohibit targeting on the basis of religion. *See* Department of Homeland Security, U.S. Customs and Border Protection, CBP Directive 51735-013B (Dec. 9, 2020), https://perma.cc/83ZD-LE5P (CBP Standards of Conduct). As relevant here, the Standards direct that "[e]mployees will not act or fail to act on an official matter in a manner that improperly takes into consideration an individual's . . . religion." *Id.* at § 7.11.1. They also prohibit CBP employees from "mak[ing] abusive, derisive, profane or harassing statements or gestures, or engag[ing] in any other conduct evidencing hatred or invidious prejudice to or about another person or group on account of . . . religion." *Id.* at 7.11.2. Every CBP employee is required to "know the Standards of Conduct and their application to his or her behavior." *Id.* at § 6.7.[2]

---

[2] The previous version of the CBP Standards of Conduct includes the same requirements. *See* Department of Homeland Security, U.S. Customs and Border

## C.     U.S. Border Inspections

All travelers seeking to enter the United States must present themselves and their belongings for inspection at the border. 19 U.S.C. §§ 1433(b), 1459(a); 8 U.S.C. § 1225(a)(3); 19 C.F.R. § 148.11; 8 C.F.R. § 235.1(a). CBP inspects all travelers entering the United States to ensure that they are legally eligible to enter (as a U.S. citizen or otherwise) and that their belongings are not being introduced into the country contrary to law.  A traveler, with or without his or her belongings, is permitted to enter the United States only when those processes are complete.

During inspection at a port of entry's primary arrival location, or "primary," a CBP officer reviews a traveler's documentation and any other relevant information about him or her, including pertinent law enforcement information and "lookouts"—including any "wants and warrants" or watchlist matches.[3]  *See* Privacy Impact Assessment Update for CBP Border Searches of Electronic Devices,

Protection, CBP Directive 51735-013A at §§ 5.7, 6.11.1, 6.11.2 (Mar. 13, 2012), https://perma.cc/2U8V-7VFS.

[3] The DHS Watchlist Service receives a copy of the Terrorist Screening Database (TSDB), a consolidated database maintained by the Federal Bureau of Investigations's Terrorist Screening Center.  *See* Department of Homeland Security, Privacy Impact Assessment for the Watchlist Service, DHS Reference No. DHS/ALL/PIA-027(d) (July 10, 2020), https://perma.cc/6H9V-Y4BH.   The TSDB contains the identities of known and suspected terrorists.  *Id.*  Nominations to the TSDB "must rely upon articulable intelligence or information which creates a reasonable suspicion that the individual is engaged, has been engaged, or intends to engage, in conduct constituting, in preparation for, in aid or in furtherance of, or related to, terrorism and/or terrorist activities."  *See Elhady v. Kable*, 993 F.3d 208, 214 (4th Cir. 2021) (citations omitted).  As a general matter, the government does not disclose the watchlist status of any individual; among other things, such status is protected by the law enforcement privilege, and in some instances, by statute.  *See* 49 U.S.C. § 114(r); *see also, e.g., Blitz v. Napolitano*, 700 F.3d 733, 737 n.5 (4th Cir. 2012).

DHS/CBP/PIA-008(a) at 3 & n.8 (Jan. 4, 2018), https://perma.cc/H456-2XH8 (CBP PIA for Elec. Devices). If the officer determines that traveler warrants additional inspection, he or she will refer the traveler for additional scrutiny, or "secondary inspection." *Id.* at 3. In the context of air or sea travel, CBP officers may also question travelers who are in the process of obtaining their baggage. *See* U.S. Customs and Border Protection, Privacy Impact Assessment for the TECS System: CBP Primary and Secondary Processing at 4 (Dec. 22, 2010), https://perma.cc/4BDV-XNTS (CBP PIA for TECS). This interaction may involve inspection of the traveler and his or her possessions. *Id.*

Upon secondary inspection, CBP officers may conduct a basic or advanced search of a traveler's electronic devices. CBP PIA for Elec. Devices at 3. CBP officers may also notify HSI special agents if they believe further investigation is warranted. *See* ICE, Who We Are, https://www.ice.gov/about-ice (describing HSI's investigative mission). A "basic search" is performed with or without suspicion in the traveler's presence, and involves a review of information that is "resident upon the device and would ordinarily be visible by scrolling through the phone manually," including contact lists, text messages, pictures, and video and audio files. *Id.* at 6. An "advanced search" involves connecting a device to external equipment "not merely to gain access to the device, but to review, copy, and/or analyze its contents." *Id.* If CBP determines following a basic search that no further examination is needed, the electronic device is returned to the traveler, and he or she is free to leave. *Id.* CBP provides passengers whose devices are selected for further examination with a "tear-sheet" providing the reasons an individual may be selected for additional inspection, the bases for CBP's search authority, an overview of the search process, and resources for travelers who may have questions or complaints. *Id.* at 4, 12; *see* U.S. Customs and Border Protection, Inspection of Electronic Devices Tear-Sheet, https://perma.cc/JZ4W-7CYF.

Depending on how a traveler enters the United States (by air, sea, or land), CBP collects certain information from and about him or her at various stages of the trip for law enforcement purposes, including admissibility determinations. CBP PIA for TECS at 3. These different types of information collections are physically located within the information technology architecture of TECS, a system of records that includes "temporary and permanent enforcement, inspection, and operational records relevant to the antiterrorism and law enforcement mission of CBP and numerous other federal agencies it supports."[4] *Id.* at 2. Among other uses, TECS serves as a data repository to support law enforcement "lookouts," border screening, and reporting for CBP's primary and secondary inspection processes. *Id.* Records of all inspections at U.S. ports of entry, including relevant information and results of CBP secondary inspections, are entered into TECS. *Id.* at 4–6. Such records are retained by TECS for a maximum of 75 years. *Id.* at 14.

CBP owns and operates TECS; CBP may also share information collected in TECS with certain other DHS components that show a need to know the information, consistent with their missions, *id.* at 15–16, and other federal government agencies that have demonstrated a justifiable need for the information, pursuant to a memorandum of understanding with CBP, *id.* at 16–17. CBP also sometimes grants access to TECS records to outside federal, state, local, tribal, and foreign agencies responsible for law enforcement, counterterrorism, and border security. *Id.* at 17. This is done on a need-to-know basis and for a specific purpose consistent with the TECS Privacy Act Statement of Records Notification. *Id.*

Individuals who experience difficulties during travel—including delayed

---

[4] TECS is not an acronym; the system is an updated and modified version of the former Treasury Enforcement Communications System. The term "TECS" describes both an information-sharing platform encompassing different systems of records, and the above-described system of records. *See* CBP PIA for TECS at 1.

