Mohammad Tajsar (SBN 280152)
mtajsar@aclusocal.org
ACLU Foundation of Southern California
1313 West 8th Street
Los Angeles, CA 90017
Tel: (213) 977-9500

*Counsel for Plaintiffs*
(Additional counsel continued on next page)

## UNITED STATES DISTRICT COURT
## FOR THE CENTRAL DISTRICT OF CALIFORNIA

| | |
|---|---|
| ABDIRAHMAN ADEN KARIYE, MOHAMAD MOUSLLI, and HAMEEM SHAH, <br><br> *Plaintiffs*, <br><br> v. <br><br> ALEJANDRO MAYORKAS, Secretary of the U.S. Department of Homeland Security, in his official capacity; CHRIS MAGNUS, Commissioner of U.S. Customs and Border Protection, in his official capacity; TAE D. JOHNSON, Acting Director of U.S. Immigration and Customs Enforcement, in his official capacity; and STEVE K. FRANCIS, Acting Executive Associate Director, Homeland Security Investigations, in his official capacity, <br><br> *Defendants*. | **PLAINTIFFS' OPPOSITION TO DEFENDANTS' MOTION TO DISMISS** <br><br> No. 2:22-cv-01916-FWS-GJS <br><br> Hon. Fred W. Slaughter <br><br> **<u>Hearing</u>** <br><br> Date: July 28, 2022 <br><br> Time: 10:00 a.m. |

---

Ashley Gorski (*pro hac vice*)
agorski@aclu.org
Scarlet Kim (*pro hac vice*)
scarletk@aclu.org
Sarah Taitz (*pro hac vice*)
staitz@aclu.org
American Civil Liberties Union Foundation
125 Broad Street, Floor 18
New York, NY 10004
Tel: (212) 549-2500

Daniel Mach (*pro hac vice*)
dmach@aclu.org
Heather L. Weaver (SBN 226853)
hweaver@aclu.org
American Civil Liberties Union Foundation
915 15th St., NW Ste. 600
Washington, DC 20005
Tel: (202) 675-2330

Teresa Nelson (*pro hac vice*)
tnelson@aclu-mn.org
American Civil Liberties Union of Minnesota
P.O. Box 14720
Minneapolis, MN 55415
Tel: (651) 645-4097

*Counsel for Plaintiffs*

# TABLE OF CONTENTS

Introduction..................................................................................................1

Factual Background .......................................................................................2

Legal Standards.............................................................................................6

Argument ......................................................................................................6

I.    Plaintiffs plausibly allege a policy and/or practice of targeting Muslim Americans for religious questioning during secondary inspection. ................6

II.   Plaintiffs plausibly allege that religious questioning violates their constitutional and statutory rights....................................................................12

    A.   Plaintiffs plausibly allege Establishment Clause violations. ..................12

         1.   Plaintiffs plausibly allege that Defendants violate the principle of denominational neutrality and cannot satisfy strict scrutiny under *Larson*. ..................................................................................13

         2.   Plaintiffs plausibly allege violations of the coercion test.................17

    B.   Plaintiffs plausibly allege violations of the Free Exercise Clause and RFRA.........................................................................................19

         1.   Plaintiffs plausibly allege a substantial burden on their religious exercise. ..................................................................................20

         2.   Plaintiffs are not required to plead a substantial burden under the Free Exercise Clause................................................................24

    C.   Plaintiffs plausibly allege violations of the First Amendment right to free association......................................................................26

    D.   Plaintiff Shah plausibly alleges retaliation in violation of the First Amendment. ....................................................................................29

    E.   Plaintiffs plausibly allege violations of the Fifth Amendment right to equal protection................................................................................32

Conclusion ..................................................................................................34

# TABLE OF AUTHORITIES

## **Cases**

*Am. Fam. Ass'n v. City & Cnty. of San Francisco*,
 277 F.3d 1114, 1124 (9th Cir. 2002) ......................................................22, 23, 25

*Ams. for Prosperity Found. v. Bonta*,
 141 S. Ct. 2373 (2021)...........................................................................26, 27, 28

*Arce v. Douglas*,
 793 F.3d 968 (9th Cir. 2015) ..........................................................................32, 33

*Ariz. Dream Act Coal. v. Brewer*,
 855 F.3d 957 (9th Cir. 2017) ................................................................................33

*Ariz. Students' Ass'n v. Ariz. Bd. of Regents*,
 824 F.3d 858 (9th Cir. 2016) ..................................................................................6

*Armstrong v. Davis*,
 275 F.3d 849 (9th Cir. 2001) ..................................................................................8

*Armstrong v. Reynolds*,
 22 F.4th 1058 (9th Cir. 2022) ........................................................................15, 31

*Ashcroft v. Iqbal*,
 556 U.S. 662 (2009) .........................................................................................6, 33

*Askins v. Dep't of Homeland Sec.*,
 899 F.3d 1035 (9th Cir. 2018) ..............................................................15, 16, 17

*Askins v. U.S. Dep't of Homeland Sec.*,
 No. 12-cv-2600, 2013 WL 5462296 (S.D. Cal. Sept. 30, 2013)..........................9

*Awad v. Ziriax*,
 670 F.3d 1111 (10th Cir. 2012) ...........................................................................13

*Bains v. Cambra*,
 204 F.3d 964 (9th Cir. 2000) ................................................................................17

*Ballou v. McElvain*,
 29 F.4th 413 (9th Cir. 2022) ................................................................................33

*Bell Atl. Corp. v. Twombly*,
 550 U.S. 544 (2007) ................................................................................................6

*Boquist v. Courtney,*
   32 F.4th 764 (9th Cir. 2022) ............................................................. 17, 31

*Burlington Northern Railroad Co. v. Ford,*
   504 U.S. 648 (1992) ............................................................................. 32

*Bursey v. United States,*
   466 F.2d 1059 (9th Cir. 1972) ............................................................. 27

*Cal. Parents for the Equalization of Educ. Materials v. Torlakson,*
   973 F.3d 1010 (9th Cir. 2020) ........................................................ 23, 26

*Capp v. Cnty. of San Diego,*
   940 F.3d 1046 (9th Cir. 2019) ............................................................. 31

*Carson v. Makin,*
   No. 20-1088, 2022 WL 2203333 (U.S. June 21, 2022) ................... 24, 25

*Cherri v. Mueller,*
   951 F. Supp. 2d 918 (E.D. Mich. 2013) ...................................... *passim*

*Church of the Lukumi Babalu Aye, Inc. v. City of Hialeah,*
   508 U.S. 520 (1993) ............................................................................. 19

*Clark v. Libr. of Cong.,*
   750 F.2d 89 (D.C. Cir. 1984) .............................................................. 27

*Cnty. of Allegheny v. ACLU,*
   492 U.S. 573 (1989) ............................................................................. 13

*Dousa v. U.S. Dep't of Homeland Sec.,*
   No. 19-cv-1255, 2020 WL 434314 (S.D. Cal. Jan. 28, 2020) ............. 23

*El Ali v. Barr,*
   473 F. Supp. 3d 479 (D. Md. 2020) ........................................... *passim*

*Espinoza v. Mont. Dep't of Revenue,*
   140 S. Ct. 2246 (2020) ......................................................................... 25

*Everson v. Bd. of Educ. of Ewing Twp.,*
   330 U.S. 1 (1947) ................................................................................. 18

*Fazaga v. FBI,*
   965 F.3d 1015 (9th Cir. 2020) ...................................................... 7, 21, 24

*Frudden v. Pilling,*
   742 F.3d 1199 (9th Cir. 2014) ............................................................. 15

*Fulton v. City of Philadelphia,*
    141 S. Ct. 1868 (2021).................................................................................24, 25

*Gonzales v. O Centro Espirita Beneficente Uniao do Vegetal,*
    546 U.S. 418 (2006) ..............................................................................15

*Guan v. Mayorkas,*
    530 F. Supp. 3d 237 (E.D.N.Y. 2021).................................................28

*Hassan v. City of New York,*
    804 F.3d 277 (3d Cir. 2015) .................................................................16

*Henry v. Cnty. of Shasta,*
    132 F.3d 512 (9th Cir. 1997) ................................................................9

*Hiramanek v. Clark,*
    No. C-13-0228, 2014 WL 107634 (N.D. Cal. Jan. 10, 2014) ............12

*Holt v. Hobbs,*
    574 U.S. 352 (2015) .....................................................................15, 16

*Hunter v. Cnty. of Sacramento,*
    652 F.3d 1225 (9th Cir. 2011).............................................................9

*In re Geller,*
    751 F.3d 1355 (Fed. Cir. 2014) .........................................................17

*Inouye v. Kemna,*
    504 F.3d 705 (9th Cir. 2007) .............................................................18

*Janfeshan v. U.S. CBP,*
    No. 16-cv-6915, 2017 WL 3972461 (E.D.N.Y. Aug. 21, 2017)..............8, 14, 33

*Jibril v. Mayorkas,*
    20 F.4th 804 (D.C. Cir. 2021)..............................................................9

*Jones v. Slade,*
    23 F.4th 1124 (9th Cir. 2022) ................................................16, 21, 24

*Kennedy v. Bremerton School District,*
    No. 21-418, 2022 WL 2295034 (U.S. June 27, 2022) ...................12, 25

*Kirkpatrick v. Cnty. of Washoe,*
    843 F.3d 784 (9th Cir. 2016)...............................................................9

*LaDuke v. Nelson,*
    762 F.2d 1318 (9th Cir. 1985) .............................................................8

*Laird v. Tatum,*
 408 U.S. 1 (1972)......................................................................22

*Larson v. Valente,*
 456 U.S. 228 (1982) .........................................................*passim*

*Lee v. Weisman,*
 505 U.S. 577 (1992) ..............................................................12, 18

*Lemon v. Kurtzman,*
 403 U.S. 602 (1971) ...................................................................12

*Lemus v. Cnty. of Merced,*
 No. 15-cv-00359, 2016 WL 2930523 (E.D. Cal. May 19, 2016) ......................11

*Little Sisters of the Poor Saints Peter & Paul Home v. Pennsylvania,*
 140 S. Ct. 2367 (2020)...............................................................25

*Lucas v. Cnty. of Fresno,*
 No. 18-cv-01488, 2019 WL 7370418 (E.D. Cal. Dec. 31, 2019) .....................11

*MacPherson v. I.R.S.,*
 803 F.2d 479 (9th Cir. 1986) ......................................................28

*Masterpiece Cakeshop v. Colo. Civ. Rts. Comm'n,*
 138 S. Ct. 1719 (2018)..........................................................25, 26

*Mayfield v. United States,*
 599 F.3d 964 (9th Cir. 2010) ........................................................8

*McDaniel v. Paty,*
 435 U.S. 618 (1978) .................................................................19

*Melendres v. Arpaio,*
 695 F.3d 990 (9th Cir. 2012) .....................................................8, 9

*Melendres v. Maricopa Cnty.,*
 No. CV-07-2513-PHX-GMS, 2009 WL 2707241 (D. Ariz. Aug. 24, 2009)........ 9

