BRIAN M. BOYNTON
Principal Deputy Assistant Attorney General
Civil Division

BRIGHAM J. BOWEN
Assistant Branch Director
Federal Programs Branch, Civil Division

LESLIE COOPER VIGEN
Trial Attorney (D.C. Bar No. 1019782)
Civil Division, Federal Programs Branch
United States Department of Justice
1100 L Street, NW, Washington, D.C. 20005
Telephone: (202) 305-0727
Email:  leslie.vigen@usdoj.gov

*Counsel for Defendants*

## IN THE UNITED STATES DISTRICT COURT
## FOR THE CENTRAL DISTRICT OF CALIFORNIA

| | |
|---|---|
| ABDIRAHMAN ADEN KARIYE, *et al.*, | CASE NO. 2:22-CV-1916-FWS-GJS |
| | |
| *Plaintiffs*, | **REPLY MEMORANDUM IN SUPPORT OF DEFENDANTS' MOTION TO DISMISS THE COMPLAINT** |
| v. | |
| | |
| ALEJANDRO MAYORKAS, Secretary of the Department of Homeland Security, in his official capacity, *et al*., | **Hearing:** |
| | Date: July 28, 2022 |
| *Defendants*. | Time: 10:00 a.m. |
| | Courtroom: 10D |
| | |
| | Honorable Fred W. Slaughter |
| | **United States District Judge** |

# TABLE OF CONTENTS

INTRODUCTION ..................................................................................1

ARGUMENT ........................................................................................2

A.   Plaintiffs Have Not Plausibly Alleged a Policy or Practice of Improper Religious Questioning. ...................................................................2

B.   Plaintiffs Fail to State a Claim Under the Constitution or RFRA. ................5

    1.   Plaintiffs do not plausibly allege an Establishment Clause violation. 5

    2.   Plaintiffs do not plausibly allege a violation of their free exercise rights under the First Amendment or RFRA. .....................................8

    3.   Plaintiffs do not plausibly allege a violation of the First Amendment right to freedom of association. ........................................................14

    4.   Plaintiff Shah does not plausibly allege retaliation in violation of his First Amendment rights. ...................................................................17

    5.   Plaintiffs do not plausibly allege an Equal Protection violation. .......19

CONCLUSION ....................................................................................20

i

# TABLE OF AUTHORITIES

**Cases**

*Am. Fam. Ass'n, Inc. v. City and Cnty. of San Francisco,*
  277 F.3d 1114 (9th Cir. 2002) .......................................................... 12

*Ams. for Prosperity Found. v. Bonta,*
  141 S. Ct. 2373 (2021) ............................................................... 14, 16

*Apache Stronghold v. United States,*
  --- F.4th ----, 2022 WL 2284927 (9th Cir. June 24, 2022) ................... 9, 11, 13

*Ariz. Dream Act Coal. v. Brewer,*
  855 F.3d 957 (9th Cir. 2017) .......................................................... 20

*Askins v. U.S. Dep't of Homeland Sec.,*
  899 F.3d 1035 (9th Cir. 2018) ......................................................... 14

*Ave. 6E Investments, LLC v. City of Yuma,*
  818 F.3d 493 (9th Cir. 2016) .......................................................... 20

*Awad v. Ziriax,*
  670 F.3d 1111 (10th Cir. 2012) ........................................................ 7

*Blair v. Bethel Sch. Dist.,*
  608 F.3d 540 (9th Cir. 2010) ..................................................... 17, 19

*Bursey v. United States,*
  466 F.2d 1059 (9th Cir. 1972) ......................................................... 16

*Cal. Parents for the Equalization of Educ. Materials v. Torlakson,*
  973 F.3d 1010 (9th Cir. 2020) ...................................................... 9, 13

*Cherri v. Mueller,*
  951 F. Supp. 2d 918–36 (E.D. Mich. 2013) ..................................... 5, 7, 10

*City of Indianapolis v. Edmond,*
  531 U.S. 32 (2000) ................................................................... 15

*Clark v. Library of Congress,*
  750 F.2d 89 (D.C. Cir. 1984) .......................................................... 16

*Doe v. Reed,*
  561 U.S. 186  (2010) .................................................................. 14

ii

*Dousa v. DHS*,
   2020 WL 434314 (S.D. Cal. Jan. 28, 2020) ........................................... 9, 12, 20

*Droz v. C.I.R.*,
   48 F.3d 1120 (9th Cir. 1995) ....................................................... 7

*El Ali v. Barr*,
   473 F. Supp. 3d 479 (D. Md. 2020) ................................................ 10

*Fazaga v. FBI*,
   965 F.3d 1015 (9th Cir. 2020) ...................................................... 11

*Furnace v. Sullivan*,
   705 F.3d 1021 (9th Cir. 2013) ...................................................... 20

*Gonzales v. O Centro Espirita Beneficiente Uniao do Vegetal*,
   546 U.S. 418 (2006) ............................................................... 13

*Guan v. Mayorkas*,
   530 F. Supp. 3d 237 (E.D.N.Y. 2021) ............................................. 16

*Holt v. Hobbs*,
   574 U.S. 352 (2015) ............................................................... 13

*Inouye v. Kemna*,
   504 F.3d 705 (9th Cir. 2007) ........................................................ 8

*Jones v. Slade*,
   23 F.4th 1124 (9th Cir. 2022) ....................................................... 9

*Kennedy v. Bremerton Sch. Dist.*,
   142 S. Ct. 2407 (2022) .............................................................. 6

*Larson v. Valente*,
   456 U.S. 228 (1982) ................................................................ 7

*Lee v. Weisman*,
   505 U.S. 577 (1992) ................................................................ 8

*Lemon v. Kurtzman*,
   403 U.S. 602 (1971) ................................................................ 6

*Lyons v. City of Los Angeles*,
   461 U.S. 95 (1983) ................................................................. 2

*MacPherson v. IRS,*
    803 F.2d 479 (9th Cir. 1986) ................................................................ 16

*Martinez v. City of Santa Rosa,*
    499 F. Supp. 3d 748 (N.D. Cal. 2020) ................................................. 19

*Masterpiece Cakeshop, Ltd. v. Colo. C.R. Comm'n,*
    138 S. Ct. 1719 (2018) ........................................................................ 13

