1
2
3
4
5
6
7
8                    **UNITED STATES DISTRICT COURT**

9                    **CENTRAL DISTRICT OF CALIFORNIA**

10

11   ABDIRAHMAN ADEN KARIYE, et            Case No.: CV 22-01916-FWS-GJS
     al.,
12                                         **ORDER GRANTING DEFENDANTS'**
                                           **MOTION TO DISMISS PLAINTIFFS'**
13                        Plaintiffs,      **COMPLAINT [40]**

14        v.

15   ALEJANDRO MAYORKAS, et al.,

16

17                        Defendants.

18
19
20
21
22
23
24
25
26
27
28

1   Before the court is Defendants Alejandro Mayorkas, Secretary of

2   the Department of Homeland Security, in his official capacity; Chris Magnus,

3   Commissioner of U.S. Customs and Border Protection, in his official capacity;

4   Tae D. Johnson, Acting Director of U.S. Immigration and Customs Enforcement, in

5   his official capacity; and Steve K. Francis', Acting Executive Associate Director,

6   Homeland Security Investigations, in his official capacity (collectively, "Defendants")

7   Motion to Dismiss ("Motion" or "Mot.") Plaintiffs Abdirahman Aden Kariye,

8   Mohamad Mouslli, and Hameem Shah's (collectively, "Plaintiffs") Complaint.  (Dkt.

9   40.)  Plaintiffs' Complaint ("Compl.") seeks injunctive relief, declaratory relief, and

10   attorneys' fees and costs for violations of the First Amendment, Fifth Amendment,

11   and the Religious Freedom Restoration Act ("RFRA"), 42 U.S.C. §§ 2000bb *et seq*.

12   (Dkt. 1.)

13   The court held a hearing on the Motion on July 28, 2022.  (Dkt. 49.)  Present at

14   the hearing were Plaintiffs' counsel and Defendants' counsel.  (*Id*.)  At the conclusion

15   of the hearing on the Motion, the court took the matter under submission.  (*Id*.)  Based

16   on the state of the record, as applied to the applicable law, the court **GRANTS** the

17   Motion.

18   **I.    Background**

19      **A.      Summary of Complaint Allegations**

20   Plaintiff Abdirahman Aden Kariye is a U.S. citizen who lives in Bloomington,

21   Minnesota.  (Compl. ¶ 8.)  Plaintiff Kariye is Muslim and serves as an imam at a local

22   mosque.  (*Id*.)  Plaintiff Mohamad Mouslli is a U.S. citizen who lives in Gilbert,

23   Arizona.  (*Id*. ¶ 9.)  Plaintiff Mouslli is Muslim and works in commercial real estate.

24   (*Id*.)  Plaintiff Hameem Shah is a U.S. citizen who lives in Plano, Texas.  (*Id*. ¶ 10.)

25   Plaintiff Shah is Muslim and works in financial services.  (*Id*.)

26   Defendants are the heads of the U.S. Department of Homeland Security

27   ("DHS") and its agencies: U.S. Customs and Border Protection ("CBP") and U.S.

28   Immigration and Customs Enforcement ("ICE"), of which Homeland Security

Investigations ("HSI") is a subcomponent.  (*Id.* ¶ 11.)  Defendant Alejandro Mayorkas is the Secretary of DHS and has authority over all DHS policies and practices, including those challenged in this lawsuit.  (*Id.* ¶ 12.)  Plaintiffs name Defendant Mayorkas in his official capacity.  (*Id.*)  Defendant Chris Magnus is the Commissioner of CBP and has authority over all CBP policies and practices, including those challenged in this lawsuit.  (*Id.* ¶ 13.)  Plaintiffs name Defendant Magnus in his official capacity.  (*Id.*)  Defendant Tae Johnson is Acting Director of ICE and has authority over all ICE policies and practices, including those challenged in this lawsuit.  (*Id.* ¶ 14.)  Plaintiffs name Defendant Johnson in his official capacity.  (*Id.*)  Defendant Steve K. Francis is the Acting Executive Associate Director of HSI and has authority over all HSI policies and practices, including those challenged in this lawsuit.  (*Id.* ¶ 15.)  Plaintiffs name Defendant Francis in his official capacity.  (*Id.*)

Plaintiffs allege at border crossings and international airports in the United States, Defendants' border officers frequently subject travelers who are Muslim, or whom they perceive to be Muslim, to questioning about their religion.  (*Id.* ¶ 16.)  In May 2011, after the American Civil Liberties Union ("ACLU") and other organizations submitted complaints to DHS describing border questioning of Muslim Americans about their religious beliefs and practices, the DHS Office for Civil Rights and Civil Liberties disclosed that it had opened an investigation into CBP questioning "of U.S. citizens and legal residents who are Muslim, or appear to be Muslim, about their religious and political beliefs, associations, and religious practices and charitable activities protected by the First Amendment and Federal law."  (*Id.* ¶ 17.)  In a letter to the ACLU dated May 3, 2011, the DHS Office for Civil Rights and Civil Liberties stated that it had received "a number of complaints like yours, alleging that U.S. Customs and Border Protection (CBP) officers have engaged in inappropriate questioning about religious affiliation and practices during border screening."  (*Id.*)

The DHS Office for Civil Rights and Civil Liberties issued a memorandum on May 3, 2011, to the CBP Commissioner stating that it had received the following:

> [N]umerous accounts from American citizens, legal permanent residents, and visitors who are Arab and/or Muslim, alleging that officials from U.S. Customs and Border Protection (CBP) repeatedly question them and other members of their communities about their religious practices or other First Amendment protected activities, in violation of their civil rights or civil liberties.

(*Id*. ¶ 18.)

The May 3, 2011, Memorandum included descriptions of border officers' questioning of Muslims about their religious beliefs and practices at various ports of entry across the United States. (*Id*. ¶ 19.) In July 2012, the DHS Office for Civil Rights and Civil Liberties informed the ACLU and other organizations that it had suspended its investigation because individuals had filed a lawsuit challenging the practice, and that litigation is still pending. (*Id*. ¶ 20.) Plaintiffs allege, on information and belief, the DHS Office for Civil Rights and Civil Liberties never resumed its investigation or issued findings about whether border questioning about religious beliefs and practices complies with federal law. (*Id*. ¶ 21.)

Plaintiffs allege Defendants' written policies permit border officers to question Americans about their religious beliefs, practices, and associations. (*Id*. ¶ 23.) ICE requires officers who work at ports of entry to carry a sample questionnaire to guide their interrogations of travelers, which includes questions about a traveler's religious beliefs, practices, and associations. (*Id*.) CBP has a policy that allows it to collect and maintain information about an individual's religious beliefs, practices, and associations in numerous circumstances. (*Id*.) On information and belief, CBP views the collection and retention of Plaintiffs' responses to the religious questioning described herein as authorized by its policy. (*Id*.) Defendants have a policy and/or

practice of intentionally targeting selected Muslims (or individuals perceived to be Muslim) for religious questioning.  (*Id*. ¶ 24.)

Plaintiffs allege that while Defendants' border officers routinely and intentionally single out Muslim Americans to demand answers to religious questions, travelers perceived as practicing faiths other than Islam are not routinely subjected to similarly intrusive questioning about their religious beliefs, practices, and associations.  (*Id*.)  The religious questioning of Muslims typically takes place in the context of "secondary inspection," a procedure by which CBP detains, questions, and searches certain travelers before they are permitted to enter the country.  (*Id*. ¶ 25.)

Plaintiffs allege the secondary inspection environment is coercive because of the following elements present during the inspection: (1) border officers carry weapons, typically identify themselves as border officers or wear government uniforms, and command travelers to enter and remain in the secondary inspection areas; (2) travelers are not free to leave those areas until officers give them permission; (3) secondary inspection areas are separated from the public areas of airports and ports of entry; (4) border officers typically take possession of travelers' passports, routinely conduct physical searches and/or searches of travelers' belongings, including their electronic devices, and use the nature of the secondary inspection environment to compel Muslim American travelers to answer questions about their religious beliefs, practices, and associations.  (*Id*. ¶ 26.)  Plaintiffs allege Muslim American travelers have no meaningful choice but to disclose their First Amendment-protected beliefs and activity in response to border officers' inquiries. (*Id*. ¶ 27.)

CBP officers are required to create a record of every secondary inspection at an airport or land crossing.  (*Id*. ¶ 28.)  CBP officers routinely document travelers' responses to questions asked during secondary inspections, including Muslim Americans' responses to questions about their religious beliefs, practices, and associations.  (*Id*.)  When HSI agents are involved in or otherwise present during

secondary inspection, they also routinely create and maintain records of the secondary inspection. (*Id.*) Border officers input the records of secondary inspections into DHS databases, including a DHS database called TECS, which functions as a repository for the sharing of information among tens of thousands of federal, state, local, tribal, and foreign law enforcement, counterterrorism, and border security agencies. (*Id.* ¶ 29.) TECS users include personnel from various federal agencies; TECS data is also accessible to officers from over 45,000 state and local police departments and retained for up to 75 years. (*Id.*) Plaintiffs allege being Muslim and practicing Islam are protected religious beliefs and activity, and these religious beliefs and practices do not indicate that an individual has or is engaged in any immigration or customs-related crime or that an individual has or is engaged in any other unlawful activity. (*Id.* ¶ 30.) Plaintiffs allege Muslim travelers' personal religious information is not germane to any legitimate purpose that Defendants may assert. (*Id.*)

**B. Religious Questioning of Plaintiffs by Defendants' Border Officers**

**a. Plaintiff Kariye**

Plaintiff Kariye is a U.S. citizen and an imam at a mosque in Bloomington, Minnesota who is a member of the local Muslim and interfaith communities, as well as a participant in civic life and charitable endeavors. (*Id.* ¶ 31.) CBP officers have questioned Plaintiff Kariye about his Muslim faith on at least five occasions. (*Id.* ¶ 32.) Plaintiffs allege on each occasion the environment was coercive: CBP officers wearing uniforms and carrying weapons commanded Plaintiff Kariye to enter and remain in an area separated from other travelers, usually a windowless room, took Plaintiff Kariye's belongings from him, searched his electronic devices, and questioned him at length. (*Id.*)

**i. First Religious Questioning Incident: September 12, 2017**

On September 12, 2017, Plaintiff Kariye arrived home to the United States from Saudi Arabia, where he had participated in the Hajj. (*Id.* ¶ 33.) In the Islamic faith, the Hajj is a sacred religious pilgrimage to Mecca, the holiest city for Muslims. (*Id.*)

Upon his arrival at the Seattle-Tacoma International Airport, Plaintiff Kariye was detained for secondary inspection by two CBP officers in a small, windowless room for approximately two hours.  (*Id.* ¶ 34.)  During the first incident, a CBP officer questioned Plaintiff Kariye about his religious beliefs, practices, and associations, including questions about which mosque he attends and whether he had been on the Hajj before.  (*Id.* ¶ 35.)  Plaintiff Kariye answered these questions because he was not free to leave without the permission of a CBP officer and felt that he had no choice but to answer based on the circumstances of his detention.  (*Id.* ¶ 36.)  A CBP officer took notes during Plaintiff Kariye's detention, including while Plaintiff Kariye responded to CBP's questions about his religious beliefs, practices, and associations.  (*Id.* ¶ 37.)

### ii.  Second Religious Questioning Incident: February 6, 2019

On February 6, 2019, CBP asked Plaintiff Kariye questions related to his religion during a secondary inspection at the Peace Arch Border Crossing near Blaine, Washington.  (*Id.* ¶ 38.)  Plaintiff Kariye was returning to the United States by car from a trip to Vancouver, where he had been on a vacation with friends.  (*Id.*)  Two CBP officers detained Plaintiff Kariye for approximately three hours.  (*Id.*)  The officers told Plaintiff Kariye that he would not be free to leave unless he answered their questions.  (*Id.*)  During the detention, a CBP officer questioned Plaintiff Kariye about his religious beliefs, practices, and associations, including questions about Plaintiff Kariye's involvement with a charitable organization affiliated with Muslim communities, how he fundraised for this charity, and whether his fundraising involved visiting mosques.  (*Id.* ¶ 39.)  Plaintiffs allege the obligation to provide charity and assistance to the needy, or zakat, is a central tenet of Islam.  (*Id.*)

Plaintiff Kariye answered the CBP officer's questions about his religious charitable beliefs and activities because he was not free to leave without the permission of a CBP officer and felt that he had no choice but to answer based on the circumstances of his detention.  (*Id.* ¶ 40.)  A CBP officer took notes during Plaintiff

Kariye's detention, including while Plaintiff Kariye responded to CBP's questions about his religious beliefs, practices, and associations.  (*Id*. ¶ 41.)

### iii.   Third Religious Questioning Incident: November 24, 2019

On November 24, 2019, CBP asked Plaintiff Kariye questions related to his religion during a secondary inspection in a CBP preclearance area at Ottawa International Airport in Canada.  (*Id*. ¶ 42.)  CBP officers are posted at Ottawa International Airport and conduct inspections there for travelers headed to the United States.  (*Id*.)  Plaintiff Kariye was returning to the United States after attending a wedding in Canada.  (*Id*.)  Plaintiff Kariye was flying to Detroit, Michigan, and then to Seattle, Washington.  (*Id*.)  A CBP officer detained Plaintiff Kariye for approximately one hour in a small, windowless room.  (*Id*.)

During the detention, the CBP officer questioned Plaintiff Kariye about his religious associations.  (*Id*. ¶ 43.)  The CBP officer questioned Plaintiff Kariye about a youth sports league that he helped to run.  (*Id*.)  Although Plaintiff Kariye had not informed the officer that he was Muslim, the officer asked whether the sports league was "for black and white kids, or is it just for Muslim kids?"  (*Id*.)  Plaintiff Kariye understood the question as an acknowledgment of his Islamic faith and an attempt to ascertain what kinds of religious activities he participated in.  (*Id*.)  Plaintiff Kariye answered the questions because he was not free to leave without the permission of a CBP officer and felt that he had no choice but to answer based on the circumstances of his detention.  (*Id*. ¶ 44.)  The CBP officer took notes during Plaintiff Kariye's detention, including while Plaintiff Kariye responded to CBP's questioning about his religious beliefs and associations.  (*Id*. ¶ 45.)

### iv.   Fourth Religious Questioning Incident: August 16, 2020

On August 16, 2020, CBP officers asked Plaintiff Kariye questions related to his religion during a secondary inspection at the Seattle-Tacoma International Airport.  (*Id*. ¶ 46.)  Plaintiff Kariye was returning to the United States from a vacation with a friend.  (*Id*.)  Plaintiff Kariye had traveled from Turkey to Seattle, Washington, via the

Netherlands.  (*Id*.)  CBP officers had photographs of Plaintiff Kariye that they used to identify him when he came off the jet bridge.  (*Id*.)  Multiple CBP officers detained Plaintiff Kariye for several hours in a small, windowless room.  (*Id*.)  To the best of Plaintiff Kariye's recollection, one of the officers, a supervisor, was named "Abdullah Shafaz" or something close to it.  (*Id*.)

During the detention, CBP officers questioned Plaintiff Kariye about his religious beliefs, practices, and associations.  (*Id*. ¶ 47.)  These questions included:

      a.  What type of Muslim are you?

      b.  Are you Sunni or Shi'a?

      c.  Are you Salafi or Sufi?

      d.  What type of Islamic lectures do you give?

      e.  Where did you study Islam?

      f.  How is knowledge transmitted in Islam?

      g.  Do you listen to music?

      h.  What kind of music do you listen do?

      i.  What are your views on Ibn Taymiyyah?

(*Id*.)

Plaintiff Kariye understood the questions regarding music and his views on Ibn Taymiyyah, a medieval Muslim scholar, as designed to elicit information about the nature and strength of his religious beliefs and practices.  (*Id*. ¶ 48.)  During the detention, a CBP officer threatened Plaintiff Kariye multiple times with retaliation by saying that, if Plaintiff Kariye did not cooperate, CBP would make things harder for him.  (*Id*. ¶ 49.)  The officer also said that Plaintiff Kariye was welcome to challenge the legality of the detention, but if he did so publicly or went to the media, CBP would make things harder for him during his future travels.  (*Id*.)

Plaintiff Kariye answered the CBP officers' questions because he was not free to leave without the permission of a CBP officer and felt that he had no choice but to answer based on the circumstances of his detention.  (*Id*. ¶ 50.)  A CBP officer took

notes during Plaintiff Kariye's detention, including while Plaintiff Kariye responded to CBP's questions about his religious beliefs, practices, and associations. (*Id.* ¶ 51.)

After several hours of detention, two of the CBP officers who had detained Plaintiff Kariye escorted him to a separate room, where they performed a thorough, full-body pat-down search, which included touching his buttocks and groin. (*Id.* ¶ 52.) Plaintiff alleges the CBP officers had no basis to suspect Plaintiff Kariye of carrying contraband or weapons, and they had already been in close proximity to him during his detention. (*Id.*) After the pat-down, the officers finally permitted Plaintiff Kariye to leave. (*Id.*)

### v. Fifth Religious Questioning Incident: January 1, 2022

On January 1, 2022, a plainclothes CBP officer asked Plaintiff Kariye questions related to his religion during a secondary inspection at the Minneapolis-Saint Paul Airport. (*Id.* ¶ 53.) Plaintiff Kariye was returning to the United States from a trip to Somalia, Kenya, and the United Arab Emirates, where he had traveled for vacation and to visit family. (*Id.*) The officer detained Plaintiff Kariye for approximately an hour and a half. (*Id.*) During the detention, the CBP officer questioned Plaintiff Kariye about his religious beliefs, practices, and associations, including whether he had met a particular friend at a mosque. (*Id.* ¶ 54.) The officer then said, "I assume you're a Muslim, aren't you?" (*Id.*)

Plaintiff Kariye answered these questions because he was not free to leave without the permission of a CBP officer and felt that he had no choice but to answer based on the circumstances of his detention. (*Id.* ¶ 55.) A CBP officer took notes during Plaintiff Kariye's detention, including while Plaintiff Kariye responded to CBP's questions about his religious beliefs, practices, and associations. (*Id.* ¶ 56.) During each of these five religious questioning incidents, Plaintiff Kariye alleges his travel and identification documents were valid, and he was not transporting contraband. (*Id.* ¶ 57.)

