Ashley Gorski*
agorski@aclu.org
Scarlet Kim*
scarletk@aclu.org
Sarah Taitz*
staitz@aclu.org
American Civil Liberties Union Foundation
125 Broad Street, Floor 18
New York, NY 10004
Tel: (212) 549-2500

*Attorneys for Plaintiffs*
(Additional counsel continued on next page)

## UNITED STATES DISTRICT COURT
## FOR THE CENTRAL DISTRICT OF CALIFORNIA

| | |
|---|---|
| ABDIRAHMAN ADEN KARIYE, MOHAMAD MOUSLLI, and HAMEEM SHAH, <br><br> *Plaintiffs*, <br><br> v. <br><br> ALEJANDRO MAYORKAS, Secretary of the U.S. Department of Homeland Security, in his official capacity; TROY MILLER, Acting Commissioner of U.S. Customs and Border Protection, in his official capacity; TAE D. JOHNSON, Acting Director of U.S. Immigration and Customs Enforcement, in his official capacity; and STEVE K. FRANCIS, Acting Executive Associate Director, Homeland Security Investigations, in his official capacity, <br><br> *Defendants*. | **AMENDED COMPLAINT FOR INJUNCTIVE AND DECLARATORY RELIEF** <br><br> No. 2:22-cv-01916-FWS-GJS <br> Hon. Fred W. Slaughter |

AMENDED COMPLAINT FOR INJUNCTIVE AND DECLARATORY RELIEF

Case 2:22-cv-01916-FWS-GJS   Document 61   Filed 11/14/22   Page 2 of 49   Page ID #:502

Mohammad Tajsar (SBN 280152)
mtajsar@aclusocal.org
ACLU Foundation of Southern California
1313 West 8th Street
Los Angeles, CA 90017
Tel: (213) 977-9500

Daniel Mach*
dmach@aclu.org
Heather L. Weaver (SBN 226853)
hweaver@aclu.org
American Civil Liberties Union Foundation
915 15th St., NW Ste. 600
Washington, DC 20005
Tel: (202) 675-2330

Teresa Nelson*
tnelson@aclu-mn.org
American Civil Liberties Union of Minnesota
P.O. Box 14720
Minneapolis, MN 55415
Tel: (651) 645-4097


*Admitted pro hac vice

# INTRODUCTION

1.      "How often do you pray?" "Do you attend mosque?" "Which mosque do you attend?" "Are you Sunni or Shi'a?" These are just some of the deeply personal and religiously intrusive questions that federal border officers ask Plaintiffs—three Muslim U.S. citizens—when they return home to the United States from international travel. Border officers ask these questions pursuant to a broader policy and/or practice by U.S. Customs and Border Protection ("CBP") and Homeland Security Investigations ("HSI") of targeting Muslim American travelers for questioning about their religious beliefs, practices, and associations, and retaining the answers in a law enforcement database for up to 75 years.

2.      Religious questioning such as this violates the U.S. Constitution. It furthers no valid—let alone compelling—government interest, and it is an affront to the First Amendment freedoms of religion and association. Moreover, because Defendants specifically target Muslim Americans for such questioning, they also violate the First and Fifth Amendments' protections against unequal treatment on the basis of religion. Just as border officers may not single out Christian Americans to ask what denomination they are, which church they attend, and how regularly they pray, singling out Muslim Americans for similar questions is unconstitutional. Plaintiffs are entitled to full and equal membership in American society. By targeting Plaintiffs for religious questioning merely because they are Muslim, Defendants' border officers stigmatize them for adhering to a particular faith and condemn their religion as subject to suspicion and distrust.

3.      This practice also violates the Religious Freedom Restoration Act ("RFRA"), 42 U.S.C. § 2000bb *et seq*. It substantially burdens Plaintiffs' religious practices in several ways, including by coercing Plaintiffs into modifying or abandoning certain religious practices and expression while traveling, contrary to their religious beliefs.

4.      Through this lawsuit, Plaintiffs seek a declaratory judgment that the

AMENDED COMPLAINT FOR INJUNCTIVE AND DECLARATORY RELIEF

religious questioning of them, and the policy and/or practice of religious questioning by the U.S. Department of Homeland Security ("DHS") and CBP, violates the First and Fifth Amendments and RFRA. Plaintiffs also seek an injunction prohibiting DHS and CBP from questioning them at ports of entry about their religious beliefs, practices, and associations. Finally, Plaintiffs seek an injunction requiring Defendants to expunge records containing information unlawfully obtained through their religious questioning of Plaintiffs.

## JURISDICTION AND VENUE

5.     This Court has subject matter jurisdiction over Plaintiffs' claims under 28 U.S.C. § 1331.

6.     This Court has authority to issue declaratory and injunctive relief pursuant to 28 U.S.C. §§ 2201–02, Rule 57 of the Federal Rules of Civil Procedure, and its inherent equitable powers.

7.     Venue is proper in this Court pursuant to 28 U.S.C. § 1391(e). A substantial part of the events giving rise to Plaintiffs' claims occurred in this Court's judicial district, and Defendants are officers of the United States sued in their official capacities.

## PARTIES

### *Plaintiffs*

8.     Plaintiff Imam Abdirahman Aden Kariye is a U.S. citizen who lives in Bloomington, Minnesota. He is Muslim and serves as an imam at a local mosque.

9.     Plaintiff Mohamad Mouslli is a U.S. citizen who lives in Gilbert, Arizona, with his wife and three children. He is Muslim and works in commercial real estate.

10.     Plaintiff Hameem Shah is a U.S. citizen who lives in Plano, Texas. He is Muslim and works in financial services.

### *Defendants*

11.     Defendants, who are responsible for the challenged religious

questioning and retention of information, are the heads of the DHS and its agencies: CBP and U.S. Immigration and Customs Enforcement ("ICE"), of which HSI is a subcomponent.

12.    Defendant Alejandro Mayorkas is the Secretary of DHS. He has authority over all DHS policies and practices, including those challenged in this lawsuit. Plaintiffs sue him in his official capacity.

13.    Defendant Troy Miller is the Acting Commissioner of CBP. He has authority over all CBP policies and practices, including those challenged in this lawsuit. Plaintiffs sue him in his official capacity.

14.    Defendant Tae Johnson is Acting Director of ICE. He has authority over all ICE policies and practices, including those challenged in this lawsuit. Plaintiffs sue him in his official capacity.

15.    Defendant Steve K. Francis is the Acting Executive Associate Director of HSI. He has authority over all HSI policies and practices, including those challenged in this lawsuit. Plaintiffs sue him in his official capacity.

## FACTUAL BACKGROUND

### *Religious Questioning of Muslim Americans at the U.S. Border*

16.    At border crossings and international airports in the United States, Defendants' border officers frequently subject travelers who are Muslim, or whom they perceive to be Muslim, to questioning about their religion.

17.    In May 2011, after the American Civil Liberties Union ("ACLU") and other organizations submitted complaints to DHS describing border questioning of Muslim Americans about their religious beliefs and practices, the DHS Office for Civil Rights and Civil Liberties ("CRCL") disclosed that it had opened an investigation into CBP questioning "of U.S. citizens and legal residents who are Muslim, or appear to be Muslim, about their religious and political beliefs, associations, and religious practices and charitable activities protected by the First Amendment and Federal law." In a letter to the ACLU dated May 3, 2011, CRCL

stated that it had received "a number of complaints like yours, alleging that U.S. Customs and Border Protection (CBP) officers have engaged in inappropriate questioning about religious affiliation and practices during border screening."

18.     In a memorandum dated May 3, 2011 ("May 3 Memorandum"), CRCL informed the CBP Commissioner that it had received "numerous accounts from American citizens, legal permanent residents, and visitors who are Arab and/or Muslim, alleging that officials from U.S. Customs and Border Protection (CBP) repeatedly question them and other members of their communities about their religious practices or other First Amendment protected activities, in violation of their civil rights or civil liberties."

19.     The May 3 Memorandum included detailed descriptions of border officers' questioning of Muslims about their religious beliefs and practices—including whether the travelers were Muslim, whether they attended a mosque, how frequently they prayed, and whether they were Sunni or Shi'a—at various ports of entry across the United States, including in Boston, Buffalo, Miami, Seattle, Detroit, Atlanta, and New York City.

20.     In July 2012, CRCL informed the ACLU and other organizations that it had suspended its investigation into border questioning about religious beliefs and practices because individuals had filed a lawsuit challenging the practice. That litigation is pending.

21.     In 2019, CRCL acknowledged that DHS had received over two dozen complaints about CBP questioning travelers regarding their religious beliefs and practices, including questioning about sect (*e.g.*, Sunni or Shi'a Islam), affiliation with a particular house of worship, and frequency of prayer.

22.     As of 2020, CRCL was reviewing numerous allegations that "CBP officers at ports of entry have inappropriately questioned travelers about their religious beliefs and practices."

23.     Religious questioning of Muslim Americans at ports of entry continues

1   today, as Plaintiffs' experiences demonstrate.

2        24.    Far from prohibiting this unconstitutional and unlawful conduct,

3   Defendants' written policies permit border officers to question Americans about

4   their religious beliefs, practices, and associations. For example, ICE requires its

5   officers who work at ports of entry to carry with them a sample questionnaire to

6   guide their interrogations of travelers, which includes intrusive questions about a

7   traveler's religious beliefs, practices, and associations. DHS has a policy that allows

8   it to collect and maintain information about an individual's religious beliefs,

9   practices, and associations in numerous circumstances. On information and belief,

10  DHS and CBP view the collection and retention of Plaintiffs' responses to the

11  religious questioning described herein as authorized by that policy.