9

entry into the United States at a port of entry or border crossing—may file an inquiry through the DHS Traveler Redress Inquiry Program (DHS TRIP).  *See* DHS TRIP, https://www.dhs.gov/dhs-trip, *permanent link available at* https://perma.cc/RN8P-XYUH.  Upon receipt of a DHS TRIP inquiry, relevant agencies review and make any necessary updates to a traveler's record.  *See id.*  After review has concluded, the individual receives a final determination letter.  *Id.*

## PLAINTIFFS' ALLEGATIONS

Plaintiffs are three U.S. citizens who self-identify as Muslim.  Compl. ¶¶ 8–10.  Each alleges that, on at least one occasion, he has been asked questions related to his religious beliefs, practices, or associations during secondary inspection at a U.S. port of entry or border crossing.  *See, e.g.*, *id.* ¶¶ 31–32, 74, 108.  Two of Plaintiffs—Abdirahman Aden Kariye and Mohamad Mouslli—allege, upon information and belief, that their questioning arises, in part, from their placement on a "U.S. government watchlist."  *Id.* ¶¶ 58–59, 94–95.  Plaintiffs Kariye and Mouslli do not contest their alleged watchlist status here, allege they have challenged it otherwise, or contend that any watchlist placement was improper.

Plaintiff Kariye alleges that he has been asked questions pertaining to his religion at five U.S. border crossings between September 2017 and January 2022.  *See id.* ¶¶ 33–56.  He does not specify how many times he has entered the United States without such questioning.  According to him, these questions concerned, among other things, whether upon returning from the Hajj, he had been on the pilgrimage previously, *id.* ¶ 35; his "involvement with a charitable organization affiliated with Muslim communities," *id.* ¶ 39; whether a sports league in which he coaches was "just for Muslim kids," *id.* ¶ 43; and "whether he had met a particular friend at a mosque" during a recent trip, *id.* ¶ 54.

Plaintiff Mouslli alleges that he has been asked questions regarding religion upon returning from his four most recent international trips, between August 2018

and June 2021.  *See id.* ¶¶ 75–93.  These inquiries allegedly included whether he is Muslim, *id.* ¶ 77; whether he attends a mosque, *id.* ¶¶ 81, 85, 90; and whether he prays every day, *id.* ¶¶ 81, 90.

Plaintiff Hameem Shah alleges that he was asked questions about religion upon entry to the United States on one occasion, in May 2019.  *See id.* ¶¶ 108–130. He does not specify how many times he crossed the border prior to May 2019 without such questioning.  He has not traveled internationally since.  *Id.* ¶ 135.

On that day, Plaintiff Shah alleges that, after he "passed through primary inspection without incident," a CBP officer at baggage claim requested that Shah accompany him for an inspection.  *Id.* ¶ 109.  In secondary inspection, two CBP officers searched Shah's baggage.  *Id.* ¶ 111.  Shah was carrying a personal journal, which he initially asked the officers not to read.  *Id.* ¶¶ 113–14.  The journal contained notes related to Shah's religion and religious associates.  *Id.* ¶¶ 114, 128. After reading the journal, officers allegedly asked Shah follow-up questions about his religious beliefs, practices, and associations.  *Id.* ¶¶ 117–18, 128.  The officers next said they would search Shah's laptop and phone.  *Id.* ¶ 116.  Shah said he did not consent and asked for a supervisor.  *Id.*  After the supervisor arrived, Shah again said he did not consent, and asserted that he "wanted to stand up for his constitutional rights."  *Id.* ¶ 120.  The supervisor informed Shah that his reluctance "made the officers more suspicious of him." *Id.* ¶ 121.  Shah then told the supervisor he no longer wanted to enter the United States, and asked to "leave the country and go back to Europe."  *Id.* ¶ 123.  The supervisor explained that Shah would have to leave his devices because they had been seized.  *Id.*

The supervisor then gave Shah the option of unlocking his phone for inspection, or refusing, in which case the officers would hold his laptop and phone "for further examination" and return them later.  *Id.*  Shah chose to unlock the phone, and an officer searched it manually in Shah's presence; Shah believes the officer

viewed messages, pictures, emails, call history, maps history, internet history, "Airbnb," and "internal files." *Id.* ¶¶ 124, 131.  Another officer said "he needed to continue looking through [Shah's] journal using a computer" and left the room with it, which Shah objected to. *Id.* ¶ 125–26.  Twenty to thirty minutes later, the officer returned with Shah's journal and another officer, who Shah believes was an HSI agent.[5] *Id.* ¶ 127.  The HSI agent asked Shah additional questions about his journal, including "the identity of a local imam." *Id.* ¶ 128.  After approximately two hours, Shah left freely with his phone and journal.  *Id.* ¶¶ 130–31.  In response to a subsequent Freedom of Information Act (FOIA) request, CBP allegedly provided "a redacted document stating that [Shah's] detention and questioning [were] 'Terrorist Related.'" *Id.* ¶ 134.

Plaintiffs allege that they are asked questions about their religious beliefs, practices, and associations at the U.S. border because they are Muslim, pursuant to a policy or practice of targeting Muslim American travelers for such questioning.[6] *Id.* ¶¶ 1, 62, 99, 137.  They assert that this alleged questioning makes them feel anxious, distressed, and stigmatized. *Id.* ¶¶ 72, 106, 143.  Plaintiffs also allege that the questioning places pressure upon them to modify their religious practices, including avoiding carrying religious journals or texts while traveling, *id.* ¶¶ 70, 141; refraining from praying in airports, *id.* ¶¶ 69, 103–04; and altering their religious dress, *id.* ¶¶ 67–68.  Plaintiffs do not, however, allege any direct connection between any of these religious practices and an instance of religious questioning—except Plaintiff Shah's journal writings. *See id.* ¶¶ 114, 128.

_____

[5] Plaintiffs do not otherwise allege that HSI participated in their questioning; they do not allege that ICE participated in their questioning at all.

[6] In some instances, Plaintiffs characterize this as a CBP and HSI policy, *see* Compl. ¶ 1; on other occasions they refer to it as a DHS and CBP policy, *see id.* ¶ 4.

1   Plaintiffs collectively raise five causes of action: violation of the First

2   Amendment's Establishment Clause (Count 1), *id.* ¶¶ 144–53; violation of the First

3   Amendment's Free Exercise Clause (Count 2), *id.* ¶¶ 154–61; violation of the First

4   Amendment right to free association (Count 3), *id.* ¶¶ 162–70; violation of the Fifth

5   Amendment Due Process Right to Equal Protection (Count 5), *id.* ¶¶ 177–85; and

6   violation of RFRA (Count 6), *id.* ¶¶ 186–89. Plaintiff Shah alone raises a claim of

7   retaliation in violation of the First Amendment (Count 4). *Id.* ¶¶ 171–76.

8   Plaintiffs appear to seek both facial and as-applied relief. They seek a

9   declaration that "the religious questioning of Plaintiffs" and "the policies and

10  practices of DHS and CBP" are unlawful. *Id.* at 35. They also seek an injunction

11  prohibiting DHS and CBP from asking Plaintiffs religious questions during

12  U.S. border inspections, and an order expunging records concerning alleged

13  religious questioning of Plaintiffs and alleged retaliation against Plaintiff Shah. *Id.*

14  **LEGAL STANDARDS**

15  **A.    Standard of Review**

16  Under Rule 12(b)(6), a court must dismiss a complaint if it fails to state a

17  claim upon which relief can be granted. To survive a Rule 12(b)(6) motion to

18  dismiss, the plaintiff must allege "enough facts to state a claim to relief that is

19  plausible on its face." *See Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007).