*Mellen v. Bunting,*
 327 F.3d 355 (4th Cir. 2003) .......................................................18

*Menotti v. City of Seattle,*
 409 F.3d 1113 (9th Cir. 2005) .......................................................9

*Mitchell v. Washington,*
 818 F.3d 436 (9th Cir. 2016)........................................................32

*Mood v. Cnty. of Orange,*
  No. SAC 17-762-SVW (KK), 2019 WL 301734 (C.D. Cal. Jan. 2, 2019).........11

*Naoko Ohno v. Yuko Yasuma,*
  723 F.3d 984 (9th Cir. 2013) ..................................................................21, 22, 24

*Navajo Nation v. U.S. Forest Serv.,*
  535 F.3d 1058 (9th Cir. 2008) ........................................................20, 21, 23, 24

*NLRB v. Cath. Bishop of Chicago,*
  440 U.S. 490 (1979) .........................................................................................22

*Norman-Bloodsaw v. Lawrence Berkeley Lab'y,*
  135 F.3d 1260 (9th Cir. 1998) ...........................................................................7

*O'Brien v. Welty,*
  818 F.3d 920 (9th Cir. 2016) ......................................................................29, 31

*Oyenik v. Corizon Health, Inc.,*
  696 F. App'x 792 (9th Cir. 2017)........................................................................9

*Pacific Shores Props., LLC v. City of Newport Beach,*
  730 F.3d 1142 (9th Cir. 2013) .........................................................................33

*Perez v. Cox,*
  788 F. App'x 438 (9th Cir. 2019) .....................................................................11

*Redman v. Cnty. of San Diego,*
  942 F.2d 1435 (9th Cir. 1991) .........................................................................11

*Roman Cath. Diocese of Brooklyn v. Cuomo,*
  141 S. Ct. 63, 66 (2020).....................................................................................25

*Rouser v. White,*
  630 F. Supp. 2d 1165 (E.D. Cal. 2009) ............................................................13

*Shelton v. Tucker,*
  364 U.S. 479 (1960) ..........................................................................................27

*Sklar v. Comm'r,*
  282 F.3d 610 (9th Cir. 2002) ............................................................................13

*Starr v. Baca,*
  652 F.3d 1202 (9th Cir. 2011) ............................................................................6

*Tandon v. Newsom,*
  141 S. Ct. 1294 (2021).......................................................................................24

*Tiwari v. Mattis*,
   363 F. Supp. 3d 1154 (W.D. Wash. 2019) ........................................................34

*Trinity Lutheran Church of Columbia, Inc. v. Comer*,
   137 S. Ct. 2012 (2017) ..............................................................19, 20, 25

*United States v. Arnold*,
   533 F.3d 1003 (9th Cir. 2008) ..............................................................29, 32

*United States v. Cano*,
   934 F.3d 1002 (9th Cir. 2019) ..............................................................29, 30

*United States v. Gering*,
   716 F.2d 615 (9th Cir. 1983) ........................................................................29

*United States v. Ickes*,
   393 F.3d 501 (4th Cir. 2005) ........................................................................32

*United States v. Mayer*,
   503 F.3d 740 (9th Cir. 2007) ........................................................................28

*United States v. Rubio*,
   727 F.2d 786 (9th Cir. 1983) ........................................................................28

*Vernon v. City of L.A.*,
   27 F.3d 1385, 1394 (9th Cir. 1994) ..............................................................22, 23

*Video Software Dealers Ass'n v. Schwarzenegger*,
   556 F.3d 950 (9th Cir. 2009) ........................................................................15

*Vill. of Arlington Heights v. Metro. Hous. Dev. Corp.*,
   429 U.S. 252 (1977) ........................................................................................32

*Watison v. Carter*,
   668 F.3d 1108 (9th Cir. 2012) ......................................................................31

**Statutes**

6 U.S.C. § 202 ........................................................................................16

42 U.S.C. § 1983 ........................................................................................8

42 U.S.C. § 2000bb-1 ........................................................................19, 20, 21, 24

42 U.S.C. § 2000cc-5 ........................................................................................24

**<u>Rules</u>**

Fed. R. Civ. P. 12(b)(6) ........................................................................ 1, 6

**<u>Other Authorities</u>**

Department of Homeland Security, U.S. Customs and Border Protection,

    CBP Directive 51735-013A (Mar. 13, 2012),

    https://perma.cc/2U8V-7VFS .............................................................. 11

Memorandum from Kevin K. McAleenan to All DHS Employees

    (May 17, 2019), https://perma.cc/6ZN4-TAKB ............................... 5, 10

Memorandum from Sec'y Napolitano to DHS Component Heads

    (April 26, 2013), https://perma.cc/MP7M-2SS4 .................................. 10

# **INTRODUCTION**

"How many times a day do you pray?" "Do you attend mosque?" "Which mosque do you attend?" "Are you Sunni or Shi'a?" These are just some of the deeply personal and religiously intrusive questions that federal border officers require Plaintiffs—three Muslim U.S. citizens—to answer when they return home to the United States from international travel. Border officers ask these questions pursuant to a broader policy and/or practice by U.S. Customs and Border Protection ("CBP") and Homeland Security Investigations ("HSI") of targeting Muslim American travelers for questioning about their religious beliefs, practices, and associations, and retaining the answers in a law enforcement database for up to 75 years. This type of intrusive questioning, and the retention of Plaintiffs' responses, satisfies no legitimate—let alone compelling—government interest. It violates Plaintiffs' rights to practice their religion without undue government interference and to be treated equally with other Americans.

In an effort to close the courthouse doors on Plaintiffs, Defendants urge the Court to invert the bedrock standards that apply on a motion to dismiss under Rule 12(b)(6)—to reject Plaintiffs' well-pled allegations, to decide fact-intensive questions without the benefit of discovery, and to draw every inference in Defendants' favor. But at this early phase in litigation, the Court must do just the opposite. Each of Plaintiffs' claims is supported by concrete factual allegations regarding specific instances of religious questioning. Indeed, several of Plaintiffs' claims—under the Establishment Clause, Free Exercise Clause, and Equal Protection Clause—trigger strict scrutiny, which requires that *the government* bear the heavy burden of showing that its religious questioning is narrowly tailored to a compelling interest. Yet Defendants' brief utterly fails to explain how they will meet that standard—much less establish that a violation of strict scrutiny is implausible. Instead, Defendants repeat the generic refrain that their questioning is justified by the government's interest in "protecting the U.S. border" and "preventing terrorism."

Not once, however, do Defendants bother to explain *how* religious questioning actually protects the border or prevents terrorism. What is the connection between how many times a Muslim individual prays each day and any potential act of terrorism? Defendants do not say—because there is none. What bearing does a Muslim traveler's adherence to Sunni or Shi'a religious tenets have on border security? Again, Defendants do not say. To connect such questions to terrorism, Defendants would have to rely on false and offensive stereotypes about Muslims. Well over one billion people worldwide identify as Muslims, and many engage in religious practices such as praying and attending mosque. Suggesting that these practices render Muslims suspect is factually untenable, religiously discriminatory, and deeply stigmatizing to Muslim Americans. And even if Defendants could somehow present evidence demonstrating otherwise, it would not be appropriate at this stage of the litigation. Accepting Plaintiffs' plausible allegations as true and drawing all reasonable inferences in their favor, as the law requires, Defendants' motion to dismiss should be denied.

## **FACTUAL BACKGROUND**

Plaintiffs Imam Abdirahman Aden Kariye ("Imam Kariye"), Mohamad Mouslli ("Mr. Mouslli"), and Hameem Shah ("Mr. Shah") are Muslim U.S. citizens who have been questioned by Defendants' border officers about their religious beliefs, practices, and associations upon return to the United States from abroad. Compl. ¶¶ 8–10, 31–134. In total, they have experienced ten incidents of religious questioning by border officers at six different ports of entry. *Id.* ¶¶ 31–134. Defendants retain records of Plaintiffs' responses to these questions in a DHS database called "TECS" for up to 75 years, where they are accessible to officers from over 45,000 law enforcement departments. *Id.* ¶¶ 28–29, 134.

The religious questioning takes place during secondary inspection, a procedure by which border officers detain, question, and search certain travelers before they are permitted to enter the country. *Id.* ¶¶ 25–26, 32–60, 74–95, 108–130.

When border officers select travelers for secondary inspection, the officers—typically armed and wearing government uniforms—detain the individuals in an area separate from the general inspection area and prohibit them from leaving without officers' express permission. *Id.* ¶ 26. During these inspections, the officers take possession of the travelers' passports and conduct searches of their belongings, including their electronic devices. *Id.* ¶¶ 26, 32, 74, 116–32.

Border officers have detained Plaintiffs for periods of time ranging from one to seven hours. *Id.* ¶¶ 34, 38, 42, 52, 76, 80, 84, 130. Because of the coercive nature of the secondary inspection environment, Plaintiffs have no meaningful choice but to disclose their religious beliefs, practices, and associations in response to officers' inquiries. *See, e.g.*, *id.* ¶¶ 25–27, 32, 46–50, 74–78, 111–15.

Imam Kariye has been subjected to religious questioning during secondary inspection at least five times over the last six years. *Id.* ¶¶ 31–60.[1] In one instance, a CBP officer asked him which mosque he attends and demanded details about his participation in Hajj, an Islamic religious pilgrimage. *Id.* ¶¶ 33–37. On another occasion, border officers asked Imam Kariye to identify what "type" of Muslim he is ("Are you Sunni or Shi'a?" "Are you Salafi or Sufi?"), and then asked him questions regarding his religious education and beliefs, including whether he listens to music and what his views are on a particular Islamic scholar. *Id.* ¶ 47.

Mr. Mouslli has been subjected to questioning about his religious beliefs, practices, and associations during secondary inspection at least four times over the

---

[1] These incidents took place on September 12, 2017, at Seattle-Tacoma International Airport; February 6, 2019, at the Peace Arch Border Crossing; November 24, 2019, at the Ottawa International Airport; August 16, 2020, at the Seattle-Tacoma International Airport; and January 1, 2022, at the Minneapolis-Saint Paul Airport. Compl. ¶¶ 33–57.

(cont'd)

last six years. *Id.* ¶¶ 74–95.[2] CBP officers have asked him whether he is a Muslim, whether he is Sunni or Shi'a, whether he attends mosque, and how many times a day he prays. *Id.* ¶¶ 77, 81, 85, 90.

Mr. Shah was subjected to religious questioning during a secondary inspection on May 7, 2019, at LAX. *Id.* ¶ 108. Border officers searched his belongings and read his personal journal. *Id.* ¶¶ 110–14. When they found references to his faith in his journal, they interrogated him about it: "How religious do you consider yourself?" and "What mosque do you attend?", among other religious questions. *Id.* ¶¶ 117, 127–28. One officer informed Mr. Shah, "I'm asking because of what we found in your journal." *Id.* ¶ 118. During the encounter, Mr. Shah stated that he did not consent to being searched and otherwise attempted to assert his constitutional rights at least eight times. *Id.* ¶¶ 110, 113, 116, 118, 120, 122, 123, 126. Officers retaliated against him for these objections by intensifying their search and asking additional invasive religious questions. *Id.* ¶¶ 110–30.