*Melendres v. Arpaio,*
    695 F.3d 990 (9th Cir. 2012) .................................................................. 5

*Mitchell v. Washington,*
    818 F.3d 436 (9th Cir. 2016) ............................................................... 19

*Naoko Ohno v. Yuko Yasuma,*
    723 F.3d 894 (9th Cir. 2013) .................................................................. 9

*Navajo Nation v. U.S. Forest Serv.,*
    535 F.3d 1058 (9th Cir. 2008) (en banc) ......................................... 9, 10

*Nieves v. Bartlett,*
    139 S. Ct. 1715 (2019) ........................................................................ 18

*NLRB v. Catholic Bishop of Chicago,*
    440 U.S. 490 (1979) ............................................................................ 10

*Oyenik v. Corizon Health, Inc.,*
    696 F. App'x 792 (9th Cir. 2017) .......................................................... 5

*Phillips v. United States,*
    2021 WL 2587961 (C.D. Cal. June 22, 2021) ............................... 16, 17

*Rouser v. White,*
    630 F. Supp. 2d 1165 (C.D. Cal. 2009) ................................................. 7

*Scott v. Rosenberg,*
    702 F.2d 1263 (9th Cir. 1983) ............................................................... 7

*Shelton v. Tucker,*
    364 U.S. 479 (1960) ............................................................................ 16

*Skylar v. C.I.R.,*
    282 F.3d 610 (9th Cir. 2002) ................................................................. 7

iv

*Skylar v. C.I.R.*,
    549 F.3d 1252 (9th Cir. 2008) .......................................................................... 7

*Tabbaa v. Chertoff*,
    509 F.3d 89 (2d Cir. 2007) ................................................................................ 14

*Town of Greece v. Galloway*,
    572 U.S. 565 (2014) ............................................................................................ 6

*Trevino v. Gates*,
    99 F.3d 911 (9th Cir. 1996) ................................................................................ 5

*Trinity Lutheran Church of Columbia, Inc. v. Comer*,
    137 S. Ct. 2012 (2017) ....................................................................................... 11

*United States v. Cano*,
    934 F.3d 1002 (9th Cir. 2019) .......................................................................... 17

*United States v. Cotterman*,
    709 F.3d 952 (9th Cir. 2013) (en banc) .......................................................... 18

*United States v. Flores-Montano*,
    541 U.S. 149 (2004) .......................................................................................... 13

*Urenia v. Public Storage*,
    2015 WL 4885998 (C.D. Cal. Aug. 14, 2015) .............................................. 19

*Vernon v. Davis*,
    27 F.3d 1385 (9th Cir. 1994) ..................................................................... 6, 9, 12

*Video Software Dealers Ass'n v. Schwarzenegger*,
    556 F.3d 950 (9th Cir. 2009) ............................................................................ 13

*Walker v. Gomez*,
    370 F.3d 969 (9th Cir. 2004) ............................................................................ 19

**Statutes**

42 U.S.C. § 2000bb-1 ........................................................................................... 8

**U.S. Constitution**

U.S. Const. amend. I ............................................................................................. 6

v

# INTRODUCTION

The Defendant agencies—the Department of Homeland Security (DHS), its component agencies U.S. Customs and Border Protection (CBP) and U.S. Immigration and Customs Enforcement (ICE), and ICE's operational directorate Homeland Security Investigations (HSI)—bear the weighty responsibility of securing our nation's borders while "upholding the principles of professionalism, impartiality, courtesy, and respect for civil rights and civil liberties."  McAleenan Memo. at 1.  To that end, DHS and CBP have explicit, written policies proscribing the type of religious targeting Plaintiffs claim underlies the border inspections alleged to have occurred here.  Plaintiffs' assertions depend upon a purported policy or practice of religious discrimination.  Their support for such a sweeping claim is sporadic instances of alleged questions regarding religion posed to three individuals—two of whom claim to be on government watchlists, and the other of whom claims a single instance of questioning—seeking entry into the United States over the course of six years.  But assuming such individualized and discrete questioning occurred as alleged, the questions largely relate to core border-security issues:  an individual's purpose for travel, his occupation, what he did while abroad, and the items he has chosen to carry into the United States.  The complaint thus fails to plausibly allege a widespread policy of religious discrimination.

Nor have Plaintiffs otherwise stated a constitutional or statutory claim.  As to the Establishment Clause, Plaintiffs' citations to inapposite case law cannot avoid the conclusion that a few instances of alleged individualized questions concerning religion do not somehow amount to an establishment of state religion.  Plaintiffs fail to plead a substantial burden on their religious exercise, as required to state a claim under the Free Exercise Clause or the Religious Freedom Restoration Act (RFRA), because they point to no action that was both forbidden by their religion, and mandated or incentivized by the government.  Plaintiffs' free association claims are

1

no different than those previously rejected by the Ninth Circuit in the context of law enforcement inquiries into First-Amendment-protected activities. And in any event, Plaintiffs allege no harm to their associations. Plaintiff Shah has not adequately pleaded that he was subjected to an adverse action that differed in any meaningful way from a typical secondary inspection at the border, nor has he plausibly alleged any retaliatory governmental action. Finally, Plaintiffs' Equal Protection Clause claim fails because they have sufficiently pleaded neither discriminatory purpose, nor that they received worse treatment than a similarly situated group based on a protected characteristic. And even if Plaintiffs had plausibly alleged a constitutional or RFRA violation, dismissal would still be appropriate because Defendants' alleged actions were narrowly tailored to serve the compelling governmental interests of securing the U.S. border, and investigating potential threats to national security. For all of these reasons, as further explained in Defendants' opening brief, *see generally* Defs.' Br., ECF No. 40-1, the complaint should be dismissed.