///

### vi.  Plaintiff Kariye Alleges CBP's Religious Questioning Is Substantially Likely to Recur

Plaintiff Kariye alleges on information and belief, he has been placed on a U.S. government watchlist, and he will continue to be subject to detention, searches, and questioning, including religious questioning, each time he returns to the United States from international travel.  (*Id*. ¶ 58.)  For years, Plaintiff Kariye has experienced travel issues consistent with placement on a U.S. government watchlist.  (*Id*. ¶ 59.)  Frequently between 2013 and 2019, and "persistently from 2020 to the present," Plaintiff Kariye has been unable to print his boarding passes for domestic or international flights from the internet or self-service kiosks at the airport, and airline agents must receive clearance from a supervisor or government agency before providing Plaintiff Kariye with his boarding pass.  (*Id*.)  That process typically takes approximately an hour and has taken up to two hours.  (*Id*.)  Whenever Plaintiff Kariye takes a domestic or international flight, his boarding pass is marked with "SSSS," which indicates "Secondary Security Screening Selection," and he is subject to additional screening.  (*Id*.)  Placement on a watchlist consistently results in a traveler's boarding pass being stamped with "SSSS."  (*Id*.)

Whenever Plaintiff Kariye returns to the United States following international travel, whether by plane or by car, he is subject to secondary inspection.  (*Id*. ¶ 60.)  Whenever Plaintiff Kariye returns to a U.S. airport following international travel, CBP officers are either waiting for him at the arrival gate or meet him at primary inspection.  (*Id*.)  The officers then escort Plaintiff Kariye to a secondary inspection area, where CBP officers detain and question him.  (*Id*.)  Plaintiff Kariye does not know why the U.S. government has placed him on a watchlist.  (*Id*.)  Plaintiff Kariye travels internationally frequently for leisure, to visit family abroad, and for religious pilgrimages.  (*Id*. ¶ 61.)  Plaintiff Kariye intends to continue to travel internationally in the near future and alleges when he does so, upon his return home to the United

States, he alleges he is at substantial risk of again being questioned by CBP officers about his religious beliefs, practices, and associations.  (*Id*.)

### vii.  Plaintiff Kariye Alleges CBP's Religious Questioning Causes Him Significant Distress

Plaintiff Kariye further alleges CBP officers ask him intrusive and personal questions about his religious beliefs, practices, and associations because he is a Muslim.  (*Id*. ¶ 62.)  Plaintiff Kariye alleges religious questioning by CBP harms him and impedes his religious practice.  (*Id*. ¶ 63.)  On information and belief, DHS and CBP maintain records pertaining to Plaintiff Kariye's religious beliefs, practices, and associations from border officers' questioning of Plaintiff Kariye about these topics, and Defendants' retention of such information in government systems causes Plaintiff Kariye ongoing distress and harm.  (*Id*. ¶ 64.)  Plaintiff Kariye alleges CBP's questioning about his religious beliefs, practices, and associations is insulting and humiliating, and border officers convey a message of official disapproval of Islam by: (1) targeting Plaintiff Kariye for religious questioning because he is a Muslim, (2) asking him specific questions about his Islamic religious beliefs, practices, and associations, and (3) retaining information about his religious beliefs, practices, and associations.  (*Id*. ¶ 65.)  Plaintiff Kariye alleges CBP conveys the stigmatizing message that the U.S. government views adherence to Islamic religious beliefs and practices as inherently suspicious and that Muslim Americans are not entitled to the full constitutional protections afforded to other Americans.  (*Id*.)  Plaintiff Kariye alleges Defendants are officially condemning his faith, which makes him feel marginalized and like an outsider when coming home to his own country.  (*Id*.)

Plaintiff Kariye alleges CBP's religious questioning places pressure on him to modify or curb his religious expression and practices, contrary to his sincere religious beliefs.  (*Id*. ¶ 66.)  Specifically, Plaintiff Kariye alleges when traveling back to the United States from abroad, he modifies or eliminates certain religious practices to avoid calling attention to his faith and incurring additional scrutiny and religious

questioning by CBP and cannot fully practice and express his faith in the way he otherwise would while traveling.  (*Id*.)

For example, Plaintiff Kariye typically wears a Muslim cap, known as a kufi, when he is in public, a common religious practice for many Muslim men.  (*Id*. ¶ 67.) For Plaintiff Kariye, the kufi represents his Muslim identity, emulates the dress of the Prophet Mohammad, and signifies love and reverence for the Prophet.  (*Id*.)  Despite his sincerely held religious belief that he should wear his kufi in public, Plaintiff Kariye no longer wears his kufi at the airport or the border when returning home to the United States from abroad, in order to avoid additional CBP scrutiny and religious questioning.  (*Id*. ¶ 68.)

Plaintiff Kariye also modifies his prayer practice while traveling back into the United States.  (*Id*. ¶ 69.)  As a Muslim, Plaintiff Kariye believes that he must pray at five specific times each day, which involves kneeling on the ground in a particular direction (toward Mecca), bowing, and placing his forehead to the ground in prayer. (*Id*.)  However, to avoid additional CBP scrutiny and religious questioning, Plaintiff Kariye typically refrains from these physical acts of prayer at the airport and the border, even though he would ordinarily pray in this manner during the religiously designated prayer times.  (*Id*.)

Plaintiff Kariye also avoids carrying religious texts while traveling back into the United States.  (*Id*. ¶ 70.)  As a Muslim and an imam, Plaintiff Kariye's religious duties require him to study a variety of religious texts, such as the Quran, commentaries on the Quran, and Islamic jurisprudence in matters relating to family law and rules pertaining to charity.  (*Id*.)  However, to avoid additional CBP scrutiny and religious questioning, Plaintiff Kariye no longer carries physical copies of these texts with him when he travels home to the United States from abroad, hindering his ability to study these texts while traveling.  (*Id*.)

Plaintiff Kariye is proud to be a Muslim and his sincere religious beliefs direct him to wear a kufi in public, pray in a particular manner, and study various religious

texts.  (*Id.* ¶ 71.)  Plaintiff Kariye alleges it causes him distress to forgo wearing his kufi, modify his prayer practice, and avoid carrying religious texts as he travels, but, because of CBP's questioning, Plaintiff Kariye takes these measures when traveling back into the United States to avoid calling attention to his religion and incurring additional scrutiny and religious questioning by CBP.  (*Id.*)

Plaintiff Kariye alleges CBP's religious questioning has made and continues to make him feel anxious, humiliated, and stigmatized as a Muslim American.  (*Id.* ¶ 72.) Plaintiff Kariye experiences anxiety before traveling home due to CBP's religious questioning, and, in the weeks following each incident of religious questioning, the humiliation replays in Plaintiff Kariye's mind.  (*Id.*)  CBP's scrutiny and religious questioning cause him to suffer acute distress, which has interfered with his daily life, including distracting him from work and from his relationships with family members. (*Id.*)

### b.  Plaintiff Mouslli

Plaintiff Mouslli is a U.S. citizen who is Muslim.  (*Id.* ¶ 73.)  He lives in Gilbert, Arizona, with his wife and three children, all U.S. citizens.  (*Id.*)  Plaintiff Mouslli works in commercial real estate.  (*Id.*)  On the last four occasions that Plaintiff Mouslli has traveled internationally, CBP officers have asked him questions related to his religion upon his return home to the United States.  (*Id.* ¶ 74.)  Plaintiff Mouslli alleges on each occasion the environment was coercive: CBP officers wearing uniforms and carrying weapons commanded Plaintiff Mouslli to enter and remain in an area separated from other travelers, took Plaintiff Mouslli's belongings from him, searched his electronic devices, and questioned him at length.  (*Id.*)

### i.  First Religious Questioning Incident: August 9, 2018

Plaintiff Mouslli alleges on or about August 9, 2018, CBP officers asked Plaintiff Mouslli questions related to his religion during a secondary inspection at the border crossing near Lukeville, Arizona.  (*Id.* ¶ 75.)  Plaintiff Mouslli was returning to

1   the United States by car from a trip to Mexico, where he had been on vacation with a

2   friend.  (*Id.*)

3        After CBP officers checked Plaintiff Mouslli's passport, several officers

4   surrounded the car.  (*Id.* ¶ 76.)  The officers forced Plaintiff Mouslli to remain in the

5   car for approximately 30 minutes, after which the officers brought him into the

6   station.  (*Id.*)  In total, CBP officers detained Plaintiff Mouslli for approximately six to

7   seven hours.  (*Id.*)  CBP officers questioned Plaintiff Mouslli about his religious

8   beliefs, practices, and associations, including whether he is a Muslim and whether he

9   is Sunni or Shi'a.  (*Id.* ¶ 77.)  Plaintiff Mouslli answered these questions because he

10  was not free to leave without the permission of a CBP officer and felt that he had no

11  choice but to answer based on the circumstances of his detention.  (*Id.* ¶ 78.)  A CBP

12  officer took notes during Plaintiff Mouslli's detention, including while Plaintiff

13  Mouslli responded to CBP's questions about his religious beliefs, practices, and

14  associations.  (*Id.* ¶ 79.)

15       **ii.  Second Religious Questioning Incident: August 19, 2019**

16       On or about August 19, 2019, CBP officers again asked Plaintiff Mouslli

17  questions related to his religion during a secondary inspection at Los Angeles

18  International Airport ("LAX").  (*Id.* ¶ 80.)  Plaintiff Mouslli was returning to the

19  United States from a trip to Dubai to visit family and the Netherlands to visit his

20  sister.  (*Id.*)  The officers detained Plaintiff Mouslli for approximately one and a half

21  to two hours, along with his minor son who had joined him for the trip.  (*Id.*)  The

22  CBP officers questioned Plaintiff Mouslli about his religious beliefs, practices, and

23  associations, including whether he attends a mosque and how many times a day he

24  prays.  (*Id.* ¶ 81.)  Plaintiff Mouslli answered these questions because he and his son

25  were not free to leave without the permission of a CBP officer, and he felt that he had

26  no choice but to answer based on the circumstances of his detention.  (*Id.* ¶ 82.)

27       Plaintiff Mouslli was also worried about extending the detention, given the

28  presence of his son.  (*Id.*)  A CBP officer took notes during Plaintiff Mouslli's

detention, including while Plaintiff Mouslli responded to CBP's questions about his religious beliefs, practices, and associations.  (*Id*. ¶ 83.)

### iii.  Third Religious Questioning Incident: March 11, 2020

On March 11, 2020, CBP officers asked Plaintiff Mouslli questions related to his religion during another secondary inspection at LAX.  (*Id*. ¶ 84.)  Plaintiff Mouslli was returning to the United States from a trip to Dubai to visit his parents.  (*Id*.)  The officers detained Plaintiff Mouslli for approximately one and a half to two hours.  (*Id*.)  The CBP officers questioned Plaintiff Mouslli about his religious beliefs, practices, and associations, once again demanding to know whether he attends a mosque and whether he is Sunni or Shi'a.  (*Id*. ¶ 85.)  Plaintiff Mouslli answered these questions because he was not free to leave without the permission of a CBP officer and felt that he had no choice but to answer based on the circumstances of his detention.  (*Id*. ¶ 86.)  A CBP officer took notes during Plaintiff Mouslli's detention, including while Plaintiff Mouslli responded to CBP's questions about his religious beliefs, practices, and associations.  (*Id*. ¶ 87.)  Because of the delay from the secondary inspection, including CBP's religious questioning, Plaintiff Mouslli missed his connecting flight from LAX to Phoenix, and he had to rent a car at additional expense to drive home to Arizona.  (*Id*. ¶ 88.)

### iv.  Fourth Religious Questioning Incident: June 5, 2021

On or about June 5, 2021, CBP officers again asked Plaintiff Mouslli questions related to his religion during a secondary inspection at LAX.  (*Id*. ¶ 89.)  Plaintiff Mouslli was returning to the United States from a trip to Dubai to visit his parents.  (*Id*.)  The officers detained him for approximately one and a half to two hours, along with his minor daughter who had joined him for the trip.  (*Id*.)  CBP officers questioned Plaintiff Mouslli about his religious beliefs, practices, and associations, including whether he goes to a mosque and whether he prays every day.  (*Id*. ¶ 90.)

Plaintiff Mouslli answered these questions because he and his daughter were not free to leave without the permission of a CBP officer, and he felt that he had no

choice but to answer based on the circumstances of his detention.  (*Id*. ¶ 91.)  He was also worried about extending the detention, given the presence of his daughter.  (*Id*.)  A CBP officer took notes during Plaintiff Mouslli's detention, including while Plaintiff Mouslli responded to CBP's questions about his religious beliefs, practices, and associations.  (*Id*. ¶ 92.)  Plaintiff Mouslli alleges during each of these four religious questioning incidents, his travel and identification documents were valid, and he was not transporting contraband.  (*Id*. ¶ 93.)

### v. Plaintiff Mouslli Alleges CBP's Religious Questioning Is Substantially Likely to Recur and Causes Him Significant Distress

On information and belief, Plaintiff Mouslli alleges he has been placed on a U.S. government watchlist, and he will continue to be subject to detention, searches, and questioning, including religious questioning, each time he returns to the United States from international travel.  (*Id*. ¶ 94.)  In late 2017, Plaintiff Mouslli began experiencing travel issues consistent with placement on a U.S. government watchlist.  (*Id*. ¶ 95.)  Since 2017, Plaintiff Mouslli has been unable to print his boarding passes for domestic or international flights from the internet or self-service kiosks at the airport, and airline agents must receive clearance from a supervisor or government agency before providing Plaintiff Mouslli with his boarding pass.  (*Id*.)  Whenever Plaintiff Mouslli takes a domestic or international flight, his boarding pass is marked with "SSSS," and he is subject to additional screening.  (*Id*.)  Whenever Plaintiff Mouslli returns to the United States following international travel, whether by plane or by car, he is subject to secondary inspection.  (*Id*.)  Whenever Plaintiff Mouslli returns to a U.S. airport following international travel, CBP officers are waiting for him at the arrival gate.  (*Id*.)  The officers then escort Plaintiff Mouslli to a secondary inspection area, where CBP officers detain and question Plaintiff Mouslli.  (*Id*.)  Plaintiff Mouslli does not know why the U.S. government has placed him on a watchlist.  (*Id*.)

Plaintiff Mouslli considered taking a trip with his son to Dubai in February 2022 to visit his family.  (*Id*. ¶ 96.)  However, Plaintiff Mouslli decided that this particular trip would not be worth the difficulty, discomfort, and stigma of CBP scrutiny in secondary inspection, including CBP's religious questioning.  (*Id*.)  Although Plaintiff Mouslli intends to travel internationally in the near future to visit his family in Dubai and the Netherlands, he now weighs the necessity of every trip against the likelihood of future detention and religious questioning by border officers.  (*Id*. ¶ 97.)  When Plaintiff Mouslli travels again internationally, he is at risk of being questioned by CBP officers again about his religious beliefs, practices, and associations upon his return home to the United States.  (*Id*. ¶ 98.)  CBP officers ask Plaintiff Mouslli questions about his religious beliefs, practices, and associations because he is a Muslim.  (*Id*. ¶ 99.)  Religious questioning by CBP harms Plaintiff Mouslli and impedes his religious practice.  (*Id*. ¶ 100.)  He further alleges, on information and belief, DHS and CBP maintain records pertaining to Plaintiff Mouslli's religious beliefs, practices, and associations, as a result of border officers' questioning of Plaintiff Mouslli about these topics.  (*Id*. ¶ 101.)  Defendants' retention of such information in government systems causes Plaintiff Mouslli ongoing distress and harm.  (*Id*. ¶ 102.)  CBP's questions regarding Plaintiff Mouslli's religious beliefs, practices, and associations are insulting and humiliating to him.  (*Id*.)

Plaintiff Mouslli alleges border officers convey a message of official disapproval of Islam by: (1) targeting Plaintiff Mouslli for religious questioning because he is a Muslim; (2) asking him specific questions about his Islamic religious beliefs, practices, and associations; and (3) retaining information about his religious beliefs, practices, and associations.  (*Id*.)  Plaintiff Mouslli alleges CBP conveys the stigmatizing message that the U.S. government views adherence to Islamic religious beliefs and practices as inherently suspicious and that Muslim Americans are not entitled to the full constitutional protections afforded to other Americans.  (*Id*.)