12       25.    In particular, Defendants have a policy and/or practice of intentionally

13  targeting selected Muslims (or individuals perceived to be Muslim) for religious

14  questioning. While Defendants' border officers routinely and intentionally single out

15  Muslim Americans to demand answers to questions about their religious beliefs,

16  practices, and associations, travelers perceived as practicing faiths other than Islam

17  are not routinely subjected to similarly intrusive questioning about their religious

18  beliefs, practices, and associations.

19       26.    This religious questioning of Muslims typically takes place in the

20  context of "secondary inspection," a procedure by which CBP detains, questions,

21  and searches certain travelers before they are permitted to enter the country.

22       27.    The secondary inspection environment is inherently coercive:

23            a.   Border officers carry weapons, typically identify themselves as

24                 border officers or wear government uniforms, and command

25                 travelers to enter and remain in the secondary inspection areas.

26            b.   Travelers are not free to leave those areas until officers give them

27                 permission.

28            c.   Secondary inspection areas are separated from the public areas of

AMENDED COMPLAINT FOR INJUNCTIVE AND DECLARATORY RELIEF

airports or other ports of entry.

    d.  During the secondary inspection process, border officers typically take possession of travelers' passports and routinely conduct physical searches and/or searches of travelers' belongings, including their electronic devices. Border officers use the coercive nature of the secondary inspection environment to compel Muslim American travelers to answer intrusive questions about their religious beliefs, practices, and associations.

28.    Because of the coercive nature of secondary inspections, Muslim American travelers singled out for religious questioning during this process have no meaningful choice but to disclose their First Amendment-protected beliefs and activity in response to border officers' inquiries.

29.    In addition, as part of this religious questioning, Defendants have a policy and/or practice of retaining—for decades—travelers' coerced responses to questions about their religious beliefs, practices, and associations. CBP officers are required to create a record of every secondary inspection at an airport or land crossing. Through this record, they routinely document travelers' responses to questions asked during secondary inspections, including Muslim Americans' coerced responses to questions about their religious beliefs, practices, and associations. When HSI agents are involved in or otherwise present during secondary inspection, they also routinely create and maintain records of the secondary inspection, including Muslim Americans' coerced responses to questions about their religious beliefs, practices, and associations.

30.    Border officers input the records of secondary inspections into DHS databases, including a DHS database called TECS, which is the updated and modified version of the former Treasury Enforcement Communications System. TECS functions as a repository for the sharing of information among thousands of federal, state, local, tribal, and foreign law enforcement, counterterrorism, and

border security agencies, which can use the information for investigative and other activities that can result in civil or criminal sanctions.

a. TECS users include personnel from CBP, ICE, the Federal Bureau of Investigation, Department of Defense, Transportation Security Administration, U.S. Citizenship and Immigration Services, U.S. Drug Enforcement Administration, and Department of State.

b. TECS data is also accessible to officers from thousands of state and local police departments.

c. Data is retained in TECS for up to 75 years.

31.     Alternatively, even if Defendants do not engage in a policy and/or practice of singling out Muslims *in particular* for religious questioning, Defendants have a policy and/or practice of subjecting travelers of faith, including Plaintiffs, to questioning about their religious beliefs, practices, and associations during secondary inspections. Defendants also have a policy and/or practice of retaining, for decades, travelers' coerced responses to those religious questions, and making those responses accessible to thousands of law enforcement departments through TECS.

### *Islamic religious belief and practice are constitutionally protected and not any indication of criminal or other wrongdoing.*

32.     Being Muslim and practicing Islam are constitutionally protected religious belief and activity.

33.     There are nearly two billion Muslim people worldwide, and approximately 3.45 million Muslims living in the United States. Like any religion, Islam has certain core tenets, and at the same time, religious practice can vary among individuals. According to a 2017 Pew Research survey, approximately 59 percent of Muslim Americans pray daily, and 43 percent attend religious services weekly. Prayer and mosque attendance—just like prayer and attendance at houses of worship in any religion—are peaceful religious activities. They have no relationship to

violence or other unlawful activity.

34.   Fifty-five percent of Muslim Americans identify as Sunnis and 16 percent as Shi'a. Affiliation with either sect reflects a set of religious beliefs. It does not indicate any relationship to violence or other unlawful activity.

35.   In recent years especially, U.S. national security policies and practices have disproportionately and wrongly targeted Muslim Americans, and prominent U.S. politicians have at times made public statements casting doubt on the patriotism of Muslim Americans, resulting in widespread and false stigma. These factors contribute to a widespread and harmful misperception that Islamic belief and practice are associated with wrongdoing or terrorism.

36.   Despite decades of research, there is no scientifically valid model or profile that can predict whether an individual will commit an act of terrorism, which is a form of political violence. Religiosity of any kind, including Muslim religiosity, is not predictive of violence or terrorism. It is exceedingly rare for Muslim Americans to commit terrorist acts.

37.   Islamic religious belief and practice also are not in any way indicative of immigration or customs-related crime within CBP's enforcement mandate, nor any other unlawful activity.

38.   Accordingly, Muslim travelers' personal religious information is not germane to any legitimate purpose that Defendants may assert.

### *American history and tradition protect religious belief and ensure freedom from religious discrimination.*

39.   Through the First Amendment's religion clauses, the Framers intended, among other things, to protect religious belief and exercise from unjustified government interference, to prohibit official religious coercion, and to ensure that different faiths and denominations are treated equally by the government.

40.   Thomas Jefferson and James Madison were highly influenced by the experiences of religious minorities in colonial America. Many of the original

European settlers of the colonies that would become the United States came to America fleeing religious persecution. Unfortunately, however, religious strife and persecution were commonplace in colonial America. "Catholics found themselves hounded and proscribed because of their faith; Quakers who followed their conscience went to jail; Baptists were peculiarly obnoxious to certain dominant Protestant sects; men and women of varied faiths who happened to be in a minority in a particular locality were persecuted because they steadfastly persisted in worshipping God only as their own consciences dictated." *Everson v. Bd. of Ed. of Ewing Twp.*, 330 U.S. 1, 10 (1947).

41.     The Founders' response was to protect the free exercise of all religions and the right of religious people of different faiths to be treated equally by the government. Madison's *Memorial and Remonstrance Against Religious Assessments*—written just a few years before he helped introduce the Bill of Rights—articulated his belief in the "unalienable right" of religious freedom and in religious neutrality.

42.     Madison wrote, "Government will be best supported by protecting every Citizen in the enjoyment of his Religion with the same equal hand which protects his person and his property; by neither invading the equal rights of any Sect, nor suffering any Sect to invade those of another."

43.     As summarized by the Supreme Court, Madison's vision of "equality" and "freedom for all religion" required legislators to "accord to their own religions the very same treatment given to small, new, or unpopular denominations." *Larson v. Valente*, 456 U.S. 228, 245 (1982).

44.     After Madison's *Memorial and Remonstrance* gained wide support, the Virginia Assembly passed the Virginia Bill for Religious Liberty, written by Thomas Jefferson. The bill stated that no person should "suffer on account of his religious opinions or belief." *See Everson*, 330 U.S. at 13.

45.     Jefferson's own writings about the Virginia Bill for Religious Freedom

stated that one of the statute's goals was the protection of every denomination—explicitly including Muslims, Jews, and Hindus. In his autobiography, he wrote that the legislative intention had been "to comprehend, within the mantle of its protection, the Jew and the Gentile, the Christian and Mahometan, the Hindoo, and Infidel of every denomination." Jefferson's personal library included a Quran, a purchase that appears to have stemmed from his curiosity about the world's religions and that informed his views on religious freedom and pluralism. While Jefferson critiqued aspects of Christianity, Judaism, and Islam, he insisted on civil rights for practitioners of all faiths.

46.     Influenced by the Virginia Bill, and in light of their own experiences with religious discrimination in Europe and the colonies, the Framers intended the First Amendment to protect "the principle of neutrality" in order to "guard against the civic divisiveness that follows when the government weighs in on one side of religious debate." *McCreary Cnty. v. ACLU of Ky.*, 545 U.S. 844, 876 (2005).

47.     As Justice Gorsuch recently explained, "Our forebears resolved that this Nation would be different. Here, they resolved, each individual would enjoy the right to make sense of his relationship with the divine, speak freely about man's place in creation, *and have his religious practices treated with respect*." *Shurtleff v. City of Boston*, 142 S. Ct. 1583, 1608 (2022) (Gorsuch, J., concurring) (emphasis added).

48.     Indeed, given this historical record, the Supreme Court has emphasized that government neutrality toward religion is "the clearest command of the Establishment Clause." *Larson*, 456 U.S. at 244–46.

49.     The principle of religious neutrality has carried forward throughout American history, forbidding government from discriminating against religious minorities.

***The United States' history and tradition is to protect religious belief, practice, and association—not to subject citizens to coercive questioning regarding those beliefs, practices, and associations.***

50.     There is no American history or tradition of questioning U.S. citizens in a coercive environment about their First Amendment-protected religious beliefs, practices and associations. Nor is there a history or tradition of retaining that information for decades.

51.     For example, through the mandatory decennial U.S. census (responses to which are required by law), the U.S. government collects and retains demographic information regarding Americans, but this census has never included questions requiring individuals to disclose their religious beliefs, practices, and associations.

52.     The U.S. Census Bureau has repeatedly refused to add questions to the mandatory decennial census regarding individual religious beliefs, practices, and associations, out of concerns that such questions would violate the religion clauses of the First Amendment.