20  A claim is facially plausible when the plaintiff pleads facts that "allow[] the court

21  to draw the reasonable inference that the defendant is liable for the misconduct

22  alleged." *See Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (citation omitted). There

23  must be "more than a sheer possibility that a defendant has acted unlawfully." *Id.*

24  In other words, while courts do not require "heightened fact pleading of specifics,"

25  a plaintiff must allege facts sufficient to "raise a right to relief above the speculative

26  level." *See Twombly*, 550 U.S. at 547, 555.

27  Establishing the plausibility of a complaint's allegations is "context-specific"

13

and "requires the reviewing court to draw on its judicial experience and common sense." *Iqbal*, 556 U.S. at 679.  Although a plaintiff's specific factual allegations may be consistent with his or her claim, a court must assess whether there are other "more likely explanations" for a defendant's conduct such that the plaintiff's claims cross the line "from conceivable to plausible." *Id.* at 680–81 (quoting *Twombly*, 550 U.S. at 570).

On a Rule 12(b)(6) motion to dismiss, the court accepts all material facts alleged in the complaint as true and construes them in the light most favorable to the plaintiff. *Knievel v. ESPN*, 393 F.3d 1068, 1072 (9th Cir. 2005).  The court need not accept conclusory allegations, allegations contradicted by exhibits attached to the complaint or matters properly subject to judicial notice, unwarranted deductions of fact, or unreasonable inferences. *Daniels-Hall v. Nat'l Educ. Ass'n*, 629 F.3d 992, 998 (9th Cir. 2010).

**B.    The Federal Government's Authority at the Border**

"Since the founding of our Republic, Congress has granted the Executive plenary authority to conduct routine searches and seizures at the border, without probable cause or a warrant, in order to regulate the collection of duties and to prevent the introduction of contraband into this country." *United States v. Montoya de Hernandez*, 473 U.S. 531, 537 (1985). Accordingly, "searches of persons or packages at the national borders rest on different considerations and different rules of constitutional law from domestic regulations." *United States v. Ramsey*, 431 U.S. 606, 619 (1977).  Courts have recognized the Government's authority at the border to question travelers at length and to conduct wide-ranging, suspicionless searches of travelers, their vehicles, and their luggage and private effects. *See, e.g.*, *United States v. Flores-Montano*, 541 U.S. 149, 155–56 (2004) (concluding that the removal, disassembly, and reassembly of a vehicle's gas tank as part of a border inspection was routine); *Tabbaa v. Chertoff*, 509 F.3d 89, 94–95, 99 (2d Cir. 2007).

The Ninth Circuit has specifically recognized that "manual searches of cell phones at the border are reasonable without individualized suspicion." *United States v. Cano*, 934 F.3d 1002, 1016 (9th Cir. 2019); *see also United States v. Cotterman*, 709 F.3d 952, 960–61 & n.6 (9th Cir. 2013) (en banc) (affirming that a "simple search" of a traveler's laptop at the border does not require reasonable suspicion).

In light of the Government's authority and paramount interest in protecting its borders, courts have recognized that travelers crossing the U.S. border have no right to be free of detentions lasting several hours. *See, e.g.*, *Flores-Montano*, 541 U.S. at 155 & n.3 ("[D]elays of one to two hours at international borders are to be expected."); *Tabbaa*, 509 F.3d at 100 ("'[C]ommon sense and ordinary human experience' suggest that it may take up to six hours for CBP to complete the various steps at issue here, including vehicle searches, questioning, and identity verification, all of which we have already found to be routine."). "[P]ursuant to the long-standing right of the sovereign to protect itself by stopping and examining persons and property crossing into this country," such searches "are reasonable simply by virtue of the fact that they occur at the border." *Ramsey*, 431 U.S. at 616.

## ARGUMENT

### A.   Plaintiffs Have Not Plausibly Alleged a Policy or Practice of Targeting Muslims for Improper Religious Questioning.

The majority of Plaintiffs' claims depend, at least in part, on allegations that the Defendant agencies allegedly "target Muslim Americans" for questioning about their religious beliefs, practices, and associations. Compl. ¶ 2; *see also id.* ¶¶ 147–48, 157, 165, 180. But Plaintiffs fail to plausibly allege the existence of such a policy or practice. Contrary to Plaintiffs' allegations, Defendants' written policies explicitly prohibit targeting, profiling, or discrimination on the basis of religion. Plaintiffs' conclusory allegations that Defendants have an officially sanctioned

practice that is diametrically opposed to their stated policies fail to meet the plausibility standard.

To properly allege a policy or practice, a plaintiff must either show "that the defendant had, at the time of the injury, a written policy," or "that the harm is part of a 'pattern of officially sanctioned . . . behavior, violative of the plaintiffs' [federal] rights.'" *Mayfield v. United States*, 599 F.3d 964, 971 (9th Cir. 2010) (quoting *Armstrong v. Davis*, 275 F.3d 849, 861 (9th Cir. 2001), *overruled on other grounds by Johnson v. California*, 543 U.S. 499 (2005)). Plaintiffs here show neither.

At the outset, it is undisputed that the Defendant agencies have no written policy of targeting Muslims for questioning about their religious beliefs, practices or associations. Quite the contrary. The official, written policy of DHS—which covers CBP, ICE, and HSI—provides that "DHS does not profile, target, or discriminate against any individual for exercising his or her First Amendment rights"—including the free exercise of religion. McAleenan Memo at 1. The policy mandates that "DHS personnel should not pursue by questioning, research or other means, information relating to how an individual exercises his or her First Amendment rights" unless certain conditions, such as relevancy to a "criminal, civil, or administrative activity relating to a law DHS enforces or administers," are present. *Id.* at 2. The CBP Standards of Conduct also explicitly prohibit its employees from "act[ing] or fail[ing] to act on an official matter in a manner that improperly takes into consideration an individual's . . . religion." CBP Standards of Conduct at § 7.11.1. The complaint points to no contrary written policy.[7]

---

[7] The complaint references these written policies, alleging that they "permit border officers to question Americans about their religious beliefs, practices, and associations." *See* Compl. ¶ 23. But Plaintiffs do not assert that they target Muslims. *Id.*; *cf.* McAleenan Memo.

Nor have Plaintiffs plausibly alleged that Defendants have an "officially sanctioned" practice of targeting Muslims, in violation of Defendants' own stated policies. *See Mayfield*, 599 F.3d at 971 (quoting *Armstrong*, 275 F.3d at 861). As an initial matter, Plaintiffs make virtually no attempt to show that this alleged practice exists beyond Plaintiffs, or affects any of the countless other Muslim travelers who enter the United States from abroad each year.[8] Plaintiffs also do not endeavor, apart from conclusory speculation, to demonstrate that non-Muslim travelers are not also questioned about their religious practices, beliefs, and associations at the border in appropriate circumstances. These omissions alone support dismissal of Plaintiffs' claims that an official, DHS-wide practice of targeting Muslims—in a manner inconsistent with DHS's stated policies—exists.