Border officers' religious questioning is stigmatizing and deeply humiliating to Plaintiffs, who reasonably perceive the questioning to convey a clear message: The U.S. government views adherence to Islamic religious beliefs and practices as inherently suspicious and bears hostility toward the faith and its followers. *Id.* ¶¶ 65, 102, 140. This religious questioning imposes substantial pressure on Plaintiffs to abandon or curb certain visible religious practices while traveling—contrary to their sincerely held religious beliefs—to avoid incurring additional scrutiny and religious questioning. *Id.* ¶¶ 66–70, 103–04, 141–42. For example, while returning home from international travel, Imam Kariye and Mr. Mouslli refrain from physical acts of prayer; Imam Kariye does not wear his Muslim cap and avoids carrying religious texts; and Mr. Shah will no longer carry his religious journal. *Id.* All three men are

---

[2] These incidents took place on August 9, 2018, at a border crossing near Lukeville, Arizona; August 19, 2019, at Los Angeles International Airport ("LAX"); March 11, 2020, at LAX; and June 5, 2021, at LAX. *Id.* ¶¶ 74–93.

proud Muslims and experience significant distress as a result of Defendants' coercive religious questioning, the ongoing retention of records documenting their responses to these questions, and the substantial pressure to modify their religious practices. *Id.* ¶¶ 71–72, 105–06, 142–43.

The religious questioning of Plaintiffs and retention of their responses is part of a policy and/or practice by Defendants that has persisted for more than a decade. In 2011, DHS received "numerous" complaints from Muslim Americans about such questioning. *Id.* ¶¶ 16–20. In the intervening years, several Muslim Americans have challenged such questioning in court. *See infra* § I (collecting cases). Moreover, Defendants' written policies expressly permit border officers to question Americans about their religion. *Id.* ¶ 23. For example, DHS policy allows officers to collect and retain information protected by the First Amendment in several circumstances. *See* Memorandum from Kevin K. McAleenan to All DHS Employees at 2, https://perma.cc/6ZN4-TAKB ("McAleenan Memo"). U.S. Immigration and Customs Enforcement ("ICE") requires officers who work at ports of entry to carry a questionnaire to guide their interrogations of travelers, which includes intrusive questions about a traveler's religious beliefs, practices, and associations. Compl. ¶ 23. In addition, CBP officers are required to create records of every secondary inspection at an airport or land crossing, and officers routinely document Muslim travelers' responses, including Plaintiffs' responses, to questions about their religious beliefs, practices, and associations. *See, e.g.*, *id.* ¶¶ 28, 41, 79, 83, 134. Officers input those records into the TECS database, where they are maintained for up to 75 years and accessible to tens of thousands of law enforcement agencies. *Id.* ¶ 29; *see also id.* ¶ 134 (TECS record of Mr. Shah containing information about his religious practice).

On March 24, 2022, Plaintiffs filed this lawsuit, seeking: (1) a declaration that the religious questioning of Plaintiffs, and the policies and practices of DHS and CBP set forth in the Complaint, are unlawful; (2) an injunction against further

religious questioning of Plaintiffs; (3) expungement of all records collected through religious questioning of Plaintiffs; and (4) expungement of all records collected as a result of retaliatory action against Mr. Shah. On May 31, 2022, Defendants moved to dismiss under Federal Rule of Civil Procedure 12(b)(6) for failure to state a claim. *See* Mot. to Dismiss, ECF No. 40-1 (May 31, 2022) ("Defs. Br.").

## LEGAL STANDARDS

In determining whether Defendants have satisfied their burden on a Rule 12(b)(6) motion, the Court must "accept the complaint's well-pleaded factual allegations as true and construe all inferences in the [Plaintiffs'] favor." *Ariz. Students' Ass'n v. Ariz. Bd. of Regents*, 824 F.3d 858, 864 (9th Cir. 2016). Defendants' motion to dismiss must be denied if Plaintiffs have alleged "enough facts to state a claim to relief that is plausible on its face." *See Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007); *see also Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (plaintiffs need only plead "factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged"). This plausibility standard is not a "*probability requirement.*" *Starr v. Baca*, 652 F.3d 1202, 1217 (9th Cir. 2011) (emphasis in original). Rather, it "'simply calls for enough fact to raise a reasonable expectation that discovery will reveal evidence' to support the allegations." *Id.* (quoting *Twombly*, 550 U.S. at 556).

## ARGUMENT

**I.    Plaintiffs plausibly allege a policy and/or practice of targeting Muslim Americans for religious questioning during secondary inspection.**

Defendants' motion to dismiss unspecified claims on the ground that the Complaint does not adequately plead a policy and/or practice of targeting Muslims for religious questioning should be denied. The Complaint plausibly alleges that Defendants have a policy and/or practice of (1) targeting Muslim Americans, including Plaintiffs, for religious questioning; or (2) alternatively, subjecting travelers—regardless of their faith—to religious questioning; and (3) retaining

records reflecting answers to such questioning for up to 75 years. Compl. ¶¶ 16–29, 31–56, 73–92, 107–34, 152, 160, 169. These allegations establish Plaintiffs' standing to seek declaratory and injunctive relief.

Critically, Defendants do not dispute the second and third allegations above. They do not dispute Plaintiffs' allegation, pled in the alternative, *id.* ¶¶ 152, 160, 169, that Defendants have a policy and/or practice of subjecting some travelers, regardless of their faith, to religious questioning. *See* Defs. Br. 1, 16 n.7, 21, 32. Nor do they dispute that Defendants' policies authorize the retention of records reflecting answers to religious questioning for up to 75 years. Defs. Br. 8. Because Defendants do not dispute the plausibility of these allegations, Plaintiffs may pursue declaratory and equitable relief, including, at a minimum, (1) a declaration that the religious questioning of Plaintiffs, and the policies and practices of Defendants that permit religious questioning in general, are unlawful; (2) an injunction prohibiting the religious questioning of Plaintiffs; and (3) the expungement of records of Plaintiffs' responses to religious questions, which Defendants retain in accordance with their policies. *See, e.g.*, *Fazaga v. FBI*, 965 F.3d 1015, 1053 & n.32 (9th Cir. 2020) (en banc), *rev'd on other grounds*, 142 S. Ct. 1051 (2022) (discussing expungement remedy); *Norman-Bloodsaw v. Lawrence Berkeley Lab'y*, 135 F.3d 1260, 1275 (9th Cir. 1998) (same). Plaintiffs may pursue this relief regardless of whether they have plausibly alleged a policy and/or practice of specifically *targeting Muslims* for religious questioning.

However, for the reasons below, Plaintiffs' allegations concerning Defendants' policy and/or practice of targeting Muslims are plausible. Accordingly, Plaintiffs may also pursue relief that would specifically declare unlawful the discriminatory targeting of Muslims for religious questioning, and prohibit the religious questioning of Plaintiffs on the ground that it is discriminatory.

The Complaint describes a practice or a "pattern of officially sanctioned . . . behavior" involving the targeting of Muslim Americans for religious

1   questioning. *Mayfield v. United States*, 599 F.3d 964, 971 (9th Cir. 2010) (quoting
2   *LaDuke v. Nelson,* 762 F.2d 1318, 1324 (9th Cir. 1985).[3] It details ten incidents in
3   which three Muslim Americans were subject to similar religious questioning by
4   numerous different border officers at six different points of entry. Compl. ¶¶ 31–56,
5   73–92, 107–34. It further alleges that this type of religious questioning—targeting
6   Islamic beliefs, practices, and associations—has been an ongoing practice for over
7   a decade, as documented by numerous complaints made by Muslim Americans to
8   DHS. *See id.* ¶¶ 16–30; *see also Cherri v. Mueller*, 951 F. Supp. 2d 918, 933–34
9   (E.D. Mich. 2013) (challenge brought by several Muslim Americans to religious
10  questioning at the border); *El Ali v. Barr*, 473 F. Supp. 3d 479, 524–26 (D. Md.
11  2020) (same); *Janfeshan v. U.S. CBP*, No. 16-cv-6915, 2017 WL 3972461, at *4,
12  *10 (E.D.N.Y. Aug. 21, 2017) (challenge brought by Muslim lawful permanent
13  resident to border search and religious questioning). The Complaint also alleges that
14  non-Muslims are not routinely subject to similar questioning. Compl. ¶¶ 16–24.

15      Under Ninth Circuit case law, the ten similar incidents experienced by the
16  three Plaintiffs at the hands of numerous different border officers, coupled with a
17  history of similar complaints, are plainly sufficient to allege a policy and/or practice
18  of targeting Muslims for religious questioning. *See, e.g.*, *Melendres v. Arpaio*, 695
19  F.3d 990, 995, 999 (9th Cir. 2012) (affirming district court's finding that defendants
20  engaged in a policy or practice of unconstitutional traffic stops where five plaintiffs

21  _____
    [3] *Mayfield*'s "officially sanctioned" dictum originated in *LaDuke*, 762 F.2d at 1324,
22  where the Ninth Circuit was describing one of several district court findings—not
    imposing a new bar to pleading the likelihood of recurrence of an injury. *See also*
23  *Armstrong v. Davis*, 275 F.3d 849, 861 (9th Cir. 2001) (there are "at least" two ways
24  to demonstrate that an injury is likely to recur).

25      Insofar as Defendants suggest that a policy or practice is a requirement to name
26  them as defendants in a suit for injunctive relief outside of 42 U.S.C. § 1983, *see*
    Defs. Br. 19, they have cited no law in support of that proposition. And, in any event,
27  Defendants do not dispute that Plaintiffs have plausibly alleged a policy and/or
28  practice with respect to religious questioning in general and the retention of records.

were involved in three incidents); *see also Askins v. U.S. Dep't of Homeland Sec.*, No. 12-cv-2600, 2013 WL 5462296, at *7 (S.D. Cal. Sept. 30, 2013), *on reconsideration in part*, No. 12-cv-2600, 2015 WL 12434362 (S.D. Cal. Jan. 29, 2015) (finding a "pattern of officially sanctioned behavior" where "Plaintiffs have plead[ed] two instances of CBP officers improperly searching and seizing the persons and property of two separate individuals at two separate ports of entry"); *see also Jibril v. Mayorkas*, 20 F.4th 804, 812 (D.C. Cir. 2021) (holding that plaintiffs had standing to sue heads of government agencies based on two incidents of prolonged detention and intrusive searches); *Cherri*, 951 F. Supp. 2d at 933–34 (holding that Muslim Americans adequately stated policy and practice of religious questioning based on allegations similar to those here).[4]

Moreover, in the Section 1983 context, the Ninth Circuit has inferred a practice from a pattern of repeated behavior towards a single individual, *see Oyenik v. Corizon Health, Inc.*, 696 F. App'x 792, 794 (9th Cir. 2017), and from the involvement of many different officers, *see Henry v. Cnty. of Shasta*, 132 F.3d 512, 521 (9th Cir. 1997), *opinion amended on denial of reh'g*, 137 F.3d 1372 (9th Cir. 1998). Both factors are present here. *See, e.g.*, Compl. ¶¶ 32, 74, 108. The Ninth Circuit has also been clear that "unofficial" and "informal" policy and practice suffice for liability. *Kirkpatrick v. Cnty. of Washoe*, 843 F.3d 784, 797 (9th Cir. 2016); *Hunter v. Cnty. of Sacramento*, 652 F.3d 1225, 1233–35 (9th Cir. 2011).