## ARGUMENT

### A.   Plaintiffs Have Not Plausibly Alleged a Policy or Practice of Improper Religious Questioning.

At the outset, in order to warrant *any* relief against official-capacity Defendants, Plaintiffs must allege conduct attributed to the agencies themselves. *See Lyons v. City of Los Angeles*, 461 U.S. 95, 104 (1983) (observing that "relatively few instances of violations . . . , without any showing of a deliberate policy on behalf of the named defendants, [does] not provide a basis for equitable relief"). Plaintiffs have chosen to do so by claiming an official policy or practice. *See, e.g.*, Compl. ¶ 4, ECF No. 1. But they fail entirely to present plausible allegations of such a generalized practice. Even assuming some of the alleged events could be characterized as improper—a doubtful inference in the first place—Plaintiffs allege

isolated examples of rogue behavior, rather than a policy or practice of improper religious questioning, of Muslims or others. *See* Defs.' Br. 19.

Plaintiffs cannot contest that DHS's (and its component agencies') official policy proscribes not only religious discrimination, but any means of "profil[ing], target[ing], or discriminat[ing] against any individual for exercising his or her First Amendment rights."  McAleenan Memo. at 1; *see also* CBP Standards of Conduct § 7.11.1.[1]   That policy also directs that DHS personnel must neither "collect, maintain in DHS systems, or use information protected by the First Amendment," nor "pursue by questioning, research or other means, information about how an individual exercises his or her First Amendment rights" except in specific circumstances, such as where they are relevant to statutorily authorized law enforcement activity. *Id.* at 2.  Plaintiffs are thus incorrect that Defendants admit to having a policy of "subjecting travelers—regardless of their faith—to religious questioning" or retaining records reflecting First-Amendment-protected information. Pls.' Br. 6–7, ECF No. 44.  Quite the opposite.  Plaintiffs' mischaracterizations do not alter the fact that DHS policy explicitly *prohibits* such questioning and record retention, except in limited exceptions authorized by an individual, statute, or law enforcement activity.  *See* Defs.' Br. 5–6, 16 (citing McAleenan Memo.).  It almost goes without saying that an exception to a policy is not a policy itself.  Plaintiffs' claims therefore may not proceed solely on this theory.  *Contra* Pls.' Br. 7.

Plaintiffs' insistence that their claims do not depend on a policy of targeting Muslims betrays their concern that no such policy or practice exists.  As Defendants' brief explained, at most, Plaintiffs allege that two Plaintiffs who claim to be on

---

[1] Plaintiffs are wrong to assert that Defendants' written policies actually *permit* religious discrimination, and that the directive that "DHS does not profile, target, or discriminate against any individual for exercising his or her First Amendment rights" somehow, covertly, allows DHS personnel to do just that.  *See* Pls.' Br. 10–11.

government watchlists were each asked questions related to religion a handful of times upon entry into the United States over the course of six years, and that another Plaintiff was asked questions related to an item CBP officers found during secondary inspection a single time.[2]  *See* Defs.' Br. 17–19.  Many of these alleged questions relate to a Plaintiff's purpose for international travel, *see* Compl. ¶¶ 33–35, or what a Plaintiff did while abroad, *see id.* ¶ 54.  Moreover, one of Plaintiffs is an imam; questions about his occupation would sensibly implicate religion.  *See id.* ¶ 31.

These allegations suggest questioning that occurred in specific circumstances consistent with Defendants' policies, and consistent with law.  *See* Defs.' Br. 18 (citing McAleenan Memo. at 3).  Indeed, DHS policy recognizes that First-Amendment-protected information is properly gathered where "the information is pertinent to and within the scope of an authorized civil, criminal, or administrative law enforcement activity," including questions "relating to an individual's occupation, purpose for international travel, or any merchandise the individual seeks to bring across the border," in order "to validate information supplied by an individual or determine whether potential . . . violations exist," or "relating to information regarding an individual indicating a potential violation of a law DHS enforces or administers, or a threat to border security, national security, officer safety, or public safety." *Id.* (quoting McAleenan Memo. at 3).

Plaintiffs' insistence that the number of alleged questions here is sufficient to state a policy or practice does not rescue their claims.  *See* Pls.' Br. 8–9.  While the

---

[2] In an attempt to expand the reach of these allegations, Plaintiffs belatedly point to sometimes decades-old complaints that are being adjudicated elsewhere.  *See* Pls.' Br. 8.  But these stale third-party allegations cannot support Plaintiffs' prospective claim, related to a supposed policy that exists *today*.  *See* Defs.' Br. 17 n.8.  Nor are allegations about a questionnaire used by ICE in the past relevant where the complaint does not allege it was used here.  *Contra* Pls.' Br. 11.

Plaintiffs' allegations being sporadic and disconnected is sufficient to doom the claims, *see Oyenik v. Corizon Health, Inc.*, 696 F. App'x 792, 794 (9th Cir. 2017) (observing in the § 1983 context that "[l]iability for improper custom may not be predicated on isolated or sporadic incidents" (quoting *Trevino v. Gates*, 99 F.3d 911, 918 (9th Cir. 1996))), Defendants should prevail for a different reason.  Plaintiffs' allegations show questions logically related to eliciting information relevant to CBP's border security mission, and *not* to a purported practice of indiscriminately targeting Muslims (or others) for religious questioning.  That distinction renders Plaintiffs' cited cases inapposite.  *See, e.g.*, *Melendres v. Arpaio*, 695 F.3d 990, 998–99 (9th Cir. 2012) (finding policy or practice where defendants admitted that they believed, incorrectly, that they could detain individuals based upon suspicion of "mere unlawful presence in the country").  And even if Plaintiffs had plausibly alleged one or more of these isolated instances was inconsistent with DHS policy, such allegation would speak, at most, to potential individual policy violations.

**B.    Plaintiffs Fail to State a Claim Under the Constitution or RFRA.**

    **1.    Plaintiffs do not plausibly allege an Establishment Clause violation.**

Plaintiffs' opposition brief proves that their Establishment Clause claim should be dismissed.  They make no attempt to refute Defendants' arguments demonstrating that the complaint fails to state a claim.  The Supreme Court's most recent gloss on the Establishment Clause, issued subsequent to Defendants' motion, does not alter this conclusion.  Instead of providing a response, Plaintiffs urge the Court to apply alternative tests that are plainly inapposite.  And they fail to point to a single analogous case holding that specific questioning of a few individuals about religion, in a law enforcement context, plausibly demonstrates an Establishment Clause violation.  Thus, consistent with the only other court to have considered such a claim in a similar context, the Court should dismiss this count. *See Cherri v. Mueller*, 951 F. Supp. 2d 918, 935–36 (E.D. Mich. 2013).