Plaintiff Mouslli alleges Defendants are officially condemning his faith and he feels marginalized and like an outsider when coming home to his own country.  (*Id.*)

Plaintiff Mouslli also alleges CBP's religious questioning imposes pressure on him to modify his religious expression and practices, contrary to his sincere religious beliefs. (*Id.* ¶ 103.)  In particular, when traveling back to the United States from abroad, Plaintiff Mouslli eliminates certain religious practices and expression to avoid calling attention to his faith and incurring additional scrutiny and religious questioning by CBP, and Plaintiff Mouslli cannot fully practice and express his faith in the way that he otherwise would while traveling.  (*Id.*)

For example, CBP's religious questioning imposes pressure on Plaintiff Mouslli to modify his prayer practice while traveling back into the United States.  (*Id.* ¶ 104.)  As a Muslim, Plaintiff Mouslli believes he must pray at five specific times each day, which involves kneeling on the ground in a particular direction (toward Mecca), bowing, and placing his forehead to the ground in prayer.  (*Id.*)  However, to avoid additional CBP scrutiny and religious questioning, Mr. Mouslli refrains from these physical acts of prayer at the airport and the border, even though he would ordinarily pray in this manner during the religiously designated prayer times.  (*Id.*)  Plaintiff Mouslli is proud to be a Muslim.  (*Id.* ¶ 105.)  His sincere religious beliefs counsel him to pray in a particular way and it causes him distress to forgo physical acts of prayer at the airport and in secondary inspection.  (*Id.*)  Because of CBP's practice of asking questions about his faith, Plaintiff Mouslli takes these "protective measures" when traveling back into the United States to avoid calling attention to his religion and incurring additional scrutiny and religious questioning by CBP.  (*Id.*)  Religious questioning by CBP has made and continues to make Plaintiff Mouslli feel anxious and distressed, particularly because of the invasive and personal nature of religious questioning and the stigma of being targeted because he is Muslim.  (*Id.* ¶ 106.)

///

///

### c. Plaintiff Shah

#### i. First Religious Questioning Incident: May 7, 2019

Plaintiff Shah is a U.S. citizen and Muslim who works in financial services. (*Id.* ¶ 107.)  Plaintiff Shah lives in Plano, Texas.  (*Id.*)  On May 7, 2019, CBP officers asked Plaintiff Shah questions related to his religion during a secondary inspection at LAX.  (*Id.* ¶ 108.)  Plaintiff Shah was returning to the United States from a trip to Serbia and Bosnia for vacation.  (*Id.*)  After Plaintiff Shah passed through primary inspection without incident, a CBP officer ("Officer 1") stopped him in the baggage retrieval area and asked him to accompany him for a search.  (*Id.* ¶ 109.)  To the best of Mr. Shah's recollection, Officer 1's last name was "Esguerra" or something close to it.  (*Id.*)  Plaintiff Shah responded that he did not wish to be searched.  (*Id.* ¶ 110.)  Plaintiff Shah alleges Officer 1 replied that, because Plaintiff Shah was at the border, he did not have the option to refuse.  (*Id.*)  Officer 1 escorted Mr. Shah to a secondary inspection area.  (*Id.* ¶ 111.)  There, Officer 1 and a second officer ("Officer 2") began to search Plaintiff Shah's belongings.  (*Id.*)  To the best of Plaintiff Shah's recollection, Officer 2's last name was "Gonzalez" or something close to it.  (*Id.*)  Plaintiff Shah alleges the environment was coercive because both officers were wearing uniforms and carrying weapons and they commanded Plaintiff Shah to enter and remain in an area separate from travelers who were not subject to secondary inspection.  (*Id.* ¶ 112.)

Officer 2 reviewed a notebook that Plaintiff Shah had been carrying in his backpack—a personal journal that Plaintiff Shah had kept for years.  (*Id.* ¶ 113.)  Plaintiff Shah told Officer 2 that the notebook was a personal journal and asked him not to read it, but Officer 2 persisted.  (*Id.*)  Officer 2 pointed out that many of the notes in Plaintiff Shah's journal were related to religion.  (*Id.* ¶ 114.)  He asked Plaintiff Shah why and where he had taken the notes and whether he had traveled in the Middle East.  (*Id.*)  Officer 1 told Plaintiff Shah that they were trying to make sure Plaintiff Shah was a "safe person."  (*Id.*)  Plaintiff Shah answered Officer 1's

questions because he was not free to leave without the permission of a CBP officer and reasonably felt that he had no choice but to answer based on the coercive circumstances of his detention. (*Id.* ¶ 115.) The officers then told Plaintiff Shah that they were going to search his phone and laptop. (*Id.* ¶ 116.) In response, Plaintiff Shah said that he did not consent to the search of his electronic devices and asked to see a supervisor. (*Id.*) Officer 1 left to get the supervisor; Officer 2 stayed behind. (*Id.*) While he and Plaintiff Shah were alone, Officer 2 asked Plaintiff Shah a series of questions about his religious beliefs, practices, and associations. (*Id.* ¶ 117.) The officer's questions included the following:

a) What religion are you?

b) How religious do you consider yourself? Your family?

c) What mosque do you attend?

d) Do you attend any other mosques?

e) Do you watch Islamic lectures online or on social media?

(*Id.*)

When Plaintiff Shah asked Officer 2 why he was asking these questions, the officer responded, "I'm asking because of what we found in your journal." (*Id.* ¶ 118.) Plaintiff Shah answered Officer 2's questions because he was not free to leave without the permission of a CBP officer and reasonably felt that he had no choice but to answer based on the coercive circumstances of his detention. (*Id.* ¶ 119.) Later, Officer 1 returned with the supervisor. (*Id.* ¶ 120.) To the best of Plaintiff Shah's recollection, the supervisor's last name was "Lambrano," or something close to it. (*Id.*) Plaintiff Shah told the supervisor that he did not consent to a search of his electronic devices. (*Id.*) Plaintiff Shah stated that he wanted to stand up for his constitutional rights. (*Id.*) The supervisor informed Plaintiff Shah that his reluctance to allow inspection of his devices had made the officers more suspicious of him. (*Id.* ¶ 121.) Plaintiff Shah asked to speak with an attorney immediately. (*Id.* ¶ 122.) Officer 1 responded by asking, "Why? You're not under arrest." (*Id.*) Plaintiff Shah

then told the supervisor that he no longer wished to enter the United States and wanted instead to return to the transit area so that he could leave the country and go back to Europe. (*Id*. ¶ 123.) The supervisor responded that Plaintiff Shah could not take his devices with him because they had been seized. (*Id*.) The supervisor gave Plaintiff Shah two options: (1) unlock his phone, in which case the officers would inspect the device in Plaintiff Shah's presence; or (2) refuse to unlock his phone, in which case the officers would hold Plaintiff Shah's phone and laptop for further examination and return them to him at a later date. (*Id*.) Mr. Shah felt that he had no meaningful choice, so he unlocked his phone. (*Id*. ¶ 124.) Officer 2 took the phone, wrote down the International Mobile Equipment Identity and serial numbers, and manually searched through the phone without letting Plaintiff Shah see the screen. (*Id*.) Officer 1 told Plaintiff Shah he needed to continue looking through Plaintiff Shah's journal using a computer, and he left the secondary inspection area with the journal. (*Id*. ¶ 125.) Plaintiff Shah again objected to the search of his phone and his journal. (*Id*. ¶ 126.) About twenty to thirty minutes after Officer 1 had left, he returned with Plaintiff Shah's journal; he was accompanied by an officer or agent in plain clothes ("Officer 3"). (*Id*. ¶ 127.) To the best of Plaintiff Shah's recollection, Officer 3's name was "Ali," or something close to it. (*Id*.) On information and belief, Officer 3 was an HSI agent. (*Id*.)

Officer 3 asked Plaintiff Shah about aspects of his religious associations that Plaintiff Shah had recorded in his personal journal. (*Id*. ¶ 128.) Specifically, Officer 3 asked Plaintiff Shah about the identity of a local imam in the Phoenix area. (*Id*.) Plaintiff Shah answered Officer 3's questions about the imam because he was not free to leave without the permission of a CBP officer and felt that he had no choice but to answer based on the circumstances of his detention. (*Id*. ¶ 129.) Approximately two hours after he was taken to secondary inspection, the officers returned Plaintiff Shah's passport and allowed him to leave. (*Id*. ¶ 130.)

After leaving secondary inspection, Plaintiff Shah opened his phone and could see that Officer 2 had viewed private text messages, WhatsApp messages, internal files, emails, call history, Google maps history, Google Chrome, Airbnb, and photos of family members spanning ten years, some of which were stored in the cloud but must have been cached on the device. (*Id.* ¶ 131.) Plaintiff Shah believes that Officer 2 viewed these apps and files because Plaintiff Shah has a habit of closing apps or files after he uses them, meaning Officer 2 must have viewed everything that was open at the time he returned the phone to Mr. Shah. (*Id.*) The fact that Officer 2 viewed this content, particularly photos of Plaintiff Shah's family members, made Mr. Shah feel extremely distressed and uncomfortable. (*Id.* ¶ 132.) Plaintiff Shah's travel and identification documents were valid, and he was not transporting contraband. (*Id.* ¶ 133.)

In response to requests under the Freedom of Information Act and the Privacy Act, CBP has provided Plaintiff Shah with a redacted document stating that his detention and questioning was "Terrorist Related." (*Id.* ¶ 134.) This document is labeled "IOIL," which is a type of incident report entered into TECS. (*Id.*) The document includes the following description:

> During examination of his belongings, subject was very cautious and focused on his journal that was found in his hand carry. Subject demanded for us not to read his journal because he felt that it was an invasion of his privacy. [Redacted] Upon reading the journal, some notes regarding his work and religion were found. Subject stated he's self-employed working as a financial trader. Subject didn't want to elaborate on the type of work he does but just mentioned that he is able to work remotely. Subject's notes regarding his religion (Islam) seemed to be passages from an individual he calls [redacted]. Subject stated that he is the Imam at the Islamic Center of the North East Valley located in Scottsdale, AZ. Subject mentioned that he also goes to another mosque but refused to provide the name. Subject claimed he's a devote [sic] Sunni Muslim.

(*Id.*)

Before the pandemic, Plaintiff Shah frequently traveled internationally for leisure and visits with family abroad. (*Id*. ¶ 135.) He intends to resume traveling internationally in the near future. (*Id*.) At primary inspection, CBP officers query TECS to identify a traveler's recent border crossings. (*Id*. ¶ 136.) Because CBP has a TECS entry stating that Plaintiff Shah's previous detention and questioning was "Terrorist Related," on information and belief, when Plaintiff Shah travels internationally again, he is at substantial risk of being referred to secondary inspection upon his return home to the United States and being questioned by CBP officers about his religious beliefs, practices, and associations. (*Id*.) Plaintiff Shah alleges CBP and HSI officers asked him intrusive questions about his religious beliefs, practices, and associations because he is a Muslim. (*Id*. ¶ 137.) In addition, Plaintiff Shah alleges CBP and HSI officers subjected him to retaliatory questioning and searches because he is Muslim, because of the Islamic religious content of his journal, and because he repeatedly invoked his constitutional rights. (*Id*.) Plaintiff Shah alleges religious questioning by CBP and HSI harms him and impedes his religious practice. (*Id*. ¶ 138.)

Defendants maintain records pertaining to Plaintiff Shah's religious beliefs, practices, and associations, as a result of border officers' questioning of Plaintiff Shah about these topics. (*Id*. ¶ 139.) In addition, on information and belief, Defendants maintain copies of the contents of his journal and phone, collected in retaliation for the religious contents of the journal and his invocation of his rights. (*Id*.) Defendants' unlawful retention of such information in government systems causes Plaintiff Shah ongoing, irreparable distress and harm for which he has no adequate remedy at law. (*Id*.) CBP's and HSI's invasive questions regarding Plaintiff Shah's religious beliefs, practices, and associations are insulting and humiliating to him. (*Id*. ¶ 140.) Border officers convey a message of official disapproval of Islam by (1) targeting Plaintiff Shah for religious questioning because he is a Muslim; (2) asking specific questions about his Islamic religious beliefs, practices, and associations; and (3) retaining

information about his religious beliefs, practices, and associations. (*Id.*)  In particular, Plaintiff Shah alleges CBP and HSI convey the stigmatizing message that the U.S. government views adherence to Islamic religious beliefs and practices as inherently suspicious and that Muslim Americans are not entitled to the full constitutional protection afforded to other Americans. (*Id.*)  Plaintiff Shah feels marginalized and like an outsider when coming home to his own country "[d]ue to this official condemnation of his faith." (*Id.*)

Plaintiff Shah further alleges CBP's and HSI's religious questioning imposes pressure on him to modify his religious practices, contrary to his sincere religious beliefs. (*Id.* ¶ 141.)  As part of his religious practice, Plaintiff Shah regularly writes in a personal journal. (*Id.*)  These writings include expressions of his beliefs and devotion and other notes pertaining to his faith and religious practice and is a "vital outlet for his religious expression." (*Id.*)  In meditating on religious questions or issues, Plaintiff Shah often revisits his previous entries and draws on them for spiritual inspiration. (*Id.*)  Plaintiff Shah alleges the next time he travels internationally, he intends to leave his journal at home to avoid having it become a basis for questioning and Plaintiff Shah will thus be unable to document his religious expression or consult previous entries while out of the country. (*Id.*)

Plaintiff Shah is proud to be a Muslim, and the prospect of leaving his journal at home when traveling internationally is distressing to him. (*Id.* ¶ 142.)  Nevertheless, Plaintiff Shah intends to take this protective measure to avoid incurring additional religious questioning and retaliatory scrutiny by CBP and HSI. (*Id.*)  Plaintiff Shah feels violated and humiliated by the border officers' religious questioning and retaliatory searches. (*Id.* ¶ 143.)  Plaintiff Shah remains extremely concerned about the private information Defendants retain from his journal and phone, as well as the information they retain about his personal religious beliefs, practices, and associations. (*Id.*)

1    **C.    Procedural History**

2        On May 31, 2022, Defendants filed the Motion to Dismiss.  (Dkt. 40.)  On June

3    27, 2022, Plaintiffs opposed the Motion.  (Dkt. 44.)  On July 14, 2022, Defendants

4    filed a Reply.  (Dkt. 47.)  On July 28, 2022, the court held a hearing on the Motion.

5    (Dkt. 49.)  At the conclusion of the hearing on the Motion, the court took the matter

6    under submission.  (*Id*.)

7    **II.    Legal Standard**

8        **A.    Motion to Dismiss Pursuant to Rule 12(b)(6)**

9        Rule 12(b)(6) permits a defendant to move to dismiss a complaint for "failure to

10   state a claim upon which relief can be granted."  Fed. R. Civ. P. 12(b)(6).  To

11   withstand a motion to dismiss brought under Rule 12(b)(6), a complaint must allege

12   "enough facts to state a claim to relief that is plausible on its face."  *Bell Atl. Corp. v.*

13   *Twombly*, 550 U.S. 544, 570 (2007).  While "a complaint attacked by a Rule 12(b)(6)

14   motion to dismiss does not need detailed factual allegations," a plaintiff must provide

15   "more than labels and conclusions" and "a formulaic recitation of the elements of a

16   cause of action" such that the factual allegations "raise a right to relief above the

17   speculative level."  *Id.* at 555 (citations and internal quotation marks omitted); *see*

18   *also Ashcroft v. Iqbal*, 556 U.S. 662, 679 (2009) (reiterating that "recitals of the

19   elements of a cause of action, supported by mere conclusory statements, do not

20   suffice").

21       "Establishing the plausibility of a complaint's allegations is a two-step process

22   that is 'context-specific' and 'requires the reviewing court to draw on its judicial

23   experience and common sense.'"  *Eclectic Props. E., LLC v. Marcus & Millichap Co.*,

24   751 F.3d 990, 995-96 (9th Cir. 2014) (quoting *Iqbal*, 556 U.S. at 679).  "First, to be

25   entitled to the presumption of truth, allegations in a complaint . . . must contain

26   sufficient allegations of underlying facts to give fair notice and to enable the opposing

27   party to defend itself effectively."  *Id.* at 996 (quoting *Starr v. Baca*, 652 F.3d 1202,

28   1216 (9th Cir. 2011)).  "Second, the factual allegations that are taken as true must

plausibly suggest an entitlement to relief, such that it is not unfair to require the opposing party to be subjected to the expense of discovery and continued litigation." *Id.* (quoting *Baca*, 652 F.3d at 1216); *see also Iqbal*, 556 U.S. at 681. But "'[w]here a complaint pleads facts that are merely consistent with a defendant's liability, it stops short of the line between possibility and plausibility of entitlement to relief.'" *Id.* (quoting *Iqbal*, 556 at U.S. 678).

In *Sprewell v. Golden State Warriors*, the Ninth Circuit described legal standards for motions to dismiss made pursuant to Rule 12(b)(6):

> Review is limited to the contents of the complaint. *See Enesco Corp. v. Price/Costco, Inc.*, 146 F.3d 1083, 1085 (9th Cir. 1998). All allegations of material fact are taken as true and construed in the light most favorable to the nonmoving party. *See id.* The court need not, however, accept as true allegations that contradict matters properly subject to judicial notice or by exhibit. *See Mullis v. United States Bankr. Ct.,* 828 F.2d 1385, 1388 (9th Cir.1987). Nor is the court required to accept as true allegations that are merely conclusory, unwarranted deductions of fact, or unreasonable inferences. *See Clegg v. Cult Awareness Network*, 18 F.3d 752, 754–55 (9th Cir. 1994).