53.     The decision to keep religion out of the decennial census was reinforced when, in 1976, Congress enacted a law stating, "no person shall be compelled to disclose information relative to his religious beliefs or to membership in a religious body" as part of the census. *See* 13 U.S.C. § 221(c).

## RELIGIOUS QUESTIONING OF PLAINTIFFS BY DEFENDANTS' BORDER OFFICERS

### Abdirahman Aden Kariye

54.     Imam Abdirahman Aden Kariye is a U.S. citizen and an imam at a mosque in Bloomington, Minnesota. He is a prominent member of the local Muslim and interfaith communities, as well as an active participant in civic life and charitable endeavors.

55.     CBP officers have questioned Imam Kariye about his Muslim faith on at least five occasions. On each occasion, the environment was coercive: CBP

officers wearing uniforms and carrying weapons commanded Imam Kariye to enter and remain in an area separated from other travelers, usually a windowless room. They took Imam Kariye's belongings from him, searched his electronic devices, and questioned him at length. Because the environment was coercive, Imam Kariye's responses to CBP's questions were coerced. He was not free to leave without the permission of a CBP officer, and he reasonably believed that if he did not answer all questions, he would not be permitted to leave and would be subject to additional and lengthy scrutiny.

### First Religious Questioning Incident: September 12, 2017

56.     On September 12, 2017, Imam Kariye arrived home to the United States from Saudi Arabia, where he had participated in the Hajj. The Hajj is a sacred religious pilgrimage to Mecca, the holiest city for Muslims.

57.     Upon his arrival at the Seattle-Tacoma International Airport, Imam Kariye was detained for secondary inspection by CBP in a small, windowless room. Two CBP officers were present during the detention, which lasted for approximately two hours.

58.     During the detention, a CBP officer questioned Imam Kariye about his religious beliefs, practices, and associations, including questions about which mosque he attends and whether he had been on the Hajj before.

59.     Imam Kariye answered these questions because he was not free to leave without the permission of a CBP officer and reasonably felt that he had no choice but to answer, based on the coercive circumstances of his detention.

60.     A CBP officer took notes during Imam Kariye's detention, including while Imam Kariye responded to CBP's questions about his religious beliefs, practices, and associations.

### Second Religious Questioning Incident: February 3, 2019

61.     On or about February 3, 2019, CBP again subjected Imam Kariye to religious questioning during secondary inspection at the Peace Arch Border Crossing

near Blaine, Washington. Imam Kariye was returning to the United States by car from a trip to Vancouver, where he had been on a vacation with friends. Two CBP officers detained Imam Kariye for approximately three hours. The officers told Imam Kariye that he would not be free to leave unless he answered their questions.

62.    During the detention, a CBP officer questioned Imam Kariye about his religious beliefs, practices, and associations, including questions about Imam Kariye's involvement with a charitable organization affiliated with Muslim communities, how he fundraised for this charity, and whether his fundraising involved visiting mosques. The obligation to provide charity and assistance to the needy, or *zakat*, is a central tenet of Islam.

63.    Imam Kariye answered the CBP officer's questions about his religious charitable beliefs and activities because he was not free to leave without the permission of a CBP officer and reasonably felt that he had no choice but to answer, based on the coercive circumstances of his detention.

64.    A CBP officer took notes during Imam Kariye's detention, including while Imam Kariye responded to CBP's questions about his religious beliefs, practices, and associations.

### Third Religious Questioning Incident: November 24, 2019

65.    On November 24, 2019, CBP again subjected Imam Kariye to religious questioning during secondary inspection in a CBP preclearance area at Ottawa International Airport in Canada. CBP officers are posted at Ottawa International Airport and conduct inspections there for travelers headed to the United States. Imam Kariye was returning to the United States after attending a wedding in Canada. He was flying to Detroit, Michigan, and then to Seattle, Washington. A CBP officer detained Imam Kariye for approximately one hour in a small, windowless room.

66.    During the detention, the CBP officer questioned Imam Kariye about his religious associations. In particular, the officer questioned Imam Kariye about a youth sports league that he helped to run. Although Imam Kariye had not informed

the officer that he was Muslim, the officer asked whether the sports league was "for black and white kids, or is it just for Muslim kids?" Imam Kariye understood the question as an acknowledgment of his Islamic faith and an attempt to ascertain what kinds of religious activities he participated in.

67.    Imam Kariye answered the questions because he was not free to leave without the permission of a CBP officer and reasonably felt that he had no choice but to answer, based on the coercive circumstances of his detention.

68.    The CBP officer took notes during Imam Kariye's detention, including while Imam Kariye responded to CBP's questioning about his religious beliefs and associations.

### Fourth Religious Questioning Incident: August 16, 2020

69.    On August 16, 2020, CBP officers again subjected Imam Kariye to religious questioning during secondary inspection at the Seattle-Tacoma International Airport. Imam Kariye was returning to the United States from a vacation with a friend. He had traveled from Turkey to Seattle, Washington, via the Netherlands. CBP officers had photographs of Imam Kariye that they used to identify him when he came off the jet bridge. Multiple CBP officers detained him for several hours in a small, windowless room. To the best of Imam Kariye's recollection, one of the officers, a supervisor, was named "Abdullah Shafaz" or something close to it.

70.    During the detention, CBP officers questioned Imam Kariye about his religious beliefs, practices, and associations. These questions included:

        a.  What type of Muslim are you?

        b.  Are you Sunni or Shi'a?

        c.  Are you Salafi or Sufi?

        d.  What type of Islamic lectures do you give?

        e.  Where did you study Islam?

        f.  How is knowledge transmitted in Islam?

g.  Do you listen to music?

h.  What kind of music do you listen do?

i.  What are your views on Ibn Taymiyyah?

71.  Imam Kariye understood the questions regarding music (religious opinions about which can vary among Muslims) and his views on Ibn Taymiyyah, a medieval Muslim scholar, as designed to elicit information about the nature and strength of his religious beliefs and practices.

72.  During the detention, a CBP officer threatened Imam Kariye multiple times with retaliation. The officer said that, if Imam Kariye did not cooperate, CBP would make things harder for him. The officer also said that Imam Kariye was welcome to challenge the legality of the detention, but if he did so publicly or went to the media, CBP would make things harder for him during his future travels.

73.  Imam Kariye answered the CBP officers' questions because he was not free to leave without the permission of a CBP officer and reasonably felt that he had no choice but to answer, based on the coercive circumstances of his detention.

74.  A CBP officer took notes during Imam Kariye's detention, including while Imam Kariye responded to CBP's questions about his religious beliefs, practices, and associations.

75.  After several hours of detention, two of the CBP officers who had detained Imam Kariye escorted him to a separate room, where they performed a thorough, full-body pat-down search, which included touching his buttocks and groin. The CBP officers had no basis to suspect Imam Kariye of carrying contraband or weapons, and they had already been in close proximity to him during his lengthy detention. After the pat-down, the officers finally permitted Imam Kariye to leave.

### *Fifth Religious Questioning Incident: December 31, 2021*

76.  On or about December 31, 2021, a plainclothes CBP officer subjected Imam Kariye to religious questioning during secondary inspection at the Minneapolis-Saint Paul Airport. Imam Kariye was returning to the United States

from a trip to Somalia, Kenya, and the United Arab Emirates, where he had traveled for vacation and to visit family. The officer detained Imam Kariye for approximately an hour and a half.

77.    During the detention, the CBP officer questioned Imam Kariye about his religious beliefs, practices, and associations, including whether he had met a particular friend at a mosque. The officer then said, "I assume you're a Muslim, aren't you?"

78.    Imam Kariye answered these questions because he was not free to leave without the permission of a CBP officer and reasonably felt that he had no choice but to answer, based on the coercive circumstances of his detention.

79.    A CBP officer took notes during Imam Kariye's detention, including while Imam Kariye responded to CBP's questions about his religious beliefs, practices, and associations.

80.    During each of these five religious questioning incidents, Imam Kariye's travel and identification documents were valid, and he was not transporting contraband.

*Imam Kariye is a law-abiding religious leader*
*and does not pose a national security risk.*

81.    Imam Kariye is a law-abiding citizen with no criminal record and no ties to terrorist activity.

82.    Imam Kariye's religious beliefs and preaching do not in any way condone violence or terrorism. He has never participated in nor advocated for any acts of violence or terrorism, and has never been accused by any government agency of doing so.

83.    Like many individuals, and upon information and belief, Imam Kariye was unjustly and improperly placed on the U.S. government's master watchlist, called the Terrorist Screening Database (also known as the "watchlist"), due to an error or misplaced suspicion.

84.     Government errors and reliance on unjustified suspicion in placing people on the watchlist are common because the standard for placement is remarkably low. Placement may be based on "reasonable suspicion" that the individual is a known or "suspected" terrorist. A suspected terrorist is defined broadly as "an individual who is reasonably suspected to be, or have been, engaged in conduct constituting, in preparation for, in aid of, or related to terrorism and/or terrorist activities based on an articulable and reasonable suspicion." In other words, the standard for placement is extraordinarily low—suspicion that the individual might be suspicious.

85.     Under the government's Watchlisting Guidance, "concrete facts are not necessary" to satisfy the "reasonable suspicion" standard, and uncorroborated information of questionable or even doubtful reliability can serve as the basis for watchlisting an individual. Under the Guidance, an anonymous letter or single social media post could satisfy the "reasonable suspicion" standard.