Instead, Plaintiffs allege that three Muslim individuals were asked questions regarding their religion during some, but not all, of their U.S. border crossings between 2017 and 2022. These ten collective alleged incidents, occurring over the course of five years, serve as Plaintiffs' primary purported evidence of an alleged DHS-wide practice. But even assuming that Plaintiffs were questioned as set forth in the complaint, they advance only conclusory allegations to support the claim that this questioning was pursuant to an unstated official practice that defies Defendants' policies, rather than in a neutral manner consistent with them. In urging otherwise, Plaintiffs ask the Court to make the types of "unwarranted deductions of fact" or "unreasonable inferences" that courts are unwilling to make. *See In re Gilead*

---

[8] Plaintiffs do allege that, more than ten years ago, their counsel and other advocacy organizations "submitted complaints to DHS describing border questioning of Muslim Americans about their religious beliefs and practices." Compl. ¶ 17. These stale, decade-old allegations do not support the assertion that a policy exists *today*— particularly given that circumstances have changed demonstrably over time, including DHS's publication of a policy that explicitly reaffirms its prohibition on questioning on the basis of religion. *See generally* McAleenan Memo.

*Sciences Sec. Litig.*, 536 F.3d 1049, 1055 (9th Cir. 2008).

Plaintiffs' allegations suggest that such questioning occurred in specific circumstances consistent with Defendants' policies, and consistent with law. DHS policy recognizes that First-Amendment-protected information is properly gathered where "the information is pertinent to and within the scope of an authorized civil, criminal, or administrative law enforcement activity." McAleenan Memo. at 3. This includes questions "relating to an individual's occupation, purpose for international travel, or any merchandise the individual seeks to bring across the border," in order "to validate information supplied by an individual or determine whether potential . . . violations exist," or "relating to information regarding an individual indicating a potential violation of a law DHS enforces or administers, or a threat to border security, national security, officer safety, or public safety." *Id.*

The alleged questioning here appears to fit into these categories. For example, Plaintiff Kariye alleges he was asked about his religion upon returning from the Hajj, a well-known religious pilgrimage. Compl. ¶¶ 33–35. Such questions plainly relate to his "purpose for international travel." *See* McAleenan Memo. at 3. Moreover, Kariye describes himself as an "imam at a local mosque." Compl. ¶ 8. DHS policy recognizes that questions regarding an individual's occupation are pertinent to authorized law enforcement activities. *See* McAleenan Memo. at 3. Plaintiffs Kariye and Mouslli both also allege that they are on a watchlist. Compl. ¶¶ 58, 94. Assuming that this allegation is true, it would reasonably lead to certain questions about their activities and associations in connection with investigating possible "threat[s] to border security" or "national security." *See* McAleenan Memo. at 3.

Plaintiff Shah alleges a single secondary inspection, which involved questions stemming directly from a routine search of his belongings, *see* Compl. ¶¶ 113–18, and which was afterwards allegedly labeled "Terrorist Related" in a TECS entry, *id.* ¶ 136. Such questioning was therefore rationally related to what Shah sought to bring

across the border, and potentially also to investigating information "indicating a potential violation of a law . . . , or a threat to border security, national security, officer safety, or public safety."  *See* McAleenan Memo. at 3.

But even if one or more of these isolated instances of alleged questioning was inconsistent with DHS policy, it would be wholly speculative to attribute that incident to an unstated (and contradictory) official policy of targeting Muslims.  That type of isolated "rogue" conduct speaks, at most, to potential individual *violations* of policy, not the existence of a constitutionally infirm policy.  The remedy for such instances of non-compliance does not lie in prospective, official-capacity relief against the agency Defendants.

Therefore, Plaintiffs' claims that are based on allegations of an official policy and/or practice cannot proceed.  Further, Plaintiffs cannot seek a declaratory judgment that would amount to an advisory opinion about a "policy" that they have not adequately alleged exists.  *See* Compl. at 35 (requesting a declaration that "the policies and practices of DHS and CBP described in the complaint" are illegal).

**B.    Plaintiffs Fail to State a Claim Under the Constitution or RFRA.**

Against this backdrop of overall pleading insufficiency, each of Plaintiffs' six claims also fails to state a claim upon which relief can be granted.

**1.    Plaintiffs do not plausibly allege an Establishment Clause violation (Count 1).**

Plaintiffs first claim that Defendants' alleged questions about their religious beliefs, practices, and associations at the U.S. border violate the Establishment Clause by failing to adhere to "the fundamental principle of denominational neutrality," that they lack secular purpose or effect, and that they foster excessive entanglement with religion. Compl. ¶¶ 148, 150.  In the alternative, Plaintiffs allege that Defendants have a policy or practice of religious questioning of travelers in general, which allegedly suffers from the same deficiencies. *Id.* ¶ 152.  But these

conclusory allegations fail to state the basic elements of an Establishment Clause claim. Count One should therefore be dismissed. *Accord Cherri v. Mueller*, 951 F. Supp. 2d 918, 935–36 (E.D. Mich. 2013) (dismissing claim that alleged religious questioning of Muslims at the border violated the Establishment Clause).

The First Amendment's Establishment Clause provides that "Congress shall make no law respecting an establishment of religion." U.S. Const. amend. I. "This clause applies not only to official condonement of a particular religion or religious belief, but also to official disapproval or hostility towards religion." *Am. Fam. Ass'n*, 277 F.3d at 1120–21. The test articulated in *Lemon v. Kurtzman*, 403 U.S. 602 (1971), "remains the dominant mode of Establishment Clause analysis" in the Ninth Circuit. *Freedom From Religion Found., Inc. v. Chino Valley Unified Sch. Dist. Bd. of Educ.*, 896 F.3d 1132, 1149 (9th Cir. 2018). Under *Lemon*, "[g]overnment conduct does not violate the Establishment Clause if (1) it has a secular purpose, (2) its principal or primary effect is not to advance or inhibit religion, and (3) it does not foster excessive government entanglement with religion." *Cholla Ready Mix, Inc. v. Civish*, 382 F.3d 969, 975 (9th Cir. 2004). The final two prongs are often "collapsed" into the question of "whether the challenged governmental practice has the effect of endorsing [or disapproving of] religion." *Johnson v. Poway Unified Sch. Dist.*, 658 F.3d 954, 972 (9th Cir. 2011) (quoting *Trunk v. City of San Diego*, 629 F.3d 1099, 1106 (9th Cir. 2011)). In Establishment Clause challenges, "[c]ontext is critical when evaluating the government's conduct." *Id.* Here, Defendants' alleged conduct has a secular purpose and effect, and thus satisfies the *Lemon* test.

To begin, the first prong—secular purpose—focuses on "whether [the] government's actual purpose is to endorse or disapprove of religion." *Kreisner v. City of San Diego*, 1 F.3d 775, 782 (9th Cir. 1993) (quoting *Lynch v. Donnelly*, 465 U.S. 668, 690 (1984)). "A practice will stumble on the purpose prong only if it is motivated wholly by an impermissible purpose." *Am. Fam. Ass'n*, 277 F.3d at 1121

(quoting *Kreisner*, 1 F.3d at 782).  "Government action . . . satisfies the purpose prong if it is 'grounded in a secular purpose.'"  *Cath. League for Religious & Civ. Rts. v. City & Cnty. of S.F.*, 567 F.3d 595, 600 (9th Cir. 2009) (quoting *Vasquez v. L.A. Cnty.*, 487 F.3d 1246, 1255 (9th Cir. 2007)).  The government's "stated reasons will generally get deference," provided that the secular purpose is "genuine."  *Id.* (quoting *McCreary Cnty. v. ACLU of Ky.*, 545 U.S. 844, 864 (2005)).  "The eyes that look to purpose belong to an objective observer."  *Id.* at 601 (quoting *McCreary Cnty.*, 545 U.S. at 862).