In arguing that Plaintiffs have not plausibly alleged a discriminatory policy or practice, Defendants err in several respects. First, they attack a straw man by

---

[4] *Melendres* involved additional evidentiary support for the existence of a policy or practice because it was decided on summary judgment, after the benefit of discovery. *See Melendres*, 695 F.3d at 995; *see also Melendres v. Maricopa Cnty.*, No. CV-07-2513-PHX-GMS, 2009 WL 2707241, at *4 (D. Ariz. Aug. 24, 2009) (holding that plaintiffs adequately alleged an unconstitutional policy or practice where the complaint described "three instances in which five Plaintiffs were subjected to the challenged conduct").

1   asserting that Plaintiffs have failed to allege a policy or practice of targeting "all"
2   Muslims for religious questioning. Defs. Br. 1–2. Plaintiffs nowhere claim that
3   Defendants subject all Muslims who cross the border, or even all Muslims referred
4   to secondary inspection, to religious questioning. Rather, Plaintiffs allege that under
5   Defendants' policy and/or practice, Muslims are routinely targeted and subject to
6   religious questioning, and Plaintiffs are swept up as a result. Compl. ¶¶ 16–24.

7         Second, Defendants maintain that the ten incidents in the Complaint, which
8   Plaintiffs plausibly allege were discriminatory, were consistent with their policies—
9   while also arguing that Plaintiffs' allegations of discrimination are inconsistent with
10  those policies. Defs. Br. 17–18. Defendants cannot have it both ways. At bottom,
11  given the repeated incidents experienced by Plaintiffs over the past six years, and
12  Defendants' own admission that their policies permit religious questioning under
13  some circumstances, it is plausible that border officers are, in fact, interpreting the
14  McAleenan Memo and CBP Standards of Conduct to permit the targeting of
15  Muslims for religious questioning. *See* Defs. Br. 16. Indeed, the McAleenan Memo
16  explicitly authorizes the collection, maintenance, and use of "information protected
17  by the First Amendment" in several situations, including where such information "is
18  *relevant to* a criminal, civil, or administrative activity *relating to* a law DHS enforces
19  or administers." Memo at 2 (emphases added). In practice, this extraordinarily low
20  threshold opens the door to discrimination and bias. And although the memo
21  includes descriptive, prefatory language stating that "DHS does not profile, target,
22  or discriminate against any individual for exercising his or her First Amendment
23  rights," it does not formally forbid those actions, nor does it provide any guidance
24  about what constitutes religious discrimination. *Compare* Memorandum from Sec'y
25  Napolitano to DHS Component Heads (April 26, 2013), https://perma.cc/MP7M-
26  2SS4 (prohibiting consideration of race and ethnicity unless a compelling
27  government interest is present and the activity is narrowly tailored). Similarly,
28  CBP's Standards of Conduct make plain that officers may "[]properly" take religion

into consideration, without providing guidance on when the consideration of religion is improper. *See* Defs. Br. 16 (quoting CBP Standards of Conduct § 7.11.1); *see also* Compl. ¶ 23 (describing ICE questionnaire—which Defendants fail to address— carried by officers at ports of entry and featuring questions about religious beliefs, practices, and associations). In any event, regardless of what Defendants' policies authorize, a written policy is not dispositive as to the existence of a practice—and Plaintiffs have plainly alleged a discriminatory practice. *See, e.g.*, *Hunter*, 652 F.3d at 1235–36; *Redman v. Cnty. of San Diego*, 942 F.2d 1435, 1445 (9th Cir. 1991); *Perez v. Cox*, 788 F. App'x 438, 440–41 (9th Cir. 2019); *Mood v. Cnty. of Orange*, No. SAC 17-762-SVW (KK), 2019 WL 301734, at *7 (C.D. Cal. Jan. 2, 2019), *report and recommendation adopted*, No. SACV 17-762-SVW (KK), 2019 WL 296198 (C.D. Cal. Jan. 22, 2019).

Third, Defendants err in stating that it is "undisputed" that they have no written policy of targeting Muslims for religious questioning. Defs. Br. 16. Discovery will determine whether Defendants' discriminatory policies are written or unwritten. But given that Defendants' public policies plainly permit religious questioning in numerous circumstances, and given the discriminatory practices discussed above, Plaintiffs have plausibly alleged the existence of a discriminatory policy.

Finally, because the parties disagree as to whether the ten religious questioning incidents took place pursuant to a policy or practice, the matter requires further factual development and cannot serve as a basis for granting Defendants' motion. Disagreements regarding the existence of a policy or practice and the availability of prospective relief are not properly decided at the pleading stage, but instead, should be resolved based on an evidentiary record. *See, e.g.*, *Lucas v. Cnty. of Fresno*, No. 18-cv-01488, 2019 WL 7370418, at *12 (E.D. Cal. Dec. 31, 2019); *Lemus v. Cnty. of Merced*, No. 15-cv-00359, 2016 WL 2930523, at *4 (E.D. Cal. May 19, 2016); *Hiramanek v. Clark*, No. C-13-0228, 2014 WL 107634, at *5 (N.D.

Cal. Jan. 10, 2014).

## II. Plaintiffs plausibly allege that religious questioning violates their constitutional and statutory rights.

### A. Plaintiffs plausibly allege Establishment Clause violations.

To state a valid claim under the Establishment Clause, Plaintiffs need only allege facts showing a plausible violation under any applicable doctrinal test. Here, Plaintiffs have alleged facts plausibly establishing that Defendants' religious questioning does not withstand strict scrutiny under *Larson v. Valente*, 456 U.S. 228 (1982)—the controlling standard where a plaintiff alleges that the government has violated the principle of denominational neutrality. Plaintiffs have also alleged facts showing a plausible violation of the "coercion" test. *See Lee v. Weisman*, 505 U.S. 577, 587–88 (1992). In arguing otherwise, Defendants err by disregarding the controlling strict scrutiny standard in *Larson*, ignoring Plaintiffs' well-pled allegations concerning numerous incidents of religious questioning, and urging this Court to make fact-intensive determinations that are inappropriate on a motion to dismiss.[5]

---

[5] Although Plaintiffs do not concede any of Defendants' arguments with respect to *Lemon v. Kurtzman*, 403 U.S. 602 (1971), Def. Br. 19–23, in light of the Supreme Court's June 27, 2022, ruling in *Kennedy v. Bremerton School District*, No. 21-418, 2022 WL 2295034 (U.S. June 27, 2022), Plaintiffs do not address *Lemon* here. In *Kennedy*, a case that did not implicate denominational targeting or the *Larson* test, the Supreme Court emphasized a "historical practices and understandings" analysis of Establishment Clause violations. *Kennedy*, 2022 WL 2295034, at *14. Applying that lens to this case, there is no legitimate historical practice of singling out one faith for disfavor, as the Court has repeatedly made clear. *See, e.g.*, *Larson*, 456 U.S. at 244–47; *cf. Kennedy*, 2022 WL 2295034, at *9 n.1. However, Plaintiffs would be willing to submit supplemental briefing on this issue if the Court so desires.

1    **1. Plaintiffs plausibly allege that Defendants violate the**
2       **principle of denominational neutrality and cannot satisfy**
3       **strict scrutiny under *Larson*.**

4       "The clearest command of the Establishment Clause is that one religious
5  denomination cannot be officially preferred over another." *Larson*, 456 U.S. at 244.
6  When the government violates this "principle of denominational neutrality," strict
7  scrutiny applies. *Id.* at 246–47; *see also Cnty. of Allegheny v. ACLU*, 492 U.S. 573,
8  608–09 (1989) ("We have expressly required strict scrutiny of practices suggesting
9  a denominational preference . . . in keeping with the unwavering vigilance that the
10 Constitution requires against any violation of the Establishment Clause." (internal
11 quotation marks and citations omitted)).

12      Plaintiffs allege that border officers expressly target them for religious
13 questioning because of their Islamic faith, as part of a policy and/or practice of
14 intentionally singling out Muslims for such questioning. *See, e.g.*, Compl. ¶¶ 16–30,
15 65, 102, 140. Accepting Plaintiffs' well-pled allegations as true—as the Court must
16 on a motion to dismiss—*Larson* should govern the Establishment Clause analysis.
17 *See, e.g., Sklar v. Comm'r*, 282 F.3d 610, 619 (9th Cir. 2002) (applying *Larson*
18 where tax deduction applied only to members of Church of Scientology); *Awad v.*
19 *Ziriax*, 670 F.3d 1111, 1128 (10th Cir. 2012) (applying *Larson* to proposed state
20 constitutional amendment to ban the use of Sharia law by courts); *Rouser v. White*,
21 630 F. Supp. 2d 1165, 1195 (E.D. Cal. 2009) (holding that where state action
22 discriminates among religions, *Larson* applies).

23      Defendants fail to even mention *Larson*'s strict scrutiny test, asserting instead
24 that Plaintiffs' claims of religious discrimination are "conclusory." *See, e.g.*, Defs.
25 Br. 17, 20, 34. But Defendants disregard the actual allegations in the Complaint.
26 Plaintiffs, three Muslim Americans, allege that across ten instances at several
27 different ports of entry, numerous border officers subjected them to similar questions
28 regarding their Islamic faith. *See* Compl. ¶¶ 31–57, 73–93, 107–34. Plaintiffs further

allege a long history of similar complaints made by other Muslim Americans, and the fact that Americans of other faiths are not routinely subject to similar questioning. *Id.* ¶¶ 16–24.

Furthermore, Plaintiffs' descriptions of the ten incidents include concrete, detailed facts illustrating Defendants' denominational targeting of Muslims. They allege that border officers ask questions that specifically target Islamic faith and practice, as opposed to neutral questions that could apply to all faiths. *See, e.g.*, *id.* ¶ 35 (Imam Kariye asked about Hajj and mosque attendance); *id.* ¶ 47 (Imam Kariye asked "Are you Sunni or Shi'a?" "Are you Salafi or Sufi?" and "What are your views on [Islamic scholar] Ibn Taymiyyah?"); *id.* ¶ 77 (Mr. Mouslli asked whether he is Muslim and whether he is Sunni or Shi'a); *id.* ¶ 81 (Mr. Mouslli asked about mosque attendance and daily prayer); *id.* ¶ 117 (Mr. Shah asked "What mosque do you attend?" and "Do you watch Islamic lectures online or on social media?"). A border officer even expressly told Mr. Shah that he was asking him questions about his religion "because of what we found in your journal," which contained notes regarding Islam. *Id.* ¶¶ 117–18.