After Defendants' opening brief, the Supreme Court held that the *Lemon v. Kurtzman*, 403 U.S. 602 (1971), cited by Defendants, should be replaced. *See Kennedy v. Bremerton Sch. Dist.*, 142 S. Ct. 2407, 2427 (2022). But Plaintiffs' Establishment Clause claim warrants dismissal under the analysis advanced in *Kennedy*, just as it did under *Lemon*. And for the purposes of adjudicating this motion, the Ninth Circuit case law that Defendants relied upon remains the best analogue to the alleged facts here, and the best available guide as to how the Ninth Circuit will interpret Establishment Clause claims post-*Kennedy*.

Given that this Circuit has not yet construed *Kennedy*, it is helpful to return to first principles. The Establishment Clause provides that "Congress shall make no law respecting an establishment of religion." U.S. Const. amend. I. *Kennedy* instructs that "the Establishment Clause must be interpreted by 'reference to historical practices and understandings.'" 142 S. Ct. at 2427 (quoting *Town of Greece v. Galloway*, 572 U.S. 565, 576 (2014)). Looking to "original meaning and history," *id.*, there can be no doubt that specific, targeted, individualized inquiries by law enforcement that touch upon religion were not part of what the framers had in mind when proscribing "law[s] respecting an establishment of religion." To the government's knowledge, the Establishment Clause has never been interpreted in this manner.

Indeed, Plaintiffs' inability to cite to any case so holding is telling, as is the fact that few cases involving Establishment Clause challenges to governmental investigations of individuals exist. In the closest analogue in this Circuit, *Vernon v. Davis*, 27 F.3d 1385 (9th Cir. 1994), the Ninth Circuit held that a city investigation into whether a police officer's religious views improperly impacted his performance did not violate the Establishment Clause. *See id.* at 1396–1401. Although *Vernon* relied upon *Lemon*, its outcome is nonetheless relevant, as it speaks to the fact that there is no established history of finding Establishment Clause violations where a

limited governmental investigation leads to inquiries about religion.  *See also Scott v. Rosenberg*, 702 F.2d 1263, 1276 (9th Cir. 1983) (investigation requiring disclosure of a pastor's personal donations, which his religion compelled him to keep secret, did not violate the Establishment Clause).

Plaintiffs attempt to skirt the issue by asserting that the Court must apply strict scrutiny under *Larson v. Valente*, 456 U.S. 228 (1982).  Not so.  *Larson* does not provide the correct standard here.  That case articulates a seldom-used test that provides for application of strict scrutiny to statutes that "facially discriminate[] amongst religions." *Skylar v. C.I.R.*, 282 F.3d 610, 618–19 (9th Cir. 2002); *see also Skylar v. C.I.R.*, 549 F.3d 1252, 1256 n.3 (9th Cir. 2008); *accord Awad v. Ziriax*, 670 F.3d 1111, 1127 (10th Cir. 2012) ("*Larson*'s rare use likely reflects that legislatures seldom pass laws that make 'explicit and deliberate distinctions between different religious organizations'" (citation omitted)).

The Ninth Circuit has refused to apply strict scrutiny under *Larson* to statutes that were "not facially discriminatory."  *See Droz v. C.I.R.*, 48 F.3d 1120, 1124 (9th Cir. 1995).  Plaintiffs point to no case in which *Larson* applied *not* involving a written, facially discriminatory governmental policy.[3]  And the complaint alleges no such policy.  Instead, DHS has a facially neutral written policy that prohibits all questioning about First-Amendment-protected activities except in specific contexts. *See* Defs.' Br. 5–7.  What is more, only one of Plaintiffs' cited cases so much as mentions the Establishment Clause in a similar context, and it *dismisses* a claim analogous to the one brought here.  *See Cherri*, 951 F. Supp. 2d at 935–36.  Plaintiffs

---

[3] *Rouser v. White*, 630 F. Supp. 2d 1165 (C.D. Cal. 2009), similarly involved a written prison policy demonstrating "facial denominational preference." *Id.* at 1196.

are thus incorrect that *Larson* governs, or requires the application of strict scrutiny.[4]

Plaintiffs' alternative argument—that asking individuals questions about their own religious beliefs or practices amounts to religious "coercion"—fails at the outset.   The coercion test, which Plaintiffs neglect to explain, provides that "government may not coerce anyone to support or participate in religion."  *Lee v. Weisman*, 505 U.S. 577, 587 (1992).  Cases finding religious coercion involve a governmental entity forcing religion upon unwilling participants in some manner. *See, e.g.*, *id.* at 598–99 (prayer at public middle school graduation); *Inouye v. Kemna*, 504 F.3d 705, 713–14 (9th Cir. 2007) ("religion-based drug treatment program"). The allegations here cannot possibly be read as showing that Plaintiffs were "coerce[d]" into "support[ing] or participat[ing] in religion."  *See Lee*, 505 U.S. at 587.  Instead, Plaintiffs appear to be arguing that because they were, in their view, "coerced" into answering questions about their religious beliefs and practices, the Establishment Clause was somehow violated.[5]  But that is not the test.  And once again, Plaintiffs cite no case that might support their flawed reasoning.

## 2.   Plaintiffs do not plausibly allege a violation of their free exercise rights under the First Amendment or RFRA.

Plaintiffs also fail to state a claim for violation of their free exercise rights. As Defendants have shown, Plaintiffs have not adequately alleged that any governmental action imposed a "substantial burden" on their exercise of religion. Such showing is required to state a claim under RFRA, *see* 42 U.S.C. § 2000bb-

---

[4] Even if strict scrutiny were applied, dismissal would still be appropriate for the reasons explained in Defendants' opening brief, Defs.' Br. 27–28, 29–30, and *infra*.

[5] As Plaintiffs implicitly recognize by not advancing a Fifth Amendment claim for coercive interrogation, the facts alleged here would in no way support it.  Plaintiffs' appropriation of the language of this doctrine cannot mask defects in their pleadings.