266 F.3d 979, 988 (9th Cir. 2001).

## III.   DISCUSSION

### A. Plaintiffs Have Sufficiently Alleged the Existence of an Official Practice, Policy or Custom of Targeting Muslim Americans for Religious Questioning[1]

---

[1] The court notes that the parties' briefing includes references to a memorandum authored by Kevin K. McAleenan, the former Acting Secretary of the Department of Homeland Security ("McAleenan Memorandum"). Neither party has requested judicial notice of the memorandum, nor is the memorandum attached to the Complaint. Accordingly, the court does not take judicial notice of the McAleenan Memorandum at this time.

1     The court first considers whether Plaintiffs have sufficiently alleged the

2  existence of an official practice, policy or custom to have standing to assert the claims

3  in the Complaint.  *See Armstrong v. Davis*, 275 F.3d 849, 861 (9th Cir. 2001) (a

4  plaintiff must demonstrate "the harm alleged is directly traceable to a written policy"

5  or that "the harm is part of a pattern of officially sanctioned . . . behavior" to have

6  standing) (citation and internal quotation marks omitted) (*overruled on other grounds*

7  *by Johnson v. California*, 543 U.S. 499 (2005)).  As a threshold matter, the court finds

8  that the Complaint and Plaintiffs' briefing present multiple theories as to what

9  constitutes Defendants' allegedly illegal official practice, policy or custom.  Plaintiffs

10  argue that the Complaint plausibly alleges several policies in the alternative: "(1)

11  targeting Muslim Americans, including Plaintiffs, for religious questioning; or (2)

12  alternatively, subjecting travelers—regardless of their faith—to religious questioning;

13  and (3) retaining records reflecting answers to such questioning for up to 75 years."

14  (Opp. at 6-7.)

15     However, the court finds that it is not sufficiently clear which policy Plaintiffs

16  are identifying as the purportedly illegal practice, policy or custom at issue here.  In

17  other words, it is not sufficiently clear whether Plaintiffs identify the allegedly illegal

18  policy as Defendants subjecting *all* travelers to questioning and retaining their

19  personal information or specifically targeting Muslims for questioning and retaining

20  their information.  (*See* Opp. at 6-7 (listing three policies of: "(1) targeting Muslim

21  Americans, including Plaintiffs, for religious questioning; or (2) alternatively,

22  subjecting travelers—regardless of their faith—to religious questioning; and (3)

23  retaining records reflecting answers to such questioning for up to 75 years.").)

24     Given that the Complaint—in contrast to Plaintiffs' briefing—alleges that

25  "Defendants' border officers do not direct these intrusive questions to all travelers"

26  and instead "have a policy and/or practice of intentionally targeting selected Muslims

27  (or individuals perceived to be Muslim) for religious questioning" (Compl. ¶ 24), the

28  court's discussion below is limited to Plaintiff's first listed basis for an official

practice, policy or custom—that Defendants are "targeting Muslim Americans, including Plaintiffs, for religious questioning." (*See* Opp. at 6-7.)  To the extent that Plaintiffs challenge additional policies, these policies must be clarified in an amended pleading.

Assuming that Defendants' alleged policy of targeting Muslims for religious questioning is the relevant policy at issue, the parties agree that *Mayfield v. United States*, 599 F.3d 964 (9th Cir. 2010) provides the relevant standard here for determining whether a policy exists. (*See* Mot. at 16; Opp. at 8.)  In *Mayfield*, the Ninth Circuit held that there are two ways for a plaintiff to establish an official practice, policy or custom:

> First, a plaintiff may show that the defendant had, at the time of the injury, a written policy, and that the injury 'stems from' that policy. . . .  Second, the plaintiff may demonstrate that the harm is part of a 'pattern of officially sanctioned . . . behavior, violative of the plaintiffs' [federal] rights.

*Id*. at 971 (citations and internal quotation marks omitted).

Plaintiffs maintain that both prongs are met here because "[d]iscovery will determine whether Defendants' discriminatory policies are written or unwritten" and the Complaint describes a pattern of "officially sanctioned behavior" based on ten incidents of questioning. (Opp. at 7-11.)  The court finds that, per Plaintiffs' argument that discovery is needed to determine whether Defendants' policies are "written or unwritten," Plaintiffs have not adequately alleged that a written policy exists at this time. *Cf. Mayfield*, 599 F.3d at 971 ("First, a plaintiff may show that the defendant had, at the time of the injury, a written policy, and that the injury 'stems from' that policy.").

As for whether Plaintiffs have adequately alleged a pattern of officially sanctioned behavior, the court observes that there is limited relevant case law in this area, but that at least one court in the Ninth Circuit has held that multiple instances of

allegedly unconstitutional conduct can establish a "pattern of official sanctioned behavior." *See Askins v. U.S. Dep't of Homeland Sec.*, 2013 WL 5462296, at *7 (S.D. Cal. Sept. 30, 2013) (finding a "pattern of official sanctioned behavior" in violation of the Fourth Amendment where plaintiffs alleged two instances of CBP officers searching and seizing the persons and property of individuals at two separate ports of entry for taking photographs), *amended on other grounds*, 2015 WL 12434362 (S.D. Cal. Jan. 29, 2015).  The court also considers the analysis of district courts in other Circuits.  *See, e.g., Cherri v. Mueller*, 951 F. Supp. 2d 918, 933-34 (E.D. Mich. 2013) (plaintiffs sufficiently alleged an official policy, custom and practice where plaintiffs alleged they were asked the same questions about their religious practices and beliefs on multiple occasions, the Complaint attached a DHS memorandum regarding law enforcement questioning of religion at the border, DHS informed plaintiffs' counsel that the agency had received a number of similar complaints, and DHS wrote a memorandum to CBP personnel informing them of complaints from Muslim-Americans).

Here, the Complaint alleges that Plaintiffs were subjected to religious questioning on ten different occasions.  (*See generally* Compl.)  The Complaint further alleges that in May 2011, after the ACLU and other organizations submitted complaints to DHS, DHS disclosed that it had opened an investigation into CBP questioning "of U.S. citizens and legal residents who are Muslim, or appear to be Muslim, about their religious and political beliefs, associations, and religious practices and charitable activities protected by the First Amendment and Federal law." (*Id*. ¶ 17.)  In a May 3, 2011, letter to the ACLU, DHS stated that it had received "a number of complaints like yours, alleging that U.S. Customs and Border Protection (CBP) officers have engaged in inappropriate questioning about religious affiliation and practices during border screening." (*Id*.)  In a May 3, 2011, memorandum to the CBP Commissioner ("May 3 Memorandum"), DHS stated that it had received "numerous accounts from American citizens, legal permanent residents, and visitors

1   who are Arab and/or Muslim, alleging that officials from U.S. Customs and Border
2   Protection (CBP) repeatedly question them and other members of their communities
3   about their religious practices or other First Amendment protected activities, in
4   violation of their civil rights or civil liberties." (*Id.* ¶ 18.)  The May 3 Memorandum
5   included descriptions of border officers' questioning of Muslims about their religious
6   beliefs and practices at various ports of entry across the United States. (*Id.* ¶ 19.)  In
7   July 2012, DHS informed the ACLU and other organizations that it had "suspended
8   its investigation into border questioning about religious beliefs and practices because
9   individuals had filed a lawsuit challenging the practice." (*Id.* ¶ 20.)  The Complaint
10  alleges, on information and belief, DHS never resumed its investigation or issued
11  findings about whether border questioning about religious beliefs and practices
12  complies with federal law.  (*Id.* ¶ 21.)

13       Based on these allegations, the court finds that the Complaint alleges "enough
14  facts to state a claim to relief that is plausible on its face" to establish a pattern of
15  officially sanctioned behavior for an official practice, policy or custom. *Twombly*,
16  550 U.S. at 570.  Taken as true, the Complaint alleges that Plaintiffs not only
17  experienced religious questioning on ten different occasions, but that DHS
18  acknowledged receiving numerous complaints about religious questioning at the
19  border, issued memoranda on the subject, and acknowledged the existence of an
20  internal investigation into border officers' questioning of Muslims regarding their
21  religious practices. *See also Cherri*, 951 F. Supp. 2d at 933-34 (holding plaintiffs
22  sufficiently alleged an official policy, custom and practice based on similar facts).  In
23  short, Plaintiffs have not sufficiently alleged that there is a relevant written policy at
24  this time, but have sufficiently alleged that there may be a pattern of "officially
25  sanctioned behavior" based on ten incidents of religious questioning, the May 2011
26  and July 2012 correspondence between the ACLU and DHS, and the DHS May 3,
27  2011, Memorandum. *Mayfield,* 599 F.3d at 971.

28

1    Accordingly, the court finds that Plaintiffs have sufficiently alleged the
2    existence of an official practice, policy or custom of targeting Muslim Americans for
3    religious questioning based on a pattern of officially sanctioned behavior for Plaintiffs
4    to have standing to assert the causes of action in the Complaint.

5    **B. First Claim (Violation of the First Amendment Establishment Clause)**

6    The First Amendment's Establishment Clause provides that "Congress shall
7    make no law respecting an establishment of religion." U.S. Const. amend. I. "This
8    clause applies not only to official condonement of a particular religion or religious
9    belief, but also to official disapproval or hostility towards religion." *Am. Fam. Ass'n,*
10   *Inc. v. City & Cnty. of San Francisco*, 277 F.3d 1114, 1120-21 (9th Cir. 2002); *see*
11   *also Church of the Lukumi Babalu Aye, Inc. v. City of Hialeah*, 508 U.S. 520, 532
12   (1993) ("In our Establishment Clause cases we have often stated the principle that the
13   First Amendment forbids an official purpose to disapprove of a particular religion or
14   of religion in general."); *Vernon v. City of Los Angeles*, 27 F.3d 1385, 1396 (9th Cir.
15   1994) ("The government neutrality required under the Establishment Clause is thus
16   violated as much by government disapproval of religion as it is by government
17   approval of religion.").

18   Previously, the Ninth Circuit analyzed Establishment Clause claims under the
19   standard set forth in *Lemon v. Kurtzman*, 403 U.S. 602 (1971), which employed a
20   three-part test to determine whether government conduct violated the Establishment
21   Clause. *See Cholla Ready Mix, Inc. v. Civish*, 382 F.3d 969, 975 (9th Cir. 2004)
22   (describing the inquiry under the *Lemon* test as whether the government conduct at
23   issue: "(1) it has a secular purpose, (2) its principal or primary effect is not to advance
24   or inhibit religion, and (3) it does not foster excessive government entanglement with
25   religion"). However, recently, in *Kennedy v. Bremerton Sch. Dist.*, the Supreme Court
26   abrogated *Lemon* and established a new standard for evaluating Establishment Clause
27   claims. 142 S. Ct. 2407 (2022). Under *Kennedy*, "[i]n place of *Lemon* and the
28   endorsement test, this Court has instructed that the Establishment Clause must be

interpreted by reference to historical practices and understandings." *Id.* at 2428 (citation and internal quotation marks omitted).

Plaintiffs urge the court to apply two alternative standards set forth in *Larson v. Valente*, 456 U.S. 228 (1982) and *Inouye v. Kemna*, 504 F.3d 705 (9th Cir. 2007). (Opp. at 13-19.)  As discussed below, the court finds that neither standard governs here.  Previously, *Lemon*—not the alternative standards proposed by Plaintiffs—was "the *dominant* mode of Establishment Clause analysis" in the Ninth Circuit prior to its abrogation.  *Freedom From Religion Found., Inc. v. Chino Valley Unified Sch. Dist. Bd. of Educ.*, 896 F.3d 1132, 1149 (9th Cir. 2018) (emphasis added).  The court briefly reviews each of Plaintiffs' proposed alternative standards below.

The Ninth Circuit has described *Larson* as "a framework for determining whether a *statute* grants an unconstitutional denominational preference." *Sklar v. Comm'r*, 282 F.3d 610, 618 (9th Cir. 2002) (emphasis added); *see id.* ("Under that test, articulated in *Larson v. Valente* . . . the first inquiry is whether or not the law facially discriminates amongst religions.  The second inquiry, should it be found that the law does so discriminate, is whether or not, applying strict scrutiny, that discrimination is justified by a compelling governmental interest.").  The court finds no statute at issue here that would make *Larson* applicable, and Plaintiffs have not identified one.

Nor is the coercion test set forth in *Inouye* applicable here.  In *Inouye*, the Ninth Circuit considered whether a parole officer violated a parolee's First Amendment rights by requiring attendance in a religious drug treatment program as a condition of his parole.  504 F.3d at 712.  The Ninth Circuit held that "it is essentially uncontested that requiring a parolee to attend religion-based treatment programs violates the First Amendment" because "[f]or the government to coerce someone to participate in religious activities strikes at the core of the Establishment Clause of the First Amendment, whatever else the Clause may bar." *Id.*; *see also Lee v. Weisman*, 505 U.S. 577, 587 (1992) ("It is beyond dispute that, at a minimum, the Constitution

guarantees that government may not coerce anyone to support or participate in
religion or its exercise.").  Although Plaintiffs argue they were subjected to coercive
conditions during secondary inspection, Plaintiffs cite to no authority holding that
coercive conditions alone satisfy the *Inouye* test.  (Opp. at 17-19.)  *Cf. Lee*, 505 U.S.
at 593-94 (finding Establishment Clause violation where students were required to
take part in an approximately two-minute prayer as part of a graduation ceremony).
Indeed, Plaintiffs appear to argue that the "coercion" here applies to the secondary
inspection setting that Plaintiffs experienced, rather than coercion to "support or
participate in religion or its exercise."  (*See* Opp. at 18 ("The secondary inspection
setting in which religious questioning occurs is inherently coercive."); *Lee*, 505 U.S.
at 587.  Here, Plaintiffs allege only that they were coerced into participating in
secondary inspection rather than any religious activity.  (*See* Compl. ¶ 32 ("CBP
officers have questioned Imam Kariye about his Muslim faith on at least five
occasions.  On each occasion, the environment was coercive."); *id*. ¶¶ 36, 40, 44, 50,
55 (describing the "coercive circumstances of [the] detention"; *id*. ¶¶ 74, 78, 82, 86,
91 (alleging the same for Plaintiff Mouslli); *id*. ¶¶ 112, 115, 119, 129 (alleging the
same for Plaintiff Shah).)

　　　　Accordingly, the court finds that *Kennedy*, not *Larson* or *Inouye*, sets forth the
relevant standard for analyzing Establishment Clause violations.  142 S. Ct. 2428; *see
also Freedom From Religion Found.*, 896 F.3d at 1149.  Given the recency of the
decision, the court observes that there is limited case law interpreting and applying the
*Kennedy* standard to analogous cases.  In the absence of such authority, the court
considers historical practices regarding the government's authority to question
individuals at the border, per the Supreme Court's instruction to interpret the
Establishment Clause "by reference to historical practices and understandings."  142
S. Ct. at 2428.  *See also Sabra v. Maricopa Cnty. Cmty. Coll. Dist*., 44 F.4th 867, 888
(9th Cir. 2022) ("Instead of relying on the *Lemon* test, lower courts must now interpret
the Establishment Clause by 'reference to historical practices and understandings.' . . .

Going forward, 'the line that courts and governments must draw between the permissible and the impermissible has to accord with history and faithfully reflect the understanding of the Founding Fathers.'") (citation and internal quotation marks omitted); *Kane v. de Blasio*, 2022 WL 3701183, at *10 (S.D.N.Y. Aug. 26, 2022) (applying *Kennedy* test to an Establishment Clause challenge to New York's vaccine mandate and reviewing the "long history of vaccination requirements in this country and in this Circuit.").

The court finds substantial legal authority supporting the government's historically broad authority to implement security measures at the border.  In *United States v. Montoya de Hernandez*, 473 U.S. 531 (1985), the Supreme Court explained the plenary authority of the Executive Branch at the border:

> Since the founding of our Republic, Congress has granted the Executive plenary authority to conduct routine searches and seizures at the border, without probable cause or a warrant, in order to regulate the collection of duties and to prevent the introduction of contraband into this country. . . . [The] Court has long recognized Congress' power to police entrants at the border . . . .  Consistent[], therefore, with Congress' power to protect the Nation by stopping and examining persons entering this country, the Fourth Amendment's balance of reasonableness is qualitatively different at the international border than in the interior.  Routine searches of the persons and effects of entrants are not subject to any requirement of reasonable suspicion, probable cause, or warrant . . . .  These cases reflect longstanding concern for the protection of the integrity of the border.

473 U.S. at 537-38.

The Supreme Court has repeatedly emphasized that such plenary authority is rooted in historical practices and understanding of the government's authority at the border.  In *United States v. Ramsey,* 431 U.S. 606 (1977), the Supreme Court explained:

> That searches made at the border, pursuant to the long-standing right of the sovereign to protect itself by stopping and examining persons and property

crossing into this country, are reasonable simply by virtue of the fact that they occur at the border, should, by now, require no extended demonstration . . . .   Border searches, then, from before the adoption of the Fourth Amendment, have been considered to be "reasonable" by the single fact that the person or item in question had entered into our country from outside.    There has never been any additional requirement that the reasonableness of a border search depended on the existence of probable cause.  This longstanding recognition that searches at our borders without probable cause and without a warrant are nonetheless "reasonable" has a history as old as the Fourth Amendment itself.  We reaffirm it now.