86.     The government has failed to ensure that individuals who do not meet even these loose criteria are not placed on the watchlist or are promptly removed from it. Publicly available information shows that as of June 2017, the Terrorist Screening Database contained approximately 1,160,000 people. That number that has grown significantly and steadily since June 2013, when there were approximately 680,000 people on the watchlist. From 2008 through 2017, a total of 1,137,254 people were added to the watchlist. Government documents show that as of 2014, nearly half the people on the watchlist had no recognized terrorist-group affiliation.

87.     The Inspector General of the Department of Justice has criticized the Terrorist Screening Center—the entity responsible for maintaining the watchlist—for employing weak quality-assurance mechanisms and for failing to remove people from the watchlist when information did not support their placement on it. Public reports also confirm that the government has placed or retained people on

government watchlists in error.

88.     The "minimum identifying criteria" for inclusion on the watchlist can be as skeletal as a last name, an occupation, and a date-of-birth range spanning years. Requiring such an incomplete level of identifying information for inclusion on the watchlist makes misidentifications likely.

89.     An individual who seeks to challenge placement on the watchlist may submit a standard form to the DHS Traveler Redress Inquiry Program ("DHS TRIP"). DHS TRIP then responds to the individual with a letter that does not confirm or deny whether the person is in fact watchlisted. The letter does not provide any notice of the basis for placement on the watchlist. It does not state how the government has resolved the redress petition. Individuals who seek to challenge their placement on the watchlist are therefore placed in the impossible situation of trying to prove themselves innocent without actually having been accused of wrongdoing or knowing the basis for any actual or spurious suspicion.

**CBP's religious questioning of Imam Kariye is substantially likely to recur.**

90.     On information and belief, Imam Kariye was previously placed on the U.S. government watchlist, and Defendants had him removed from it on or around May 2022, in response to this litigation. Imam Kariye has no basis for knowing why the government placed him on the watchlist. Defendants may choose to add Imam Kariye to the watchlist again at any time, even though such a decision would be unjustified. If so, he will continue to be subject to detention, searches, and questioning, including religious questioning, each time he returns to the United States from international travel.

91.     For years, Imam Kariye has experienced travel issues consistent with placement on the U.S. government watchlist. Frequently between 2013 and 2019, and persistently from 2020 until May 2022, Imam Kariye was unable to print his boarding passes for domestic or international flights from the internet or self-service kiosks at the airport, and airline agents had to receive clearance from a supervisor or

government agency before providing Imam Kariye with his boarding pass. That process typically takes approximately an hour and has taken up to two hours. Whenever Imam Kariye took a domestic or international flight, his boarding pass was marked with "SSSS," which indicates "Secondary Security Screening Selection," and he was subject to additional screening. Placement on the watchlist consistently results in a traveler's boarding pass being stamped with "SSSS."

92.    Whenever Imam Kariye returned to the United States following international travel from 2020 until May 2022, whether by plane or by car, he was subject to secondary inspection. Whenever Imam Kariye returned to a U.S. airport following international travel, CBP officers were either waiting for him at the arrival gate or met him at primary inspection. The officers then escorted Imam Kariye to a secondary inspection area, where CBP officers detained and questioned him.

93.    Imam Kariye travels internationally frequently for leisure and to visit family abroad, including his father and other family who live in East Africa. He has also traveled internationally for religious pilgrimages. He intends to continue to travel internationally in the near future. When he does so, upon his return home to the United States, he is at substantial risk of again being questioned by CBP officers about his religious beliefs, practices, and associations.

**CBP's religious questioning causes Imam Kariye significant distress.**

94.    CBP officers ask Imam Kariye intrusive and personal questions about his religious beliefs, practices, and associations because he is a Muslim.

95.    Religious questioning by CBP harms Imam Kariye and impedes his religious practice.

96.    On information and belief, DHS and CBP maintain records pertaining to Imam Kariye's religious beliefs, practices, and associations, as a result of border officers' questioning of Imam Kariye about these topics. Defendants' unlawful retention of such information in government systems causes Imam Kariye ongoing, irreparable distress and harm for which he has no adequate remedy at law.

97.     CBP's invasive questions regarding Imam Kariye's religious beliefs, practices, and associations are insulting and humiliating to him. Border officers convey a message of official disapproval of Islam by (1) targeting Imam Kariye for religious questioning because he is a Muslim, (2) asking him specific questions about his Islamic religious beliefs, practices, and associations, and (3) retaining information about his religious beliefs, practices, and associations. In particular, CBP conveys the stigmatizing message that the U.S. government views adherence to Islamic religious beliefs and practices as inherently suspicious, and that Muslim Americans are not entitled to the full constitutional protections afforded to other Americans. Due to this official condemnation of his faith, Imam Kariye feels marginalized and like an outsider when coming home to his own country.

98.     CBP's religious questioning also coerces Imam Kariye into modifying or curbing his religious expression and practices, contrary to his sincere religious beliefs. In particular, when traveling back to the United States from abroad, Imam Kariye modifies or eliminates certain religious practices central to his faith to avoid calling attention to his faith and incurring additional scrutiny and religious questioning by CBP. Because of CBP's scrutiny and religious questioning, Imam Kariye cannot fully practice and express his faith in the way that he otherwise would while traveling.

99.     For example, CBP's religious questioning coerces Imam Kariye into modifying his religious dress while traveling back to the United States. Imam Kariye typically wears a Muslim cap, known as a kufi, when he is in public. Wearing a kufi is a common religious practice for many Muslim men. For Imam Kariye, the kufi represents his Muslim identity. It emulates the dress of the Prophet Mohammad, and it signifies love and reverence for him.

100.    Despite his sincerely held religious belief that he should wear his kufi in public, Imam Kariye no longer wears his kufi at the airport or the border when returning home to the United States from abroad, in order to avoid additional CBP

scrutiny and religious questioning.

101.   CBP's religious questioning also coerces Imam Kariye into modifying his prayer practice while traveling back into the United States. As a Muslim, Imam Kariye believes that he must pray at five specific times each day. This prayer practice involves kneeling on the ground in a particular direction (toward Mecca), bowing, and placing his forehead to the ground in prayer. However, to avoid additional CBP scrutiny and religious questioning, Imam Kariye typically refrains from these physical acts of prayer at the airport and the border, even though he would ordinarily pray in this manner during the religiously designated prayer times.

102.   CBP's religious questioning also coerces Imam Kariye into avoiding carrying religious texts while traveling back into the United States. As a Muslim and an imam, Imam Kariye's religious duties require him to study a variety of religious texts, such as the Quran, commentaries on the Quran, and Islamic jurisprudence in matters relating to family law and the rules pertaining to charity. However, to avoid additional CBP scrutiny and religious questioning, Imam Kariye no longer carries physical copies of these texts with him when he travels home to the United States from abroad, hindering his ability to study these texts while traveling.

103.   Imam Kariye is proud to be a Muslim. His sincere religious beliefs counsel him to wear a kufi in public, pray in a particular manner, and study various religious texts. These practices are central to his religious beliefs. It causes him distress to forgo wearing his kufi, modify his prayer practice, and avoid carrying religious texts as he travels. Nevertheless, because of CBP's practice of subjecting him to intrusive questions about his faith, he is coerced into refraining from these religious practices when traveling back into the United States. If Imam Kariye does engage in these religious practices, he risks being penalized through additional unwarranted scrutiny and religious questioning by CBP.

104.   Because Imam Kariye is Muslim, he is subjected to unnecessary religious questioning by CBP. In other words, he is forced to choose between, on the

one hand, being Muslim—and, on the other, being treated just like any other law-abiding citizen and receiving CBP's permission to reenter the country without undue scrutiny. Imam Kariye is also forced to choose between outward displays of religiosity and avoiding *additional* religious questioning. These forced choices are a substantial burden on his religious practice.

105.   CBP's religious questioning has made and continues to make Imam Kariye feel anxious, humiliated, and stigmatized as a Muslim American. Imam Kariye experiences anxiety before traveling home due to CBP's religious questioning. In the weeks following each incident of religious questioning described above, the humiliation of CBP's intrusive demands for information about his faith has replayed in Imam Kariye's mind. CBP's scrutiny and religious questioning cause him to suffer acute distress, which has interfered with his daily life, including by distracting him from work and from his relationships with family members.

## **Mohamad Mouslli**

106.   Plaintiff Mohamad Mouslli is a U.S. citizen who is Muslim. He lives in Gilbert, Arizona, with his wife and three children, all U.S. citizens. Mr. Mouslli works in commercial real estate.

107.   On four recent occasions that Mr. Mouslli has traveled internationally, CBP officers have subjected him to religious questioning upon his return home to the United States. On each occasion, the environment was coercive: CBP officers wearing uniforms and carrying weapons commanded Mr. Mouslli to enter and remain in an area separated from other travelers. They took Mr. Mouslli's belongings from him, searched his electronic devices, and questioned him at length. Because the environment was coercive, Mr. Mouslli's responses to CBP's questions were coerced. He was not free to leave without the permission of a CBP officer, and he reasonably believed that if he did not answer all questions, he would not be permitted to leave and would be subject to additional and lengthy scrutiny.

### First Religious Questioning Incident: August 9, 2018

108.   On or about August 9, 2018, CBP officers subjected Mr. Mouslli to religious questioning during secondary inspection at the border crossing near Lukeville, Arizona. He was returning to the United States by car from a trip to Mexico, where he had been on vacation with a friend.

109.   After CBP officers checked Mr. Mouslli's passport, several officers surrounded the car. They forced Mr. Mouslli to remain in the car for approximately 30 minutes, after which the officers brought him into the station. In total, CBP officers detained Mr. Mouslli for approximately six to seven hours.