Defendants' alleged conduct easily passes muster here.  Plaintiffs claim that Defendants ask either Muslims, or religious individuals in general, about their religious beliefs, practices, and associations in the process of conducting secondary inspections of travelers entering the United States from abroad.  *See* Compl. ¶¶ 147, 152.  Plaintiffs make the conclusory claim, without elaboration, that this questioning "does not have a predominantly secular purpose."  *Id.* ¶ 150.  But an objective observer, viewing this alleged questioning in context, would easily conclude that Defendants' primary purpose is not to "endorse or disapprove of religion," *see Kreisner*, 1 F.3d at 782 (quoting *Lynch*, 465 U.S. at 690), but rather to advance their missions, including securing the U.S. border; preserving national security; and carrying out the laws DHS is charged with enforcing, *see, e.g.*, 6 U.S.C. § 202.  This is particularly true given that DHS has an explicit policy setting forth the religion-neutral circumstances that may necessitate questioning about First-Amendment-protected activities in the course of fulfilling its statutory mandate.  *See generally* McAleenan Memo.

Next, when evaluating the effects prong, courts "consider whether the government action has the principal or primary effect of advancing or inhibiting religion."  *Am. Fam. Ass'n*, 277 F.3d at 1122 (quoting *Lemon*, 403 U.S. at 612).  The inquiry is "whether it would be objectively reasonable for the government action to

be construed as sending primarily a message of either endorsement or disapproval of religion." *Vernon v. City of L.A.*, 27 F.3d 1385, 1398 (9th Cir. 1994).  For example, in *Vernon*, the Ninth Circuit found, in the context of a city's investigation into whether an officer's religious views were improperly impacting his performance, that even if "one may infer possible city disapproval of [his] religious beliefs from the direction of the investigation, this cannot objectively be construed as the primary focus or effect of the investigation." *Id.* at 1398–99.  Instead, for a suggestion of disapproval to violate the Establishment Clause, it must "overwhelm" a governmental action's "secular dimensions." *Cath. League*, 567 F.3d at 605.  The effects inquiry is also undertaken "from the perspective of a 'reasonable observer.'" *Am. Fam. Ass'n*, 277 F.3d at 1122 (quoting *Kreisner*, 1 F.3d at 784).

The alleged religious questioning by Defendants cannot objectively be construed to send primarily a message of disapproval of religion.  Instead, the primary effect—consistent with the primary purpose—was to further CBP's border security mission.  Despite the fact that Plaintiffs claim to infer a "stigmatizing message" from questions about their religious beliefs, practices, or associations, Compl. ¶¶ 65, 102, 140, it strains credulity to argue that the *primary* purpose of any such border examination is to disapprove of religion, and not, as DHS has stated, to assess an individual's admissibility into the country, investigate potential violations of the laws DHS administers, and preserve border and national security.  *See* McAleenan Memo. at 3.  "[A]ny statements from which disapproval can be inferred [are] only incidental and ancillary." *Am. Fam. Ass'n*, 277 F.3d at 1122–23; *see also, e.g.*, *Cath. League*, 567 F.3d at 605.

Finally, as to excessive entanglement, "[s]ome level of interaction between government and religious communities is inevitable; entanglement must be 'excessive' to violate the Establishment Clause." *Cholla Ready Mix*, 382 F.3d at 977.  The Ninth Circuit has observed "that the Supreme Court has usually found

excessive administrative entanglement in situations involving either state aid to groups affiliated with a religious institution, such as parochial schools, or where religious employees and public employees must work closely together." *Vernon*, 27 F.3d at 1400–01 (citations omitted). "Administrative entanglement typically involves comprehensive, discriminating, and continuing state surveillance of religion." *Id.* at 1399; *see Lemon*, 403 U.S. at 619 (finding excessive entanglement where the state imposed "pervasive restrictions" on aid to parochial schools, requiring "continuing state surveillance" to ensure compliance). This is distinct from situations such as that in *Vernon*, where no excessive entanglement existed when the city investigated the impact of an individual's religious beliefs for a specific purpose and limited that investigation to six months, thus avoiding "the reality or the appearance of on-going government interference in church affairs." 27 F.3d at 1399.

The situation here is akin to that in *Vernon*. Plaintiffs raise no allegation of governmental interference in organized religious institutions. Instead, their only particularized allegations point to a handful of relatively short, sporadic interactions between individual Muslims and CBP officers (or once, an HSI agent), each conducted in connection with, and limited to, a specific U.S. border crossing. The alleged examinations sometimes involved only one or two questions concerning religion. *See, e.g.*, Compl. ¶ 43 (alleging Plaintiff Kariye was asked whether a sports league he coached was "just for Muslim kids"); *id.* ¶ 35 (alleging Plaintiff Kariye was asked "which mosque he attends and whether he had been on the Hajj before"). These limited, context-specific interactions do not rise to the level of *excessive* entanglement, and certainly do not constitute "continuing state surveillance" of any one religious organization. *See Vernon*, 27 F.3d at 1399.

The Court should dismiss Count One.

### 2. Plaintiffs do not plausibly allege a violation of their free exercise rights under the First Amendment (Count 2) or RFRA (Count 6).

Plaintiffs next assert violations of their right to free exercise of religion under the Constitution, Compl. ¶¶ 154–61, and RFRA, *id.* ¶¶ 186–89. They allege that Defendants treat Muslims—or in the alternative, religious persons in general— unequally by singling them out for questioning in a manner that is not neutral or generally applicable. *Id.* ¶¶ 157–60. But Plaintiffs do not explain how this alleged questioning imposes any burden on their free exercise of religion. *See id.*; *accord Cherri*, 951 F. Supp. 2d at 934–35 (dismissing similar free exercise claims where plaintiffs "ha[d] not established that being queried about their religious practices and beliefs at the border infringes or burdens their ability to freely exercise their religion"). That omission is fatal to both their First Amendment and RFRA claims. And even if it were not, individualized questioning is the least restrictive means of achieving the compelling governmental interest of protecting the U.S. border.

The Free Exercise Clause provides that "Congress shall make no law . . . prohibiting the free exercise [of religion]." U.S. Const., amend. I. "The right to freely exercise one's religion, however, 'does not relieve an individual of the obligation to comply with a valid and neutral law of general applicability.'" *Stormans, Inc. v. Selecky*, 586 F.3d 1109, 1127 (9th Cir. 2009) (quoting *Employment Div. v. Smith*, 494 U.S. 872, 879 (1990)). "'[I]f the object of a law is to infringe upon or restrict practices *because* of their religious motivation," however, it must be "justified by a compelling interest and . . . narrowly tailored to advance that interest.'" *Fazaga v. FBI*, 965 F.3d 1015, 1058 (9th Cir. 2020) (quoting *Church of the Lukumi Babalu Aye, Inc. v. City of Hialeah*, 508 U.S. 520, 533 (1993)), *reversed and remanded on other grounds*, 142 S. Ct. 1051 (2022). To properly plead a Free Exercise claim, plaintiffs must specifically allege a "burden on their religious exercise or practice." *Cal. Parents for the Equalization of Educ. Materials v.*

*Torlakson*, 973 F.3d 1010, 1019 (9th Cir. 2020).  In the Free Exercise context, the Ninth Circuit has "continued to apply the *Sherbert* substantial burden test to government conduct that did not involve an actual regulation or criminal law." *Am. Fam. Ass'n*, 277 F.3d at 1124; *see also Cal. Parents*, 973 F.3d at 1019 (confirming the ongoing validity of *American Family Association* and *Vernon*).