Given these factual allegations, it is more than plausible that Defendants' border officers engage in express and intentional discrimination on the basis of Plaintiffs' faith. In the analogous context of equal protection claims, courts have held that allegations concerning border officers' questions about Islamic religious practice plausibly establish discrimination against Muslims. *See, e.g.*, *Cherri*, 951 F. Supp. 2d at 937 (plaintiffs "sufficiently alleged" that religious questioning was "only applied against Muslims, and not travelers of other faiths"); *El Ali*, 473 F. Supp. 3d at 516–18 (holding that Muslim travelers adequately alleged religious discrimination in watchlisting where CBP interrogated them about their religious beliefs); *Janfeshan*, 2017 WL 3972461, at *10 (CBP agent's questions about plaintiff's Muslim faith and ties to Afghanistan raised a reasonable inference that CBP acted on basis of religion and national origin).

Because the Complaint plausibly alleges that border officers' religious questioning discriminates among religions, strict scrutiny applies. *Larson*, 456 U.S. at 246–47. The government bears the burden of showing that its religious questioning is justified by a compelling interest and closely fitted to that interest. *See id.* In applying strict scrutiny, "the devil lies in the details." *See Askins v. Dep't of Homeland Sec.*, 899 F.3d 1035, 1045 (9th Cir. 2018). And critically, because the strict scrutiny analysis is fact-intensive, it is typically inappropriate for resolution on a motion to dismiss. *See Frudden v. Pilling*, 742 F.3d 1199, 1207 (9th Cir. 2014) ("Whether Defendants' countervailing interest is sufficiently compelling . . . is a question for summary judgment or trial." (citation omitted)); *Armstrong v. Reynolds*, 22 F.4th 1058, 1079 (9th Cir. 2022) ("[A] dispute on the factual merits cannot affect our resolution of this motion to dismiss.").

Dismissal here is especially unwarranted because Defendants' justifications for religious questioning cannot possibly satisfy strict scrutiny.

First, Defendants' generic appeals to "border security and preventing terrorism," Defs. Br. 27, do not establish a compelling government interest. *See, e.g.*, *Gonzales v. O Centro Espirita Beneficente Uniao do Vegetal*, 546 U.S. 418, 438 (2006) (the government's "invocation of such general interests, standing alone, is not enough" under strict scrutiny). To establish such an interest, the government must do more than merely recite potential harms; it must show that the challenged government action "actually furthers" the asserted interest. *Holt v. Hobbs*, 574 U.S. 352, 364 (2015). For example, in a case challenging government regulation of video games, the Ninth Circuit held that the government's interest in preventing psychological harm to minors was compelling in the "abstract," but was not "legally compelling," because of the insufficiency of the "evidence the State proffer[ed] of the effect of video games on minors." *Video Software Dealers Ass'n v. Schwarzenegger*, 556 F.3d 950, 961–64 (9th Cir. 2009).

Similarly, here, Defendants do not draw any plausible connection between

their stated goals and border officers' intrusive questions about Plaintiffs' religious beliefs, practices, and associations. Nor can they. How often Muslim Americans pray, whether they attend mosque, and whether they are Sunni or Shi'a has no relevance to "border security" or "[p]reventing the entry of terrorists and instruments of terrorism into the United States." 6 U.S.C. § 202; Defs. Br. 35. Indeed, whether and how an American practices Islam provides no indicia of whether that person has engaged in *any* immigration or customs-related crime within CBP's enforcement mandate—or, for that matter, any other unlawful activity. Compl. ¶ 30.

Second, even if Defendants could demonstrate that the religious questioning of Plaintiffs "actually furthers" border security and the detection of terrorists, *Holt*, 574 U.S. at 364, Defendants cannot meet their burden of showing that this questioning is narrowly tailored to those interests. Narrow tailoring requires the government to "prove that these specific restrictions are the least restrictive means available to further its compelling interest. They cannot do so through general assertions of national security[.]" *Askins*, 899 F.3d at 1044–45; *see also Jones v. Slade*, 23 F.4th 1124, 1144 (9th Cir. 2022) (under strict scrutiny, government must show that "it has actually considered and rejected the efficacy of less restrictive measures before adopting the challenged practice"); *Hassan v. City of New York*, 804 F.3d 277, 306 (3d Cir. 2015), *as amended* (Feb. 2, 2016) ("No matter how tempting it might be to do otherwise, we must apply the same rigorous standards [of narrow tailoring] even where national security is at stake.").

Defendants fail to establish that asking Plaintiffs other, non-religious questions would not suffice to further the government's asserted interests—or that Defendants have even considered alternatives to their discriminatory questioning. Although Defendants argue that the religious questioning of Plaintiffs was narrowly tailored because the interrogations were "targeted and individualized" and "focuse[d] only on individuals in specific contexts," Defs. Br. 27, 35, they do not explain why they would possibly need to know, for example, the precise religious

denominations of Plaintiffs, how often Mr. Mouslli prays, or Imam Kariye's religious views on music. *See, e.g.*, Compl. ¶¶ 47, 77, 81, 85.[6] At a minimum, it is plausible that border officers could perform their duties without inquiring into the details of Plaintiffs' religious beliefs, practices, and associations. *See, e.g.*, *Boquist v. Courtney*, 32 F.4th 764, 773 (9th Cir. 2022) (court must accept well-pled allegations as true and draw all reasonable inferences in plaintiff's favor). Because Defendants' arguments amount to no more than "general assertions of national security," *Askins*, 899 F.3d at 1044–45, they are insufficient to meet their burden under strict scrutiny—particularly at the motion-to-dismiss stage.[7] Accordingly, Plaintiffs have stated a violation of the Establishment Clause under *Larson*.

### 2. Plaintiffs plausibly allege violations of the coercion test.

Given Plaintiffs' allegations that Defendants' actions explicitly target them

---

[6] Indeed, any security-related conclusions that Defendants draw based on Plaintiffs' answers to these or similar questions would likely be based on impermissible and invidious anti-Muslim stereotypes. *Cf. In re Geller*, 751 F.3d 1355, 1357, 1372 (Fed. Cir. 2014) (holding that trademark creating "a direct association of Islam and its followers with terrorism" would be disparaging to "to a substantial composite of American Muslims"); *Bains v. Cambra*, 204 F.3d 964, 975 (9th Cir. 2000) (prosecutor improperly promoted stereotype that adherents of Sikhism are "predisposed to violence when a family member has been dishonored").

[7] Defendants contend that Imam Kariye's and Mr. Mouslli's alleged watchlist placement, and the "Terrorist Related" label on the record of Mr. Shah's encounter, somehow justify the religious questioning of Plaintiffs. Defs. Br. 27. Not so. Plaintiffs are law-abiding citizens whom the government has unfairly cast as suspicious. Although this lawsuit does not challenge Imam Kariye's or Mr. Mouslli's watchlist placement, it bears emphasis that more than one million people are watchlisted—based on a policy standard that does not require concrete facts supporting suspicion, and without a meaningful process to clear their names.

But even setting those facts aside, the government's internal labels fail to satisfy strict scrutiny because, for the reasons discussed above, they fail to establish that border officers' questions about Plaintiffs' religious beliefs, practices, and associations are narrowly tailored to a compelling government interest. *See also infra* § II.D (discussing the government's baseless assertion concerning Mr. Shah).

because of their Muslim faith, *Larson* is the most appropriate test for evaluating the plausibility of Plaintiffs' Establishment Clause claim, and the Court's inquiry may end there. But if the Court were to conclude otherwise, Plaintiffs also have adequately alleged Establishment Clause violations under the coercion test. While religious coercion by the government is not necessary to prove an Establishment Clause violation, such coercion "strikes at the core of the Establishment Clause of the First Amendment, whatever else the Clause may bar." *Inouye v. Kemna*, 504 F.3d 705, 712 (9th Cir. 2007); *see also Everson v. Bd. of Educ. of Ewing Twp.*, 330 U.S. 1, 15–16 (1947) ("No person can be punished for entertaining or professing religious beliefs or disbeliefs, for church attendance or non-attendance."). Plaintiffs plausibly allege that Defendants' religious questioning violates the coercion test by subjecting them to mandatory questioning because of their Muslim faith, requiring them to reveal deeply personal religious information, and pressuring them to alter their religious practices. *See, e.g.*, Compl. ¶¶ 33–57, 62–72, 75–92, 96–106, 108–143.

The secondary inspection setting in which religious questioning occurs is inherently coercive. *See, e.g.*, *id.* ¶¶ 25–27, 32, 46–50, 74–78, 111–15. Border officers typically carry weapons, wear government uniforms, and command travelers to enter and remain in a separated secondary inspection area. *Id.* ¶ 26. Travelers are not free to leave without permission, and officers typically take possession of their passports and conduct physical searches. *Id.* Over the course of hours, during numerous separate interrogations, Defendants' border officers have asked Plaintiffs granular questions about their religious beliefs, practices, and associations. *See* Compl. ¶¶ 33–54, 75–90, 109–30. These incidents are neither "short" nor "sporadic." *See* Defs. Br. 23. This coercive environment leaves Plaintiffs no meaningful choice but to profess their religious beliefs in response to border officers' inquiries. *See, e.g.*, *id.* ¶¶ 27, 46–50; *cf. Lee*, 505 U.S. at 588 (noting "subtle coercive pressures" in the school environment); *Mellen v. Bunting*, 327 F.3d 355,

371 (4th Cir. 2003) (similar, in military academy context). Furthermore, Defendants' interrogations impose substantial pressure on Plaintiffs to forgo certain religious expression while traveling across the border. *See* Compl. ¶¶ 66–72, 103–06, 141–43; *see also infra* § II.B.1. Accordingly, Plaintiffs have plausibly alleged that Defendants' religious questioning violates the coercion test.[8]

### B. Plaintiffs plausibly allege violations of the Free Exercise Clause and RFRA.

The Free Exercise Clause "protect[s] religious observers against unequal treatment" and against government action that imposes "special disabilities" based on religious status. *Trinity Lutheran Church of Columbia, Inc. v. Comer*, 137 S. Ct. 2012, 2019 (2017) (quoting *Church of the Lukumi Babalu Aye, Inc. v. City of Hialeah*, 508 U.S. 520, 533, 542 (1993)). Government conduct that treats individuals unequally because of their religious identity is subject to the "strictest scrutiny" and must be narrowly tailored to advance a government interest "of the highest order." *Id.* at 2019 (quoting *McDaniel v. Paty*, 435 U.S. 618, 628 (1978)). The Religious Freedom Restoration Act of 1993 ("RFRA") applies a similar standard to any federal government action that "substantially burden[s] a person's exercise of religion even if the burden results from a rule of general applicability." 42 U.S.C. § 2000bb-1(a)–(b) (government must show that its conduct is "the least restrictive means of furthering that compelling governmental interest"). Plaintiffs have plausibly alleged free-exercise and RFRA violations by pleading facts showing that Defendants'

---

[8] Importantly, while Plaintiffs plausibly allege that they are targeted for religious questioning because of their Islamic faith, the success of their claim under the coercion test does not turn on that allegation. As noted above, Plaintiffs have also alleged, in the alternative, that Defendants improperly subject people of faith to intrusive questioning. Thus, even if Plaintiffs are not targeted as Muslims, border officers ask and record their answers to intrusive, irrelevant religious questions. *See* Compl. ¶¶ 29, 32–57, 75–92, 114, 117, 128, 134, 139. Such questioning coerces Plaintiffs to profess their beliefs and to modify their religious expressions.