1(a), or under the Free Exercise Clause where, as here, government conduct does not involve a law or regulation, *see Cal. Parents for the Equalization of Educ. Materials v. Torlakson*, 973 F.3d 1010, 1019 (9th Cir. 2020). At most, the allegations show that Plaintiffs chose to alter their religious practices in limited situations, absent governmental coercion or incentivization. Plaintiffs are also incorrect insofar as they suggest that the Court should eschew controlling Ninth Circuit case law requiring a showing of a substantial burden. And even if the alleged border inspections somehow imposed a substantial burden—which they did not— they were narrowly tailored to further a compelling governmental interest.

Plaintiffs do not dispute that, in the RFRA context, demonstrating a substantial burden on the exercise of religion requires a showing that "individuals are forced to choose between following the tenets of their religion and receiving a governmental benefit," or are "coerced to act contrary to their religious beliefs by the threat of civil or criminal sanctions." Defs.' Br. 25 (quoting *Navajo Nation v. U.S. Forest Serv.*, 535 F.3d 1058, 1069–70 (9th Cir. 2008) (en banc)); *see also Apache Stronghold v. United States*, --- F.4th ----, 2022 WL 2284927, at *9 (9th Cir. June 24, 2022) (reaffirming that, under RFRA, "the government imposes a substantial burden on religion in two—and only two—circumstances").[6] In contrast, an individual's decision to alter his religious practices without being required or pressured to do so by the government does not constitute a substantial burden. *See Vernon*, 27 F.3d at 1395; *Dousa v. DHS*, 2020 WL 434314, at *7–8

---

[6] The Ninth Circuit recently confirmed that it has "interpreted RFRA and [the Religious Land Use and Institutionalized Persons Act (RLUIPA)] to apply different substantial burden standards." *Apache Stronghold*, 2022 WL 2284927, at *14. The other cases Plaintiffs urge the Court to look to here, both of which utilize RLUIPA standards, are thus inapplicable. *See* Pls.' Br. 21 (citing *Jones v. Slade*, 23 F.4th 1124 (9th Cir. 2022) and *Naoko Ohno v. Yuko Yasuma*, 723 F.3d 894 (9th Cir. 2013)).

(S.D. Cal. Jan. 28, 2020).

Plaintiffs first appear to assert that the act of answering questions about their religious beliefs, practices, and associations alone constitutes a substantial burden on their religious exercise.  *See* Pls.' Br. 20–22.  But even assuming *arguendo* that Plaintiffs were compelled to do so, Plaintiffs have not alleged that responding to questions is "contrary to their religious beliefs," as required to demonstrate a substantial burden.  *See Navajo Nation*, 535 F.3d at 1070.  Absent such allegations, that action alone could not substantially burden Plaintiffs' religious exercise under controlling case law—regardless of whether the answers were compelled.

As their only support, Plaintiffs rely on an out-of-circuit case in which a district court stated that "[t]he very process of inquiry" into religious beliefs might "impose a substantial burden."  *See El Ali v. Barr*, 473 F. Supp. 3d 479, 526 (D. Md. 2020) (quoting *NLRB v. Catholic Bishop of Chicago*, 440 U.S. 490, 502 (1979)).  This case conflicts with another decision involving similar allegations, in which a district court dismissed plaintiffs' free exercise claims, finding that their allegations "suggest[ed] a burden on their ability to cross the border quickly, not their ability to practice Islam."  *Cherri*, 951 F. Supp. 2d at 935.  And *El Ali* is not persuasive, as that court provided scant explanation for its statement, and the Supreme Court case from which it quotes is readily distinguishable.[7]  In any event, in this Circuit, answering religious questions alone does not pose a substantial burden without allegations that it also violates Plaintiffs' beliefs.

_____

[7] *Catholic Bishop* considered whether the NLRB could exercise jurisdiction over religious schools, which might require investigations into areas like "the good faith of the position asserted by the clergy-administrators and its relationship to the school's religious mission."  *See* 440 U.S. at 502.  The Supreme Court there posited that "the very process of inquiry" might "impinge on rights guaranteed by the Religion Clauses."  *Id.*  But that context-specific supposition cannot stand for the broader proposition that *any* questioning about religion creates a substantial burden.

Plaintiffs next argue that their religious expression is substantially burdened by their alleged alteration of certain religious practices during return travel to the United States. Pls.' Br. 22–24. But as the Ninth Circuit recently reiterated, even acts that "interfere significantly with private persons' ability to pursue spiritual fulfillment" do not constitute a free exercise violation "if the affected individuals were not being 'coerced by the Government's actions into violating their religious beliefs.'" *Apache Stronghold*, 2022 WL 2284927, at *17 (quoting *Trinity Lutheran Church of Columbia, Inc. v. Comer*, 137 S. Ct. 2012, 2020 (2017)). Under analogous circumstances in *Fazaga v. FBI*, 965 F.3d 1015 (9th Cir. 2020), *reversed on other grounds*, 142 S. Ct. 1051 (2022), the Ninth Circuit observed that, although the plaintiffs alleged that they "altered their religious practices as a result of the FBI's surveillance" of a mosque, its precedent "cast doubt upon" whether such alleged action "constitutes a substantial burden upon religious practice" and that "[t]here is no pertinent case law indicating otherwise." *See id.* at 1061–62.[8]

Here, Plaintiffs do not allege any direct governmental coercion or incentivization requiring them to forego or modify their religious practices when returning from international travel. *See* Defs.' Br. 26–27. And except in one discrete instance, they do not allege that any of the practices Plaintiffs allegedly refrain from when returning from abroad previously resulted in any questioning

---

[8] It is *Plaintiffs* who omit critical facts about *Fazaga*. *Contra* Pls.' Br. 21, n.10. *Fazaga* affirmed dismissal of a RFRA claim against individual-capacity defendants. As to the RFRA claim against the government, *Fazaga* noted that the government "made no arguments" in support of dismissal "other than the state secrets privilege," which that court held was displaced by statutory law. 965 F.3d at 1062. As a result, *Fazaga* simply found that the complaint had stated a RFRA claim, subject to all defenses. *Id.* at 1062 & n.45. The Ninth Circuit did not decide any issue analogous to that presented here. Moreover, due to the Supreme Court's reversal of the state secrets privilege holding, the case remains on appeal.

11

about religion.  The complaint's allegations show questions motivated, for example, by the purpose of a Plaintiff's travel, or what he did abroad.  *See supra* p. 4.