431 U.S. at 616-19.

Additionally, the court finds substantial authority holding that maintaining border security is a compelling government interest.  *See Haig v. Agee*, 453 U.S. 280, 307 (1981) ("It is obvious and unarguable that no governmental interest is more compelling than the security of the Nation.") (citation and internal quotation marks omitted); *Holder v. Humanitarian L. Project*, 561 U.S. 1, 28 (2010) ("Everyone agrees that the Government's interest in combating terrorism is an urgent objective of the highest order."); *United States v. Flores-Montano*, 541 U.S. 149, 152 (2004) ("The Government's interest in preventing the entry of unwanted persons and effects is at its zenith at the international border."); *Al Haramain Islamic Found., Inc. v. U.S. Dep't of Treasury*, 686 F.3d 965, 980 (9th Cir. 2012) ("On the other side of the scale, the government's interest in national security cannot be understated."); *Tabbaa v. Chertoff*, 509 F.3d 89, 103 (2d Cir. 2007) ("It is undisputed that the government's interest in protecting the nation from terrorism constitutes a compelling state interest."); *Carroll v. United States*, 267 U.S. 132, 154 (1925) ("Travelers may be so stopped in crossing an international boundary because of national self-protection reasonably requiring one entering the country to identify himself as entitled to come in, and his belongings as effects which may be lawfully brought in.")

In light of the case law holding that the government has plenary authority at the border and that maintaining border security is a compelling government interest,

1 the court finds that "reference to historical practices and understandings" weighs

2 against finding an Establishment Clause violation based on religious questioning at

3 the border. *Kennedy*, 142 S. Ct. at 2428.

4   Accordingly, Plaintiffs have not sufficiently alleged an Establishment Clause

5 violation and the court **GRANTS** the Motion as to Plaintiffs' Establishment Clause

6 claim (Count 1).

7   **C. Second Claim (Violation of the First Amendment Free Exercise Clause)**

8   The Free Exercise Clause of the First Amendment of the U.S. Constitution

9 provides that "Congress shall make no law respecting an establishment of religion, or

10 prohibiting the free exercise thereof." U.S. Const., amend. I. "The right to freely

11 exercise one's religion, however, 'does not relieve an individual of the obligation to

12 comply with a 'valid and neutral law of general applicability on the ground that the

13 law proscribes (or prescribes) conduct that his religion prescribes (or proscribes).'"

14 *Stormans, Inc. v. Selecky*, 586 F.3d 1109, 1127 (9th Cir. 2009) (quoting *Emp. Div. v.*

15 *Smith*, 494 U.S. 872, 879 (1990)).

16   "[A] law that is neutral and of general applicability need not be justified by a

17 compelling governmental interest even if the law has the incidental effect of

18 burdening a particular religious practice. Neutrality and general applicability are

19 interrelated, and . . . failure to satisfy one requirement is a likely indication that the

20 other has not been satisfied." *Church of the Lukumi Babalu Aye*, 508 U.S. at 531. "A

21 law failing to satisfy these requirements must be justified by a compelling

22 governmental interest and must be narrowly tailored to advance that interest." *Id*. at

23 531-32. But "[f]acial neutrality is not determinative. The Free Exercise Clause, like

24 the Establishment Clause, extends beyond facial discrimination." *Id*. at 534. "Official

25 action that targets religious conduct for distinctive treatment cannot be shielded by

26 mere compliance with the requirement of facial neutrality. The Free Exercise Clause

27 protects against governmental hostility which is masked, as well as overt." *Id*.

28

Plaintiffs alleging a Free Exercise claim must "allege a substantial burden on their religious practice or exercise." *Cal. Parents for the Equalization of Educ. Materials v. Torlakson*, 973 F.3d 1010, 1016 (9th Cir. 2020), *cert. denied sub nom. Cal. Parents for Equalization of Educ. Materials v. Torlakson*, 141 S. Ct. 2583 (2021). "The free exercise inquiry asks whether government has placed a substantial burden on the observation of a *central* religious belief or practice and, if so, whether a compelling governmental interest justifies the burden." *Hernandez v. Comm'r*, 490 U.S. 680, 699 (1989) (emphasis added). Thus, "[t]he Free Exercise Clause of the First Amendment protects only 'the observation of a central religious belief or practice.'" *Navajo Nation v. U.S. Forest Serv.*, 535 F.3d 1058, 1076 (9th Cir. 2008) (quoting *Hernandez*, 490 U.S. at 699).

### a. Plaintiffs Have Not Sufficiently Alleged a Substantial Burden[2]

### i. Plaintiffs' Alleged Burden Is a Subjective Chilling Effect

The parties first dispute whether the protective measures taken by Plaintiffs constitute a substantial burden or are merely a "subjective chilling effect." (Mot. at 24-28; Opp. at 20-24.) Defendants cite to *Vernon v. City of Los Angeles*, 27 F.3d 1385 (9th Cir. 1994) (cert. denied, 115 S. Ct. 510) and *Dousa v. U.S. Dep't of Homeland Sec.*, 2020 WL 434314, at *5 (S.D. Cal. Jan. 28, 2020) for the proposition that a plaintiff is not substantially burdened in their religious practice when they voluntarily refrain from religious activity. (Mot. at 26-27.) The court reviews both cases below.

---

[2] Plaintiffs argue in the alternative that they are not required to plead a substantial burden under the Free Exercise Clause because the Supreme Court has not applied such a requirement to Free Exercise claims. (Opp. at 24-26.) In the absence of binding authority holding that a substantial burden is not required to assert a Free Exercise claim, the court continues to follow existing precedent.

In *Vernon*, the Ninth Circuit considered whether the plaintiff, the Assistant Chief of Police of the Los Angeles Police Department ("LAPD"), experienced a substantial burden when the LAPD conducted an investigation into "whether [plaintiff's] religious views were having an impermissible effect on his on-duty police department performance." *Id.* at 1388.  The plaintiff in *Vernon* alleged that the investigation "chilled [him] in the exercise of his religious beliefs," because he "fear[ed] that he can no longer worship as he chooses, consult with his ministers and the elders of his church, participate in Christian fellowship and give public testimony to his faith without severe consequences." *Id.* at 1394.  The plaintiff in *Vernon* thus argued that the investigation "interfered with [his] freedom to worship in the way [he] want[s] without repercussions." *Id.*  The Ninth Circuit found that, based on the record, the investigation "resulted in no disciplinary action being taken," and that the plaintiff had admitted "in his deposition testimony that no one has specifically told him that he cannot [consult with his church elders]." *Id.* at 1395.  Based on that record, the Ninth Circuit held that plaintiff "failed to show any concrete and demonstrable injury" and a substantial burden could not be based on "mere subjective chilling effects with neither a claim of specific present objective harm [n]or a threat of specific future harm." *Id.* (citation and internal quotation marks omitted).

In *Dousa*, the district court considered whether the plaintiff, a pastor who was allegedly subjected to government "surveillance, detention, and harassment" for her activities ministering to asylum seekers at the U.S.-Mexico border, had a cognizable Free Exercise claim.  2020 WL 434314, at *1.  Plaintiff alleged she suffered three distinct harms from the government's activities: (1) the government revoked, or at least attempted to revoke, her border crossing card ("SENTRI" card), hindering her ability to enter the United States; (2) the government detained and interrogated her on January 2, 2019; and (3) the government monitored her domestic activities. *Id.* at *3.  Plaintiff argued the cumulative effect of these harms was that she was "dissuaded from traveling to Mexico and ministering to refugees, something her religious beliefs

compel her to do" and that she felt "compelled to warn penitents about the possibility of government surveillance, chilling her ability to provide pastoral counseling and absolution." *Id.*

The *Dousa* court held that because the challenged government action was "neither regulatory, proscriptive [n]or compulsory," "the [threshold] question is not necessarily whether the Government action is neutral and generally applicable, but rather 'whether it substantially burdens a religious practice and either is not justified by a substantial state interest or is not narrowly tailored to achieve that interest.'" *Id.* at *7 (quoting *Am. Family Ass'n*, 277 F.3d at 1123-24). Analyzing this threshold question, the court held that plaintiff's alleged harms did not rise to the level of a substantial burden because plaintiff's decision to refrain from providing religious counseling were "subjective chills." *Id.* at *8. Based on evidence of plaintiff's continued ability to travel and use her Global Entry privileges, the court held that plaintiff did not face a "present objective harm [n]or a threat of specific future harm" and that "any harms felt are not the direct result of government action, but rather a result of her decision to limit her religious practices for her own subjective reasons." *Id.* However, the court clarified that "if the Government had revoked Dousa's SENTRI card (and Dousa could show that the revocation was the result of her engaging in protected activity), the Court would have no problem finding a substantial burden" because the revocation "would effectively amount to a government sanction, and it would undoubtedly make it more difficult for her to travel and to practice her sincerely held beliefs." *Id.*

Here, Plaintiffs allege that they were intentionally targeted for religious questioning on ten occasions, and information about their religious beliefs, practices, and associations was collected and is now maintained in government databases. (*See* Compl. ¶¶ 33-57 (Plaintiff Kariye alleges he was subjected to religious questioning on five occasions from September 12, 2017, to January 1, 2022); *id*. ¶¶ 75-93 (Plaintiff Mouslli alleges he was subjected to religious questioning on four occasions from

1   August 9, 2018, to June 5, 2021); *id*. ¶¶ 107-43 (Plaintiff Shah alleges he was

2   subjected to religious questioning on one occasion on May 7, 2019).)  Plaintiffs

3   further allege they have suffered emotional distress from these experiences.  (*Id*.

4   ¶¶ 62-72, 94-106, 135-43.)

5        Plaintiffs also allege they have modified their religious practices during

6   international travel because of their experiences.  More specifically, Plaintiff Kariye

7   alleges he now "modifies or eliminates certain religious practices to avoid calling

8   attention to his faith," including "no longer wear[ing] his kufi at the airport or the

9   border," "refrain[ing] from . . . physical acts of prayer at the airport and the border,"

10  and "avoid[ing] carrying religious texts while traveling back into the United States."

11  (*Id*. ¶¶ 66-70.)  Plaintiff Mouslli also "refrains from these physical acts of prayer at the

12  airport and the border."  (*Id*. ¶ 104).  Plaintiff Shah alleges "the next time he travels

13  internationally, he intends to leave his journal at home to avoid having it become a

14  basis for questioning."  (*Id*. ¶ 141.)

15       The court finds that the ongoing harms alleged by Plaintiffs here—their

16  modifications to religious practices during international travel—hew closely to the

17  harms alleged in *Vernon* and *Dousa*, and similarly do not constitute a substantial

18  burden under the Free Exercise Clause because they are subjective chilling effects.

19  *See Vernon*, 27 F.3d at 1395 (substantial burden could not be based on "mere

20  subjective chilling effects with neither a claim of specific present objective harm [n]or

21  a threat of specific future harm"); *Dousa*, 2020 WL 434314, at *8 (no substantial

22  burden where "any harms felt are not the direct result of government action, but rather

23  a result of her decision to limit her religious practices for her own subjective

24  reasons.").

25        Indeed, Plaintiffs describe their actions as *preventative* measures they adopted

26  to avoid questioning in the future, not coerced actions compelled by government

27  officials.  (*See* Compl. ¶¶ 66-70) (Plaintiff Kariye alleges he "modifies or eliminates

28  certain religious practices to avoid calling attention to his faith," including "no longer

wear[ing] his kufi at the airport or the border," "refrains from . . . physical acts of prayer at the airport and the border," and "avoids carrying religious texts while traveling back into the United States"); *id*. ¶ 104 (Plaintiff Mouslli "refrains from these physical acts of prayer at the airport and the border"); *id*. ¶ 141 (Plaintiff Shah alleges "the next time he travels internationally, he intends to leave his journal at home to avoid having it become a basis for questioning.").  As in *Dousa*, the court finds that "any harms felt are not the direct result of government action, but rather a result of [plaintiff's] decision to limit her religious practices for her own subjective reasons."  2020 WL 434314, at *8; *see also Am. Fam. Ass'n*, 277 F.3d at 1124 ("[W]hen the challenged government action is neither regulatory, proscriptive [n]or compulsory, alleging a subjective chilling effect on free exercise rights is not sufficient to constitute a substantial burden.").  Accordingly, the court finds that the protective measures alleged by Plaintiffs constitute a subjective chilling effect rather than a substantial burden.

> ii.  **Plaintiffs Do Not Plausibly Allege They Were Deprived of a Government Benefit or Coerced to Act Contrary to their Religious Beliefs**

Although Plaintiffs urge the court to follow the reasoning of *Navajo Nation v. U.S. Forest Serv.,* 535 F.3d 1058 (9th Cir. 2008) to find that they have plausibly alleged a substantial burden, the court's analysis is no different under *Navajo Nation*. (Opp. at 20.)  In *Navajo Nation*, the Ninth Circuit considered whether the "use of artificial snow for skiing on a portion of a public mountain sacred in [the plaintiffs'] religion" violates RFRA and other unrelated statutes.  *Id.* at 1062-63.  The harm alleged was to the plaintiffs' "subjective spiritual experience," "[t]hat is, the presence of the artificial snow on the Peaks is offensive to the Plaintiffs' feelings about their religion and will decrease the spiritual fulfillment Plaintiffs get from practicing their religion on the mountain."  *Id.* at 1063.  Under these facts, the Ninth Circuit explained that "a government action that decreases the spirituality, the fervor, or the satisfaction

with which a believer practices his religion is not what Congress has labeled a 'substantial burden'—a term of art chosen by Congress to be defined by reference to Supreme Court precedent—on the free exercise of religion." *Id.*  The Ninth Circuit further explained that a substantial burden is "imposed only when individuals are forced to choose between following the tenets of their religion and receiving a governmental benefit (*Sherbert* [374 U.S. 398 (1963)]) or coerced to act contrary to their religious beliefs by the threat of civil or criminal sanctions (*Yoder* [406 U.S. 205 (1972)])." *Id.* at 1070.  The court finds that because the Ninth Circuit's analysis in *Navajo Nation* is explicitly grounded in binding Supreme Court precedent in *Sherbert* and *Yoder*, it does not dictate a departure from the analysis above.

The court finds Plaintiffs have not adequately alleged that they were "forced to choose between following the tenets of their religion and receiving a government benefit" under *Sherbert* or "coerced to act contrary to their religious beliefs" under *Yoder*.[3]  *Id.* at 1070.  The court reviews both cases below.  In *Sherbert*, the Supreme Court held that South Carolina could not deny unemployment benefits to a claimant, a member of the Seventh-Day Adventist Church, who refused jobs that required the claimant to work on the Sabbath Day of her faith.  374 U.S. at 398.  In *Yoder*, the Supreme Court held that respondents' criminal convictions for violating Wisconsin's

---

[3] The Ninth Circuit has "continued to apply the *Sherbert* substantial burden test to government conduct that did not involve an actual regulation or criminal law." *Am. Fam. Ass'n*, 277 F.3d at 1124; *see also Kennedy,* 142 S. Ct. at 2421 (listing *Sherbert* as one of the "Court's precedents" relevant to analyzing a plaintiff's Free Exercise claim); *id.* at 2421-22 ("[A] plaintiff may carry the burden of proving a free exercise violation in various ways, including by showing that a government entity has burdened his sincere religious practice pursuant to a policy that is not 'neutral' or 'generally applicable.' . . .  Should a plaintiff make a showing like that, this Court will find a First Amendment violation unless the government can satisfy 'strict scrutiny' by demonstrating its course was justified by a compelling state interest and was narrowly tailored in pursuit of that interest.").

compulsory school-attendance law were invalid under the Free Exercise Clause based on respondents' belief that their children's compulsory attendance at high school violated the Amish religion and way of life.  406 U.S. at 206-09.

Here, Plaintiffs have not plausibly alleged they were deprived of a government benefit or coerced to act contrary to their religious beliefs.  First, under *Sherbert*, Plaintiffs argue they were deprived of the benefit of being allowed to reenter the United States.  (*See* Opp. at 20 ("The governmental benefit—or in this case, right— that hangs in the balance each time Plaintiffs travel internationally is permission to reenter their own country").)  Assuming that permission to reenter the United States is a government benefit, the court finds the Complaint does not plausibly allege that Plaintiffs were deprived of such a benefit.  To the contrary, although Plaintiffs experienced secondary inspection on ten occasions, the Complaint alleges Plaintiffs were allowed to renter the United States on each such occasion.  (*See generally*, Compl.)  *See also Flores-Montano*, 541 U.S. at 155 n.3 (2004) ("We think it clear that delays of one to two hours at international borders are to be expected.").

Second, under *Yoder*, Plaintiffs argue they are coerced because if they "do not reveal information about their religious beliefs and practices, they risk being subjected to further harassment and detention for an unknown period of time" and "border officers implicitly (and even explicitly) threaten Plaintiffs with sanctions for not complying."  (Opp. at 20.)  The court observes that the coercion argued by Plaintiffs here appears to be pressure to "reveal information about their religious beliefs and practices."  (*Id*.)  However, the Ninth Circuit has described the coercion contemplated by *Yoder* as an individual being "coerced to act contrary to their *religious beliefs* by the threat of civil or criminal sanctions."  *Navajo Nation*, 535 F.3d at 1075.  Here, the Complaint does not sufficiently allege why revealing information about Plaintiffs' religious beliefs and practices is contrary to their religious beliefs.  Nor does the Complaint sufficiently allege what civil or criminal sanctions were threatened by Defendants.  Accordingly, the court finds that the Complaint does not plausibly allege

Plaintiffs were deprived of the government benefit of reentering the United States or that by revealing information about their religious beliefs and practices, they were coerced to act contrary to their religious beliefs.