110.   During the detention, CBP officers questioned Mr. Mouslli about his religious beliefs, practices, and associations, including whether he is a Muslim and whether he is Sunni or Shi'a.

111.   Mr. Mouslli answered these questions because he was not free to leave without the permission of a CBP officer and reasonably felt that he had no choice but to answer, based on the coercive circumstances of his detention.

112.   A CBP officer took notes during Mr. Mouslli's detention, including while Mr. Mouslli responded to CBP's questions about his religious beliefs, practices, and associations.

### Second Religious Questioning Incident: August 6, 2019

113.   On or about August 6, 2019, CBP officers again subjected Mr. Mouslli to religious questioning during secondary inspection at Los Angeles International Airport ("LAX"). He was returning to the United States from a trip to Dubai to visit family and the Netherlands to visit his sister. The officers detained Mr. Mouslli for approximately one-and-a-half to two hours, along with his minor son, who had joined him for the trip.

114.   During the detention, the CBP officers questioned Mr. Mouslli about his religious beliefs, practices, and associations, including whether he attends a mosque and how many times a day he prays.

AMENDED COMPLAINT FOR INJUNCTIVE AND DECLARATORY RELIEF

115.   Mr. Mouslli answered these questions because he and his son were not free to leave without the permission of a CBP officer, and he reasonably felt that he had no choice but to answer, based on the coercive circumstances of his detention. He was also worried about extending the detention, given the presence of his son.

116.   A CBP officer took notes during Mr. Mouslli's detention, including while Mr. Mouslli responded to CBP's questions about his religious beliefs, practices, and associations.

### Third Religious Questioning Incident: March 11, 2020

117.   On March 11, 2020, CBP officers subjected Mr. Mouslli to religious questioning during another secondary inspection at LAX. Mr. Mouslli was returning to the United States from a trip to Dubai to visit his parents. The officers detained Mr. Mouslli for approximately one-and-a-half to two hours.

118.   During the detention, the CBP officers questioned Mr. Mouslli about his religious beliefs, practices, and associations, once again demanding to know whether he attends a mosque and whether he is Sunni or Shi'a.

119.   Mr. Mouslli answered these questions because he was not free to leave without the permission of a CBP officer and reasonably felt that he had no choice but to answer, based on the coercive circumstances of his detention.

120.   A CBP officer took notes during Mr. Mouslli's detention, including while Mr. Mouslli responded to CBP's questions about his religious beliefs, practices, and associations.

121.   Because of the delay from the secondary inspection, including CBP's religious questioning, Mr. Mouslli missed his connecting flight from LAX to Phoenix, and he had to rent a car at additional expense to drive home to Arizona.

### Fourth Religious Questioning Incident: June 5, 2021

122.   On or about June 5, 2021, CBP officers again subjected Mr. Mouslli to religious questioning during secondary inspection at LAX. Mr. Mouslli was returning to the United States from a trip to Dubai to visit his parents. The officers

detained him for approximately one-and-a-half to two hours, along with his minor daughter, who had joined him for the trip.

123. During the detention, CBP officers questioned Mr. Mouslli about his religious beliefs, practices, and associations, including whether he goes to a mosque and whether he prays every day.

124. Mr. Mouslli answered these questions because he and his daughter were not free to leave without the permission of a CBP officer, and he reasonably felt that he had no choice but to answer, based on the coercive circumstances of his detention. He was also worried about extending the detention, given the presence of his daughter.

125. A CBP officer took notes during Mr. Mouslli's detention, including while Mr. Mouslli responded to CBP's questions about his religious beliefs, practices, and associations.

126. During each of these four religious questioning incidents, Mr. Mouslli's travel and identification documents were valid, and he was not transporting contraband.

### *Mr. Mouslli is a law-abiding citizen*
### *and does not pose a national security risk.*

127. Mr. Mouslli is a law-abiding citizen with no criminal record and no ties to terrorist activity.

128. Mr. Mouslli has never participated in nor advocated for any acts of violence, and has never been accused by any government agency of doing so.

129. Like Imam Kariye and many others, upon information and belief, Mr. Mouslli is unjustly and improperly on the U.S. government watchlist due to an error or misplaced suspicion.

130. Such errors are common because of the flaws in the watchlisting process described in paragraphs 83–89 above.

***CBP's religious questioning of Mr. Mouslli is substantially likely to recur***
***and causes him significant distress.***

131.    On information and belief, Mr. Mouslli has been placed on the U.S. government watchlist, and he will continue to be subject to detention, searches, and questioning, including religious questioning, each time he returns to the United States from international travel. Mr. Mouslli has no basis for knowing why the government placed him on the watchlist.

132.    In late 2017, Mr. Mouslli began experiencing travel issues consistent with placement on the watchlist. Since 2017, Mr. Mouslli has been unable to print his boarding passes for domestic or international flights from the internet or self-service kiosks at the airport, and airline agents must receive clearance from a supervisor or government agency before providing Mr. Mouslli with his boarding pass. Whenever Mr. Mouslli takes a domestic or international flight, his boarding pass is marked with "SSSS," and he is subject to additional screening. Whenever Mr. Mouslli returns to the United States following international travel, whether by plane or by car, he is subject to secondary inspection. Whenever Mr. Mouslli returns to a U.S. airport following international travel, CBP officers are waiting for him at the arrival gate. The officers then escort Mr. Mouslli to a secondary inspection area, where CBP officers detain and question Mr. Mouslli. Mr. Mouslli does not know why the U.S. government has placed him on the watchlist.

133.    Mr. Mouslli considered taking a trip with his son to Dubai in February 2022 to visit his family. However, he decided that this particular trip would not be worth the difficulty, discomfort, and stigma of CBP scrutiny in secondary inspection, including CBP's religious questioning.

134.    While Mr. Mouslli intends to travel internationally in the near future to visit his mother, brother, and sister, who live in Dubai, and his sister, who lives in the Netherlands, he now weighs the necessity of every trip against the substantial likelihood of future detention and religious questioning by border officers.

135.   When Mr. Mouslli travels again internationally, he is at substantial risk of again being questioned by CBP officers upon his return home to the United States about his religious beliefs, practices, and associations.

136.   CBP officers ask Mr. Mouslli intrusive questions about his religious beliefs, practices, and associations because he is a Muslim.

137.   Religious questioning by CBP harms Mr. Mouslli and impedes his religious practice.

138.   On information and belief, DHS and CBP maintain records pertaining to Mr. Mouslli's religious beliefs, practices, and associations, as a result of border officers' questioning of Mr. Mouslli about these topics. Defendants' unlawful retention of such information in government systems causes Mr. Mouslli ongoing, irreparable distress and harm for which he has no adequate remedy at law.

139.   CBP's invasive questions regarding Mr. Mouslli's religious beliefs, practices, and associations are insulting and humiliating to him. Border officers convey a message of official disapproval of Islam by (1) targeting Mr. Mouslli for religious questioning because he is a Muslim, (2) asking him specific questions about his Islamic religious beliefs, practices, and associations, and (3) retaining information about his religious beliefs, practices, and associations. In particular, CBP conveys the stigmatizing message that the U.S. government views adherence to Islamic religious beliefs and practices as inherently suspicious, and that Muslim Americans are not entitled to the full constitutional protections afforded to other Americans. Due to this official condemnation of his faith, Mr. Mouslli feels marginalized and like an outsider when coming home to his own country.

140.   CBP's religious questioning also coerces Mr. Mouslli into modifying his religious expression and practices, contrary to his sincere religious beliefs. In particular, when traveling back to the United States from abroad, Mr. Mouslli eliminates certain religious practices and expression central to his faith to avoid calling attention to his faith and incurring additional scrutiny and religious

questioning by CBP. Because of CBP's scrutiny and religious questioning, Mr. Mouslli cannot fully practice and express his faith in the way that he otherwise would while traveling.

141.  For example, CBP's religious questioning coerces Mr. Mouslli into modifying his prayer practice while traveling back into the United States. As a Muslim, Mr. Mouslli believes he must pray at five specific times each day. This prayer practice involves kneeling on the ground in a particular direction (toward Mecca), bowing, and placing his forehead to the ground in prayer. However, to avoid additional CBP scrutiny and religious questioning, Mr. Mouslli refrains from these physical acts of prayer at the airport and the border, even though he would ordinarily pray in this manner during the religiously designated prayer times.

142.  Mr. Mouslli is proud to be a Muslim. His sincere religious beliefs counsel him to pray in a particular way. It causes him distress to forgo physical acts of prayer at the airport and in secondary inspection. Physical acts of prayer are central to his religious belief. Nevertheless, because of CBP's practice of subjecting him to intrusive questions about his faith, he is coerced into refraining from physical acts of prayer when traveling back into the United States. If Mr. Mouslli does engage in prayer while traveling, he risks being penalized through additional unwarranted scrutiny and religious questioning by CBP.

143.  Because Mr. Mouslli is Muslim, he is subjected to unnecessary religious questioning by CBP. In other words, he is forced to choose between, on the one hand, being Muslim—and, on the other, being treated just like any other law-abiding citizen and receiving CBP's permission to reenter the country without undue scrutiny. Mr. Mouslli is also forced to choose between outward displays of religiosity and avoiding *additional* religious questioning. These forced choices are a substantial burden on his religious practice.

144.  Religious questioning by CBP has made and continues to make Mr. Mouslli feel anxious and distressed, particularly because of the invasive and personal

nature of religious questioning and the stigma of being targeted because he is Muslim.

### Hameem Shah

145.    Plaintiff Hameem Shah is a U.S. citizen and Muslim who works in financial services. Mr. Shah lives in Plano, Texas.