RFRA provides that the "[g]overnment shall not substantially burden a person's exercise of religion even if the burden results from a rule of general applicability," 42 U.S.C. § 2000bb-1(a), unless that burden "is in furtherance of a compelling governmental interest," and "is the least restrictive means of furthering that . . . interest," *id.* at § 2000bb-1(b).  Thus, "[t]o establish a prima facie RFRA claim," a plaintiff must demonstrate that (1) "the activities the plaintiff claims are burdened by the government action" are an "exercise of religion," and (2) that the government action at issue "substantially burden[s]" that exercise of religion. *Navajo Nation v. U.S. Forest Serv.*, 535 F.3d 1058, 1068 (9th Cir. 2008) (en banc). "If the plaintiff cannot [properly allege] either element, his RFRA claim fails." *Id.*

Where challenged governmental conduct is not a law or regulation, therefore, the burden inquiries under the Free Exercise Clause and RFRA are similar.  "Under RFRA, a 'substantial burden' is imposed only when individuals are forced to choose between following the tenets of their religion and receiving a governmental benefit, or coerced to act contrary to their religious beliefs by the threat of civil or criminal sanctions." *Id.* at 1069–70.  "Any burden imposed on the exercise of religion short of that . . . is not a 'substantial burden' within the meaning of RFRA, and does not require the application of the compelling interest test." *Id.*  "[W]hen [a] challenged government action is neither regulatory, proscriptive or compulsory, alleging a subjective chilling effect on free exercise rights is not sufficient to constitute a substantial burden." *Am. Fam. Ass'n*, 277 F.3d at 1124.

For example, in *Vernon*, the Ninth Circuit found that the plaintiff failed to establish a substantial burden where he alleged that "the existence of a government investigation ha[d] discouraged him from pursuing his personal religious beliefs and practices." *Vernon*, 27 F.3d at 1395. Instead, it held that such "mere subjective chilling effects" were "simply not objectively discernable and are therefore not [] cognizable." *Id.*; *accord Dousa v. DHS*, 2020 WL 434314, at *7–8 (S.D. Cal. Jan. 28, 2020) (holding that a Free Exercise challenge was unlikely to succeed on the merits where plaintiff voluntarily "refrained from providing religious counseling and from blessing marriages" based on "subjective chills," not a government mandate); *see also Fazaga*, 965 F.3d at 1062 (observing that there is "no pertinent case law" indicating that alleged illegal surveillance of Muslims "constitutes a substantial burden upon religious practice").

Plaintiffs here allege neither that they have been forced to choose between their religion and receiving a governmental benefit, nor that they have been forced to act contrary to their religious beliefs due to potential civil or criminal sanctions. Instead, they assert that they either do, or plan to, "modify or curb [their] religious expression and practices . . . when traveling back to the United States from abroad" to avoid questions related to religion. Compl. ¶ 66; *see also id.* ¶¶ 67–70, 103–04, 141, 188. Nowhere do Plaintiffs allege, however, that the government coerces or otherwise mandates these behavioral modifications. They do not allege that their religion forbids such modifications. And these modifications have not, according to Plaintiffs, have any effect on their alleged religious questioning. On the one hand, Plaintiffs fail to allege that any religious questioning directly resulted from the religious practices from which they now refrain while returning to the United States (except the religious notes in Plaintiff Shah's journal). *See id.* ¶¶ 114, 128. And on the other hand, Plaintiffs allege that they continue to be questioned about their religion and will be in the future. *See, e.g., id.* ¶¶ 58, 94, 136. Plaintiffs have

therefore failed to assert that the government in some way incentivized them to alter their religious practices.  And they allege no impediment to, or consequences arising from, resuming their religious exercise during future travel into the United States.  *Accord Dousa*, 2020 WL 434314, at *8.  Plaintiffs' situation is thus analogous to *Vernon* and *Dousa* because the "subjective chilling effects" that allegedly arise from the government investigations alleged here do not impose a substantial burden on Plaintiffs' exercise of religion.  Instead, as in *Dousa*, "any harms felt are not the direct result of government action, but rather a result of [Plaintiffs'] decision[s] to limit [their] religious practices for [their] own subjective reasons."  *See id.*

But even if Plaintiffs' choice to alter their religious practices when returning from travel abroad were deemed a substantial burden on their religious exercise, the questioning alleged here is the least restrictive means of advancing a compelling government interest.  There can be no dispute that the government has a compelling interest in protecting its borders and preventing and investigating potential acts of terrorism.  *See Haig v. Agee*, 453 U.S. 280, 307 (1981) ("[N]o governmental interest is more compelling than the security of the Nation."); *Holder v. Humanitarian Law Project*, 561 U.S. 1, 28 (2010) ("[T]he Government's interest in combating terrorism is an urgent objective of the highest order."); *Flores-Montano*, 541 U.S. at 152; *Al Haramain Islamic Found., Inc. v. U.S. Dep't of Treasury*, 686 F.3d 965, 980 (9th Cir. 2012) ("[T]he government's interest in national security cannot be understated."); *Tabbaa*, 509 F.3d at 103 ("It is undisputed that the government's interest in protecting the nation from terrorism constitutes a compelling state interest . . . .").  The complaint alleges that two individuals on terrorist watchlists, and another who alleges his inspection was labeled "Terrorist Related," were asked questions, including about their religious beliefs, practices, and associations at the border.  *See* Compl. ¶¶ 58, 94, 134.  The questions Plaintiffs report being asked under those circumstances are targeted and individualized.  *See, e.g.*, *id.* ¶¶ 35, 39, 54, 128.  Such

inquiries constitute the least restrictive means of investigating potential threats to national security at the U.S. border.  *Accord Tabbaa*, 509 F.3d at 105–06.

Plaintiffs' free exercise claims therefore must be dismissed.

### 3.      Plaintiffs do not plausibly allege a violation of the First Amendment right to freedom of association (Count 3).

Plaintiffs claim that Defendants' alleged "questioning about their religious associations" violates their right to freedom of association under the First Amendment.   Compl. ¶ 164.   But such questioning does not impede their associational rights in any meaningful way.  It is also plainly intertwined with the compelling governmental interests of securing the border and preserving national security, and narrowly tailored.  This claim therefore cannot stand.