(cont'd)

religious questioning is not religiously neutral and is not narrowly tailored to a government interest.[9]

### 1. Plaintiffs plausibly allege a substantial burden on their religious exercise.

Defendants argue that Plaintiffs' RFRA and Free Exercise Clause claims must be dismissed because Plaintiffs have not adequately alleged a "substantial burden" on their religious exercise. Defs. Br. 26–27. But Plaintiffs' allegations are more than sufficient to establish this burden at the motion-to-dismiss stage.

Contrary to Defendants' argument, Defs. Br. 26, Plaintiffs have plausibly alleged that they are both "forced to choose between following the tenets of their religion and receiving a governmental benefit," *and* are "coerced to act contrary to their religious beliefs by threat of criminal and civil sanctions." *Navajo Nation v. U.S. Forest Serv.*, 535 F.3d 1058, 1070 (9th Cir. 2008) (en banc) (discussing two different frameworks for "substantial burden" under RFRA). The governmental benefit—or in this case, right—that hangs in the balance each time Plaintiffs travel internationally is permission to reenter their own country. If Plaintiffs do not reveal information about their religious beliefs and practices, they risk being subjected to further harassment and detention for an unknown period of time. Moreover, the facts alleged in the Complaint show that border officers implicitly (and even explicitly) threaten Plaintiffs with sanctions for not complying. Plaintiffs have alleged that, due to the coercive context of religious questioning, they reasonably feel that they may

---

[9]To prevail on a free-exercise or RFRA claim, a plaintiff need not show that he was treated unequally because of his *particular* faith. Although Plaintiffs have plausibly alleged that border officers specifically target Muslims for religious questioning, they allege in the alternative, Compl. ¶¶ 156–61, that officers target people of faith based on their religious status. *See Trinity Lutheran*, 137 S. Ct. at 2019. Strict scrutiny applies in either instance. *Cf. id.* at 2019–20. And as explained in the discussion of Plaintiffs' Establishment Clause claim, *see supra* § II.A.1, Defendants' conduct cannot survive strict scrutiny.

1   not leave unless and until they answer Defendants' questions; that Defendants have
2   threatened to make it harder for at least one Plaintiff (Imam Kariye) if he did not
3   cooperate; and that Defendants retaliated against another (Mr. Shah) because he
4   objected to their questions. *See, e.g.*, Compl. ¶¶ 25–27, 32, 36, 40, 44, 46–50, 74–
5   78, 86, 91, 109–29.

6        This type of direct coercion constitutes a substantial burden on religious
7   exercise. *See Navajo Nation*, 535 F.3d at 1070. But as the Ninth Circuit has more
8   recently made clear, so too does governmental action that "[m]ore
9   subtly . . . impact[s] religious exercise indirectly" by "discouraging
10  an . . . [individual] from doing that which he is religiously compelled or encouraged
11  to do." *Jones*, 23 F.4th at 1140 (discussing "substantial burden" requirement under
12  a statute that mirrors RFRA). Similarly, in *Naoko Ohno v. Yuko Yasuma,* 723 F.3d
13  984, 1011 (9th Cir. 2013), the Court explained that government conduct constitutes
14  a substantial burden where it has "a tendency to coerce individuals into acting
15  contrary to their religious beliefs" or exerts "substantial pressure on an adherent to
16  modify his behavior and to violate his beliefs." *See also Fazaga v. FBI*, 965 F.3d
17  1015, 1061–62 (9th Cir. 2020), *rev'd and remanded on other grounds*, 142 S. Ct.
18  1051 (2022) (holding that plaintiffs stated a RFRA claim against government
19  defendants where they "allege[d] that they altered their religious practices," by, for
20  example, forgoing religious dress and decreasing mosque attendance due to FBI
21  surveillance).[10] Applying *Jones* and *Naoko Ohno*, there is no question that Plaintiffs
22  have plausibly alleged a substantial burden.

23       Indeed, in another case involving the religious questioning of Muslim
24  travelers at the border, the court observed that the "very process of inquiry" into

25
───────────────────────────────
26  [10] Defendants do not fully describe the holding in *Fazaga*. Defs. Br. 26. While the
    ruling dismissed certain claims on qualified immunity grounds, it *allowed* plaintiffs'
27  RFRA claim against the government defendants to proceed based on plaintiffs'
28  allegations of altered religious conduct. *See Fazaga*, 965 F.3d at 1061.

1   sensitive religious matters in an inherently coercive environment can itself constitute
2   a substantial burden. *El Ali*, 473 F. Supp. 3d at 526 (quoting *NLRB v. Cath. Bishop*
3   *of Chicago*, 440 U.S. 490, 502 (1979)). Plaintiffs here have further alleged that
4   Defendants' coercive questioning resulted in their divulging deeply personal
5   information about their religious beliefs, practices, and associations. Compl. ¶¶ 26–
6   27, 32–55, 64, 74–91, 101, 112–129, 143.

7       In addition, Defendants' religious questioning has imposed "substantial
8   pressure," *Naoko Ohno,* 723 F.3d at 1011, on Plaintiffs to modify or abandon
9   specific religious expression and practices at the border, which they would otherwise
10  undertake and sincerely believe they should engage in as part of their faith. Compl.
11  ¶¶ 66–70, 103–105, 141–42. Specifically, because of the coercive nature of
12  Defendants' religious questioning, Imam Kariye and Mr. Mouslli both refrain from
13  physical acts of prayer in airports and the border when returning from international
14  travel. *Id.* ¶¶ 66–67, 103–105. Imam Kariye also forgoes religious dress and avoids
15  carrying religious texts when returning from international travel. *Id.* ¶¶ 68–70. And
16  due to the pressure of religious questioning, Mr. Shah will no longer travel with his
17  religious journal and will cease documenting his religious thoughts and expression
18  during his foreign travels. *Id.* ¶¶ 141–42. Plaintiffs reasonably feel coerced to take
19  these protective measures, which run contrary to their sincerely held religious
20  beliefs, to avoid incurring additional scrutiny and religious questioning. *See also El*
21  *Ali*, 473 F. Supp. 3d at 526.

22      Although Defendants trivialize Plaintiffs' protective measures as "subjective
23  chilling effects" that do not impose a substantial burden, Defs. Br. 27, the allegations
24  here go far beyond the generic and subjective chilling effects alleged in the cases
25  relied on by Defendants. *See* Defs. Br. 24–27.[11] For example, in *Navajo Nation*, 535

26  ─────────────────────
27  [11] Contrary to Defendants' argument, Defs. Br. 25, the religious questioning of
    Plaintiffs is also "proscriptive or compulsory" within the meaning of *American*
28  *Family Ass'n v. City & County of San Francisco*, 277 F.3d 1114, 1124 (9th Cir.
                                                                        (cont'd)

F.3d at 1063, the plaintiffs challenged a government snow-making plan but did not claim any coercion and did not otherwise alter their religious conduct as a result of the plan. They "continue[d] to pray, conduct their religious ceremonies, and collect plants for religious use" despite the artificial snow. *Id.* The "sole effect of the artificial snow" on plaintiffs' religious exercise was that it undermined their "subjective spiritual experience" by "decreas[ing] the spiritual fulfillment Plaintiffs get from practicing their religion on the mountain." *Id.* In *American Family*, the complaint did not "allege any specific religious conduct that was affected by the Defendants' actions." 277 F.3d at 1124; *see also Cal. Parents for the Equalization of Educ. Materials v. Torlakson*, 973 F.3d 1010, 1019 (9th Cir. 2020) ("Appellants failed to allege *any* specific religious conduct that was affected by the Defendants' actions." (internal quotation marks and citation omitted)); *Cherri*, 951 F. Supp. 2d at 935 (same). Defendants' reliance on *Dousa v. U.S. Dep't of Homeland Sec.*, No. 19-cv-1255, 2020 WL 434314 (S.D. Cal. Jan. 28, 2020), is also misplaced. There, the plaintiff alleged that she refrained from certain religious activities but did not connect her decision to do so with a "threat of specific future harm." *Id.* at *8. And in *Vernon*, 27 F.3d at 1394–95, a police officer failed to satisfy his burden at summary judgment because he adduced no evidence that his religious practice was chilled by the existence of a government investigation into his on-duty activities.

In contrast to these cases, Plaintiffs allege that Defendants' religious questioning is compulsory, coercing them to divulge their religious beliefs, practices, and associations. Plaintiffs further identify specific religious practices that are burdened by the government's conduct, and they allege that they have modified those practices to avoid future harm while traveling back into the United States. *See*

---

2002), and the cases it relies on (*Vernon v. City of L.A.,* 27 F.3d 1385, 1394 (9th Cir. 1994); *Laird v. Tatum*, 408 U.S. 1, 11, 13 (1972)), which is another reason that Plaintiffs' protective measures are not based on subjective chill. *See* Compl. ¶¶ 26–27.

Compl. ¶¶ 66–70, 103–105, 141–42. That Plaintiffs feel substantial pressure to modify their religious practices is an eminently reasonable response to Defendants' questioning: The questions appear to be aimed at detecting Plaintiffs' religiosity as Muslims, and, therefore, Plaintiffs have logically concluded that they must avoid or minimize certain Islamic religious acts that could further draw attention to their Muslim identity and risk an extended scope and duration of religious questioning. *See id.*; *see also Fazaga*, 965 F.3d at 1061; *El Ali*, 473 F. Supp. 3d at 526.

Defendants' remaining arguments are unavailing. They contend that Plaintiffs' claims of substantial pressure and coercion falter because Plaintiffs have not pled that their protective measures, in fact, reduce Defendants' religious questioning, or that "their religion forbids such modifications." Defs. Br. 26. But Defendants cite no precedent in support of either proposition, and Plaintiffs are aware of none. Indeed, the latter argument is at odds with RFRA, which applies to "any exercise of religion, whether or not compelled by, or central to, a system of religious belief." *See* 42 U.S.C. § 2000bb-2 (incorporating 42 U.S.C. § 2000cc-5). In any event, Plaintiffs plausibly allege that Defendants' questioning is a substantial burden within the meaning of *Navajo Nation*, *Naoko Ohno*, and *Jones*.