Instead, like the plaintiffs in *Vernon* and *Dousa*, Plaintiffs claim that they chose to forego certain religious practices in specific circumstances due to their concerns about the hypothetical consequences of the government observing those actions.  *See* Defs.' Br. 26–27.  Plaintiffs attempt to distinguish those cases by characterizing their actions as a "reasonable response" to having been asked questions about their religion on discrete occasions upon reentry into the United States over the years.  Pls.' Br. 24.  But the plaintiffs in *Vernon* and *Dousa* doubtless considered their responses reasonable, as well.  *See Vernon*, 27 F.3d at 1395 (plaintiff testified that the government's actions "implied" he should no longer engage in certain religious acts); *Dousa*, 2020 WL 434314, at *8 (plaintiff alleged refraining from certain religious practices out of "fear[] that [they] might be monitored").  Regardless of Plaintiffs' view about the logic of their response, it does not follow that that response was *coerced* by the government, as required to show a substantial burden.  And because they do not broadly assert that religious questioning stemmed directly from these acts, they allege no "present objective harm" or "threat of specific future harm" that would befall them if they resume.  *See Dousa*, 2020 WL 434314, at *8 (quoting *Vernon*, 27 F.3d at 1395).  Instead, the allegations suggest they are free to do so without any change in their treatment by the government.

Plaintiffs also argue that their Free Exercise Clause claim survives even without a showing of substantial burden, asserting the Supreme Court has not applied this standard in recent years.  Pls.' Br. 24–26.  That conclusion would be inconsistent with the Ninth Circuit's practice of "continu[ing] to apply the *Sherbert* substantial burden test to government conduct that did not involve an actual regulation or criminal law," *Am. Fam. Ass'n, Inc. v. City and Cnty. of San*

*Francisco*, 277 F.3d 1114, 1124 (9th Cir. 2002), which that court reaffirmed less than two years ago, *see Cal. Parents*, 973 F.3d at 1019.  Indeed, *California Parents* rejected virtually the same argument Plaintiffs make here.  973 F.3d at 1019–20. Even more recently, the Ninth Circuit rejected a similar argument in the RFRA context, holding that recent Supreme Court decisions did not alter the meaning of "substantial burden" in this Circuit.  *See Apache Stronghold*, 2022 WL 2284927, at *15–17.  The same conclusion is warranted here.[9]  Thus, because Plaintiffs have not adequately pleaded a substantial burden, their claims require dismissal.

But even if Plaintiffs had demonstrated the requisite burden—which they have not—the alleged questioning is the least restrictive means of advancing a compelling government interest.  Surprisingly, Plaintiffs dispute that the government has a compelling interest in policing its borders and investigating and preventing potential acts of terrorism, notwithstanding the numerous controlling cases to the contrary. *See* Defs' Br. 27–28 (collecting cases).  In so arguing, they rely on cases analyzing the state's interest in "the effect of video games on minors," Pls.' Br. 15 (quoting *Video Software Dealers Ass'n v. Schwarzenegger*, 556 F.3d 950, 961–64 (9th Cir. 2009)), and in prison inmates' beard length, *see id.* (citing *Holt v. Hobbs*, 574 U.S. 352 (2015)).  But the border presents a different set of considerations.  *See, e.g.*, *United States v. Flores-Montano*, 541 U.S. 149, 153 (2004).  Although the government must do more that recite a "general interest" in "safety" or similar high-level concerns, *see Gonzales v. O Centro Espirita Beneficente Uniao do Vegetal*,

---

[9] To the extent Plaintiffs argue that this case is different because it purportedly involves the types of "expressions of hostility" present in *Masterpiece Cakeshop, Ltd. v. Colo. C.R. Comm'n*, 138 S. Ct. 1719 (2018), *see* Pls.' Br. 26, that is clearly wrong.  That case involved overt hostility towards religion, like characterizing "a man's faith as 'one of the most despicable pieces of rhetoric that people can use.'" *See id.* at 1729.  Plaintiffs' allegations are in no way comparable.

546 U.S. 418, 438 (2006), it cannot be seriously disputed that the government has a compelling interest in ensuring that individuals who, by their own allegations, are on terrorist watchlists, or persons whose behavior arouses suspicion during a border examination, are properly scrutinized before entering the United States.[10]

Nor are Plaintiffs correct that the questions alleged here were not narrowly tailored. The complaint alleges that two individuals on terrorist watchlists, and another who alleges his inspection was labeled "Terrorist Related," were asked questions, including about their activities while abroad or effects they sought to bring into the country. *See* Defs' Br. 27–28. The questions Plaintiffs report being asked under those circumstances are targeted and individualized. *See id.* Such inquiries constitute the least restrictive means of testing the veracity of individuals seeking to enter this country, and of investigating potential threats to national security at the U.S. border. *Accord Tabbaa v. Chertoff*, 509 F.3d 89, 105–06 (2d Cir. 2007).

### 3. Plaintiffs do not plausibly allege a violation of the First Amendment right to freedom of association.

Plaintiffs also fail to state a claim for violation of the First Amendment right to freedom of association. No First Amendment violation results from discrete and limited questioning of individuals by law enforcement, resulting in no harm to their associations. Defs.' Br. 28–30. And even if Plaintiffs had pleaded a prima facie case, which they have not, the questions are narrowly tailored to fit "a sufficiently important governmental interest." *See Ams. for Prosperity Found. v. Bonta*, 141 S. Ct. 2373, 2383 (2021) (quoting *Doe v. Reed*, 561 U.S. 186, 196 (2010)).

Recall what is being alleged here. Plaintiffs aver that two individuals who,

---

[10] *Askins v. U.S. Dep't of Homeland Sec.*, 899 F.3d 1035 (9th Cir. 2018), is not to the contrary. There, the Ninth Circuit recognized that, "without question, protecting our territorial integrity is a compelling interest." *Id.* at 1045. And the legal issues and the facts in *Askins* are distinguishable from those presented here.

taking their own allegations to be true, are on government watchlists, Compl. ¶¶ 58, 94, were asked on a handful of occasions by law enforcement officers at the U.S. border questions like which mosque they attend, *id.* ¶ 35, or whether they met with specific individuals while abroad, *id.* ¶ 54.   Plaintiffs allege that a third individual was asked follow-up questions about his religious associations on one occasion, in response to the routine search of an item he carried with him across the U.S. border.  *Id.* ¶¶ 113–18, 128.  The questions here logically fit within the scope of what DHS might ask within the bounds of its statutory mandate.  *See supra* p. 4. The questioning alleged here is thus analogous to the types of targeted law enforcement inquiries into First-Amendment protected activities that the Ninth Circuit has upheld on numerous occasions.  *See* Defs.' Br. 28–30.