Nor is the court persuaded by Plaintiffs' remaining citations. (*See* Opp. at 20-24) (citing *Jones v. Slade*, 23 F.4th 1124 (9th Cir. 2022), *Ohno v. Yasuma*, 723 F.3d 984 (9th Cir. 2013), *Fazaga v. Fed. Bureau of Investigation*, 965 F.3d 1015 (9th Cir. 2020); *El Ali v. Barr*, 473 F. Supp. 3d 479 (D. Md. 2020).)  The court briefly reviews and distinguishes these cases here.  *Jones* analyzes the meaning of "substantial burden" under the Religious Land Use and Institutionalized Persons Act ("RLUIPA"), 42 U.S.C. §§ 2000cc, *et seq*. but notes that this statutory standard is "more generous to the religiously observant than the Free Exercise Clause."  23 F.4th at 1139.  *Ohno* reiterates the same standard discussed by the court above—that a "substantial burden must place more than an inconvenience on religious exercise" and "must have a "tendency to coerce individuals into acting contrary to their religious beliefs" or "exert substantial pressure on an adherent to modify his behavior and to violate his beliefs."  723 F.3d at 1011.  In *Fazaga*, the Ninth Circuit held that a substantial burden existed where plaintiffs alleged that they altered their religious practices because of FBI surveillance, including trimming their beards, no longer wearing skull caps, decreasing attendance at the mosque, and no longer counseling congregants.  965 F.3d at 1061.  The court observes that plaintiffs in *Fazaga* alleged modified behavior during a fourteen-month surveillance program as compared to the alleged modifications made during international travel alleged here.  *Id.* at 1026-29.  The court further observes that the Ninth Circuit's decision in *Fazaga* has since been reversed and remanded by the Supreme Court.  *See Fed. Bureau of Investigation v. Fazaga*, 142 S. Ct. 1051 (2022).

Finally, although a Maryland district court held in *El Ali* that the "very process of inquiry *may* itself impose a substantial burden on the individuals' religious beliefs," the court is aware of no authority in the Ninth Circuit reiterating this proposition.  473

F. Supp. 3d at 526 (emphasis added).  In *El Ali*, the "inquiry" at issue included the pat-down and interrogation of a plaintiff's disabled mother because she was a travel companion, the screening of a two-month-old baby, and law enforcement agents offering to remove plaintiffs from watchlists in exchange for becoming informants on religious leaders.  473 F. Supp. 3d at 495-97.  By contrast, in this case, Plaintiffs allege ten incidents of questioning (see Compl. ¶¶ 33-57, 75-93, 108-130) and employing "protective measures" to avoid additional CBP scrutiny (*id.* ¶¶ 71, 105, 142).  Because the facts in this case are distinguishable from *El Ali,* the court finds the facts do not plausibly demonstrate that Defendants' actions constitute a substantial burden under *Sherbert* and *Yoder*.  (*See supra*, Section C.)

Accordingly, the court finds that Plaintiffs have not sufficiently alleged a substantial burden to sustain their Free Exercise Claim.

### b. Even if Plaintiffs Sufficiently Alleged a Substantial Burden, the Court would find the Questioning is Narrowly Tailored to Advance a Compelling Government Interest

Alternatively, Defendants argue that even if Plaintiffs had sufficiently alleged a substantial burden, "the questioning alleged here is the least restrictive means of advancing a compelling government interest."  (Mot. at 27 (discussing Plaintiffs' Free Exercise Clause and RFRA claims).)  The court observes that even if Plaintiffs had sufficiently alleged a substantial burden, based on the Complaint's allegations and the record before the court, the record supports Defendants' questioning is a narrowly tailored means of advancing a compelling government interest.

"[A] law that is neutral and of general applicability need not be justified by a compelling governmental interest even if the law has the incidental effect of burdening a particular religious practice."  *Church of the Lukumi Babalu Aye*, 508 U.S. at 531.  "A law failing to satisfy these requirements must be justified by a compelling governmental interest and must be narrowly tailored to advance that interest."  *Id*. at 531-32.  "The free exercise inquiry asks whether government has

1    placed a substantial burden on the observation of a central religious belief or practice

2    and, if so, whether a compelling governmental interest justifies the burden."

3    *Hernandez*, 490 U.S. at 699.

4        Defendants identify the compelling interest here as the government's interest in

5    "protecting its borders and preventing and investigating potential acts of terrorism."

6    (Mot. at 27.)  Defendants cite several cases supporting the proposition that the

7    government has a compelling interest in this area.  (*Id.*)  *See Haig*, 453 U.S. at 307 ("It

8    is obvious and unarguable that no governmental interest is more compelling than the

9    security of the Nation.") (citation and internal quotation marks omitted);

10   *Humanitarian L. Project*, 561 U.S. at 28 ("Everyone agrees that the Government's

11   interest in combating terrorism is an urgent objective of the highest order."); *Flores-*

12   *Montano*, 541 U.S. at 152 ("The Government's interest in preventing the entry of

13   unwanted persons and effects is at its zenith at the international border."); *Al*

14   *Haramain Islamic Found.*, 686 F.3d at 980 ("On the other side of the scale, the

15   government's interest in national security cannot be understated."); *Tabbaa*, 509 F.3d

16   at 103 ("It is undisputed that the government's interest in protecting the nation from

17   terrorism constitutes a compelling state interest.")

18       The court notes that case law holding that the government's action was *not*

19   narrowly tailored typically addresses conduct broader than the questioning alleged

20   here.  *Cf. Shelton v. Tucker*, 364 U.S. 479, 488 (1960) (law not narrowly tailored

21   where statute required teachers to list "the church to which he belongs, or to which he

22   has given financial support," "his political party, and every political organization to

23   which he may have contributed over a five-year period" and "every conceivable kind

24   of associational tie—social, professional, political, avocational, or religious"); *id.*

25   ("[E]ven though the governmental purpose be legitimate and substantial, that purpose

26   cannot be pursued by means that broadly stifle fundamental personal liberties when

27   the end can be more narrowly achieved.").  *See also Fulton v. City of Philadelphia,*

28   *Pa.*, 141 S. Ct. 1868, 1882 (2021) (holding that City of Philadelphia violated Free

1  Exercise Clause where it conditioned a religious agency's ability to participate in the
2  foster care system on the agency agreeing to certify same-sex couples as foster
3  parents).

4       Additionally, some of Plaintiffs' allegations support the conclusion that the
5  questioning alleged in this case would be a narrowly tailored means of achieving the
6  compelling government interest of maintaining border security.  For example, the
7  Complaint alleges that Plaintiffs Kariye and Mouslli have been on the U.S.
8  government watchlist for several years preceding the incidents of questioning.  (*See*
9  Compl. ¶¶ 58-59 (Plaintiff Kariye has been experiencing travel issues consistent with
10 placement on a government watchlist since 2013); *id.* ¶¶ 94-95 (Plaintiff Mouslli has
11 been experiencing travel issues consistent with placement on a government watchlist
12 since 2013).)  The court notes that the legality of the U.S. government's Terrorist
13 Screening Database—the government's watchlist of known or suspected terrorists—
14 has been upheld by several Circuits.  *See Elhady v. Kable*, 993 F.3d 208, 213 (4th Cir.
15 2021) (describing the database as "the federal government's consolidated watchlist of
16 known or suspected terrorists" and holding that "any wholesale reworking or
17 significant modification of the program rests within the purview of the democratic
18 branches"); *Abdi v. Wray*, 942 F.3d 1019, 1024 (10th Cir. 2019) (holding no due
19 process claim from placement on the list); *Beydoun v. Sessions*, 871 F.3d 459, 467
20 (6th Cir. 2017) (holding plaintiffs did not adequately allege their fundamental rights
21 were violated from placement on the list).

22      As for Plaintiff Shah, the Complaint alleges that CBP officers reviewed
23 Plaintiff Shah's notebook during secondary inspection and that the religious
24 questioning was due to the contents of Plaintiff Shah's notebook.  (*See* Compl. ¶ 118.)
25 The Complaint further alleges that in response to a request for information regarding
26 the questioning, CBP produced a redacted version of an incident report stating that
27 Plaintiff Shah's detention and questioning was "Terrorist Related."  (*Id*. ¶ 134.)  The
28 incident report and Plaintiff Shah's allegations of the questioning both indicate that

-48-

the questioning began only after Defendants examined his belongings and read the contents of his journal.  (*See id*. ¶¶ 118, 134.)  The court notes that the Complaint does not allege why Plaintiffs Kariye and Mouslli are on government watchlists or what was included in the contents of Plaintiff Shah's notebook—the key facts that appear to have precipitated the incidents of religious questioning.

Even if Plaintiffs had sufficiently alleged a substantial burden, the court finds that Plaintiffs have not sufficiently addressed how Defendants' questioning did not further a compelling government interest.  Accordingly, the court **GRANTS** the Motion as to Plaintiffs' Free Exercise Clause claim (Count 2).

**D. Third Claim (Violation of the First Amendment Right to Free Association)**

"The First Amendment prohibits government from 'abridging the freedom of speech, or of the press; or the right of the people peaceably to assemble, and to petition the Government for a redress of grievances.'"  *Ams. for Prosperity Found. v. Bonta*, 141 S. Ct. 2373, 2382 (2021).  The Supreme Court "has 'long understood as implicit in the right to engage in activities protected by the First Amendment a corresponding right to associate with others.'"  *Id*. (quoting *Roberts v. United States Jaycees*, 468 U.S. 609, 622 (1984)).  "[T]he freedom of association may be violated where a group is required to take in members it does not want . . . where individuals are punished for their political affiliation . . . or where members of an organization are denied benefits based on the organization's message."  *Id*. at 2382.  In addition, "[i]t is hardly a novel perception that compelled disclosure of affiliation with groups engaged in advocacy may constitute as effective a restraint on freedom of association as [other] forms of governmental action."  *NAACP v. Alabama ex rel. Patterson*, 357 U.S. 449, 462 (1958).

In *Ams. for Prosperity Found.*, the Supreme Court explained the standard of review that applies to First Amendment challenges to compelled disclosure:

We have since settled on a standard referred to as "exacting scrutiny." *Buckley v. Valeo*, 424 U.S. 1, 64, 96 S.Ct. 612, 46 L.Ed.2d 659 (1976) (per curiam). Under that standard, there must be "a substantial relation between the disclosure requirement and a sufficiently important governmental interest." *Doe v. Reed*, 561 U.S. 186, 196, 130 S.Ct. 2811, 177 L.Ed.2d 493 (2010) (internal quotation marks omitted). "To withstand this scrutiny, the strength of the governmental interest must reflect the seriousness of the actual burden on First Amendment rights." *Ibid.* (internal quotation marks omitted). Such scrutiny, we have held, is appropriate given the "deterrent effect on the exercise of First Amendment rights" that arises as an "inevitable result of the government's conduct in requiring disclosure." *Buckley*, 424 U.S., at 65, 96 S.Ct. 612.

141 S. Ct. at 2373.

Here, Plaintiffs argue that "by compelling Plaintiffs to disclose sensitive associational information and retaining that information for decades, border officers do not further any valid government interest, and their questions are not narrowly tailored to the detection of terrorists." (Opp. at 26.) Plaintiffs point to Defendants' religious questioning, including questions such as "Are you Sunni or Shi'a?" and "What mosque do you attend?" as violating Plaintiffs' right to freedom of association. (*Id.* (citing Compl. ¶¶ 19, 35, 47, 77, 81, 85, 90, 117).) According to Plaintiffs, Defendants' religious questioning and the retention of Plaintiffs' information cannot survive the "exacting scrutiny" standard the Supreme Court set forth in *Ams. for Prosperity Found.* (Opp. at 26.)

The parties do not dispute that the relevant governmental interest here is securing the border and preserving national security. (*See generally* Mot. and Opp.) Plaintiffs identify the harm to their associational rights as Defendants' questioning and the retention of Plaintiffs' information. (Opp. at 26.) Defendants argue the questioning at issue is "plainly intertwined with the compelling governmental interests of securing the border and preserving national security." (Mot. at 28.)

Accordingly, the relevant question before the court is whether there is a "substantial relation between the disclosure requirement and a sufficiently important

1    governmental interest." *Reed*, 561 U.S. at 196.  Based on the allegations in the

2    Complaint, the court finds that there is a plausible, substantial relation between

3    Defendants' compelled disclosure—the religious questioning of Plaintiffs and

4    collection of information—and the governmental interests of securing the border and

5    preserving national security.  Indeed, as discussed above, certain of Plaintiffs'

6    allegations appear to provide an explanation for Defendants' questioning of Plaintiffs.

7         The Complaint alleges that Plaintiffs Kariye and Mouslli have been on U.S.

8    government watchlists since 2013 and 2017, respectively.  (*See* Compl. ¶¶ 58-59, 94-

9    95.)  *Cf. Tabbaa*, 509 F.3d at 94 (affirming district court's grant of summary judgment

10   on plaintiffs' freedom of association claim based on Muslim travelers' experiences of

11   being searched and questioned at the border even where "Plaintiffs had no criminal

12   records, and at no time did CBP have reasonable suspicion that any particular plaintiff

13   had committed a crime or was associated with terrorists").  Additionally, as

14   Defendants argue, for Plaintiff Kariye, who works as an "imam at a local mosque"

15   (Compl. ¶ 8), questions about his associations could plausibly be considered questions

16   related to his occupation.  (Mot. at 18.)

17        As for Plaintiff Shah—the only Plaintiff not alleged to be on a government

18   watchlist—the court finds that the same "substantial relation between the disclosure

19   requirement and a sufficiently important governmental interest" exists.  *Reed*, 561

20   U.S. at 196.  As discussed above, Plaintiff Shah's questioning followed a search of the

21   contents of his journal.  (*See* Compl. ¶ 118 ("When Mr. Shah asked Officer 2 why he

22   was asking these questions, the officer responded, "I'm asking because of what we

23   found in your journal").)  The court notes that the Complaint as currently pled alleges

24   that Plaintiff was selected for secondary inspection after a trip to Serbia and Bosnia

25   and that the report of the interview was later labeled as "Terrorist Related."  (*Id.*

26   ¶¶ 108, 134.)

27         Even if Plaintiffs had sufficiently alleged a substantial disclosure under the

28   First Amendment, based on the allegations regarding Plaintiffs' questioning, the court

1    would find that Defendants have met their burden to show that the disclosure is

2    narrowly tailored to advance a compelling government interest.  (*See supra*, Section

3    C.)  Because the court would find that the government has met this more stringent

4    standard, it necessarily follows that the government satisfies the lower standard of

5    "exacting scrutiny", which requires only that there be a plausible "substantial relation

6    between the disclosure requirement and a sufficiently important governmental

7    interest."  *Reed*, 561 U.S. at 196.

8           Moreover, the court finds that Plaintiffs' cited authority regarding disclosures of

9    information is not sufficiently analogous to the facts of this case to be persuasive.

10   (*See* Opp. at 26-29) (citing *Ams. for Prosperity Found.*, 141 S. Ct. at 2379-89 (holding

11   that California's requirement for charitable organization to disclose the identities of

12   their major donors through tax documents to the California Attorney General's Office

13   violates the First Amendment right to free association); *Shelton*, 364 U.S. at 488

14   (invalidating Arkansas statute requiring teachers in state-supported schools or colleges

15   to file an affidavit revealing "the church to which he belongs, or to which he has given

16   financial support," "his political party, and every political organization to which he

17   may have contributed over a five-year period," and "every conceivable kind of

18   associational tie—social, professional, political, avocational, or religious"); *Bursey v.*

19   *United States*, 466 F.2d 1059, 1085-88 (9th Cir. 1972) (reversing decision of district

20   court to hold witnesses who were members of the staff of The Black Panther

21   newspaper in contempt for refusing to answer certain questions propounded by federal

22   grand jury); *Clark v. Libr. of Cong.*, 750 F.2d 89, 104 (D.C. Cir. 1984) (reversing

23   decision of district court dismissing employee's complaint against the Library of

24   Congress regarding investigation into the employee's activities with a political group

25   affiliated with the Socialist Workers Party); *MacPherson v. I.R.S.*, 803 F.2d 479, 484

26   (9th Cir. 1986) (affirming the district court's grant of summary judgment to Internal

27   Revenue Service regarding surveillance of plaintiff connected with the "tax protester"

28   movement but noting that even "'incidental' surveillance and recording of innocent

people exercising their First Amendment rights may have [a] 'chilling effect'" on those rights); *Guan v. Mayorkas*, 530 F. Supp. 3d 237, 266 (E.D.N.Y. 2021) (holding that the journalist-plaintiffs "plausibly alleged that they were targeted for additional scrutiny based on their exercise of their First Amendment rights through their journalism and association with their sources and other members of the media, and that this additional scrutiny constituted a substantial burden").

To the contrary, the court notes that Plaintiffs specifically do not cite cases that are more factually analogous to the allegations of the Complaint—in other words, cases implicating border security and national security concerns. *See, e.g., Tabbaa*, 509 F.3d at 103 ("[T]he [government's] reach was carefully circumscribed: it applied only to those conferences about which the government had specific intelligence regarding the possible congregation of suspected terrorists, it was limited to routine screening measures, and it was confined to those individuals, regardless of their religion, whom CBP could establish had attended the conferences in question."); *Humanitarian L. Project v. Reno*, 205 F.3d 1130, 1133 (9th Cir. 2000) (affirming district court's denial of preliminary injunction to plaintiffs alleging that statute prohibiting contributions of support to foreign terrorist organizations "infringes their associational rights under the First Amendment").

Accordingly, the court **GRANTS** the Motion as to Plaintiffs' Freedom of Association claim (Count 3).