146.    On May 7, 2019, CBP officers subjected Mr. Shah to religious questioning during secondary inspection at LAX. Mr. Shah was returning to the United States from a trip to Serbia and Bosnia for vacation.

147.    After Mr. Shah passed through primary inspection without incident, a CBP officer ("Officer 1") stopped him in the baggage retrieval area and asked him to accompany him for a search. To the best of Mr. Shah's recollection, Officer 1's last name was "Esguerra" or something close to it.

148.    Mr. Shah responded that he did not wish to be searched. Officer 1 replied that, because Mr. Shah was at the border, he did not have the option to refuse.

149.    Officer 1 escorted Mr. Shah to a secondary inspection area. There, Officer 1 and a second officer ("Officer 2") began to search Mr. Shah's belongings. To the best of Mr. Shah's recollection, Officer 2's last name was "Gonzalez" or something close to it.

150.    The environment was coercive: both officers were wearing uniforms and carrying weapons, and they commanded Mr. Shah to enter and remain in an area separated from travelers who were not subject to secondary inspection. Because the environment was coercive, Mr. Shah's responses to the officers' questions were coerced. He was not free to leave without the permission of a CBP officer, and he reasonably believed that if he did not answer all questions, he would not be permitted to leave and would be subject to additional and lengthy scrutiny.

151.    Officer 2 reviewed a notebook that Mr. Shah had been carrying in his backpack—a personal journal that Mr. Shah had kept for years. The journal contained notes about his religious beliefs and practices, which are rooted in peace

and nonviolence. It also contained to-do lists for household and work tasks, notes about business lectures he listens to in his free time, and notes about a popular podcast on travel and entrepreneurship.

152.   Mr. Shah told Officer 2 that the notebook was a personal journal and asked him not to read it, but Officer 2 persisted.

153.   Officer 2 pointed out that many of the notes in Mr. Shah's journal were related to religion. He asked Mr. Shah why and where he had taken the notes and whether he had traveled in the Middle East. Officer 1 told Mr. Shah that they were trying to make sure Mr. Shah was a "safe person."

154.   Mr. Shah answered Officer 1's questions because he was not free to leave without the permission of a CBP officer and reasonably felt that he had no choice but to answer, based on the coercive circumstances of his detention.

155.   The officers then told Mr. Shah that they were going to search his phone and laptop. In response, Mr. Shah said that he did not consent to the search of his electronic devices and asked to see a supervisor. Officer 1 left to get the supervisor; Officer 2 stayed behind.

156.   While he and Mr. Shah were alone, Officer 2 asked Mr. Shah a series of questions about his religious beliefs, practices, and associations. The officer's questions included the following:

        a.  What religion are you?

        b.  How religious do you consider yourself? Your family?

        c.  What mosque do you attend?

        d.  Do you attend any other mosques?

        e.  Do you watch Islamic lectures online or on social media?

157.   When Mr. Shah asked Officer 2 why he was asking these questions, the officer responded, "I'm asking because of what we found in your journal."

158.   Mr. Shah answered Officer 2's questions because he was not free to leave without the permission of a CBP officer and reasonably felt that he had no

choice but to answer, based on the coercive circumstances of his detention.

159.   Later, Officer 1 returned with the supervisor. To the best of Mr. Shah's recollection, the supervisor's last name was "Lambrano," or something close to it. Mr. Shah told the supervisor that he did not consent to a search of his electronic devices. Mr. Shah stated that he wanted to stand up for his constitutional rights.

160.   The supervisor informed Mr. Shah that his reluctance to allow inspection of his devices had made the officers more suspicious of him.

161.   Mr. Shah asked to speak with an attorney immediately. Officer 1 responded by asking, "Why? You're not under arrest."

162.   Mr. Shah then told the supervisor that he no longer wished to enter the United States and wanted instead to return to the transit area so that he could leave the country and go back to Europe. The supervisor responded that Mr. Shah could not take his devices with him because they had been seized. The supervisor gave Mr. Shah two options: (1) unlock his phone, in which case the officers would inspect the device in Mr. Shah's presence; or (2) refuse to unlock his phone, in which case the officers would hold Mr. Shah's phone and laptop for further examination and return them to him at a later date.

163.   Mr. Shah reasonably felt that he had no meaningful choice, so he unlocked his phone. Officer 2 took the phone, wrote down the International Mobile Equipment Identity and serial numbers, and manually searched through the phone without letting Mr. Shah see the screen.

164.   Officer 1 told Mr. Shah he needed to continue looking through Mr. Shah's journal using a computer, and he left the secondary inspection area with the journal.

165.   Mr. Shah again objected to the search of his phone and his journal.

166.   About twenty to thirty minutes after Officer 1 had left, he returned with Mr. Shah's journal; he was accompanied by an officer or agent in plain clothes ("Officer 3"). To the best of Mr. Shah's recollection, Officer 3's name was "Ali," or

something close to it. On information and belief, Officer 3 was an HSI agent.

167.   Officer 3 asked Mr. Shah about aspects of his religious associations that Mr. Shah had recorded in his personal journal. Specifically, Officer 3 asked Mr. Shah about the identity of a local imam in the Phoenix area.

168.   Mr. Shah answered Officer 3's questions about the imam because he was not free to leave without the permission of a CBP officer and reasonably felt that he had no choice but to answer, based on the coercive circumstances of his detention.

169.   Approximately two hours after he was taken to secondary inspection, the officers returned Mr. Shah's passport and allowed him to leave.

170.   After leaving secondary inspection, Mr. Shah opened his phone and could see that Officer 2 had viewed private text messages, WhatsApp messages, internal files, emails, call history, Google maps history, Google Chrome, Airbnb, and photos of family members spanning ten years, some of which were stored in the cloud but must have been cached on the device. Mr. Shah reasonably believes that Officer 2 viewed these apps and files because Mr. Shah has a habit of closing apps or files after he uses them, meaning Officer 2 must have viewed everything that was open at the time he returned the phone to Mr. Shah.

171.   The fact that Officer 2 viewed this content, particularly photos of Mr. Shah's family members, made Mr. Shah feel extremely distressed and uncomfortable.

172.   The border officers subjected Mr. Shah to longer-than-necessary detention, more extensive and intrusive questioning, and more invasive searches as retaliation for the religious beliefs reflected in his journal, as well as his statements to the officers invoking his rights.

173.   If the officers had not been acting with retaliatory motives, they would have detained Mr. Shah for a shorter period of time, and would not have conducted such extensive and intrusive questioning and searches.

174.   Mr. Shah's travel and identification documents were valid, and he was not transporting contraband.

175.   In response to requests under the Freedom of Information Act and the Privacy Act, CBP has provided Mr. Shah with a redacted document stating that his detention and questioning was "Terrorist Related," even though Mr. Shah has no connection to terrorism or any kind of political violence. This document is labeled "IOIL," which is a type of incident report entered into TECS. The document includes the following description:

> During examination of his belongings, subject was very cautious and focused on his journal that was found in his hand carry. Subject demanded for us not to read his journal because he felt that it was an invasion of his privacy. [Redacted] Upon reading the journal, some notes regarding his work and religion were found. Subject stated he's self-employed working as a financial trader. Subject didn't want to elaborate on the type of work he does but just mentioned that he is able to work remotely. Subject's notes regarding his religion (Islam) seemed to be passages from an individual he calls [redacted]. Subject stated that he is the Imam at the Islamic Center of the North East Valley located in Scottsdale, AZ. Subject mentioned that he also goes to another mosque but refused to provide the name. Subject claimed he's a devote [sic] Sunni Muslim.

### *Mr. Shah is a law-abiding citizen*
### *and does not pose a national security risk.*

176.   Mr. Shah is a law-abiding citizen with no criminal record and no ties to terrorist activity.

177.   Mr. Shah has never participated in nor advocated for any acts of violence or terrorism, and has never been accused by any government agency of doing so.

178.   None of the contents of Mr. Shah's journal related to violence or terrorism.

***CBP's religious questioning of Mr. Shah is substantially likely to recur***
***and causes him significant distress.***

179.   Before the pandemic, Mr. Shah traveled internationally frequently for leisure and visits with family abroad. He intends to resume traveling internationally in the near future.

180.   At primary inspection, CBP officers query TECS to identify a traveler's recent border crossings. Because CBP has a TECS entry stating that Mr. Shah's previous detention and questioning was "Terrorist Related," on information and belief, when Mr. Shah travels internationally again, he is at substantial risk of being referred to secondary inspection upon his return home to the United States and being questioned by CBP officers about his religious beliefs, practices, and associations.

181.   Mr. Shah does not know why, and pursuant to what standards, his detention was labeled as "Terrorist Related." Mr. Shah's statements and actions, as alleged by Mr. Shah and as described by the TECS entry, have no relation to terrorism.

182.   CBP and HSI officers asked Mr. Shah intrusive questions about his religious beliefs, practices, and associations because he is a Muslim. In addition, CBP and HSI officers subjected Mr. Shah to retaliatory questioning and searches because he is Muslim, because of the Islamic religious content of his journal, and because he repeatedly invoked his constitutional rights.

183.   Religious questioning by CBP and HSI harms Mr. Shah and impedes his religious practice.

184.   Defendants maintain records pertaining to Mr. Shah's religious beliefs, practices, and associations, as a result of border officers' questioning of Mr. Shah about these topics. In addition, on information and belief, Defendants maintain copies of the contents of his journal and phone, collected in retaliation for the religious contents of the journal and his invocation of his rights. Defendants' unlawful retention of such information in government systems causes Mr. Shah

ongoing, irreparable distress and harm for which he has no adequate remedy at law.