There is "implicit in the right to engage in activities protected by the First Amendment a corresponding right to associate with others."  *Ams. for Prosperity Found. v. Bonta*, 141 S. Ct. 2373, 2382 (2021) (quoting *Roberts v. U.S. Jaycees*, 468 U.S. 609, 622 (1984)).  The Ninth Circuit has made clear that it "strongly disagree[s] with any inference that criminal investigation is somehow prohibited when it interferes with such First Amendment interests."  *United States v. Rubio*, 727 F.2d 786, 791 (9th Cir. 1983).  It has also "refused to carve out a First Amendment exception" to the border search doctrine.  *United States v. Arnold*, 533 F.3d 1003, 1010 (9th Cir. 2008).  Where a plaintiff demonstrates that disclosure in the context of an investigation imposed an unjustified burden, however, courts have sometimes found First Amendment violations.  *See, e.g.*, *NAACP v. Alabama ex rel. Patterson*, 357 U.S. 449, 462–63 (1958) (compelled disclosure of membership lists violated the First Amendment where members faced violence and economic reprisal, and the state articulated no justifying offsetting interest); *see also Ams. for Prosperity Found.*, 141 S. Ct. at 2388 (disclosure of donor lists resulted in some being "subjected to bomb threats, protests, stalking, and physical violence").  But even

28

where such a burden exists, "compelled disclosure of membership lists violates the Constitution *only* when the investigation would likely impose hardship on associational rights not justified by a compelling interest, or when the investigation lacks a substantial connection to a subject of overriding and compelling state interest." *United States v. Mayer*, 503 F.3d 740, 748 (9th Cir. 2007) (emphasis added). The Supreme Court more recently described the required showing as "a substantial relation between the disclosure requirement and a sufficiently important governmental interest," and "narrow[] tailor[ing] to the government's asserted interest." *Ams. for Prosperity Found.*, 141 S. Ct. at 2383 (quoting *Doe v. Reed*, 561 U.S. 186, 196 (2010)).

At the outset, the facts Plaintiffs allege here are wholly distinguishable from those analyzed in *Americans for Prosperity Foundation*, or similar cases concerning large-scale disclosure of membership rosters, in both scope and effect. The alleged disclosures Plaintiffs point to are extremely limited. They assert that three individuals, who live in different cities and appear to belong to different religious organizations, have been asked a limited number of questions about their personal associations as part of discrete examinations by CBP officers (and one HSI agent) at the U.S. border over the course of five years. *See, e.g.*, Compl. ¶¶ 39, 54, 81, 85, 90, 128. They do not claim that these alleged disclosures have imposed any tangible burden on, caused them to refrain from, or created a chilling effect on, any of these associations. Nor do they claim that the government has taken any action whatsoever as a result of allegedly learning about their associations. The only conceivable harm they claim is their abstract discomfort with disclosure. *See id.* ¶ 72, 106, 140. This cannot, without more, trigger the requirements of narrow tailoring and a sufficiently important state interest. *Cf. Ams. for Prosperity Found.*, 141 S. Ct. at 2388.

But even assuming these standards must be met here, they are easily satisfied. As explained above, there can be no dispute that the government has a compelling

interest in border security and preventing terrorism. *See supra*, pp. 27–28. Defendants' alleged questions are both connected to these compelling interests and narrowly tailored. *Accord Tabbaa*, 509 F.3d at 103–05. Plaintiffs' allegations show that CBP officers (and one HSI agent) asked individualized questions, on a handful of occasions, to three individuals who either claim they are on a watchlist or acted in an objectively suspicious manner during a routine border inspection. *See, e.g.*, Compl. ¶¶ 35, 39, 43, 47, 81, 85, 90, 117, 128. These types of inquiries are similar to specific investigations revealing First-Amendment-protected associations that the Ninth Circuit has previously upheld. *See, e.g.*, *Mayer*, 503 F.3d at 748; *Rubio*, 727 F.2d at 791; *United States v. Gering*, 716 F.2d 615, 620 (9th Cir. 1983). They also stand in sharp contrast to the wide-scale disclosures held unconstitutional in *Americans for Prosperity Foundation*. *See* 141 S. Ct. at 2387. Indeed, the Supreme Court acknowledged that result turned, in part, on the fact that the disclosures were "not used to initiate investigations," *id.* at 2389, and that a targeted request for such information may be appropriate as part of an investigation. *Id.* at 2386–87.

Plaintiffs' First Amendment freedom of association claim must be dismissed.

### 4. Plaintiff Shah does not plausibly allege retaliation in violation of his First Amendment rights (Count 4).

Plaintiff Shah claims that "[t]wo CBP officers and one HSI officer" retaliated against him for writing religious notes in a journal, initially refusing searches of his journal and electronic devices, and stating "that he wanted to stand up for his constitutional rights." Compl. ¶ 172. The alleged retaliatory actions are "prolonged detention," "extensive questioning," and searches of Shah's journal and cell phone. *Id.* ¶ 173. Because none of these purported "retaliatory" actions differ from what any traveler might expect to experience in secondary inspection, and occurred only after the search of Shah began, he has not stated a claim for retaliation.

30

To state such a claim, a plaintiff must plausibly allege: "(1) he engaged in constitutionally protected activity; (2) as a result, he was subjected to adverse action by the defendant that would chill a person of ordinary firmness from continuing to engage in the protected activity; and (3) there was a substantial causal relationship between the constitutionally protected activity and the adverse action." *Blair v. Bethel Sch. Dist.*, 608 F.3d 540, 543 (9th Cir. 2010). To ultimately prevail, Plaintiffs must show that any adverse action "would not have been taken absent the retaliatory motive." *Nieves v. Bartlett*, 139 S. Ct. 1715, 1722 (2019). The First Amendment does not protect "rather minor indignit[ies] and de minimis deprivations of benefits and privileges," only "adverse, retaliatory actions . . . of [such] a nature that would stifle someone from speaking out." *Blair*, 608 F.3d at 544. The causation element is "understood to be but-for causation." *Lacey v. Maricopa Cnty.*, 693 F.3d 896, 917 (9th Cir. 2012) (quoting *Hartman v. Moore*, 547 U.S. 250, 260 (2006)).

Here, assuming *arguendo* that Plaintiff Shah engaged in constitutionally protected activity, the complaint fails to allege either an "adverse action" or a causal relationship between that activity and Defendants' alleged actions. The type of border inspection Shah alleges has been upheld time and again as "routine" and cannot be reasonably considered an adverse action that would chill a person of ordinary firmness. *See, e.g.*, *Flores-Montano*, 541 U.S. at 155–56; *Tabbaa*, 509 F.3d at 94–95, 99. Specifically, Shah claims that his personal belongings, including his journal and cell phone, were searched and that he was asked questions related to what CBP officers found, including the religious beliefs and associations documented in his journal. Compl. ¶¶ 114–29. But it is consistent with CBP standard practice— with or without suspicion—to question or route to secondary inspection travelers who are in the process of obtaining their baggage. CBP PIA for TECS at 4. This interaction may involve inspection of a traveler's possessions. *Id.*; *see also, e.g.*, *Cotterman*, 709 F.3d at 967 ("International travelers certainly expect that their

31

property will be searched at the border."). Also under typical circumstances, secondary inspection may include a basic (manual) search of a traveler's electronic devices, again without suspicion. CBP PIA for Elec. Devices at 3, 5–6; *see also Cano*, 934 F.3d at 1016 (approving such warrantless searches at the border). DHS policy recognizes that questions about First-Amendment protected activities that "relate to . . . any merchandise [an individual] seeks to bring across the border," or are used "to validate information supplied by an individual or determine whether potential criminal, civil, or administrative violations exist relating to the laws that DHS enforces or administers," are pertinent to and within the scope of DHS's border security charge. McAleenan Memo. at 3. In other words, Shah's stop did not meaningfully differ from any other routine secondary inspection at the border.