## 2. Plaintiffs are not required to plead a substantial burden under the Free Exercise Clause.

Even if the Court were to conclude that Plaintiffs have not adequately pled a substantial burden, it should still reject Defendants' motion to dismiss Plaintiffs' claim under the Free Exercise Clause. In recent years, the Supreme Court has not applied a "substantial burden" requirement to free-exercise claims challenging governmental conduct that is not religiously neutral or generally applicable. *See, e.g.*, *Carson v. Makin*, No. 20-1088, 2022 WL 2203333, at *7 (U.S. June 21, 2022) (state private school funding program prohibited aid for religious education); *Fulton v. City of Philadelphia*, 141 S. Ct. 1868, 1878 (2021) (non-discrimination provision in contract was not neutral and generally applicable vis-à-vis religion); *Tandon v.*

*Newsom*, 141 S. Ct. 1294, 1296 (2021) (state's COVID-19 restrictions treated religious exercise less favorably than secular activities); *Roman Cath. Diocese of Brooklyn v. Cuomo*, 141 S. Ct. 63, 66 (2020) (governor's executive order restricting gatherings "single[d] out houses of worship for especially harsh treatment"); *Espinoza v. Mont. Dep't of Revenue*, 140 S. Ct. 2246, 2255 (2020) (state constitutional provision excluded schools from aid programs based on their religious status); *Trinity Lutheran,* 137 S. Ct. at 2021 (same); *Masterpiece Cakeshop v. Colo. Civ. Rts. Comm'n*, 138 S. Ct. 1719, 1729 (2018) (holding that petitioner in civil rights proceedings was denied "neutral and respectful consideration" where "treatment of his case ha[d] some elements of a clear and impermissible hostility toward the sincere religious beliefs that motivated his objection"); *see also Kennedy*, 2022 WL 2295034, at *9 & n.1 (plaintiff may prove a free exercise violation by showing that official expressions of hostility accompany a policy burdening religious exercise). In not one of these cases does the Supreme Court mention a "*substantial* burden," let alone require it to be pled and proven.[12] At most, these cases merely mention—in passing—the "burden" of the challenged government conduct on religious exercise. *See, e.g.*, *Kennedy*, 2022 WL 2295034, at *9 n.1; *Fulton*, 141 S. Ct. at 1876; *Espinoza*, 140 S. Ct. at 2261.[13]

Defendants' argument to the contrary rests on outdated and inapposite case law. *See* Defs. Br. 25. In *American Family*, the Court distinguished between free-exercise claims challenging "an actual regulation or criminal law" and those challenging other governmental conduct, observing that plaintiffs must demonstrate a "substantial burden" for the latter. 277 F.3d at 1124. But subsequent Supreme

---

[12] In contrast, the Court continues to explicitly require a "substantial burden" in RFRA cases, consistent with the statutory text. *See, e.g.*, *Little Sisters of the Poor Saints Peter & Paul Home v. Pennsylvania*, 140 S. Ct. 2367 (2020).

[13] The Court did not explicitly identify *any* "burden" on the petitioners' religious exercise in *Carson*, *Masterpiece*, *Tandon*, or *Roman Catholic*.

Court decisions do not require a substantial burden in such cases. For example, in *Masterpiece Cakeshop*, 138 S. Ct. at 1729, the challenged conduct involved, in part, offhand remarks made by commission members; and in *Fulton*, 141 S. Ct. at 1881, the relevant government action was a contractual provision. The Ninth Circuit's opinion in *California Parents*, while more recent, is distinguishable not only because of the patent insufficiency of the pleading, 973 F.3d at 1019, but also because that case did not involve "expressions of hostility," *Masterpiece Cakeshop*, 138 S. Ct. at 1732—a key factor here. *See Kennedy*, 2022 WL 2295034, at *9 n.1; *see also* Compl. ¶¶ 65, 102, 140.

Plaintiffs allege that they were targeted for religious questioning because of their religious status, and thus the challenged conduct is not religiously neutral. Plaintiffs further allege that Defendants' conduct is religiously coercive and imposes on them substantial pressure to alter specific religious practices while traveling into the United States. Under the Supreme Court's recent decisions, these allegations are enough, and Plaintiffs may proceed on their claim under the Free Exercise Clause.

## C. Plaintiffs plausibly allege violations of the First Amendment right to free association.

Plaintiffs have plausibly alleged that Defendants' religious questioning—including questions such as "Are you Sunni or Shi'a?" and "What mosque do you attend?"—violates their right to freedom of association. *See, e.g.*, Compl. ¶¶ 19, 35, 47, 77, 81, 85, 90, 117. Where the government compels disclosure of protected associations, its actions are subject to exacting scrutiny, which requires "a substantial relation between the disclosure requirement and a sufficiently important governmental interest," and that the challenged requirement be "narrowly tailored." *Ams. for Prosperity Found. v. Bonta*, 141 S. Ct. 2373, 2383 (2021). Here, by compelling Plaintiffs to disclose sensitive associational information and retaining that information for decades, border officers do not further any valid government interest, and their questions are not narrowly tailored to the detection of terrorists.

1    *See supra* § II.A.1.

2         First, Defendants err in suggesting that the right to free association is limited

3    to cases involving "large-scale disclosures of membership rosters." Defs. Br. 29. To

4    the contrary, several cases uphold the right where the government seeks information

5    about an individual's associations. *See, e.g.*, *Shelton v. Tucker*, 364 U.S. 479, 480–

6    81, 490 (1960) (invalidating law requiring teachers to disclose their associations);

7    *Bursey v. United States*, 466 F.2d 1059, 1082–83, 1088 (9th Cir. 1972), *overruled in*

8    *part on other grounds* (affirming refusal to answer grand jury questions on First

9    Amendment grounds); *Clark v. Libr. of Cong.*, 750 F.2d 89, 93–94, 99 (D.C. Cir.

10   1984) (FBI field investigation of an individual based on his associations was

11   unjustified).

12        Second, Defendants are wrong to characterize Plaintiffs' disclosures about

13   their private religious associations as "extremely limited," and to argue that Plaintiffs

14   allege no more than "abstract discomfort." Defs. Br. 29. Far from being "extremely

15   limited," border officers' questions go to the core of Plaintiffs' protected

16   associations, including their precise religious denomination and where they practice

17   their religion. Plaintiffs also describe how border officers' religious questioning—

18   conducted during hours-long detentions in coercive environments, as a condition of

19   returning home—is humiliating, distressing, and profoundly stigmatizing. *See, e.g.*,

20   Compl. ¶¶ 26–27, 32, 46–52, 65–72, 74–79, 100–06, 115, 137–43. The chilling

21   impact of Plaintiffs' disclosures is all the more significant because Defendants retain

22   Plaintiffs' answers to their questions for up to 75 years, share that information in a

23   massive database accessible to tens of thousands of law enforcement departments,

24   and effectively create dossiers on Plaintiffs over time. *Id.* ¶¶ 28–29, 134.

25   Furthermore, to shield against additional questioning, Plaintiffs forgo prayer, the

26   wearing of a kufi, and the carrying of religious texts and a religious journal—

27   external manifestations of Plaintiffs' religious association. They take these measures

28   to avoid the reprisals of additional scrutiny and religious questioning by border

1   officers. *Id.* ¶¶ 66–71, 103–106, 141–43.

2      Third, even if the Court were to conclude that Plaintiffs allege no more than

3   "abstract discomfort," Defendants misstate the law in arguing that such discomfort

4   cannot trigger heightened scrutiny. Defs. Br. 29. In *Americans for Prosperity*, the

5   Supreme Court explained that "[e]xacting scrutiny is triggered by 'state action which

6   *may* have the effect of curtailing the freedom to associate,' and by the '*possible*

7   deterrent effect' of disclosure." 141 S. Ct. at 2387–88 (emphasis in original) (citation

8   omitted). That standard is easily satisfied here, because the coerced disclosure of

9   religious associations itself imposes an unjustified burden and chill on the right to

10  associate freely, as does the long-term retention of that information. *See*

11  *MacPherson v. I.R.S.*, 803 F.2d 479, 484 (9th Cir. 1986) ("The mere compilation by

12  the government of records describing the exercise of First Amendment

13  freedoms . . . has a chilling effect on such exercise." (citation omitted)); *see also*

14  *Guan v. Mayorkas*, 530 F. Supp. 3d 237, 266, 272–73 (E.D.N.Y. 2021) (holding that

15  plaintiffs plausibly alleged that CBP questioning of journalists during secondary

16  inspection violated their associational rights).

17     Fourth, Defendants attempt to analogize to Ninth Circuit cases upholding

18  criminal investigative activity that revealed First-Amendment-protected

19  associations, Defs. Br. 28, 30, but each is distinguishable. For example, border

20  officers' questioning of Plaintiffs as a precondition to entering the country is nothing

21  like the "criminal investigation" at issue in *United States v. Rubio*, and Plaintiffs are

22  not seeking a "prohibition" on law enforcement's ability to conduct criminal

23  investigations. Defs. Br. 28 (quoting 727 F.2d 786, 791 (9th Cir. 1983)). In *Rubio*,

24  the Court held that a search for indicia of membership in the Hell's Angels pursuant

25  to a "narrowly drawn" warrant did not violate a suspect's freedom of association

26  because Fourth Amendment warrant requirements sufficiently protected the

27  suspect's First Amendment interests. *Id.* at 790–92. Here, of course, border officers

28  have no warrant. In *United States v. Mayer*, 503 F.3d 740, 748 (9th Cir. 2007), an

1   undercover agent initiated investigations into members of the North American

2   Man/Boy Love Association who took part in "group activity" in which "criminal

3   conduct was openly discussed." Here, Plaintiffs were neither engaging in nor

4   discussing criminal conduct. And in *United States v. Gering*, 716 F.2d 615 (9th Cir.

5   1983), the Court concluded that the government's investigative technique of

6   "[g]leaning information from the outside of envelopes . . . does not rise to the level

7   of governmentally compelled disclosure." *Id.* at 619 n.2. This case, by contrast,

8   involves invasive questioning about associations in a coercive environment.

9       Finally, Defendants point to the Fourth Amendment border-search doctrine,

10  *see* Defs. Br. 28, but that doctrine is no help to Defendants because it underscores

11  the narrowness of border officers' authority. In *United States v. Cano*, the Ninth

12  Circuit emphasized that "border officials have no general authority to search for

13  crime," and that they are "limited to searching for contraband only." 934 F.3d 1002,

14  1017–19 (9th Cir. 2019). If it is Defendants' position that the border-search doctrine

15  governs the warrantless questioning of Plaintiffs at the border, then such questioning

16  should be limited to identity verification and the location of contraband. Religion is

17  irrelevant to both.[14]

18     **D.   Plaintiff Shah plausibly alleges retaliation in violation of the First**

19         **Amendment.**

20      To state a First Amendment retaliation claim, a plaintiff must plausibly allege

21

22  [14] Defendants' reliance on *United States v. Arnold*, 533 F.3d 1003 (9th Cir. 2008), is

23  misplaced. Defs. Br. 28. There, the court applied Fourth Amendment doctrine to
    reject the argument that border searches require "reasonable suspicion" if there is a

24  high risk that expressive material will be exposed. 533 F.3d at 1006. *But see Cano*,
    934 F.3d at 1007 (requiring reasonable suspicion for forensic cell phone searches).

25  The *Arnold* Court reasoned that the defendant's proposed test would protect terrorist

26  communications, be unworkable for government agents, and contravene precedent
    concerning the relationship between the Fourth and First Amendments. 533 F.3d at

27  1010. None of those factors are present here, where Plaintiffs seek a prohibition on

28  religious questioning—not a new Fourth Amendment standard for border searches.