Plaintiffs' attempt to distinguish these cases because there is no "criminal investigation" here fails.  *See* Pls.' Br. 28–29.  At the outset, "securing the border" is "of course, law enforcement activit[y]."  *City of Indianapolis v. Edmond*, 531 U.S. 32, 42 (2000).  It is well established that the government does not need to suspect criminal conduct in order to question persons seeking to enter the United States.  *See* Defs.' Br. 14–15.  And contrary to their assertion, Plaintiffs are seeking the exact kind of "prohibition" on the ability of law enforcement officers to conduct investigations that the Ninth Circuit has disavowed.  Pls.' Br. 28.  Were Plaintiffs' requested relief granted, the government would be prohibited from asking Plaintiffs *anything* about their "religious associations during future border inspections"—even if one were to associate with a known terrorist group that purports to be associated with Islam.  *See* Compl. at 35.  That cannot be what the First Amendment requires.

 Plaintiffs' cited authority is entirely distinguishable.  None finds a First Amendment violation in the context of discrete law enforcement questioning of individuals about their specific associations.  Instead, Plaintiffs' cases involve much more extensive disclosures, such as the membership rosters of a dissident political

group or those who worked on publications associated with it, *see Bursey v. United States*, 466 F.2d 1059, 1081 (9th Cir. 1972); large-scale disclosure of each organization to which every teacher in a state belonged, *see Shelton v. Tucker*, 364 U.S. 479, 487–88 (1960); or an extensive investigation by a government employer into an individual's "political beliefs and activities," which included interviews with neighbors, former teachers, and former co-workers, *see Clark v. Library of Congress*, 750 F.2d 89, 91 (D.C. Cir. 1984). The Supreme Court has specifically differentiated these scenarios from more limited disclosures. *See Shelton*, 364 U.S. at 487–88; *see also Ams. for Prosperity Found.*, 141 S. Ct. at 2386–87 (acknowledging targeted requests for information may be appropriate as part of an investigation).

Plaintiffs also fail to allege any actual threat to their associational activities. Although *Americans for Prosperity Foundation* stated in the abstract that exacting scrutiny was triggered by "the *possible* deterrent effect of disclosure," that effect was, for some, exacerbated by "bomb threats, protests, stalking, and physical violence." 141 S. Ct. at 2388. Plaintiffs here allege no consequences that would impede their right to associate freely. They do not allege that they have, or would, cease any associational activities. The complaint does not point to a chilling effect.

Plaintiffs now claim that the government asking questions, and recording answers, about their associations itself chills their right to associate freely, Pls.' Br. 28, but do not acknowledge that another court within this District rejected similar arguments in the standing context, *see Phillips v. United States*, 2021 WL 2587961, at *10 (C.D. Cal. June 22, 2021) (rejecting claim that "retention [of records] alone . . . produces a chilling effect"). Nor do Plaintiffs' cited cases support their argument. *MacPherson v. IRS*, 803 F.2d 479 (9th Cir. 1986), a Privacy Act case, recognized that "legitimate investigation and surveillance" "inevitably involves observation and recording" of individuals, including "people [] exercising their First Amendment rights." *Id.* at 484–85. *Guan v. Mayorkas*, 530 F. Supp. 3d 237 (E.D.N.Y. 2021),

held that the plaintiffs "failed to sufficiently plead the actual chilling of their First Amendment rights," *id.* at 258, but found standing based on non-speech-related injuries, including alleged retention of records.  The *Phillips* court disagreed and criticized that conclusion as "unexplained."  *See* 2021 WL 258796, at *9.[11]

Finally, even if the Court were to find that Plaintiffs had stated a claim, there is a substantial relationship between the government's compelling interest in protecting the U.S. border and preventing terrorism and the questions alleged here. *See* Defs.' Br. 27–28, 29–30; *supra* pp. 13–14.

### 4.    Plaintiff Shah does not plausibly allege retaliation in violation of his First Amendment rights.

Only Plaintiff Shah brings a retaliation claim.  That, too, fails.  He has not shown that the government took an adverse action against him, or that any action was in retaliation for engaging in First-Amendment-protected activity.

To state a claim for retaliation, a plaintiff must plausibly allege an "adverse action" sufficiently harsh to "chill a person of ordinary firmness from continuing to engage in [] protected activity."  *Blair v. Bethel Sch. Dist.*, 608 F.3d 540, 543 (9th Cir. 2010).  But secondary inspection is not an "adverse action."  It is part of the ordinary operation of U.S. border security that countless travelers experience each day.  *See* Defs.' Br. 31–32.  Shah asserts, without elaboration, that "the duration and scope" of his secondary inspection somehow make them different.[12]  Pls.' Br. 30.

---

[11] Plaintiffs' arguments about the border-search exception are misplaced.  *See* Pls.' Br. 29.  They allege no Fourth Amendment violation here, nor could they.  And any assertion that all searches at the border require suspicion of contraband is plainly incorrect.  *See United States v. Cano*, 934 F.3d 1002, 1019 (9th Cir. 2019) (routine border searches "can be conducted without any suspicion whatsoever").

[12] Shah also claims that the alleged "computerized scanning" of his hard copy journal is equivalent to a forensic search.  Pls.' Br. 30.  Not so.  The treatment of forensic

But both the scope—manual searches of Shah's personal belongings and follow-up questions related to those searches—and duration—two hours—of the search were entirely consistent with border searches courts have approved in the past.  *See* Defs.' Br. 30–31.  Nor does Shah's subjective assertion that *he* would hypothetically refrain from certain activities were he to travel abroad again prove the objective standard.