### E. Fourth Claim (Violation of the First Amendment (Retaliation))

A plaintiff asserting a First Amendment retaliation claim must allege the following three elements: "(1) [they were] engaged in a constitutionally protected activity, (2) the defendant's actions would chill a person of ordinary firmness from continuing to engage in the protected activity and (3) the protected activity was a substantial or motivating factor in the defendant's conduct." *O'Brien v. Welty*, 818 F.3d 920, 932 (9th Cir. 2016) (citation omitted); *see also Blair v. Bethel Sch. Dist.*, 608 F.3d 540, 543 (9th Cir. 2010) (listing the same three elements).

1    Plaintiffs' First Amendment Retaliation claim is only asserted as to Plaintiff

2    Shah and concerns Defendants' alleged retaliation against him for engaging in

3    protected activity.  (Opp. at 29-32.)  As a threshold matter, the parties do not

4    sufficiently address whether Plaintiff Shah's activity satisfies the first element of a

5    "constitutionally protected activity."  *O'Brien v. Welty*, 818 F.3d at 932.  Plaintiffs

6    describe the activity as Plaintiff Shah's "documenting his religious expression and

7    thoughts, and asserting his rights to border officers."  (Opp. at 30.)  Defendants state

8    "assuming *arguendo* that Plaintiff Shah engaged in constitutionally protected activity,

9    the complaint fails to allege either an 'adverse action' or a causal relationship between

10    that activity and Defendants' alleged actions."  (Mot. at 31.)

11    The court observes that constitutionally protected activity encompasses

12    expression of views, other than categories of speech courts have held to be

13    unprotected by the First Amendment.  *See Chaplinsky v. State of New Hampshire*, 315

14    U.S. 568, 571-72 (1942) ("There are certain well-defined and narrowly limited classes

15    of speech, the prevention and punishment of which have never been thought to raise

16    any Constitutional problem. These include the lewd and obscene, the profane, the

17    libelous, and the insulting or 'fighting' words."); *New York Times Co. v. Sullivan*, 376

18    U.S. 254, 269 (1964) ("Like insurrection, contempt, advocacy of unlawful acts, breach

19    of the peace, obscenity, solicitation of legal business, and the various other formulae

20    for the repression of expression that have been challenged in this Court, libel can

21    claim no talismanic immunity from constitutional limitations.").  *See also Obsidian*

22    *Fin. Grp., LLC v. Cox*, 740 F.3d 1284, 1291 (9th Cir. 2014) (holding in the context of

23    a First Amendment defamation claim that "[t]he protections of the First Amendment

24    do not turn on whether the defendant was a trained journalist, formally affiliated with

25    traditional news entities, engaged in conflict-of-interest disclosure, went beyond just

26    assembling others' writings, or tried to get both sides of a story.").

27    Here, the court finds that Plaintiff Shah's writing in a personal journal and

28    verbal speech constitute expression of views.  *See Kaplan v. California*, 413 U.S. 115,

119-20 (1973) ("As with pictures, films, paintings, drawings, and engravings, both oral utterance and the printed word have First Amendment protection until they collide with the long-settled position of this Court that obscenity is not protected by the Constitution."); *ETW Corp. v. Jireh Pub., Inc.*, 332 F.3d 915, 924 (6th Cir. 2003) ("The protection of the First Amendment is not limited to written or spoken words, but includes other mediums of expression, including music, pictures, films, photographs, paintings, drawings, engravings, prints, and sculptures."). Accordingly, the court finds that Plaintiffs have sufficiently alleged the first element of constitutionally protected activity regarding Plaintiff Shah's writing in his journal and his verbal communications with border officers.

As for the second element, the court finds that Plaintiffs have not sufficiently alleged that Defendants' actions would "chill a person of ordinary firmness from continuing to engage in the protected activity." *O'Brien*, 818 F.3d at 932. The parties' dispute regarding the second element focuses on whether Defendants' actions constitute a "routine" search under the Fourth Amendment, such that it would not chill a person of ordinary firmness. (*See* Mot. at 31-32 (arguing that Plaintiff Shah's border inspection was "routine" and that a two-hour inspection was not "atypical"); Opp. at 30 (arguing that Defendants' search of Plaintiff Shah's journal was non-routine, but that even if the search were routine, "the duration and scope of the inspection were nonetheless retaliatory").)

The test under the second element is "generic and objective." *O'Brien*, 818 F.3d at 933. "Whether [a plaintiff] himself was, or would have been, chilled is not the test." *Id.* Accordingly, the court considers whether Plaintiff Shah's allegations regarding his secondary inspection, questioning, and delay would "chill a person of ordinary firmness" from continuing to write in his journal and assert his constitutional rights, not whether Plaintiff Shah "was, or would have been chilled." *Id.* Here, Plaintiff Shah alleges he was escorted to a secondary inspection area by two CBP officers who searched his belongings. (Compl. ¶¶ 111-15). The search included

review of Plaintiff Shah's personal journal, phone, and laptop.  (*Id.* ¶¶ 113-16, 123-26).  Plaintiff Shah was then asked a series of questions about his religious beliefs, practices, and associations.  (*Id.* ¶¶ 117-19, 127-29).  The process of being escorted to secondary inspection, searched, and questioned by CBP officers took approximately two hours.  (*Id.* ¶ 130.)

Based on the allegations of the Complaint as applied to the law regarding border searches, the court finds that Plaintiffs have not sufficiently alleged the second element—that a person of ordinary firmness would be chilled from continuing the protected activity.  In *United States v. Cotterman*, the Ninth Circuit explained the contours of the scope of border searches:

> The broad contours of the scope of searches at our international borders are rooted in "the long-standing right of the sovereign to protect itself by stopping and examining persons and property crossing into this country." *Ramsey*, 431 U.S. at 616, 97 S. Ct. 1972.  Thus, border searches form "a narrow exception to the Fourth Amendment prohibition against warrantless searches without probable cause." *Seljan*, 547 F.3d at 999 (internal quotation marks and citation omitted).  Because "[t]he Government's interest in preventing the entry of unwanted persons and effects is at its zenith at the international border," *United States v. Flores–Montano*, 541 U.S. 149, 152, 124 S. Ct. 1582, 158 L. Ed. 2d 311 (2004), border searches are generally deemed "reasonable simply by virtue of the fact that they occur at the border." *Ramsey*, 431 U.S. at 616, 97 S. Ct. 1972.
>
> This does not mean, however, that at the border "anything goes." *Seljan*, 547 F.3d at 1000.  Even at the border, individual privacy rights are not abandoned but "[b]alanced against the sovereign's interests." *United States v. Montoya de Hernandez,* 473 U.S. 531, 539, 105 S. Ct. 3304, 87 L. Ed. 2d 381 (1985).  That balance "is qualitatively different . . . than in the interior" and is "struck much more favorably to the Government." *Id.* at 538, 540, 105 S. Ct. 3304.  Nonetheless, the touchstone of the Fourth Amendment analysis remains reasonableness. *Id.* at 538, 105 S. Ct. 3304.  The reasonableness of a search or seizure depends on the totality of the circumstances, including the scope and duration of the deprivation.

709 F.3d 952, 960 (9th Cir. 2013).

The Ninth Circuit has repeatedly held in the context of Fourth Amendment challenges that initial border searches of electronic devices and personal documents such as letters are reasonable even without particularized suspicion.  *See United States v. Seljan*, 547 F.3d 993, 1003 (9th Cir. 2008) ("An envelope containing personal correspondence is not uniquely protected from search at the border."); *United States v. Abbouchi*, 502 F.3d 850, 856 (9th Cir. 2007) ("Customs officers at the Louisville UPS hub did not need reasonable suspicion to search the contents of [a] UPS package [containing immigration documents, handwritten notes, and an identification booklet] because the search took place at the functional equivalent of the border."); *United States v. Tsai*, 282 F.3d 690, 696 (9th Cir. 2002) ([T]he INS looked briefly through [the traveler's] briefcase and luggage. The scope of the search clearly placed it within our cases' definition of a routine border search, requiring neither warrant nor individualized suspicion."); *Cotterman*, 709 F.3d at 960 ("[T]he legitimacy of the initial search of [the traveler's] electronic devices at the border is not in doubt. Officer Alvarado turned on the devices and opened and viewed image files while the [travelers] waited to enter the country."); *United States v. Arnold*, 533 F.3d 1003, 1009 (9th Cir. 2008) (holding that plaintiff "failed to distinguish how the search of his laptop and its electronic contents is logically any different from the suspicionless border searches of travelers' luggage that the Supreme Court and we have allowed" where CBP officers "simply "had [plaintiff] boot [the laptop] up, and looked at what [plaintiff] had inside").

Here, the court observes that the question is not whether Plaintiff Shah's search and questioning violated the Fourth Amendment; instead, the question is whether a person of ordinary firmness would have been chilled from engaging in protected activity in violation of the First Amendment.  But given Ninth Circuit and Supreme Court case law regarding what constitutes a routine border search, the court cannot say that Plaintiff Shah's border search—involving a search of his personal journal, phone, and laptop, being asked a series of questions about his religious beliefs, practices, and

associations, and being in secondary inspection for approximately two hours (Compl. ¶¶ 108-30)—would chill a person of ordinary firmness.  As discussed above, searches of personal documents and electronic devices are routine.  *Cf. Cotterman*, 709 F.3d at 966 (federal agents performed a "computer strip search" where "[a]fter their initial search at the border, customs agents made copies of the hard drives and performed forensic evaluations of the computers that took days to turn up contraband.").  The same is true for multi-hour delays at the border.  *See Flores-Montano*, 541 U.S. at 155 n.3 ("We think it clear that delays of one to two hours at international borders are to be expected.").  Further examination or questioning based on information uncovered in a search is also routine.  *Cotterman*, 709 F.3d at 967 ("In practical terms . . . border officials will conduct further, forensic examinations where their suspicions are aroused by what they find or by other factors. Reasonable suspicion leaves ample room for agents to draw on their expertise and experience to pick up on subtle cues that criminal activity may be afoot."); *United States v. Bravo*, 295 F.3d 1002, 1008 (9th Cir. 2002) ("Detention and questioning during routine searches at the border are considered reasonable within the meaning of the Fourth Amendment.").  *See also Tabbaa*, 509 F.3d at 98-99 ("Plaintiffs complain that they were required to answer intrusive questions about their activities at [a religious] conference, the content of the lectures they attended, and their reasons for attending.  But these questions are not materially different than the types of questions border officers typically ask prospective entrants in an effort to determine the places they have visited and the purpose and duration of their trip.").  Accordingly, the court finds that Plaintiffs have not sufficiently alleged that Defendants' actions would chill a person of ordinary firmness from continuing to engage in the protected activity.

As for the third element of causation, the court also finds that Plaintiffs have not sufficiently alleged that the protected activity was a "substantial or motivating factor in the defendant's conduct."  *O'Brien,* 818 F.3d at 932.  "To prevail on such a claim, a plaintiff must establish a 'causal connection' between the government defendant's

'retaliatory animus' and the plaintiff's 'subsequent injury.'" *Nieves v. Bartlett*, 139 S. Ct. 1715, 1722 (2019) (citation omitted). "It is not enough to show that an official acted with a retaliatory motive and that the plaintiff was injured—the motive must cause the injury." *Id*. The connection "must be a 'but-for' cause, meaning that the adverse action against the plaintiff would not have been taken absent the retaliatory motive." *Id*. Here, Plaintiff Shah alleges that when he asked the CBP officer why the officer was asking these questions, the officer responded, "I'm asking because of what we found in your journal." (*Id*. ¶ 118.) Although Plaintiffs argue that the CBP officer's statement shows retaliatory animus (see Opp. at 31), the court finds that the allegations more plausibly suggest that the questions asked were follow-up questions from the routine search. *See Cotterman*, 709 F.3d at 967 ("In practical terms . . . border officials will conduct further, forensic examinations where their suspicions are aroused by what they find or by other factors."). In other words, the allegations more plausibly allege that the questions resulted from *information* learned in the routine search rather than as retaliation for Plaintiff Shah maintaining a personal journal or speaking with border officers. Accordingly, the court finds that Plaintiffs have not sufficiently alleged that the protected activity was a substantial or motivating factor in Defendants' conduct.

Accordingly, the court **GRANTS** the Motion as to Plaintiffs' First Amendment Retaliation claim (Count 4).

**F. Fifth Claim (Violation of the Fifth Amendment Due Process Right to Equal Protection)**

The Due Process Clause of the Fifth Amendment provides that "[n]o person shall be . . . deprived of life, liberty, or property, without due process of law." U.S. Const. amend. I. "But the concepts of equal protection and due process, both stemming from our American ideal of fairness, are not mutually exclusive." *Bolling v. Sharpe*, 347 U.S. 497, 499 (1954). "This Court's approach to Fifth Amendment equal protection claims has always been precisely the same as to equal protection claims

under the Fourteenth Amendment." *Weinberger v. Wiesenfeld*, 420 U.S. 636, 638 n.2 (1975). "The Equal Protection Clause of the Fourteenth Amendment commands that no State shall 'deny to any person within its jurisdiction the equal protection of the laws,' which is essentially a direction that all persons similarly situated should be treated alike." *City of Cleburne, Tex. v. Cleburne Living Ctr.*, 473 U.S. 432, 439 (1985) (quoting *Plyler v. Doe*, 457 U.S. 202, 216 (1982)). "The Equal Protection Clause does not forbid classifications. It simply keeps governmental decisionmakers from treating differently persons who are in all relevant respects alike." *Nordlinger v. Hahn*, 505 U.S. 1, 10 (1992). "To prevail on an Equal Protection claim, plaintiffs must show that a class that is similarly situated has been treated disparately." *Ariz. Dream Act Coal. v. Brewer*, 855 F.3d 957, 966 (9th Cir. 2017) (citation omitted).

"The first step in equal protection analysis is to identify the state's classification of groups." *Country Classic Dairies, Inc. v. State of Mont., Dep't of Com. Milk Control Bureau*, 847 F.2d 593, 596 (9th Cir. 1988). "The next step in equal protection analysis would be to determine the level of scrutiny." *Id.* In *McLean v. Crabtree*, the Ninth Circuit explained the proper application of this two-step analysis:

> Analysis of an equal protection claim alleging an improper statutory classification involves two steps. Appellants must first show that the statute, either on its face or in the manner of its enforcement, results in members of a certain group being treated differently from other persons based on membership in that group . . . . Proof of discriminatory intent is required to show that state action having a disparate impact violates the Equal Protection Clause . . . . Second, if it is demonstrated that a cognizable class is treated differently, the court must analyze under the appropriate level of scrutiny whether the distinction made between the groups is justified.

173 F.3d 1176, 1185 (9th Cir. 1999).

Here, Plaintiffs allege Defendants' written policies permit border officers to question all Americans about their religious beliefs, practices, and associations.

(Compl. ¶ 23.)  Plaintiffs allege ICE requires officers who work at ports of entry to carry a sample questionnaire to guide their interrogations of travelers, which includes questions about a traveler's religious beliefs, practices, and associations.  (*Id*.)  Plaintiffs further allege CBP has a policy that allows it to collect and maintain information about an individual's religious beliefs, practices, and associations in numerous circumstances.  (*Id*.)  Moreover, Plaintiffs allege Defendants have a policy and/or practice of *intentionally* targeting selected Muslims (or individuals perceived to be Muslim) for religious questioning.  (*Id*. ¶ 24.)  Plaintiffs further allege travelers perceived as practicing faiths other than Islam are not routinely subjected to similarly intrusive questioning about their religious beliefs, practices, and associations.  (*Id*.)  According to Plaintiffs, the religious questioning of Muslims typically takes place in the context of "secondary inspection," a procedure by which CBP detains, questions, and searches certain travelers before they are permitted to enter the country.  (*Id*. ¶ 25.)

The court analyzes Plaintiffs' Fifth Amendment Due Process claim under the same lens as a Fourteenth Amendment Equal Protection claim.  *See Weinberger*, 420 U.S. at 638 n.2.  The first step is to "identify the state's classification of groups."  *Country Classic Dairies*, 847 F.2d at 596.  Here, Plaintiffs identify the government's classification as being based on religion.  (Compl. ¶ 24.)  Under the first step of the analysis, religion is a suspect class.  *See City of New Orleans v. Dukes*, 427 U.S. 297, 303 (1976) ("Unless a classification trammels fundamental personal rights or is drawn upon inherently suspect distinctions such as race, religion, or alienage, our decisions presume the constitutionality of the statutory discriminations and require only that the classification challenged be rationally related to a legitimate state interest."); *Al Saud v. Days*, 36 F.4th 949, 953 (9th Cir. 2022) ("Religion is a suspect class.").  The court finds that Plaintiffs have sufficiently alleged that they "as members of a certain group [are] being treated differently from other persons based on membership in that group."  *McLean*, 173 F.3d at 1185.  Specifically, Plaintiffs allege that although border officers

are permitted to question all Americans about their religious beliefs, practices, and associations, Defendants are "targeting selected Muslims (or individuals perceived to be Muslim) for religious questioning." (*See* Compl. ¶¶ 23-24.)