185.    CBP's and HSI's invasive questions regarding Mr. Shah's religious beliefs, practices, and associations are insulting and humiliating to him. Border officers convey a message of official disapproval of Islam by (1) targeting Mr. Shah for religious questioning because he is a Muslim, (2) asking specific questions about his Islamic religious beliefs, practices, and associations, and (3) retaining information about his religious beliefs, practices, and associations. In particular, CBP and HSI convey the stigmatizing message that the U.S. government views adherence to Islamic religious beliefs and practices as inherently suspicious, and that Muslim Americans are not entitled to the full constitutional protection afforded to other Americans. Due to this official condemnation of his faith, Mr. Shah feels marginalized and like an outsider when coming home to his own country.

186.    CBP's and HSI's religious questioning of Mr. Shah also coerces him into modifying his religious practices, contrary to his sincere religious beliefs. As part of his religious practice, Mr. Shah regularly writes in a personal journal. These writings include expressions of his beliefs and devotion and other notes pertaining to his faith and religious practice. Mr. Shah's journal is a vital outlet for his religious expression and is central to his religious practice. In meditating on religious questions or issues, he often revisits his previous entries and draws on them for spiritual inspiration. However, the next time Mr. Shah travels internationally, he intends to leave his journal at home to avoid having it become a basis for Defendants' practice of targeting Muslims for religious questioning. As a result, due to government coercion, he will be unable to document his religious expression and thoughts or consult previous entries while he is out of the country.

187.    Mr. Shah is proud to be a Muslim, and the prospect of leaving his journal at home when traveling internationally is distressing to him. Nevertheless, because of CBP's and HSI's practice of subjecting him to intrusive and retaliatory questions about his faith, he is coerced into leaving his journal at home. If Mr. Shah

AMENDED COMPLAINT FOR INJUNCTIVE AND DECLARATORY RELIEF

travels internationally with his journal, he risks being penalized through additional unwarranted scrutiny and religious questioning by CBP and HSI.

188.   Because Mr. Shah is Muslim, he is subjected to unnecessary religious questioning by border officers. In other words, he is forced to choose between, on the one hand, being Muslim—and, on the other, being treated just like any other law-abiding citizen and receiving CBP's permission to reenter the country without undue scrutiny. Mr. Shah is also forced to choose between outward displays of religiosity and avoiding *additional* religious questioning. These forced choices are a substantial burden on his religious practice.

189.   Mr. Shah feels violated and humiliated by the border officers' religious questioning and retaliatory searches. He remains extremely concerned about the private information Defendants retain from his journal and phone, as well as the information they retain about his personal religious beliefs, practices, and associations.

## CAUSES OF ACTION

### CLAIM I

### Violation of the First Amendment

### Establishment Clause

### (by all Plaintiffs against all Defendants)

190.   Plaintiffs herein incorporate by reference the allegations above.

191.   The "clearest command" of the Establishment Clause requires the government to adhere to a rigid "principle of denominational neutrality"—neither favoring nor disfavoring any particular religious sect. *Larson v. Valente*, 456 U.S. 228, 244–46 (1982). Where government action "discriminates *among* religions" in violation of this fundamental principle, strict scrutiny applies. *Id.*

192.   The denominational neutrality requirement applies to all forms of government action. *See Sklar v. Comm'r*, 282 F.3d 610, 619 (9th Cir. 2002) (applying the *Larson* test to a policy contained in an Internal Revenue Service

closing agreement).

193.   Defendants' border officers have subjected Plaintiffs to religious questioning on at least ten separate occasions, and Defendants retain Plaintiffs' responses to such questioning.

194.   Defendants engage in a policy and/or practice of singling out and targeting Muslims, including Plaintiffs, for religious questioning during secondary inspections because of their adherence to Islam. As part of this policy and/or practice of religious questioning, Defendants retain records that reflect answers to religious questions and thus contain information about the religious beliefs, practices, and associations of Muslims, including Plaintiffs.

195.   Defendants' conduct, as set forth above, violates the fundamental principle of denominational neutrality by targeting Muslims for religious questioning during secondary inspections. Americans who practice other faiths are not routinely subject to similar questioning about their beliefs and practices during secondary inspections.

196.   Defendants' conduct, as set forth above, does not further any compelling government interest and is not narrowly tailored to achieve any such interest.

197.   Requiring Plaintiffs to respond to invasive questions about their religious beliefs, practices, and associations, and retaining that information for decades, does not help to protect the border or prevent terrorism. Moreover, Defendants have less restrictive alternatives at their disposal—such as questioning focused on whether a traveler has violated immigration, customs, or border-related laws—that would help achieve those objectives.

198.   Defendants' conduct, as set forth above, is also religiously coercive because it places substantial pressure on Muslims, including Plaintiffs, to hide, suppress, or otherwise alter their faith and religious practice.

199.   Defendants' discriminatory conduct is at odds with American

"historical practices and understandings," as described in paragraphs 39–53. *See Kennedy v. Bremerton Sch. Dist.*, 142 S. Ct. 2407, 2428 (2022) (quoting *Town of Greece v. Galloway*, 572 U.S. 565, 566 (2014)).

200.   Alternatively, even if Defendants do not engage in a policy and/or practice of singling out Muslims in particular for religious questioning, Defendants have a policy and/or practice of subjecting certain travelers of faith, including Plaintiffs, to religious questioning during secondary inspections, and Defendants retain records reflecting answers to such questioning for decades. Unjustified intrusive religious questioning is at odds with American historical practices and understandings as described in paragraphs 39–53.

201.   Moreover, subjecting travelers of any faith to religious questioning during secondary inspection is religiously coercive because it places substantial pressure on people of faith, including Plaintiffs, to hide, suppress, or otherwise alter their faith and religious practice. The environment in which the questioning takes place, as well as the fact that Plaintiffs cannot leave without CBP's permission, renders the questioning itself coercive. In addition, by coercing Plaintiffs to reveal information about their religion, Defendants impermissibly coerce Plaintiffs to profess their belief in their religion.

202.   As a result, Defendants have violated the Establishment Clause of the First Amendment to the U.S. Constitution and will continue to do so if Plaintiffs are not afforded the relief below.

## CLAIM II

### Violation of the First Amendment

### Free Exercise Clause

### (by all Plaintiffs against all Defendants)

203.   Plaintiffs herein incorporate by reference the allegations above.

204.   The Free Exercise Clause "protect[s] religious observers against unequal treatment" and "'guard[s] against the government's imposition of "special

disabilities on the basis of religious views or religious status.'" *Trinity Lutheran Church of Columbia, Inc. v. Comer*, 137 S. Ct. 2012, 2019, 2021 (2017) (internal quotation marks and citations omitted). Government actions that treat individuals unequally based on their religious status are subject to the "strictest scrutiny." *Id.* at 2019.

205.   Defendants' border officers have subjected Plaintiffs to religious questioning on at least ten separate occasions, and Defendants retain Plaintiffs' responses to such questioning.

206.   Defendants engage in a policy and/or practice of singling out and targeting Muslims, including Plaintiffs, for religious questioning during secondary inspections because of their adherence to Islam. As part of this policy and/or practice of religious questioning, Defendants retain records that reflect answers to religious questions and thus contain information about the religious beliefs, practices, and associations of Muslims, including Plaintiffs.

207.   Defendants' conduct, as set forth above, is not religiously neutral or generally applicable. It treats Muslims unequally vis-à-vis travelers of other faiths and, based on their religious status, imposes on Muslims special disabilities while traveling.

208.   Defendants' conduct, as set forth above, does not advance any compelling government interest and is not narrowly tailored to achieve any such interest.

209.   Alternatively, even if Defendants do not engage in a policy and/or practice of singling out Muslims in particular for religious questioning, Defendants have a policy and/or practice of subjecting certain travelers of faith, including Plaintiffs, to religious questioning during secondary inspections, and Defendants retain records reflecting answers to such questioning for decades. This policy and/or practice targets people of faith based on their religious status and is thus subject to strict scrutiny. It does not advance any compelling government interest and is not

narrowly tailored to achieve any such interest.

210.   Requiring Plaintiffs to respond to invasive questions about their religious beliefs, practices, and associations, and retaining that information for decades, does not help to protect the border or prevent terrorism. Moreover, Defendants have less restrictive alternatives at their disposal—such as questioning focused on whether a traveler has violated immigration, customs, or border-related laws—that would help achieve those objectives.

211.   Defendants' conduct imposes a substantial burden on Plaintiffs' exercise of their sincerely held religious beliefs because it places on Plaintiffs substantial pressure to modify or eliminate certain religious practices and expression while traveling, in order to avoid calling attention to their religion and being subjected to additional coercive questioning about it. Defendants' conduct also forces Plaintiffs to choose between following the tenets of their religion and receiving a government benefit, and it coerces Plaintiffs to act contrary to their religious beliefs by threat of sanction. Plaintiffs are coerced into taking measures contrary to their sincerely held religious beliefs, in order to avoid calling attention to their religion and being subjected to additional questioning about it.

212.   As a result, Defendants have violated the Free Exercise Clause of the First Amendment to the U.S. Constitution and will continue to do so if Plaintiffs are not afforded the relief below.

**CLAIM III**

**Violation of the First Amendment**

**Right to Free Association**

**(by all Plaintiffs against all Defendants)**

213.   Plaintiffs herein incorporate by reference the allegations above.

214.   The Supreme Court has "long understood as implicit in the right to engage in activities protected by the First Amendment a right to associate with others," and has recognized "the vital relationship between freedom to associate and

privacy in one's associations." *Americans for Prosperity Found. v. Bonta*, 141 S. Ct. 2373, 2382 (2021) (internal quotation marks and citations omitted). Government actions compelling disclosure of one's associations are subject to exacting scrutiny. *Id.* at 2383–84.