Nor is the duration of Shah's alleged two-hour inspection in any way atypical, such that it would deter a reasonable person from engaging in First-Amendment-protected activity. Compl. ¶ 130. The Supreme Court has observed that "delays of one to two hours at international borders are to be expected," *Flores-Montano*, 541 U.S. at 155 & n.3, and the Second Circuit has noted that "common sense and ordinary human experience suggest that it may take up to six hours for CBP to complete" a routine border inspection, *Tabbaa*, 509 F.3d at 100. To underscore the point, the other two Plaintiffs here allege inspections lasting two hours, Compl. ¶¶ 34, 80, 84, 89; three hours, *id.* ¶ 38; and in one instance, six to seven hours, *id.* ¶ 76.

Shah also fails to plausibly allege causation. Critically, the allegations demonstrate that a CBP officer directed Shah to secondary inspection *before* becoming aware of any of the constitutionally protected activity described in the complaint. Compl. ¶ 109 ("After Mr. Shah passed through primary inspection without incident, a CBP officer . . . stopped him in the baggage retrieval area and asked him to accompany him for a search."). As explained, once Shah was in the secondary inspection area, he underwent a routine inspection, during which CBP

officers and an HSI agent allegedly encountered his protected speech.  But the search began prior to their learning of any exercise of First Amendment rights.  The but-for cause of Shah's secondary inspection, therefore, is not his protected speech, but rather the ordinary operation of CBP's efforts to secure the border.  *See Dousa*, 2020 WL 434314, at *9 (finding no retaliation where alleged surveillance occurred "not *because of* [plaintiff's] protected activities, but because of ICE's statutory mandate to enforce the nation's immigration laws").   And to the extent that Plaintiff's behavior or the results of Defendants' search influenced the course of the inspection, the only reasonable inference is that Defendants were following up on information gathered during the inspection—including Shah's objectively suspicious behavior— and tailoring their investigation to it.  *See* Compl. ¶ 123; *accord, e.g.*, *Arnold*, 533 F.3d at 1010 (acknowledging that discovery of suspicious expressive material during a border search may reasonably "prompt[] a more thorough examination").

Plaintiff Shah's retaliation claim therefore fails.

### 5.    Plaintiffs do not plausibly allege an Equal Protection violation (Count 5).

Finally, Plaintiffs fail to plausibly allege a violation of their equal protection rights.  *See* Compl. ¶¶ 177–85.  This claim is largely co-extensive with Plaintiffs' First Amendment claims, and should be dismissed for similar reasons.

The Constitution's equal protection[9] guarantee essentially requires "that all persons similarly situated should be treated alike."  *City of Cleburne v. Cleburne Living Ctr.,* 473 U.S. 432, 439 (1985).  "The first step in equal protection analysis is

---

[9] Although the equal protection rights upon which Plaintiffs rely arise from the Fifth Amendment's Due Process Clause, "the approach to Fifth Amendment equal protection claims has always been precisely the same as to equal protection claims under the Fourteenth Amendment."  *Roy v. Barr*, 960 F.3d 1175, 1181 n.3 (9th Cir. 2020).  This memorandum thus cites to cases analyzing both interchangeably.

to identify the state's classification of groups. . . . The next step in equal protection analysis would be to determine the level of scrutiny." *Country Classic Dairies, Inc. v. State of Mont., Dep't of Com. Milk Control Bureau*, 847 F.2d 593, 596 (9th Cir. 1988). "To prevail on an Equal Protection claim," a plaintiff "must show that a class that is similarly situated has been treated disparately." *Ariz. Dream Act Coal. v. Brewer*, 855 F.3d 957, 966 (9th Cir. 2017) (citation omitted).   In addition, "discriminatory intent is required to show that state action having a disparate impact violates the Equal Protection Clause." *McLean v. Crabtree*, 173 F.3d 1176, 1185 (9th Cir. 1999).   The burden is on plaintiffs to show "that discriminatory purpose was a motivating factor" in the challenged government action. *Vil. of Arlington Heights v. Metro. Hous. Dev. Corp.,* 429 U.S. 252, 270 (1977).   If a plaintiff makes such a showing, the court considers whether the governmental action in question "targets a suspect class or burdens the exercise of a fundamental right." *United States v. Hancock*, 231 F.3d 557, 565 (9th Cir. 2000).   If not, the action is constitutional as long as it meets the "highly deferential" rational basis standard.   *Id.* at 566.   If so, strict scrutiny applies, which requires an action to be "narrowly tailored to serve a compelling governmental interest." *Honolulu Wkly., Inc. v. Harris*, 298 F.3d 1037, 1047 (9th Cir. 2002) (quoting *Ball v. Massanari*, 254 F.3d 817, 823 (9th Cir. 2001)).

Here, Plaintiffs have failed to plausibly allege that they were subject to unequal treatment as compared to a similarly situated group, based on a discriminatory purpose.   Plaintiffs offer the conclusory assertions that Defendants question Muslim travelers, but not "adherents of other faiths" about their religion, and that this alleged disparate treatment "is substantially motivated by an intent to discriminate against Muslims." Compl. ¶ 182.   But as explained above, Defendants have explicit policies prohibiting their employees from treating travelers unequally on the basis of religion, and Plaintiffs have not plausibly alleged any widespread practice that contradicts these policies.   *See supra*, pp. 5–6, 15–19.   Moreover, Plaintiffs make no concrete

allegation that Defendants acted with discriminatory intent or harbor any animus towards Muslims.

    At most, Plaintiffs allege that three Muslim individuals, two of whom believe they are on a watchlist, are stopped and questioned at the U.S. border in a manner different than the broader population of travelers—including other Muslim travelers. Three Plaintiffs alone do not constitute a suspect class.  Nor does the alleged questioning burden their religious exercise. *See supra*, pp. 26–27. Such an allegation would therefore be subject only to rational basis review, and Defendants' mission of securing the border and protecting the nation against terrorist threats plainly satisfies that undemanding standard.

    But even if Defendants' alleged actions were subject to strict scrutiny—which Plaintiffs' deficient allegations do not support—they would nonetheless pass muster. As discussed in the context of Plaintiffs' free exercise and free association claims, *see supra*, pp. 27–28, 29–30, Defendants' alleged questioning is both narrowly tailored, as it focuses only on individuals in specific contexts, and asks about only specific events, and serves the compelling governmental interests of border security, combatting terrorism, and investigating potential violations of law.

    Plaintiffs' equal protection claim must be dismissed.

## CONCLUSION

    For the foregoing reasons, the complaint should be dismissed.

Dated: May 31, 2022                    Respectfully submitted,

                                       BRIAN M. BOYNTON
                                       Principal Deputy Assistant Attorney General
                                       Civil Division

                                       BRIGHAM J. BOWEN
                                       Assistant Branch Director
                                       Federal Programs Branch, Civil Division

1

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

      /s/ Leslie Cooper Vigen

LESLIE COOPER VIGEN
Trial Attorney (D.C. Bar No. 1019782)
Civil Division, Federal Programs Branch
United States Department of Justice
1100 L Street, NW, Washington, D.C. 20005
Telephone: (202) 305-0727
Email:  leslie.vigen@usdoj.gov

*Counsel for Defendants*