1    that "(1) he was engaged in a constitutionally protected activity, (2) the defendant's

2    actions would chill a person of ordinary firmness from continuing to engage in the

3    protected activity and (3) the protected activity was a substantial or motivating factor

4    in the defendant's conduct." *O'Brien v. Welty*, 818 F.3d 920, 932 (9th Cir. 2016)

5    (citation omitted). Here, Mr. Shah has plausibly alleged that (1) he engaged in

6    constitutionally protected activity—documenting his religious expression and

7    thoughts, and asserting his rights to border officers; (2) border officers subjected him

8    to adverse actions, including religious and other intrusive questioning, extensive

9    searches of his phone and journal, and longer detention, which would chill a person

10   of ordinary firmness; and (3) his religious writing and statements invoking his rights

11   were a substantial factor in the officers' conduct. Compl. ¶¶ 108–134, 172–75.

12   Accordingly, Mr. Shah's retaliation claim should proceed.

13          Defendants argue that Mr. Shah failed to allege any adverse action that would

14   chill a person of ordinary firmness because the detention, questioning, and searches

15   were "routine" under the Fourth Amendment. Defs. Br. 31. Not so. As an initial

16   matter, border officers' computerized scanning of Mr. Shah's religious journal is

17   much closer to the kind of "computer strip search" that the Ninth Circuit deemed

18   *non*-routine in *Cano*. *Compare* 934 F.3d at 1015, *with* Compl. ¶¶ 113–14, 125–27.

19   But more importantly here, even if it were a routine search, that fact would not defeat

20   a retaliation claim. Mr. Shah plausibly alleges that the duration and scope of the

21   inspection were nonetheless retaliatory and would chill a person of ordinary firmness

22   from exercising his First Amendment rights. Indeed, because of the officers'

23   retaliatory actions, Mr. Shah is himself chilled from documenting his religious

24   expression and thoughts while out of the country. *Id.* ¶¶ 141–42.

25          Defendants also argue that Mr. Shah failed to plausibly allege causation

26   because "a CBP officer directed Shah to secondary inspection *before* becoming

27   aware of any of the constitutionally protected activity." Defs. Br. 32. But Mr. Shah

28   does not allege that the initial choice to subject him to a secondary inspection was

1    retaliatory. Instead, he alleges that *during* the secondary inspection, border officers

2    retaliated against him by prolonging the duration of the inspection and intensifying

3    the searches and questioning. Compl. ¶ 173.

4       Mr. Shah plausibly alleges that border officers acted with a retaliatory motive

5    in taking these adverse actions against him. His claim is supported by an officer's

6    statement that he was asking intrusive questions "*because of what we found in your*

7    *journal.*" *Id.* ¶ 118. Defendants' brief completely ignores this statement, which

8    plainly establishes causation. By pleading direct evidence of a retaliatory motive,

9    Mr. Shah has, in fact, surpassed his burden, as a claim for retaliation can survive

10    even if based solely on circumstantial inferences. *Watison v. Carter*, 668 F.3d 1108,

11    1114 (9th Cir. 2012) ("Because direct evidence of retaliatory intent rarely can be

12    pleaded in a complaint, allegation of a chronology of events from which retaliation

13    can be inferred is sufficient to survive dismissal.").

14       Although Defendants contend that the officers' conduct was motivated by

15    "efforts to secure the border[,]" Defs. Br. 33, this unexplained and conclusory

16    assertion cannot justify dismissal of Mr. Shah's well-pled claims. Moreover, even if

17    Defendants were correct about the officers' motivation, "the mere existence of a

18    legitimate motive . . . is insufficient to mandate dismissal." *Capp v. Cnty. of San*

19    *Diego*, 940 F.3d 1046, 1056 (9th Cir. 2019); *see also O'Brien*, 818 F.3d at 932

20    ("Otherwise lawful government action may nonetheless be unlawful if motivated by

21    retaliation for having engaged in activity protected under the First Amendment.");

22    *Boquist*, 32 F.4th at 785 (same).

23       Finally, Defendants are wrong to claim that Mr. Shah exhibited "objectively

24    suspicious behavior" that justified the officers' actions. Defs. Br. 33. Not only is this

25    claim baseless, but it is inappropriate for resolution on a motion to dismiss. *See*

26    *Armstrong*, 22 F.4th at 1079. In particular, Defendants cite Mr. Shah's allegation

27    that after being asked invasive, unconstitutional religious questions, he stated he

28    would prefer to go back to Europe rather than continue to be subject to further

1   questioning and searches. Defs. Br. 33 (citing Compl. ¶ 123). Mr. Shah's desire to

2   be released from detention should be understood to reflect his extreme discomfort

3   with the officers' conduct, rather than any wrongdoing on his part. *See* Compl.

4   ¶¶ 108–23; *Boquist*, 32 F.4th at 773 (court must draw all reasonable inferences in

5   plaintiff's favor). Moreover, Mr. Shah's purportedly "suspicious" behavior came

6   *after* the officers commenced their retaliatory conduct. *See* Compl. ¶¶ 109–123.[15]

7       **E.   Plaintiffs plausibly allege violations of the Fifth Amendment right**
8           **to equal protection.**

9           Under the right to equal protection, government action discriminating "along

10  suspect lines like . . . religion" is subject to strict scrutiny. *Burlington Northern*

11  *Railroad Co. v. Ford*, 504 U.S. 648, 651 (1992). In cases of express discrimination—

12  "when a state actor explicitly treats an individual differently on the basis of" a

13  protected class—the government action is "immediately suspect" and the plaintiff

14  "need not make an extrinsic showing of discriminatory animus or a discriminatory

15  effect to trigger strict scrutiny." *Mitchell v. Washington*, 818 F.3d 436, 445–46 (9th

16  Cir. 2016) (internal quotation marks and citations omitted). Here, Plaintiffs plausibly

17  allege that border officers expressly targeted them for religious questioning because

18  they are Muslim, *see supra* § II.A.1, triggering strict scrutiny.

19          Even if the Court were to conclude that Defendants' religious questioning is

20  facially neutral, it would still violate the right to equal protection because Plaintiffs

21  have plausibly alleged that discriminatory intent was "a motivating factor" behind

22  the questioning. *See Arce v. Douglas*, 793 F.3d 968, 977 (9th Cir. 2015)

23

24  [15] Defendants attempt to bolster their claim by relying on *Arnold*, 533 F.3d at 1010,
25  *see* Defs. Br. 33, but that case is readily distinguishable. There, the Court described
    *United States v. Ickes*, 393 F.3d 501, 502 (4th Cir. 2005), in which "the inspecting
26  agent discovered a video camera containing a tape of a tennis match which 'focused
    excessively on a young ball boy,'" and further searches uncovered child
27  pornography. 553 F.3d at 1010. Mr. Shah's request to leave detention is not remotely
28  like the discovery of suggestive images on Ickes's camera.

1    (quoting *Vill. of Arlington Heights v. Metro. Hous. Dev. Corp.*, 429 U.S. 252, 266

2    (1977)). "A plaintiff may establish discriminatory purpose by 'produc[ing] direct or

3    circumstantial evidence demonstrating that a discriminatory reason more likely

4    tha[n] not motivated' the defendant and that the defendant's actions adversely

5    affected the plaintiff in some way." *Ballou v. McElvain*, 29 F.4th 413, 422 (9th Cir.

6    2022) (quoting *Ave. 6E Invs., LLC v. City of Yuma*, 818 F.3d 493, 504 (9th Cir.

7    2016)); *see id.* at 424 ("'[A]ny indication of discriminatory motive may suffice' to

8    allow a disparate treatment claim to survive summary judgment.'" (quoting *Arce*,

9    793 F.3d at 978). Here, the number of incidents alleged, the long history of similar

10   incidents, and the nature of the questions themselves give rise to a reasonable

11   inference that discrimination was a motivating factor in the religious questioning of

12   Plaintiffs. *See Cherri*, 951 F. Supp. 2d at 937; *El Ali*, 473 F. Supp. 3d at 516–18;

13   *Janfeshan*, 2017 WL 3972461, at *10.

14        In arguing to the contrary, Defendants recycle their argument that Plaintiffs'

15   allegations of discrimination are implausible because their policies prohibit it, and

16   that Plaintiffs "have not plausibly alleged any widespread practice that contradicts

17   those policies." Defs. Br. 34. For the reasons stated in Sections I and II.A.1, *supra*,

18   Defendants are wrong.

19        Defendants also assert that Plaintiffs must "show that a class that is similarly

20   situated has been treated disparately" to state an equal protection claim, and that

21   Plaintiffs have failed to plausibly allege such a class. Defs. Br. 34 (quoting *Ariz.

22   Dream Act Coal. v. Brewer*, 855 F.3d 957, 966 (9th Cir. 2017)). But the Ninth Circuit

23   has recently clarified that "a relevant comparator is not an *element* of a disparate

24   treatment claim," *Ballou*, 29 F.4th at 424–25 (emphasis in original), and its logic

25   applies to Plaintiffs' express discrimination claim as well. *See also Pacific Shores

26   Props., LLC v. City of Newport Beach*, 730 F.3d 1142, 1158–59 (9th Cir. 2013)

27   ("[R]equiring anti-discrimination plaintiffs to prove the existence of a better-treated

28   entity would lead to unacceptable results."). Regardless, Plaintiffs have plausibly

alleged that border officers do not routinely subject travelers of other faiths to similar questioning about their religious beliefs and practices. *See, e.g.*, Compl. ¶¶ 16–24. Common sense dictates that border officers do not routinely ask Americans perceived as Christian, for example, whether they are Catholic or Protestant, and how often they pray. *See Iqbal*, 556 U.S. at 679 ("Determining whether a complaint states a plausible claim for relief will . . . be a context-specific task that requires the reviewing court to draw on its judicial experience and common sense."). Drawing all reasonable inferences in Plaintiffs' favor, Plaintiffs' allegations about the treatment of non-Muslims at airports and the border are plausible.

Finally, insofar as Defendants suggest that Plaintiffs must allege discrimination against every Muslim traveler to trigger strict scrutiny, Defs. Br. 35, they are mistaken. *See, e.g.*, *Tiwari v. Mattis*, 363 F. Supp. 3d 1154, 1164 (W.D. Wash. 2019) (rejecting "defendant['s] assert[ion] that, because the discrimination is not complete, it is not subject to strict scrutiny," as "contrary to equal protection jurisprudence"). Plaintiffs plausibly allege that they are subject to discriminatory questioning because of their religion, a protected classification, and that is enough.

## CONCLUSION

For the foregoing reasons, Defendants' motion to dismiss should be denied.

Dated:  June 27, 2022          Respectfully submitted,

AMERICAN CIVIL LIBERTIES UNION
    FOUNDATION

AMERICAN CIVIL LIBERTIES UNION OF
    MINNESOTA

ACLU FOUNDATION OF SOUTHERN
    CALIFORNIA


By:   */s/ Ashley Gorski*
          Ashley Gorski
          Counsel for Plaintiffs