Shah's argument that CBP officers "prolong[ed] the duration of his inspection" and "intensifi[ed] the searches and questioning" as retaliation fares no better.  Pls.' Br. 31.  Shah concedes that the initial act of routing him to secondary inspection was not retaliatory.  *See id.* at 30–31.  But he claims that follow-up questions related to what CBP officers read in his journal were.  *See id.*  Objectively speaking, however, the alleged questioning can only be viewed as responsive to officers' searches and to Shah's objectively evasive behavior, which began as soon as officers asked to look at the journal, and culminated in his asking to return to Europe to avoid a search of his electronic devices.  *See* Compl. ¶¶ 113, 116, 120–23, 134; *see Nieves v. Bartlett*, 139 S. Ct. 1715, 1723–24 (2019) (recognizing, in the context of an arrest, that "protected speech is often a 'wholly legitimate consideration' for officers").

Plaintiffs point to no case in which an investigation that was concededly legitimate at the outset somehow became retaliatory simply because law enforcement officers pursued a course of inquiry in response to new information.  Instead, the facts here bear little resemblance to the kinds of cases in which a plaintiff typically alleges First-Amendment retaliation, such as "a government worker who loses his job as a result of some public communication critical of the government," "a regulated entity that is stripped of its business license after engaging in speech that

---

examination at the border is specific to unique characteristics of electronic devices. *See United States v. Cotterman*, 709 F.3d 952, 965 (9th Cir. 2013) (en banc).  In any event, Shah has not advanced, and could not state, a Fourth Amendment claim.

displeases the regulator," or "a prisoner who is retaliated against by prison officials for filing grievances."  *See Blair*, 608 F.3d at 544 (collecting cases).

Lastly, Shah advances no allegation that the official-capacity Defendants here—DHS, CBP, ICE, and HSI—retaliated against him.  The complaint alleges only that "[t]wo CBP and one HSI officers" committed these purportedly retaliatory actions, and they are not named defendants.  *See* Compl. ¶ 172; *see also id.* ¶¶ 174–75.  Shah's retaliation claim against the agency Defendants therefore cannot stand.  *See Martinez v. City of Santa Rosa*, 499 F. Supp. 3d 748, 751 (N.D. Cal. 2020); *see also Urenia v. Public Storage*, 2015 WL 4885998, at *4 (C.D. Cal. Aug. 14, 2015).

**5.   Plaintiffs do not plausibly allege an Equal Protection violation.**

As Defendants demonstrated in their opening brief, Plaintiffs' equal protection claim is largely co-extensive with Plaintiffs' First Amendment claims, and should be dismissed for similar reasons.  Defs.' Br. 33–35.  Plaintiffs' arguments fail.

*First*, the allegations here do not support a claim of express discrimination, which requires courts to apply strict scrutiny to "all racial classifications imposed by the government."  *See Mitchell v. Washington*, 818 F.3d 436, 444 (9th Cir. 2016).  The Ninth Circuit has applied this standard where a distinction was overt, such as where a medical treatment was denied because of a person's race, *see id.* at 445, or race was used to determine which inmates could work their assigned jobs during lockdowns, *see Walker v. Gomez*, 370 F.3d 969, 974 (9th Cir. 2004).  Despite conclusory claims to the contrary, Plaintiffs identify no such plain distinction here.  Defendants' policies would specifically prohibit such action.  *See* Defs.' Br. 5–7.  And Plaintiffs admit they do not allege a policy that applies to all Muslims.  *See* Pls.' Br. 34.  Absent an explicit distinction, Plaintiffs cannot show express discrimination.

*Second*, Plaintiffs have not plausibly alleged that Defendants acted with discriminatory purpose.  Taking into account the totality of the circumstances here, the complaint cannot reasonably be read to show that discrimination "more likely

that not" motivated the questions Plaintiffs were allegedly asked.  *See Ave. 6E Investments, LLC v. City of Yuma*, 818 F.3d 493, 504 (9th Cir. 2016).  As explained, many of these questions relate to areas at the core of CBP's border security mission, such as purpose for travel, activities while abroad, and the results of routine searches. *See supra* p. 4.  Plaintiffs' assertions, *see* Pls.' Br. 33, cannot alter that objective facts show non-discriminatory reasons underlying Defendants' questions.

*Third*, even if not required in all circumstances, Plaintiffs have not shown a similarly situated group that was treated more favorably.  *See Ariz. Dream Act Coal. v. Brewer*, 855 F.3d 957, 966 (9th Cir. 2017).  Plaintiffs point to no more than conclusory allegations and stereotyping suppositions about what questions CBP officers might ask Christian travelers.[13]  But Plaintiffs concede that CBP officers do not ask all Muslim travelers the same kinds of questions they are allegedly asked. Thus, the element distinguishing Plaintiffs from other groups purportedly not asked similar questions cannot be their religion, but must be some other factor.  *See Furnace v. Sullivan*, 705 F.3d 1021, 1030–31 (9th Cir. 2013) (dismissing equal protection claim where plaintiff's treatment was explained by something besides religion).  Differing treatment not based on a protected characteristic is subject only to rational basis review, and would easily pass muster.  *See* Defs.' Br. 34–35.

*Finally*, even if strict scrutiny were to apply here, the allegations demonstrate actions narrowly tailored to meet compelling governmental interests.  *See* Defs.' Br. 27–28, 29–30; *supra* pp. 13–14.

## CONCLUSION

The complaint should be dismissed in its entirety.

---

[13] Plaintiffs do not acknowledge that Christians have also filed complaints—unsuccessfully—against DHS claiming violation of their free exercise rights based on alleged border stops and surveillance.  *See Dousa*, 2020 WL 434314, at *6–9.

Dated: July 14, 2022

Respectfully submitted,

BRIAN M. BOYNTON
Principal Deputy Assistant Attorney General
Civil Division

BRIGHAM J. BOWEN
Assistant Branch Director
Federal Programs Branch, Civil Division

 */s/ Leslie Cooper Vigen*
LESLIE COOPER VIGEN
Trial Attorney (D.C. Bar No. 1019782)
Civil Division, Federal Programs Branch
United States Department of Justice
1100 L Street, NW, Washington, D.C. 20005
Telephone: (202) 305-0727
Email:  leslie.vigen@usdoj.gov

*Counsel for Defendants*