The court interprets Plaintiffs' claims as challenging both alleged decisions: (1) Defendants' decision to bring Plaintiffs into secondary inspection; and (2) Defendants' decision to ask Plaintiffs religious questions during secondary inspection. (Opp. at 32-34.)  However, the court finds that Plaintiffs have not sufficiently alleged a plausible factual basis for inferring that either experience—being pulled into secondary inspection or asked religious questions—were undertaken because of Plaintiffs' religion.  In other words, without this causal link, the court finds that Plaintiffs' Equal Protection claim fails to plausibly allege a necessary element.  *See McLean*, 173 F.3d at 1185 ("Appellants must first show that the statute, either on its face or in the manner of its enforcement, results in members of a certain group being treated differently from other persons based on membership in that group . . . . Proof of discriminatory intent is required to show that state action having a disparate impact violates the Equal Protection Clause.").   The court addresses the allegations regarding each Plaintiff below.

### a.  Plaintiffs Kariye and Mouslli Have Not Sufficiently Alleged Equal Protection Claims

The Complaint alleges that Plaintiffs Kariye and Mouslli only began experiencing issues with travel after they were placed on government watchlists. (*See id*. ¶¶ 58-59 (Plaintiff Kariye alleges he began experiencing issues consistent with placement on a government watchlist beginning in 2013), *id*. ¶ 95 (Plaintiff Mouslli alleges the same beginning in 2017).  The Complaint further alleges all nine instances of religious questioning experienced by Plaintiffs Kariye and Mouslli post-date their alleged placement on government watchlists. (*See id*. ¶¶ 33-57 (first religious questioning incident of Plaintiff Kariye occurred in September 2017), ¶¶ 75-93 (first religious questioning incident of Plaintiff Mouslli occurred in August 2018.)  The

Complaint also links Plaintiff Kariye and Mouslli's placement on government watchlists to their experiences during international travel.  (*See id*. ¶ 58 ("On information and belief, Imam Kariye has been placed on a U.S. government watchlist, and he will continue to be subject to detention, searches, and questioning, including religious questioning, each time he returns to the United States from international travel."); *id*. ¶ 94 ("On information and belief, Mr. Mouslli has been placed on a U.S. government watchlist, and he will continue to be subject to detention, searches, and questioning, including religious questioning, each time he returns to the United States from international travel.").  Accordingly, based on the allegations of the Complaint, the court finds that Plaintiffs Kariye and Mouslli have not plausibly alleged that they experienced secondary inspection and religious questioning because of Defendants' discriminatory intent regarding their religion.  To the contrary, the court finds that the facts as alleged raise the inference that Plaintiffs Kariye and Mouslli experienced secondary inspection and religious questioning because of their placement on government watchlists.

### b. Plaintiff Shah Has Not Sufficiently Alleged an Equal Protection Claim

As for Plaintiff Shah, the Complaint alleges Plaintiff Shah is not on a government watchlist but still experienced a single instance of religious questioning in May 2019.  (*Id*. ¶¶ 107-43.)  The Complaint alleges Plaintiff Shah was returning from a trip to Serbia and Bosnia and that after passing through primary inspection "without incident," an officer "stopped him in the baggage retrieval area and asked him to accompany him for a search."  (*Id*. ¶ 109.)  After being escorted to secondary inspection, officers began to search Plaintiff Shah's belongings.  (*Id*. ¶ 111.)  One of the officers reviewed a notebook that Plaintiff Shah had been carrying in his backpack, "a personal journal that Mr. Shah had kept for years."  (*Id*. ¶ 113.)  The officer then "pointed out that many of the notes in Mr. Shah's journal were related to religion," "asked Mr. Shah why and where he had taken the notes and whether he had

traveled in the Middle East," and told Plaintiff Shah that "they were trying to make sure Mr. Shah was a "safe person."  (*Id.* ¶ 114.)  One of the officers then began asking Plaintiff "a series of questions about his religious beliefs, practices, and associations." (*Id.* ¶ 117.)  When Plaintiff Shah asked the officer why he was asking these questions, the officer responded, "I'm asking because of what we found in your journal."  (*Id.* ¶ 118.)

The court agrees with Plaintiffs that comparison to a different group is not necessary to assert an Equal Protection claim.  (*See* Opp. at 33.)  The Ninth Circuit has made this clear, holding that "Plaintiffs bringing disparate treatment claims, either under the Equal Protection Clause or under antidiscrimination statutes, may, as we have explained . . .  point to comparators as circumstantial evidence of unlawful discriminatory intent" but that "a relevant comparator is not an element of a disparate treatment claim."  *Ballou v. McElvain*, 29 F.4th 413, 424 (9th Cir. 2022).  *See also Pac. Shores Properties, LLC v. City of Newport Beach*, 730 F.3d 1142, 1159 (9th Cir. 2013) ("[R]equiring anti-discrimination plaintiffs to prove the existence of a better-treated entity would lead to unacceptable results.").

Yet, the Ninth Circuit has also made clear that there must be sufficient factual allegations to support an inference of discrimination or discriminatory intent.  "Mere indifference to the effects of a decision on a particular class does not give rise to an equal protection claim. . . and conclusory statements of bias do not carry the nonmoving party's burden in opposition to a motion for summary judgment." *Thornton v. City of St. Helens*, 425 F.3d 1158, 1167 (9th Cir. 2005).  *See also Monteiro v. Tempe Union High Sch. Dist.*, 158 F.3d 1022, 1026 (9th Cir. 1998) ("We have held that § 1983 claims based on Equal Protection violations must plead intentional unlawful discrimination or allege facts that are at least susceptible of an inference of discriminatory intent."); *California Parents*, 973 F.3d at 1018 (affirming dismissal of Equal Protection claims where the complaint alleged that "the Standards and Framework discriminate against Hinduism by treating it less favorably than other

religions" but "[t]he allegations contain no reference to State Board policy, nor do the allegations describe any materials used in the classroom from which such a policy could be inferred."); *Young v. John*, 2018 WL 4619483, at *9 (C.D. Cal. Aug. 14, 2018), report and recommendation adopted, 2018 WL 4616342 (C.D. Cal. Sept. 24, 2018) (finding that Plaintiff did not sufficiently allege discrimination based on membership in a protected class where Plaintiff "allege[d] Defendant's actions "stem[ ] from an obvious racist and prejudice, hate filled emotion towards Blacks and Muslims. . . but does not assert any facts to suggest that Defendant intentionally treated Plaintiff differently as compared to other similarly situated individuals."); *Jimenez v. Ruelas*, 2007 WL 9723456, at *5 (C.D. Cal. Mar. 31, 2007) ("Here, plaintiff's conclusory statement that he was discriminated against because of his race, without providing any additional facts to support this statement, is insufficient to support an equal protection claim."); *Davis v. John*, 485 F. Supp. 3d 1207, 1222 (C.D. Cal. 2020) (finding plaintiff adequately alleged discriminatory intent where the defendant, a prison official, allegedly "aggressively and angrily ordered the removal of the Nation of Islam symbol from a multi-denominational chapel and podium although members of other faiths were permitted to display their religion's symbols in that location" and stated that "Black Muslims could not display their religious symbol because both the chapel and podium supposedly were reserved for Christians.").

Here, the court finds that Plaintiff Shah has not plausibly alleged that he experienced secondary inspection and religious questioning because of Defendants' discriminatory intent regarding his religion.  First, the court notes that the Complaint does not include sufficient allegations regarding why Plaintiff Shah was singled out for secondary inspection.  As currently pled, the Complaint merely states that Plaintiff Shah passed through primary inspection but was asked in the baggage retrieval area to go to secondary inspection.  (Compl. ¶ 109.)  Second, the court notes that the Complaint alleges the officers involved only began asking questions about Plaintiff Shah's religious practices after reviewing the contents of his personal journal.  (*See id*.

¶¶ 113-18.  The journal "include[d] expressions of his beliefs and devotion and other notes pertaining to his faith and religious practice."  (*Id.* ¶ 141).  Yet, as discussed above, border officers are permitted to conduct further inspection based on information uncovered during a routine search.  *See Cotterman*, 709 F.3d at 967 ("In practical terms . . . border officials will conduct further, forensic examinations where their suspicions are aroused by what they find or by other factors.  Reasonable suspicion leaves ample room for agents to draw on their expertise and experience to pick up on subtle cues that criminal activity may be afoot."); *Bravo*, 295 F.3d at 1008 ("Detention and questioning during routine searches at the border are considered reasonable within the meaning of the Fourth Amendment.").  Based on these facts, the court finds that the allegations regarding Plaintiff Shah do not sufficiently raise the inference that he was selected for secondary inspection or asked religious questions based on discriminatory intent regarding his religion.  *See Iqbal*, 556 U.S. at 680 (a Complaint must "nudg[e] . . . claims of invidious discrimination across the line from conceivable to plausible") (citation and internal quotation marks omitted).

The court finds that Plaintiffs have not sufficiently alleged the first step of an equal protection claim—that there is discriminatory intent causing "members of a certain group [to be] treated differently from other persons based on membership in that group." *McLean*, 173 F.3d at 1185.  Accordingly, the court does not reach the second step of the analysis—whether "under the appropriate level of scrutiny . . . the distinction made between the groups is justified." *Id*.

Accordingly, the court **GRANTS** the Motion as to Plaintiffs' Fifth Amendment Due Process claim (Count 5).

### G. Sixth Claim (Violation of the Religious Freedom Restoration Act)

Under the Religious Freedom Restoration Act of 1993 ("RFRA"), 42 U.S.C. §§ 2000bb *et seq*., the "[g]overnment shall not substantially burden a person's exercise of religion even if the burden results from a rule of general applicability, except as provided in subsection (b)."  42 U.S.C. § 2000bb-1(a).  Subsection (b)

1  provides that the "[g]overnment may substantially burden a person's exercise of

2  religion only if it demonstrates that application of the burden to the person—(1) is in

3  furtherance of a compelling governmental interest; and (2) is the least restrictive

4  means of furthering that compelling governmental interest."  42 U.S.C. § 2000bb-

5  1(b).

6        "To establish a prima facie RFRA claim, a plaintiff must present evidence

7  sufficient to allow a trier of fact rationally to find the existence of two elements.  First,

8  the activities the plaintiff claims are burdened by the government action must be an

9  "exercise of religion."  *Navajo Nation*, 535 F.3d at 1068.  "Second, the government

10  action must 'substantially burden' the plaintiff's exercise of religion.  *Id.*  "If the

11  plaintiff cannot prove either element, his RFRA claim fails."  *Id*.  "Conversely, should

12  the plaintiff establish a substantial burden on his exercise of religion, the burden of

13  persuasion shifts to the government to prove that the challenged government action is

14  in furtherance of a 'compelling governmental interest' and is implemented by 'the

15  least restrictive means.'"  *Id.*  "If the government cannot so prove, the court must find

16  a RFRA violation."

17        As explained by the Ninth Circuit in *Navajo Nation*, the definition of

18  "substantial burden" under RFRA is identical to the definitions adopted by the

19  Supreme Court in *Sherbert* and *Yoder*:

20  

21          Under RFRA, a "substantial burden" is imposed only when individuals are
        forced to choose between following the tenets of their religion and

22          receiving a governmental benefit (*Sherbert*) or coerced to act contrary to

23          their religious beliefs by the threat of civil or criminal sanctions (*Yoder*).
        Any burden imposed on the exercise of religion short of that described by

24          *Sherbert* and *Yoder* is not a "substantial burden" within the meaning of

25          RFRA, and does not require the application of the compelling interest test
        set forth in those two cases.

26  

27  *Id*. at 1069-70.

28

Thus, "the government must establish both a compelling interest and the least restrictive means to withstand a RFRA challenge." *Id*. at 1076. "The additional statutory requirement of a least restrictive means is triggered only by a finding that a substantial burden exists; that is the sole and threshold issue in this case. Absent a substantial burden, the government need not establish a compelling interest, much less prove it has adopted the least restrictive means." *Id*.

Unlike the Free Exercise Clause of the First Amendment, a challenged "exercise of religion" under RFRA includes "any exercise of religion, whether or not compelled by, or central to, a system of religious belief." 42 U.S.C. § 2000bb–2(4); *id.* § 2000cc–5(7)(A). "RFRA's amended definition of 'exercise of religion' merely expands the scope of what may not be substantially burdened from 'central tenets' of a religion to 'any exercise of religion.'" *Navajo Nation*, 535 F.3d at 1077. This amended definition "does not change what level or kind of interference constitutes a 'substantial burden' upon such religious exercise." *Id.*

### a. Plaintiffs Have Not Sufficiently Alleged a Substantial Burden

Under *Navajo Nation*, "[t]o establish a prima facie RFRA claim, a plaintiff must present evidence sufficient to allow a trier of fact rationally to find the existence of two elements. First, the activities the plaintiff claims are burdened by the government action must be an "exercise of religion. . . Second, the government action must 'substantially burden' the plaintiff's exercise of religion." *Id*. at 1068. The court assumes—and the parties do not contest—that the activities at issue are an "exercise of religion." *Id*. But for the same reasons as discussed above in the court's analysis of Plaintiffs' Free Exercise claim, the court is not persuaded that Plaintiffs have plausibly alleged that they were deprived of a government benefit under *Sherbert* or coerced to act contrary to their religious beliefs under *Yoder*. *Navajo Nation*, 535 F.3d at 1070.

First, under *Sherbert*, Plaintiffs argue they were deprived of the benefit of being allowed to reenter the United States. (*See* Opp. at 20 ("The governmental benefit—or

in this case, right—that hangs in the balance each time Plaintiffs travel internationally is permission to reenter their own country").)  Assuming that permission to reenter the United States is a government benefit, the court finds the Complaint does not plausibly allege that Plaintiffs were deprived of such a benefit.  To the contrary, although Plaintiffs experienced secondary inspection on ten occasions, the Complaint alleges Plaintiffs were allowed to renter the United States on each such occasion, albeit after some delay.  (*See generally*, Compl.)  *See also Flores-Montano*, 541 U.S. at 155 n.3 (2004) ("We think it clear that delays of one to two hours at international borders are to be expected."); *Haig*, 453 U.S. at 306 ("[T]he freedom to travel abroad . . . is subordinate to national security and foreign policy considerations; as such, it is subject to reasonable governmental regulation. The Court has made it plain that the *freedom* to travel outside the United States must be distinguished from the *right* to travel within the United States.") (emphasis in original).

Second, under *Yoder*, Plaintiffs argue they are coerced because if they "do not reveal information about their religious beliefs and practices, they risk being subjected to further harassment and detention for an unknown period of time" and "border officers implicitly (and even explicitly) threaten Plaintiffs with sanctions for not complying."  (Opp. at 20.)  The court observes that the coercion argued by Plaintiffs here appears to be pressure to "reveal information about their religious beliefs and practices."  (*Id.*)  However, the Ninth Circuit has described the coercion contemplated by *Yoder* as an individual being "coerced to act contrary to their religious beliefs by the threat of civil or criminal sanctions."  *Navajo Nation*, 535 F.3d at 1075.  Here, the Complaint does not sufficiently allege why revealing information about Plaintiffs' religious beliefs and practices is contrary to their religious beliefs.  Nor does the Complaint sufficiently allege what civil or criminal sanctions were threatened by Defendants.  (*See* Compl. ¶ 49 (Plaintiff Kariye alleges a CBP officer told him that if he did not cooperate, "CBP would make things harder for him.").)

1   Accordingly, the court finds that the Complaint does not plausibly allege

2   Plaintiffs were deprived of the government benefit of reentering the United States or

3   that by revealing information about their religious beliefs and practices, they were

4   coerced to act contrary to their religious beliefs, such that Plaintiffs have not

5   sufficiently alleged a substantial burden to sustain their RFRA claim.

6   **b. Plaintiffs Do Not Sufficiently Address Whether the Questioning is a**

7   **Narrowly Tailored Means of Achieving a Compelling Government**

8   **Interest**

9   Even if Plaintiffs had adequately alleged a substantial burden, Plaintiffs do not

10   sufficiently address how Defendants' questioning is not a narrowly tailored means of

11   achieving a compelling government interest.  (*See generally* Opp.)  As discussed

12   above, there is no dispute that the government has a compelling interest in protecting

13   its borders and preventing acts of terrorism.  *See Haig*, 453 U.S. at 307; *Humanitarian*

14   *L. Project*, 561 U.S. at 28; *Flores-Montano*, 541 U.S. at 152 (2004); *Al Haramain*

15   *Islamic Found.*, 686 F.3d at 980; *Tabbaa*, 509 F.3d at 103.  Plaintiffs' RFRA claim

16   thus fails for the same reason as their Free Exercise claim—Plaintiffs do not

17   sufficiently address why, even if the religious questioning were to constitute a

18   substantial burden, that burden is not a narrowly tailored means of achieving the

19   government's interest in protecting its borders and preventing acts of terrorism.  (*See*

20   *generally* Opp.)  Accordingly, the court finds that even if Plaintiffs had sufficiently

21   alleged a substantial burden, they have not sufficiently alleged why the questioning at

22   issue here is not the least restrictive means of advancing a compelling government

23   interest.

24   Accordingly, the court **GRANTS** the Motion as to Plaintiffs' RFRA claim

25   (Count 6).

26   ///

27   ///

28   ///

## IV.    DISPOSITION

For the reasons set forth above, Defendants' Motion is **GRANTED**.  Plaintiffs' claims are **DISMISSED WITHOUT PREJUDICE AND WITH LEAVE TO AMEND**.  Should Plaintiffs desire to file an Amended Complaint that addresses the issues in this ruling, Plaintiffs must file and serve it within **thirty (30)** days of service of notice of ruling.

**IT IS SO ORDERED.**

DATED: October 12, 2022

_____
Hon. Fred W. Slaughter
UNITED STATES DISTRICT JUDGE