215. Defendants' border officers have repeatedly subjected Plaintiffs to questioning about their religious associations, and Defendants retain Plaintiffs' responses to such questioning.

216. Defendants engage in a policy and/or practice of singling out and targeting Muslims, including Plaintiffs, for questioning about their religious associations during secondary inspections because of their adherence to Islam. This policy and/or practice involves expressions of hostility toward Islam. As part of this policy and/or practice, Defendants retain records that reflect answers to religious questions and thus contain information about the religious associations of Muslims, including Plaintiffs.

217. Defendants' border officers question Plaintiffs about their religious associations in inherently coercive environments, thereby compelling Plaintiffs to disclose information revealing constitutionally protected associational activities. This environment, and the fact that Plaintiffs cannot leave without CBP's permission, renders the questioning itself coercive.

218. There is no substantial relationship between Defendants' acquisition of this information and a sufficiently important government interest, and the acquisition is not narrowly tailored to achieve any such interest.

219. There is no substantial relationship between Defendants' retention of this information and a sufficiently important government interest, and the retention is not narrowly tailored to achieve any such interest.

220. Alternatively, even if Defendants do not engage in a policy and/or practice of singling out Muslims in particular for religious questioning, Defendants have a policy and/or practice of subjecting certain travelers of faith, including

Plaintiffs, to religious questioning during secondary inspections, and Defendants retain records reflecting answers to such questioning for decades. There is no substantial relationship between the acquisition or retention of this information and a sufficiently important government interest, and neither the acquisition nor retention is narrowly tailored to achieve any such interest.

221.   Requiring Plaintiffs to respond to invasive questions about their religious beliefs, practices, and associations, and retaining that information for decades, does not help to protect the border or prevent terrorism. Moreover, Defendants have less restrictive alternatives at their disposal—such as questioning focused on whether a traveler has violated immigration, customs, or border-related laws—that would help achieve those objectives.

222.   As a result, Defendants have violated Plaintiffs' right to free association under the First Amendment to the U.S. Constitution and will continue to do so if Plaintiffs are not afforded the relief below.

## CLAIM IV

### Violation of the First Amendment

### (Retaliation)

### (by Mr. Shah against all Defendants)

223.   Plaintiffs herein incorporate by reference the allegations above.

224.   Two CBP officers and one HSI officer violated Mr. Shah's First Amendment rights by retaliating against him for exercising his constitutionally protected rights to freedom of religion and freedom of speech. Mr. Shah engaged in constitutionally protected activities, including writing notes about his religious beliefs and practices in a journal that he carried during his travels, and stating to border officers that he did not wish to be searched, that he did not consent to a search of his electronic devices, and that he wanted to stand up for his constitutional rights.

225.   The officers' retaliatory adverse actions included prolonged detention; extensive questioning, including but not limited to additional religious questioning;

a search of Mr. Shah's phone, including private messages, emails and photos; and a search of Mr. Shah's private journal. Mr. Shah would have been subject to a shorter detention, less extensive questioning, and less invasive searches had the officers not acted in retaliation for his First Amendment protected speech.

226.   The officers' statements and behavior clearly indicated a substantial causal relationship between Mr. Shah's constitutionally protected activity and the retaliatory adverse actions. In particular, the officers' statements and behavior clearly indicated that they took these adverse actions as retaliation for Mr. Shah's religious beliefs reflected in his journal, as well as his statements to the officers invoking his rights.

227.   These adverse actions chill Mr. Shah from documenting his religious expression and thoughts while out of the country and from asserting his constitutional rights while in secondary inspection. These adverse actions would also chill a person of ordinary firmness from continuing to engage in constitutionally protected activity.

228.   The officers' adverse actions would lead a traveler to reasonably believe that if they engage in protected speech, officers would retaliate by subjecting them to longer-than-necessary detention, more extensive questioning, and more invasive searches.

229.   Defendants maintain records illegally obtained through the retaliatory searches and questioning.

**CLAIM V**

**Violation of the Fifth Amendment**

**Due Process Right to Equal Protection**

**(by all Plaintiffs against all Defendants)**

230.   Plaintiffs herein incorporate by reference the allegations above.

231.   The Due Process Clause of the Fifth Amendment to the U.S. Constitution provides that "[n]o person shall . . . be deprived of life, liberty, or

property, without due process of law." The Due Process Clause contains an equal protection component. Under the right to equal protection, government action discriminating "along suspect lines like . . . religion" is subject to strict scrutiny. *Burlington Northern Railroad Co. v. Ford*, 504 U.S. 648, 651 (1992).

232.   Defendants' border officers have subjected Plaintiffs to religious questioning on at least ten separate occasions, and Defendants retain Plaintiffs' responses to such questioning.

233.   Defendants engage in a policy and/or practice of singling out and targeting Muslims, including Plaintiffs, for religious questioning during secondary inspections because of their adherence to Islam. As part of this policy and/or practice of religious questioning, Defendants retain records that reflect answers to religious questions and thus contain information about the religious beliefs, practices, and associations of Muslims, including Plaintiffs.

234.   Defendants' conduct, as set forth above, discriminates on the basis of religion, a suspect classification, and is thus subject to strict scrutiny.

235.   Defendants' conduct, as set forth above, is substantially motivated by an intent to discriminate against Muslims, on whom it has a disparate effect relative to adherents of other faiths, because Defendants' border officers do not routinely subject travelers of other faiths to similar questioning about their religious beliefs and practices.

236.   Defendants' conduct, as set forth above, stigmatizes Plaintiffs as Muslims and condemns their religion as one that is the subject of intense suspicion and distrust, different from any other religion.

237.   Defendants' conduct, as set forth above, does not advance any compelling government interest and is not narrowly tailored to achieve any such interest.

238.   Requiring Plaintiffs to respond to invasive questions about their religious beliefs, practices, and associations, and retaining that information for

decades, does not help to protect the border or prevent terrorism. Moreover, Defendants have less restrictive alternatives at their disposal—such as questioning focused on whether a traveler has violated immigration, customs, or border-related laws—that would help achieve those objectives.

239.   By discriminating against Plaintiffs in this manner, Defendants have violated the equal protection component of the Due Process Clause of the Fifth Amendment to the U.S. Constitution and will continue to do so if Plaintiffs are not afforded the relief below.

## CLAIM VI

### Violation of the Religious Freedom Restoration Act,

### 42 U.S.C. § 2000bb *et seq.*

### (by all Plaintiffs against all Defendants)

240.   Plaintiffs herein incorporate by reference the allegations above.

241.   Defendants' border officers have repeatedly subjected Plaintiffs to religious questioning during secondary inspections and have recorded Plaintiffs' responses in DHS databases, where Plaintiffs' personal religious information will be retained for up to three-quarters of a century and accessible to thousands of law enforcement agencies.

242.   Defendants' conduct imposes a substantial burden on Plaintiffs' exercise of their sincerely held religious beliefs because it forces Plaintiffs to choose between following the tenets of their religion and receiving a government benefit.

243.   Defendants' conduct also imposes a substantial burden on Plaintiffs' exercise of their sincerely held religious beliefs because it coerces Plaintiffs to act contrary to their religious beliefs by threat of sanction. Plaintiffs are coerced into taking measures contrary to their sincerely held religious beliefs, in order to avoid calling attention to their religion and being subjected to additional coercive questioning about it.

244.   This substantial burden is not imposed in furtherance of a compelling

government interest, and is not the least restrictive means of furthering a compelling government interest.

245.   Requiring Plaintiffs to respond to invasive questions about their religious beliefs, practices, and associations, and retaining that information for decades, does not help to protect the border or prevent terrorism. Moreover, Defendants have less restrictive alternatives at their disposal—such as questioning focused on whether a traveler has violated immigration, customs, or border-related laws—that would help achieve those objectives.

## REQUEST FOR RELIEF

Wherefore, Plaintiffs respectfully request that this Court:

A.   *Declare* that the religious questioning of Plaintiffs, as well as the policies and practices of DHS and CBP described in the complaint, violate the First and Fifth Amendments to the U.S. Constitution and RFRA;

B.   *Enjoin* DHS and CBP and their agents, employees, successors, and all others acting in active concert with them from questioning Plaintiffs about their religious beliefs, practices, and First Amendment-protected religious associations during future border inspections;

C.   *Order* Defendants and their agents, employees, successors, and all others acting in active concert with them to expunge all records they have retained regarding the unlawful religious questioning of Plaintiffs, including records reflecting the substance of information that Plaintiffs were unlawfully compelled to disclose;

D.   *Order* Defendants and their agents, employees, successors, and all others acting in active concert with them to expunge all records that were collected as a result of retaliatory action against Mr. Shah;

E.   *Award* Plaintiffs' counsel reasonable attorneys' fees and litigation costs, including but not limited to fees, costs, and expenses pursuant to

28 U.S.C. § 2412; and

F.    *Grant* such other and further relief as the Court deems proper.

Dated:  November 14, 2022          Respectfully submitted,

AMERICAN CIVIL LIBERTIES UNION
    FOUNDATION

AMERICAN CIVIL LIBERTIES UNION OF
    MINNESOTA

ACLU FOUNDATION OF SOUTHERN
    CALIFORNIA

By:   */s/ Ashley Gorski*
        Ashley Gorski
        Attorney for Plaintiffs