BRIAN M. BOYNTON
Principal Deputy Assistant Attorney General
Civil Division

BRIGHAM J. BOWEN
Assistant Branch Director
Civil Division, Federal Programs Branch

LESLIE COOPER VIGEN (D.C. Bar No. 1019782)
LAUREL H. LUM (N.Y. Bar. No. 5729728)
SAMUEL A. REBO (D.C. Bar No. 1780665)
Trial Attorneys
Civil Division, Federal Programs Branch
United States Department of Justice
1100 L Street, NW, Washington, D.C. 20005
Telephone: (202) 305-0727
Email:  leslie.vigen@usdoj.gov

*Counsel for Defendants*

## IN THE UNITED STATES DISTRICT COURT
## FOR THE CENTRAL DISTRICT OF CALIFORNIA

| | |
|---|---|
| ABDIRAHMAN ADEN KARIYE, *et al.*,<br><br>                    *Plaintiffs*,<br><br>        v.<br><br>ALEJANDRO MAYORKAS,<br>Secretary of the Department of<br>Homeland Security, in his official<br>capacity, *et al.*,<br><br>                    *Defendants*. | CASE NO. 2:22-CV-1916-FWS-GJS<br><br>**MEMORANDUM OF POINTS AND AUTHORITIES IN SUPPORT OF DEFENDANTS' MOTION TO DISMISS THE AMENDED COMPLAINT**<br><br>**Hearing:**<br>Date:  March 23, 2023<br>Time: 10:00 a.m.<br>Place: Santa Ana, Courtroom 10D<br><br>Honorable Fred W. Slaughter<br>**United States District Judge** |

# TABLE OF CONTENTS

INTRODUCTION ................................................................................................1

BACKGROUND .................................................................................................3

A.    The Defendant Agencies and U.S. Border Inspections ................................3

B.    Plaintiffs' Allegations...................................................................................5

C.    Procedural History........................................................................................8

LEGAL STANDARDS ......................................................................................10

A.    Standard of Review .....................................................................................10

B.    The Federal Government's Authority at the Border ...................................12

ARGUMENT .....................................................................................................13

A.    Plaintiffs Do Not Plausibly Allege an Establishment Clause Violation. ....13

B.    Plaintiffs Do Not Plausibly Allege a Violation of Their Free Exercise
Rights under the First Amendment or RFRA..............................................17

      1.    Applicable law.....................................................................................17

      2.    Plaintiffs have not alleged a substantial burden on their religious
practice. .............................................................................................19

      3.    Plaintiffs do not plausibly allege they were deprived of a government
benefit or coerced to act contrary to their religious beliefs. .............21

      4.    Even had Plaintiffs alleged a substantial burden, any questioning was
narrowly tailored to advance a compelling governmental interest. ..22

C.    Plaintiffs Do Not Plausibly Allege a Violation of the First Amendment
Right to Freedom of Association.................................................................25

D.    Plaintiff Shah Does Not Plausibly Allege Retaliation in Violation of His
First Amendment Rights..............................................................................27

E.    Plaintiffs Do Not Plausibly Allege an Equal Protection Violation. ............30

i

F.    Dismissal with Prejudice Is Appropriate Because Further Amendment
      Would Be Futile..............................................................................................33

CONCLUSION ....................................................................................................34

# TABLE OF AUTHORITIES

**Cases**

*Al Haramain Islamic Found., Inc. v. U.S. Dep't of Treasury*,
 686 F.3d 965 (9th Cir. 2012) ............................................................... 23

*Alasaad v. Mayorkas*,
 988 F.3d 8 (1st Cir. 2021) ................................................................. 16

*Am. Fam. Ass'n, Inc. v. City & Cnty. of S.F.*,
 277 F.3d 1114 (9th Cir. 2002) ............................................... 15, 18, 19

*Ams. for Prosperity Found. v. Bonta*,
 141 S. Ct. 2373 (2021) ........................................................ 9, 25, 26

*Ascon Props., Inc. v. Mobil Oil Co.*,
 866 F.2d 1149 (9th Cir. 1989) ..................................................... 11, 33

*Ashcroft v. Iqbal*,
 556 U.S. 662 (2009) ........................................................... 10, 11, 25

*Askins v. U.S. Dep't of Homeland Sec.*,
 899 F.3d 1035 (9th Cir. 2018) ............................................................ 11

*Azam v. Ruzika & Wallace LLP*,
 2015 WL 13918078 (C.D. Cal. Sept. 10, 2015) ......................... 12, 34

*Ball v. Massanari*,
 254 F.3d 817 (9th Cir. 2001) ............................................................. 31

*Bell Atl. Corp. v. Twombly*,
 550 U.S. 544 (2007) ..................................................................... 10, 11

*Blair v. Bethel Sch. Dist.*,
 608 F.3d 540 (9th Cir. 2010) ............................................................. 28

*Blitz v. Napolitano*,
 700 F.3d 733 (4th Cir. 2012) .............................................................. 5

*Burcham v. City of Los Angeles*,
 562 F. Supp. 3d 694 (C.D. Cal. 2022) ............................................. 13

*Cafasso, U.S. ex rel. v. Gen. Dynamics C4 Sys., Inc.*,
 637 F.3d 1047 (9th Cir. 2011) ..................................................... 11, 33

iii

*Cal. Parents for the Equalization of Educ. Materials v. Torlakson*,
    973 F.3d 1010 (9th Cir. 2020) ........................................................ 18

*Cherri v. Mueller*,
    951 F. Supp. 2d 918 (E.D. Mich. 2013) .......................................... 14

*Church of the Lukumi Babalu Aye, Inc. v. City of Hialeah*,
    508 U.S. 520 (1993) ........................................................................ 17

*City of Cleburne v. Cleburne Living Ctr.*,
    473 U.S. 432 (1985) ........................................................................ 31

*Country Classic Dairies, Inc. v. State of Mont., Dep't of Com. Milk Control Bureau*,
    847 F.2d 593 (9th Cir. 1988) .......................................................... 31

*Daniels-Hall v. Nat'l Educ. Ass'n*,
    629 F.3d 992 (9th Cir. 2010) .................................................. 11, 14

*Doe v. Reed*,
    561 U.S. 186 (2010) ........................................................................ 26

*Dousa v. DHS*,
    2020 WL 434314 (S.D. Cal. Jan. 28, 2020) ............................ 19, 20

*Elhady v. Kable*,
    993 F.3d 208 (4th Cir. 2021) .......................................................... 24

*Employment Div. v. Smith*,
    494 U.S. 872 (1990) ........................................................................ 17

*Espinoza v. Union of Am. Physicians & Dentists, AFSCME Loc. 206*,
    562 F. Supp. 3d 904 (C.D. Cal. 2022) ...................................... 11, 33

*Freedom from Religion Found., Inc. v. Mack*,
    49 F.4th 941 (5th Cir. 2022) .......................................................... 16

*Gibler v. Barnhart*,
    111 F. App'x 504 (9th Cir. 2004) ............................................ 12, 33

*Haig v. Agee*,
    453 U.S. 280 (1981) ........................................................................ 23

*Hartman v. Moore*,
    547 U.S. 250 (2006) ........................................................................ 29

*Holder v. Humanitarian Law Project,*
   561 U.S. 1 (2010) ........................................................................... 23

*Honolulu Wkly., Inc. v. Harris,*
   298 F.3d 1037 (9th Cir. 2002) ........................................................ 31

*Humanitarian Law Project v. Reno,*
   205 F.3d 1130 (9th Cir. 2000) ........................................................ 27

*Kariye v. Mayorkas,*
   2022 U.S. Dist. LEXIS 186915 (C.D. Cal. Oct. 12, 2022) .................... *passim*

*Kennedy v. Bremerton Sch. Dist.,*
   142 S. Ct. 2407 (2022) ........................................... 9, 14, 15, 16

*Knievel v. ESPN,*
   393 F.3d 1068 (9th Cir. 2005) ........................................................ 11

*Martinez v. City of Santa Rosa,*
   499 F. Supp. 3d 748 (N.D. Cal. 2020) ........................................... 30

*McLean v. Crabtree,*
   173 F.3d 1176 (9th Cir. 1999) ........................................................ 31

*Mir v. Little Co. of Mary Hosp.,*
   844 F.2d 646 (9th Cir. 1988) ......................................................... 14

*NAACP v. Alabama ex rel. Patterson,*
   357 U.S. 449 (1958) ....................................................................... 26

*Navajo Nation v. U.S. Forest Serv.,*
   535 F.3d 1058 (9th Cir. 2008) ................................................ 18, 19, 22

*Nieves v. Bartlett,*
   139 S. Ct. 1715 (2019) ............................................................. 29, 30

*O'Brien v. Welty,*
   818 F.3d 920 (9th Cir. 2016) ......................................................... 28

*Roberts v. U.S. Jaycees,*
   468 U.S. 609 (1984) ....................................................................... 25

*Roy v. Barr,*
   960 F.3d 1175 (9th Cir. 2020) ........................................................ 31

v

*Rutman Wine Co. v. E. & J. Gallo Winery*,
   829 F.2d 729 (9th Cir. 1987) .................................................... 11, 33

*Sabra v. Maricopa Cnty. Cmty. Coll. Dist.*,
   44 F.4th 867 (9th Cir. 2022) ......................................................... 16

*Stormans, Inc. v. Selecky*,
   586 F.3d 1109 (9th Cir. 2009) ..................................................... 17

*Tabbaa v. Chertoff*,
   509 F.3d 89 (2d Cir. 2007) ................................................... *passim*

*Town of Greece v. Galloway*,
   572 U.S. 565 (2014) .................................................................. 15

*United States v. Abbouchi*,
   502 F.3d 850 (9th Cir. 2007) ......................................................... 28

*United States v. Arnold*,
   533 F.3d 1003 (9th Cir. 2008) ................................................. 25, 28

*United States v. Baxter*,
   951 F.3d 128 (3d Cir. 2020) ......................................................... 16

*United States v. Bravo*,
   295 F.3d 1002 (9th Cir. 2002) ................................................. 13, 29

*United States v. Cano*,
   934 F.3d 1002 (9th Cir. 2019) ....................................................... 12

*United States v. Cotterman*,
   709 F.3d 952 (9th Cir. 2013) ................................................ *passim*

*United States v. Flores-Montano*,
   541 U.S. 149 (2004) ........................................................... *passim*

*United States v. Hancock*,
   231 F.3d 557 (9th Cir. 2000) ......................................................... 31

*United States v. Mayer*,
   503 F.3d 740 (9th Cir. 2007) ......................................................... 26

*United States v. Montoya de Hernandez*,
   473 U.S. 531 (1985) ............................................................. 12, 15

*United States v. Ramsey*,
    431 U.S. 606 (1977) ....................................................................... 12, 13, 15, 16

*United States v. Rubio*,
    727 F.2d 786 (9th Cir. 1983) ........................................................................ 25

*United States v. Seljan*,
    547 F.3d 993 (9th Cir. 2008) ........................................................................ 28

*United States v. Tsai*,
    282 F.3d 690 (9th Cir. 2002) ........................................................................ 28

*Urenia v. Public Storage*,
    2015 WL 4885998 (C.D. Cal. Aug. 14, 2015) ............................................. 30

*Vernon v. City of Los Angeles*,
    27 F.3d 1385 (9th Cir. 1994) ........................................................................ 19

*Vil. of Arlington Heights v. Metro. Hous. Dev. Corp.*,
    429 U.S. 252 (1977) ............................................................................... 31, 32

*Waln v. Dysart Sch. Dist.*,
    --- F.4th ----, 2022 WL 17544355 (9th Cir. Dec. 9, 2022) ............................ 18

**U.S. Constitution**

U.S. Const. amend. I ..................................................................................... 14, 17

**Statutes**

6 U.S.C. § 111 ................................................................................................... 3

6 U.S.C. § 202 ................................................................................................... 3

6 U.S.C. § 215 ................................................................................................... 3

6 U.S.C. § 251 ................................................................................................... 3

8 U.S.C. § 1101 ............................................................................................... 16

8 U.S.C. § 1225 ................................................................................................. 4

8 U.S.C. § 1357 ................................................................................................. 3

19 U.S.C. § 482 ................................................................................................. 3

19 U.S.C. § 1461 ............................................................................................... 3

19 U.S.C. § 1496 ............................................................................................... 3

19 U.S.C. § 1499 ............................................................................................... 3

19 U.S.C. § 1581 ..................................................................... 4

19 U.S.C. § 1582 .................................................................... 4

42 U.S.C. § 2000bb-1 ......................................................... 18

49 U.S.C. § 114 .................................................................... 5

**Rules and Regulations**

8 C.F.R. § 235.1 ................................................................... 4

8 C.F.R. § 287 ...................................................................... 4

19 C.F.R. pt. 162 ................................................................. 4

19 C.F.R. § 148.11 .............................................................. 4

Federal Rule of Civil Procedure 12 ...................................... 8, 10, 11

**Other**

U.S. Immigration and Customs Enforcement, ICE's Mission,
    https://www.ice.gov/mission, *permanent link available at*
    https://perma.cc/5P3Y-QMZH ...................................... 4

U.S. Immigration and Customs Enforcement, Who We Are,
    https://www.ice.gov/about-ice, *permanent link available at*
    https://perma.cc/RM3U-8EZW ...................................... 4

**INTRODUCTION**

On October 12, 2022, the Court dismissed Plaintiffs' original complaint in full, finding that Plaintiffs failed to state a claim upon which relief could be granted as to any of its six counts.  Plaintiffs' amended complaint raises the same six causes of action, based on essentially the same underlying factual allegations.  It alleges, in short, that on sporadic occasions over the course of six years, two Muslim American travelers allegedly on government watchlists were asked questions implicating religion while seeking reentry into the United States from abroad.  It further alleges that another Muslim American individual was asked questions implicating religion on a single occasion, as part of a seemingly random stop, related to objects he carried across the U.S. border, including a journal containing religious writings.  The alleged questioning largely related to core border-security issues: an individual's purpose for travel, his occupation, what he did while abroad, and the items he has chosen to carry into the United States.  These same central factual allegations led the Court to properly dismiss the original complaint.  The amended complaint fails to correct the deficiencies that the Court identified in its opinion granting dismissal.  It therefore can, and should, be dismissed for the same reasons as the original complaint—this time with prejudice.

As before, Plaintiffs' amended complaint fails to state a claim under the Constitution or the Religious Freedom Restoration Act (RFRA).  First, Plaintiffs have not properly alleged a violation of the Establishment Clause, as they point to no history or tradition that would suggest that individualized, specific questioning that touches upon religion at the U.S. border somehow amounts to an establishment of state religion.   To the contrary, courts have long recognized the federal government's plenary authority at the border, including with respect to questioning and searching individuals seeking to enter the country.  Second, Plaintiffs have not plausibly alleged that the alleged questioning imposed a substantial burden on their

religious exercise, as required to state a claim under the Free Exercise Clause and RFRA.  Nor have they alleged that answering questions relating to religion is contrary to their religious beliefs, and thus have not shown that they were incentivized or coerced into acting in conflict with their religion.  And even if they had, the questions they allege being asked are narrowly tailored to advance compelling governmental interests particular to the U.S. border.  Third, Plaintiffs have not plausibly alleged any harm to their religious associations—and even if they had, the alleged questions are narrowly tailored to advance a sufficiently important government interest.

Plaintiff Shah alone alleges retaliation in violation of the First Amendment. But as before, he fails to plausibly allege that the routine secondary inspection described in the complaint would chill a person of ordinary firmness from engaging in protected conduct in the future.  He also has not plausibly alleged that any aspect of his questioning or search was in retaliation for his exercise of First Amendment rights—as opposed to a response to information learned during a border inspection. Finally, Plaintiffs have not plausibly alleged a violation of their Equal Protection rights where the allegations are most reasonably read to suggest that something other than religion—specifically, their alleged watchlist status or information learned during a border inspection—motivated CBP's alleged differential treatment.

For all of these reasons, the amended complaint must be dismissed. Moreover, Plaintiffs have had an opportunity to amend their complaint, and did not correct the deficiencies the Court previously identified.  It is not reasonable to assume that Plaintiffs could somehow do so in a future amended pleading where all of the alleged questioning incidents occurred in the past, and the facts are thus already established.  As such, further amendment would be futile, and the second dismissal should be with prejudice.

# BACKGROUND

## A.    The Defendant Agencies and U.S. Border Inspections

Several different components of the federal government work together to protect the United States and its borders from violations of U.S. immigration laws, criminal activity, and terrorist threats.   The Department of Homeland Security (DHS) is charged with ensuring compliance with federal laws at the border including those preventing contraband, other illegal goods, and inadmissible persons from entering or exiting the United States.   DHS's border authorities require the inspection of all persons entering the United States, and permit the examination and search of persons, vehicles, baggage, and merchandise to ensure compliance with any law or regulation enforced or administered by DHS and its components, and to determine if the merchandise is subject to duty or being introduced into the United States contrary to law.   DHS is also charged with "prevent[ing] terrorist attacks within the United States," 6 U.S.C. § 111(b)(1)(A), and "reduc[ing] the vulnerability of the United States to terrorism," *id.* § 111(b)(1)(B); *see also id.* § 202(1) (charging DHS with "[p]reventing the entry of terrorists and the instruments of terrorism into the United States").

Within DHS, U.S. Customs and Border Protection (CBP) serves as the nation's unified border protection agency.   CBP's responsibilities include, among other things, "[p]reventing the entry of terrorists and the instruments of terrorism into the United States"; "[s]ecuring the borders"; "[c]arrying out the immigration enforcement functions"; and enforcing customs and agricultural laws, all while "ensuring the speedy, orderly, and efficient flow of lawful traffic and commerce." 6 U.S.C. § 202; *see* 6 U.S.C. §§ 111, 215, 251.   To facilitate these functions, numerous statutes and regulations authorize CBP to inspect and search all persons, baggage, conveyances, and merchandise arriving in and departing from the United States.   *See, e.g.*, 8 U.S.C. §§ 1225, 1357; 19 U.S.C. §§ 482, 1461, 1496, 1499,

1581, 1582; 8 C.F.R. § 287; 19 C.F.R. pt. 162.

Also within DHS, Immigrations and Customs Enforcement (ICE) is a law enforcement agency that focuses primarily on securing the borders of the United States and safeguarding the country's immigration system. *See* U.S. Immigration and Customs Enforcement, ICE's Mission, https://www.ice.gov/mission, *permanent link available at* https://perma.cc/5P3Y-QMZH. It employs approximately 20,000 officers, agents, analysts, and staff to support the nation's efforts to strengthen border security and prevent the illegal movement of people, goods, and funds into the United States. *See id.* Homeland Security Investigations (HSI) is one of three directorates within ICE and serves as the principal investigative component of DHS. *See* U.S Immigrations and Customs Enforcement, Who We Are, https://www.ice.gov/about-ice, *permanent link available at* https://perma.cc/RM3U-8EZW. HSI is responsible for investigating, disrupting, and dismantling transnational criminal organizations and terrorist networks that threaten or seek to exploit the customs and immigrations laws of the United States. *See id.* In furtherance of this mission, HSI conducts federal criminal investigations into the illegal cross-border movement of people, goods, money, technology, and other contraband. *Id.* Its investigations cover a wide range of transnational crime, including terrorism, narcotics smuggling, transnational gang activity, child exploitation, human trafficking and smuggling, and money laundering. *Id.*

Pursuant to federal law, all travelers seeking to enter the United States must present themselves and their belongings for inspection at the border. 19 U.S.C. §§ 1433(b), 1459(a); 8 U.S.C. § 1225(a)(3); 19 C.F.R. § 148.11; 8 C.F.R. § 235.1(a). CBP inspects all travelers entering the United States to ensure that they are legally eligible to enter (as a U.S. citizen or otherwise) and that their belongings are not being introduced into the country contrary to law. A traveler, with or without his or

her belongings, is permitted to enter the United States only when those processes are complete.

## B.   Plaintiffs' Allegations

Plaintiffs are three U.S. citizens who self-identify as Muslim.  Am. Compl. ¶¶ 8–10, ECF No. 61.  With few, limited exceptions, Plaintiffs raise the same factual allegations in their amended complaint as they did in their initial complaint. Specifically, each alleges that, on at least one occasion, he has been asked questions related to his religious beliefs, practices, or associations during secondary inspection at a U.S. port of entry or border crossing.  *See, e.g.*, *id.* ¶¶ 55, 107, 146. Two of Plaintiffs—Abdirahman Aden Kariye and Mohamad Mouslli—allege, upon information and belief, that their questioning arises, in part, from their placement on a "U.S. government watchlist."[1]  *Id.* ¶¶ 90–91, 131–32.   Although Plaintiffs Kariye and Mouslli now contend that their alleged watchlist placement was the result of "error or misplaced suspicion," *id.* ¶¶ 83, 129, they neither specifically challenge their alleged watchlist status here nor allege they have contested it otherwise.  Kariye further alleges that he was removed from the watchlist "on or around May 2022."  *Id.* ¶ 90.

Plaintiff Kariye alleges that he has been asked questions pertaining to his religion at five U.S. border crossings between September 2017 and December 2021. *See id.* ¶¶ 56–80.  He does not specify how many times he has entered the United States without such questioning.  According to him, these questions concerned,

_____

[1] As a general matter, the government does not disclose the watchlist status of any individual; among other things, such status is protected by the law enforcement privilege, and in some instances, by statute.  *See* 49 U.S.C. § 114(r); *see also, e.g.*, *Blitz v. Napolitano*, 700 F.3d 733, 737 n.5 (4th Cir. 2012).  Defendants assume the truth of Plaintiffs' allegations about their watchlist status here solely for the purposes of this motion.

among other things, whether upon returning from the Hajj, he had been on the pilgrimage previously, *id.* ¶ 58; his "involvement with a charitable organization affiliated with Muslim communities," *id.* ¶ 62; whether a sports league in which he coaches was "just for Muslim kids," *id.* ¶ 66; and "whether he had met a particular friend at a mosque" during a recent trip, *id.* ¶ 77.

Plaintiff Mouslli alleges that he has been asked questions regarding religion upon returning from four recent international trips, between August 2018 and June 2021. *See id.* ¶¶ 108–26. He also does not specify how many times he has entered the United States without such questioning. These inquiries allegedly included whether he is Muslim, *id.* ¶ 110; whether he attends a mosque, *id.* ¶¶ 114, 118, 123; and whether he prays every day, *id.* ¶¶ 114, 123.

Plaintiff Hameem Shah alleges that he was asked questions about religion upon entry to the United States on one occasion, in May 2019. *See id.* ¶¶ 146–175. He does not specify how many times he crossed the border prior to May 2019 without such questioning. He alleges no later international travel. *See id.* ¶ 179.

On that day, Plaintiff Shah alleges that, after he "passed through primary inspection without incident," a CBP officer at baggage claim requested that Shah accompany him for an inspection. *Id.* ¶ 147. In secondary inspection, two CBP officers searched Shah's baggage. *Id.* ¶ 149. Shah was carrying a personal journal, which he initially asked the officers not to read. *Id.* ¶¶ 151–52. The journal contained, among other things, notes related to Shah's religion and religious associates. *Id.* ¶¶ 153, 167. After reading the journal, officers allegedly asked Shah follow-up questions about his religious beliefs, practices, and associations. *Id.* ¶¶ 156–57, 167. The officers next said they would search Shah's laptop and phone. *Id.* ¶ 155. Shah said he did not consent and asked for a supervisor. *Id.* After the supervisor arrived, Shah again said he did not consent, and asserted that he "wanted to stand up for his constitutional rights." *Id.* ¶ 159. The supervisor informed Shah

that his reluctance "made the officers more suspicious of him." *Id.* ¶ 160.  Shah then told the supervisor he no longer wanted to enter the United States and asked to "leave the country and go back to Europe."  *Id.* ¶ 162.  The supervisor explained that Shah would have to leave his devices because they had been seized.  *Id.*

The supervisor then gave Shah the option of unlocking his phone for inspection, or refusing, in which case the officers would hold his laptop and phone "for further examination" and return them later.  *Id.*  Shah chose to unlock the phone, and an officer searched it manually in Shah's presence; Shah believes the officer viewed messages, pictures, emails, call history, maps history, internet history, "Airbnb," and "internal files." *Id.* ¶¶ 163, 170.  Another officer said "he needed to continue looking through [Shah's] journal using a computer" and left the room with it, which Shah objected to.  *Id.* ¶¶ 164–65.  Twenty to thirty minutes later, the officer returned with Shah's journal and another officer, who Shah believes was an HSI agent.[2]  *Id.* ¶ 166.  The HSI agent asked Shah additional questions about his journal, including "the identity of a local imam." *Id.* ¶ 167.  After approximately two hours, Shah left freely with his phone and journal.  *Id.* ¶¶ 166, 169–70.  In response to a subsequent Freedom of Information Act (FOIA) request, CBP allegedly provided "a redacted document stating that [Shah's] detention and questioning [were] 'Terrorist Related.'"  *Id.* ¶ 175.

Plaintiffs allege that they are asked questions about their religious beliefs, practices, and associations at the U.S. border because they are Muslim, pursuant to a policy or practice of targeting Muslim American travelers for such questioning.[3]

---

[2] Plaintiffs do not otherwise allege that HSI participated in their questioning; they do not allege that ICE participated in their questioning at all.

[3] In some instances, Plaintiffs characterize this as a CBP and HSI policy, *see* Am. Compl. ¶ 1; on other occasions they refer to it as a DHS and CBP policy, *see id.* ¶ 4.

*Id.* ¶¶ 1, 94, 136, 182.  Plaintiffs also allege that the questioning coerces them to modify their religious practices, including avoiding carrying religious journals or texts while traveling, *id.* ¶¶ 102, 186; refraining from praying in airports, *id.* ¶¶ 101, 141–42; and altering their religious dress, *id.* ¶¶ 99–100.  Plaintiffs do not allege a direct connection between any of these religious practices and an instance of religious questioning—except Plaintiff Shah's journal writings.  *See id.* ¶¶ 153, 167.

Plaintiffs collectively raise five causes of action: violation of the First Amendment's Establishment Clause (Count 1), *id.* ¶¶ 190–202; violation of the First Amendment's Free Exercise Clause (Count 2), *id.* ¶¶ 203–12; violation of the First Amendment right to free association (Count 3), *id.* ¶¶ 213–22; violation of the Fifth Amendment Due Process Right to Equal Protection (Count 5), *id.* ¶¶ 230–39; and violation of RFRA (Count 6), *id.* ¶¶ 240–45.  Plaintiff Shah alone raises a claim of retaliation in violation of the First Amendment (Count 4).  *Id.* ¶¶ 223–29.

Plaintiffs appear to seek both facial and as-applied relief.  They seek a declaration that "the religious questioning of Plaintiffs" and "the policies and practices of DHS and CBP" are unlawful.  *Id.* at 46.  They also seek an injunction prohibiting DHS and CBP from asking Plaintiffs religious questions during U.S. border inspections, and an order expunging records concerning alleged religious questioning of Plaintiffs and alleged retaliation against Plaintiff Shah.  *Id.*

## C.    Procedural History

Plaintiffs brought this suit on March 24, 2022.  *See* Compl., ECF No. 1. Defendants filed a motion to dismiss the complaint in full pursuant to Federal Rule of Civil Procedure 12(b)(6) on May 31, 2022.  *See* Mot. to Dismiss, ECF No. 40. The motion to dismiss was fully briefed on July 14, 2022.  *See* Reply Mem. in Supp. of Mot. to Dismiss, ECF No. 47.  The Court held a hearing on Defendants' motion to dismiss on July 28, 2022.  *See id.*

On October 12, 2022, the Court granted Defendants' motion to dismiss in full.

Order, ECF No. 58, *available at Kariye v. Mayorkas*, 2022 U.S. Dist. LEXIS 186915 (C.D. Cal. Oct. 12, 2022).  Specifically, the Court held that Plaintiffs had not stated a claim for violation of the Establishment Clause under *Kennedy v. Bremerton Sch. Dist.*, 142 S. Ct. 2407 (2022), because "historical practices and understandings" did not suggest that religious questioning at the border reflected an impermissible establishment of state religion, *Kariye*, 2022 U.S. Dist. LEXIS 186915, at *56–60 (quoting *Kennedy*, 142 S. Ct. at 2428).  It further held that Plaintiffs had not plausibly alleged a violation of the Free Exercise Clause or RFRA because they had not alleged that religious questioning at the border imposed a substantial burden on their religious exercise, and that even if Plaintiffs had properly pleaded such a burden, the alleged questioning was narrowly tailored to advance compelling governmental interests in "maintaining border security." *Id.* at *60–79, *108–14.  As to Plaintiffs' freedom of association claim, the Court found that Plaintiffs had not stated a claim because a "substantial relation" existed between the alleged questioning and a "sufficiently important governmental interest," and the government's questioning was narrowly tailored to meet that interest. *Id.* at *79–86 (quoting *Ams. for Prosperity Found. v. Bonta*, 141 S. Ct. 2373, 2382 (2021)). The Court determined that Plaintiff Shah's retaliation claim warranted dismissal because he had plausibly alleged neither that the circumstances of his routine secondary inspection would chill a person of ordinary firmness from exercising their First Amendment rights, nor that his protected speech was the but-for cause of the examination. *Id.* at *86–96.  Finally, the Court dismissed Plaintiffs' Equal Protection Clause claim because Plaintiffs had not plausibly alleged that their alleged questioning was the result of religious discrimination, but instead reasonably stemmed from their watchlist status or information discovered during a border search. *Id.* at *101–02, *105–08.  Although this determination did not alter the Court's conclusion that the complaint must be dismissed in full, the Court also

found that Plaintiffs had pleaded a policy or practice of targeting Muslim Americans for religious questioning; in doing so, the Court did not consider Defendants' anti-discrimination policies because the complaint did not attach them and the parties did not request that the Court take judicial notice of them. *Id.* at *45 n.1, *49–52. The Court's dismissal was without prejudice, and the Order provided Plaintiffs leave to amend. *Id.* at *114.

On November 14, 2022, Plaintiffs filed the amended complaint at issue here. *See generally* Am. Compl.

## LEGAL STANDARDS

### A.   Standard of Review

Under Federal Rule of Civil Procedure 12(b)(6), dismissal is appropriate where a complaint fails to state a claim upon which relief can be granted. To survive a Rule 12(b)(6) motion to dismiss, the plaintiff must allege "enough facts to state a claim to relief that is plausible on its face." *See Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007). A claim is facially plausible only where the plaintiff pleads facts that "allow[] the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *See Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (citation omitted). The complaint must raise "more than a sheer possibility that a defendant has acted unlawfully." *Id.* While courts do not require "heightened fact pleading of specifics," a plaintiff must allege facts sufficient to "raise a right to relief above the speculative level." *See Twombly*, 550 U.S. at 547, 555.

Establishing the plausibility of a complaint's allegations is a "context-specific" exercise that "requires the reviewing court to draw on its judicial experience and common sense." *Iqbal*, 556 U.S. at 679. Although a plaintiff's specific factual allegations may be consistent with his or her claim, a court must assess whether there are other "more likely explanations" for a defendant's conduct such that the plaintiff's claims cross the line "from conceivable to plausible." *Id.*

1   at 680–81 (quoting *Twombly*, 550 U.S. at 570).

2       On a Rule 12(b)(6) motion to dismiss, the court accepts all material facts

3   alleged in the complaint as true and construes them in the light most favorable to

4   the plaintiff. *Knievel v. ESPN*, 393 F.3d 1068, 1072 (9th Cir. 2005). A court is not

5   required, however, to accept "legal conclusions" or "[t]hreadbare recitals of the

6   elements of a cause of action, supported by mere conclusory statements." *Iqbal*,

7   556 U.S. at 678. Nor need the court accept "allegations that are merely conclusory,"

8   "allegations that contradict . . . matters properly subject to judicial notice,"

9   "unwarranted deductions of fact," or "unreasonable inferences." *Daniels-Hall v.*

10  *Nat'l Educ. Ass'n*, 629 F.3d 992, 998 (9th Cir. 2010).

11      Where, as here, a court dismisses a complaint with leave to amend, "[i]f the

12  district court determines the amended complaint is substantially the same as the

13  initial complaint, the district court is free to follow the same reasoning and hold that

14  the amended claims suffer from the same legal insufficiencies." *Askins v. U.S.*

15  *Dep't of Homeland Sec.*, 899 F.3d 1035, 1043 (9th Cir. 2018). Thus, although the

16  district court is not "bound by any law of the case" in such circumstances, it "may

17  decide [a] second motion to dismiss in the same way it decided the first." *Id.*

18      Furthermore, a court may grant a motion to dismiss with prejudice where it

19  concludes that additional amendments to the complaint would be futile. *See, e.g.*,

20  *Rutman Wine Co. v. E. & J. Gallo Winery*, 829 F.2d 729, 738 (9th Cir. 1987)

21  ("Denial of leave to amend is not an abuse of discretion where the pleadings before

22  the court demonstrate that further amendment would be futile."); *Espinoza v. Union*

23  *of Am. Physicians & Dentists, AFSCME Loc. 206*, 562 F. Supp. 3d 904, 913

24  (C.D. Cal. 2022) (granting motion to dismiss with prejudice). A "district court's

25  discretion to deny leave to amend is particularly broad where plaintiff has

26  previously amended the complaint." *Cafasso, U.S. ex rel. v. Gen. Dynamics C4*

27  *Sys., Inc.*, 637 F.3d 1047, 1058 (9th Cir. 2011) (quoting *Ascon Props., Inc. v. Mobil*

1   *Oil Co.,* 866 F.2d 1149, 1160 (9th Cir. 1989)); *see also Gibler v. Barnhart,* 111 F.

2   App'x 504, 505 (9th Cir. 2004) ("the district court did not abuse its discretion when

3   it dismissed Plaintiff's Second Amended Complaint with prejudice, after giving

4   Plaintiff two prior opportunities to focus and clarify his complaint").  Dismissal

5   with prejudice is also appropriate where a plaintiff cannot remedy the deficiencies

6   in a complaint without making allegations that are inconsistent with prior factual

7   allegations.  *See Azam v. Ruzika & Wallace LLP*, 2015 WL 13918078, at *4–6

8   (C.D. Cal. Sept. 10, 2015)

9   **B.    The Federal Government's Authority at the Border**

10          "Since the founding of our Republic, Congress has granted the Executive

11  plenary authority to conduct routine searches and seizures at the border, without

12  probable cause or a warrant, in order to regulate the collection of duties and to

13  prevent the introduction of contraband into this country." *United States v. Montoya*

14  *de Hernandez*, 473 U.S. 531, 537 (1985). Accordingly, "searches of persons or

15  packages at the national borders rest on different considerations and different rules

16  of constitutional law from domestic regulations." *United States v. Ramsey*, 431 U.S.

17  606, 619 (1977).  Courts have recognized the Government's authority at the border

18  to question travelers at length and to conduct wide-ranging, suspicionless searches

19  of travelers, their vehicles, and their luggage and private effects. *See, e.g.*, *United*

20  *States v. Flores-Montano*, 541 U.S. 149, 155–56 (2004) (concluding that the

21  removal, disassembly, and reassembly of a vehicle's gas tank as part of a border

22  inspection was routine); *Tabbaa v. Chertoff*, 509 F.3d 89, 94–95, 99 (2d Cir. 2007).

23  The Ninth Circuit has recognized that "manual searches of cell phones at the border

24  are reasonable without individualized suspicion." *United States v. Cano*, 934 F.3d

25  1002, 1016 (9th Cir. 2019); *see also United States v. Cotterman*, 709 F.3d 952, 960–

26  61 & n.6 (9th Cir. 2013) (en banc) (affirming that a "simple search" of a traveler's

27  laptop at the border does not require reasonable suspicion).  It has also

acknowledged that additional questioning or examination stemming from information discovered during a border search is to be expected.  *See Cotterman*, 709 F.3d at 967 ("border officials will conduct further, forensic examinations where their suspicions are aroused by what they find or by other factors"); *see also United States v. Bravo*, 295 F.3d 1002, 1008 (9th Cir. 2002) ("Detention and questioning during routine searches at the border are considered reasonable within the meaning of the Fourth Amendment.").

In light of the Government's authority and paramount interest in protecting its borders, courts have recognized that travelers crossing the U.S. border have no right to be free of detentions lasting several hours.  *See, e.g.*, *Flores-Montano*, 541 U.S. at 155 n.3 ("[D]elays of one to two hours at international borders are to be expected."); *Tabbaa*, 509 F.3d at 100 ("'[C]ommon sense and ordinary human experience' suggest that it may take up to six hours for CBP to complete the various steps at issue here, including vehicle searches, questioning, and identity verification, all of which we have already found to be routine.").  "[P]ursuant to the long-standing right of the sovereign to protect itself by stopping and examining persons and property crossing into this country," such searches "are reasonable simply by virtue of the fact that they occur at the border." *Ramsey*, 431 U.S. at 616.

## ARGUMENT[4]

### A.   Plaintiffs Do Not Plausibly Allege an Establishment Clause Violation.

Plaintiffs first claim that Defendants' alleged questions about their religious beliefs, practices, and associations at the U.S. border violate the Establishment

---

[4] Defendants acknowledge that the Court previously held that Plaintiffs had sufficiently alleged an official policy, practice, or custom of targeting Muslim travelers for religious questioning.  *See Kariye*, 2022 U.S. Dist. LEXIS 186915, at *49–52.  Defendants maintain that, as they argued in the first motion to dismiss, such allegations are implausible in light of Defendants' public policies forbidding

Clause by "plac[ing] substantial pressure on Muslims, including Plaintiffs, to hide, suppress, or otherwise alter their faith and religious practice."  Am. Compl. ¶ 198.  The Court previously dismissed an almost identical claim, concluding that "historical practices and understandings" supported "the government's historically broad authority to implement security measures at the border."  *Kariye*, 2022 U.S. Dist. LEXIS 189915, at *56–57 (quoting *Kennedy*, 142 S. Ct. at 2428).  In the amended complaint, Plaintiffs allege that Defendants' alleged questioning at the border is at odds with American "historical practices and understandings" based on atmosphere-level quotes about the purpose of the Establishment Clause.  *See, e.g.*, Am. Compl. ¶ 199.  However, Plaintiffs fail to allege any new facts that might alter the Court's previous decision concluding otherwise.  The Court should again dismiss the Establishment Clause claim.  *Accord Cherri v. Mueller*, 951 F. Supp. 2d 918, 935–36 (E.D. Mich. 2013) (dismissing claim that alleged religious questioning of Muslims at the border violated the Establishment Clause).

The First Amendment's Establishment Clause provides that "Congress shall make no law respecting an establishment of religion." U.S. Const. amend. I.  "This clause applies not only to official condonement of a particular religion or

---

religious discrimination and targeting.  *See* Mem. in Supp. of Mot. to Dismiss 5–6, 15–19, ECF No. 40-1.  The Court did not previously consider these policies because Defendants did not request the Court to take judicial notice of them.  *Kariye*, 2022 U.S. Dist. LEXIS 186915, at *45 n.1.  The agency Defendants' policies are subject to judicial notice when properly presented; a request for judicial notice of those policies accompanies this motion.  *See, e.g.*, *Burcham v. City of Los Angeles*, 562 F. Supp. 3d 694, 701 (C.D. Cal. 2022) (explaining that courts may "take judicial notice of matters of public record outside the pleadings" (quoting *Mir v. Little Co. of Mary Hosp.*, 844 F.2d 646, 649 (9th Cir. 1988)); *see also Daniels-Hall*, 629 F.3d at 998–99.  Should the Court grant that request, Defendants respectfully request that the Court reconsider whether the amended complaint adequately alleges a policy, practice, or custom of religious targeting.  *See Daniels-Hall*, 629 F.3d at 998.

religious belief, but also to official disapproval or hostility towards religion." *Am. Fam. Ass'n, Inc. v. City & Cnty. of S.F.*, 277 F.3d 1114, 1120–21 (9th Cir. 2002). The Supreme Court instructed in *Kennedy* that "the Establishment Clause must be interpreted by 'reference to historical practices and understandings.'" 142 S. Ct. at 2427 (quoting *Town of Greece v. Galloway*, 572 U.S. 565, 576 (2014)). The Court held that *Kennedy* was the proper standard for analyzing Plaintiffs' Establishment Clause claim and found that the original complaint failed to plausibly plead an Establishment Clause claim because historical practices supported Defendants' alleged questioning at the border. *Kariye*, 2022 U.S. Dist. LEXIS 186915, at *56–60. The Court pointed to "substantial legal authority supporting the government's historically broad authority to implement security measures at the border," *id.* at *57 (citing *Montoya de Hernandez*, 473 U.S. at 537–38), and found that this "plenary authority" was "rooted in historical practices and understanding of the government's authority at the border," *id.* at *58 (citing *Ramsey*, 431 U.S. at 616–19). The Court further concluded that "substantial authority" supported a conclusion that "maintaining border security is a compelling government interest." *Id.* at 59. For these reasons, the Court held that Plaintiffs failed to plausibly allege an Establishment Clause claim.

In an attempt to cure the defects in their original complaint, Plaintiffs add to the amended complaint conclusory allegations that Defendants' conduct is "at odds with American historical practices and understandings," insofar as America's Founders wished, in general, "to protect the free exercise of all religions." Am. Compl. ¶¶ 41, 198–99 (quotation omitted). But Plaintiffs' high-level allegations miss the point: no party disputes the foundational principles that underlie the Establishment Clause. Rather, under *Kennedy*, Plaintiffs must plausibly allege that "historical practices and understandings" support a conclusion that Defendants' specific conduct at the international border violates the Establishment Clause. *See*

142 S. Ct. at 2428; *see also Sabra v. Maricopa Cnty. Cmty. Coll. Dist.*, 44 F.4th 867, 888 (9th Cir. 2022) ("Going forward, 'the line that courts and governments must draw between the permissible and the impermissible has to accord with history and faithfully reflect the understanding of the Founding Fathers.'" (quoting *Kennedy*, 142 S. Ct. at 2428)).  Critically, the amended complaint fails to allege any "historical practices and understandings" at the international border that would support Plaintiffs' claim, let alone allege what the Constitution's drafters accepted with regard to border questioning.  *See, e.g. Freedom from Religion Found., Inc. v. Mack*, 49 F.4th 941, 961 (5th Cir. 2022) (reviewing historical practice of courtroom prayer to conclude that nondenominational courtroom prayer did not violate the Establishment Clause under *Kennedy*).

Nor could Plaintiffs plausibly advance any such allegation.  Controlling case law makes plain the "long-standing right of the sovereign to protect itself by stopping and examining persons and property crossing into the country."  *Ramsey*, 431 U.S. at 616; *see also, e.g.*, *Alasaad v. Mayorkas*, 988 F.3d 8, 16 (1st Cir. 2021) (observing that courts have "recognized[,] from early in our history . . . . the government's 'inherent authority to protect, and a paramount interest in protecting, its territorial integrity'" (quoting *United States v. Flores-Montano*, 541 U.S. 149, 153 (2004)) (citations omitted)).  Historical practice thus confirms that the government has a "right to control 'who and what may enter the country,' and for that reason, individuals have 'limited justifiable expectations of privacy' when presenting themselves . . . for entry at a border."  *United States v. Baxter*, 951 F.3d 128, 133 (3d Cir. 2020) (quoting *Ramsey*, 431 U.S. at 617, 620, 623 n.17).  What is more, Congress has long since passed statutes whose implementation would necessarily require questions regarding religion at the border.  *See, e.g.*, 8 U.S.C. § 1101(a)(27)(C) & (42) (religious-worker visas and religious refugee status).

Thus, as the Court previously concluded, Defendants' alleged conduct easily fits within historical practices and traditions at the international border. Count One should again be dismissed.

**B.**  **Plaintiffs Do Not Plausibly Allege a Violation of Their Free Exercise Rights under the First Amendment or RFRA.**

The amended complaint also fails to allege a violation of Plaintiffs' free exercise rights under either the Constitution or RFRA because it continues to suffer from the same defects the Court identified previously. *See Kariye*, 2022 U.S. Dist. LEXIS 186915, at *60–79. Namely, Plaintiffs have not alleged that any governmental action places a substantial burden on their ability to freely exercise their religion. Instead, they point to subjective chilling effects. They also have not plausibly alleged that the government incentivizes or coerces them into violating their religious beliefs. And finally, even if Plaintiffs had properly alleged a substantial burden—which they have not—the government's alleged actions are narrowly tailored to advance a compelling governmental interest.

### 1. Applicable law

The Free Exercise Clause provides that "Congress shall make no law . . . prohibiting the free exercise [of religion]." U.S. Const., amend. I. "The right to freely exercise one's religion, however, 'does not relieve an individual of the obligation to comply with a valid and neutral law of general applicability.'" *Stormans, Inc. v. Selecky*, 586 F.3d 1109, 1127 (9th Cir. 2009) (quoting *Employment Div. v. Smith*, 494 U.S. 872, 879 (1990)). However, "if the object of a law is to infringe upon or restrict practices because of their religious motivation, the law is not neutral." *Church of the Lukumi Babalu Aye, Inc. v. City of Hialeah*, 508 U.S. 520, 533 (1993). Any governmental practice that is not neutral must be "justified by a compelling interest [that] is narrowly tailored to advance that interest." *Id.*

In the Free Exercise context, the Ninth Circuit has "continued to apply the *Sherbert* substantial burden test to government conduct that did not involve an actual regulation or criminal law." *Am. Fam. Ass'n*, 277 F.3d at 1124. To properly plead a Free Exercise claim in this Circuit under such circumstances, plaintiffs must specifically allege a "burden on their religious exercise or practice." *Cal. Parents for the Equalization of Educ. Materials v. Torlakson*, 973 F.3d 1010, 1019 (9th Cir. 2020) (confirming the ongoing validity of *American Family Association*); *Kariye*, 2022 U.S. Dist. LEXIS 186915, at *61 & n.2; *see also, e.g.*, *Waln v. Dysart Sch. Dist.*, --- F.4th ----, 2022 WL 17544355, at *4–6, *10 (9th Cir. Dec. 9, 2022) (student plausibly alleged Free Exercise claim where school district prohibited graduation cap with religious symbols but allowed secular adornments).

RFRA provides that the "[g]overnment shall not substantially burden a person's exercise of religion even if the burden results from a rule of general applicability," 42 U.S.C. § 2000bb-1(a), unless that burden "is in furtherance of a compelling governmental interest," and "is the least restrictive means of furthering that . . . interest," id. at § 2000bb-1(b). Thus, "[t]o establish a prima facie RFRA claim," a plaintiff must demonstrate that (1) "the activities the plaintiff claims are burdened by the government action" are an "exercise of religion," and (2) that the government action at issue "substantially burden[s]" that exercise of religion. *Navajo Nation v. U.S. Forest Serv.*, 535 F.3d 1058, 1068 (9th Cir. 2008) (en banc). "If the plaintiff cannot [properly allege] either element, his RFRA claim fails." *Id.*

Where challenged governmental conduct is not a law or regulation, the burden inquiries under the Free Exercise Clause and RFRA are therefore the same. "Under RFRA, a 'substantial burden' is imposed only when individuals are forced to choose between following the tenets of their religion and receiving a governmental benefit, or coerced to act contrary to their religious beliefs by the threat of civil or criminal sanctions." *Id.* at 1069–70. "Any burden imposed on the exercise of religion short

of that . . . is not a 'substantial burden' within the meaning of RFRA, and does not require the application of the compelling interest test." *Id.* "[W]hen [a] challenged government action is neither regulatory, proscriptive or compulsory, alleging a subjective chilling effect on free exercise rights is not sufficient to constitute a substantial burden." *Am. Fam. Ass'n*, 277 F.3d at 1124.

Two cases are particularly instructive in this regard. *See Kariye*, 2022 U.S. Dist. LEXIS 186915, at *62–65. The first is *Vernon v. City of Los Angeles*, 27 F.3d 1385 (9th Cir. 1994), in which the Ninth Circuit found that the plaintiff failed to establish a substantial burden where he alleged that "the existence of a government investigation ha[d] discouraged him from pursuing his personal religious beliefs and practices." *Id.* at 1395. Instead, it held that such "mere subjective chilling effects" were "simply not objectively discernable and are therefore not [] cognizable." *Id.* The second is *Dousa v. DHS*, 2020 WL 434314 (S.D. Cal. Jan. 28, 2020), in which a district court within this Circuit held that a Free Exercise challenge was unlikely to succeed on the merits where plaintiff voluntarily "refrained from providing religious counseling and from blessing marriages" based on "subjective chills," not a government mandate. *Id.* at *7–8.

## 2. Plaintiffs have not alleged a substantial burden on their religious practice.

The Court previously found that Plaintiffs had not alleged a substantial burden on their religious expression, but rather that the original complaint alleged subjective chilling effects. *See Kariye*, 2022 U.S. Dist. LEXIS 186915, *66–68. The amended complaint alleges the same burdens—that Plaintiffs choose to "modify[] or abandon[] certain religious practices and expression while traveling," Am. Compl. ¶ 3, in an attempt to "avoid calling attention to [their] faith" in the hope of avoiding "scrutiny and religious questioning," *id.* at ¶¶ 98, 140, 211. Other than a few superficial and conclusory changes, such as substituting the word "coerces"

for the phrase "imposes substantial pressure," *see, e.g.*, *id.* ¶¶ 3, 98, 99, 101, 102, 140, 141, 186, Plaintiffs have not modified the allegations related to substantial burden.  In light of the Plaintiffs' failure to cure the defects the Court previously identified, the Court can, and should, dismiss the Free Exercise and RFRA counts for the same reasons set forth in its original opinion.

Plaintiffs' alleged substantial burdens remain "*preventive* measures they adopted to avoid questioning in the future"—"not coerced actions compelled by government officials." *Kariye*, 2022 U.S. Dist. LEXIS 186915, at *67; *see also Dousa*, 2020 WL 434314, at *8 ("any harms felt are not the direct result of government action, but rather a result of her decision to limit her religious practices for her own subjective reasons").  For example, Plaintiff Kariye alleges that he "modifies or eliminates certain religious practices" when returning to the United States from abroad in order "to avoid calling attention to his faith and incurring additional scrutiny and religious questioning." Am. Compl. ¶ 98; *see also id.* ¶ 100 ("Imam Kariye no longer wears his kufi at the airport or the border when returning home to the United States from abroad, in order to avoid additional CBP scrutiny and religious questioning.").[5]  Similarly, Plaintiff Mouslli alleges that he "refrains from . . . physical acts of prayer" "to avoid additional CBP scrutiny and religious questioning." *Id.* ¶ 141.  And although Plaintiff Shah has not travelled abroad for over three years and alleges no specific future international travel plans, he asserts that "the next time [he] travels internationally, he intends to leave his journal at

---

[5] Plaintiff Kariye's rationale for modifying his behavior is even less compelling than it was when the original complaint was filed.  He no longer believes he is on a government watchlist, and therefore no longer alleges he is sent to secondary inspection each time he returns to the United States from abroad.  *See* Am. Compl. ¶¶ 90–92.  It is implausible to assert that Kariye is compelled to alter his religious behavior to avoid religious questions when he no longer alleges that the impetus for such questioning persists.

home to avoid . . . religious questioning." *Id.* ¶ 186.  Plaintiffs' own allegations
demonstrate that their alleged past or anticipated future behavioral modifications
are anticipatory measures to "avoid" hypothetical future events—not governmental
mandates or prohibitions.  Inserting the conclusory assertion that the government
"coerces" Plaintiffs' actions without altering the underlying factual allegations, *see,
e.g.*, *id.* ¶¶ 3, 98, 99, 101, 102, 140, 141, 186, does not change this outcome.
Accordingly, "the protective measures alleged by Plaintiffs" remain "subjective
chilling effect[s] rather than [] substantial burden[s]."  *Kariye*, 2022 U.S. Dist.
LEXIS 186915, at *68.

### 3. Plaintiffs do not plausibly allege they were deprived of a government benefit or coerced to act contrary to their religious beliefs.

Plaintiffs' amendments also do not alter the conclusion that "Plaintiffs have
not plausibly alleged they were deprived of a government benefit or coerced to act
contrary to their religious beliefs."  *Kariye*, 2022 U.S. Dist. LEXIS 186915, at *70.
As to the first, the amended complaint offers no more than conclusory allegations
that Plaintiffs were somehow forced "to choose between following the tenets of
their religion and receiving a government benefit."  *See* Am. Compl. ¶¶ 211, 242.
Plaintiffs do not specify how the government presented them with such a choice, or
what benefit they were allegedly threatened with deprivation of.  But assuming
Plaintiffs will again argue that the benefit was the ability to enter into the United
States, they have not plausibly alleged that they were realistically threatened with
not being able to enter the United States.  Indeed, as in the original complaint,
"although Plaintiffs experienced secondary inspection on 10 occasions, the
[amended complaint] alleges Plaintiffs were allowed to reenter the United States on
each occasion."  *See Kariye*, 2022 U.S. Dist. LEXIS 186915, at *71.

Plaintiffs have also not plausibly alleged that they were coerced to act contrary
to their religious beliefs.  Although the amended complaint, like the original

complaint, implies that Plaintiffs were required to answer questions in secondary inspection due to "coercive circumstances," *see, e.g.*, Am. Compl. ¶¶ 59, 63, 67, 73, 78, 111, 115, 119, 124, 158, it does not allege that the act of answering questions—including those about religious beliefs, practices, or associations—is contrary to Plaintiffs' religious beliefs.  It also fails to explain in any more detail than the original complaint what "criminal or civil sanctions" Plaintiffs are threatened with that coerce them to act contrary to the tenets of their religion.  *See Navajo Nation*, 535 F.3d at 1075.  At most, the amended complaint alleges that Plaintiffs "risk being penalized through additional . . . scrutiny and religious questioning" if they do not modify their religious practices during return travel to the United States.  *See* Am. Compl. ¶¶ 103, 142, 187.  But as discussed, and as the Court already concluded, the government does not force these behavioral modifications on Plaintiffs.  The amended complaint also hypothesizes that Plaintiffs "would not be permitted to leave" secondary inspection if they did not answer the government's questions.  *See id.* ¶¶ 55, 107.  But facts alleged elsewhere—namely, that Plaintiff Shah was told he could leave upon request (albeit without his seized device)—undercut this supposition.  *See id.* ¶ 162.  And in any event, Plaintiffs do not allege that answering questions is contrary to their religion.  For these additional reasons, as the Court found with respect to the original complaint, Plaintiffs have not plausibly alleged a substantial burden on their religious expression.  *See Kariye*, 2022 U.S. Dist. LEXIS 186915, at *69–72.

### 4. Even had Plaintiffs alleged a substantial burden, any questioning was narrowly tailored to advance a compelling governmental interest.

Even if Plaintiffs had alleged a substantial burden on their religious exercise, dismissal of their Free Exercise and RFRA claims would still be appropriate because the government's alleged questioning is the least restrictive means of advancing a compelling governmental interest.  As the Court already noted, there is significant

support for the proposition that the government has a compelling interest in
protecting its borders and investigating and preventing potential acts of terrorism.
*See Kariye*, 2022 U.S. Dist. LEXIS 186915, at *75–76; *see also Haig v. Agee*, 453
U.S. 280, 307 (1981) ("[N]o governmental interest is more compelling than the
security of the Nation."); *Holder v. Humanitarian Law Project*, 561 U.S. 1, 28
(2010) ("[T]he Government's interest in combating terrorism is an urgent objective
of the highest order."); *Flores-Montano*, 541 U.S. at 152; *Al Haramain Islamic
Found., Inc. v. U.S. Dep't of Treasury*, 686 F.3d 965, 980 (9th Cir. 2012) ("[T]he
government's interest in national security cannot be understated."); *Tabbaa*, 509
F.3d at 103 ("It is undisputed that the government's interest in protecting the nation
from terrorism constitutes a compelling state interest . . . ."). No amendment to the
complaint could change this precedent.

It also remains the case that the questioning alleged here is narrowly tailored
to advance this interest. *See Kariye*, 2022 U.S. Dist. LEXIS 186915, at *76–79.
Two of Plaintiffs allege they were on government watchlists at the time of the
alleged questioning incidents. *See* Am. Compl. ¶¶ 90, 131. The questions they
allege being asked mirror those alleged in the original complaint and relate to,
among other things, topics like their purpose of travel and individuals with whom
they associated while abroad. *See, e.g.*, *id.* ¶ 58 (questions about the Hajj); *id.* ¶ 77
(questions about whether Kariye "met a particular friend at a mosque"). The third
Plaintiff—Shah—alleges that the incident during which he allegedly experienced
religious questioning was labeled "Terrorist Related" in a document obtained via
the Freedom of Information Act (FOIA). *Id.* ¶ 175. The FOIA document provides
additional insight into officers' inspection of Shah, explaining that from the outset
Shah acted "very cautious" and "focused on his journal." *Id.* Officers reported
reading the journal, which contained "notes regarding his work and religion." *Id.*
Officers then recorded answers to follow-up questions about the two topics in the

journal—work and religion—focusing on a certain individual whose writings Shah referenced in the journal. *Id.*; *see also id.* ¶ 167 (alleging questions about an individual referenced in Shah's journal). Under these circumstances, the least restrictive means CBP has to advance its border security and terrorism-prevention mission is by asking tailored questions related to these topics. *Accord Tabbaa*, 509 F.3d at 105–06.

Plaintiffs' new allegations attempting to call into question the accuracy of the watchlist, *see, e.g.*, Am. Compl. ¶¶ 84–89, and asserting that none of the Plaintiffs have any ties to terrorism, *see, e.g.*, *id.* ¶¶ 81–83; 127–30; 175–78, do not change this calculus. As an initial matter, as the Court has noted, the validity of the watchlist has been upheld by a number of circuit courts. *Kariye*, 2022 U.S. Dist. LEXIS 186915, at *77–78. Among other things, nominations to the consolidated watchlist "must rely upon 'articulable intelligence or information' which 'creates a reasonable suspicion that [an] individual is engaged, has been engaged, or intends to engage in conduct constituting, in preparation for, in aid or in furtherance of, or related to, terrorism and/or terrorist activities." *Elhady v. Kable*, 993 F.3d 208, 214 (4th Cir. 2021) (citation omitted). Plaintiffs Kariye and Mouslli do not formally challenge their alleged current or former watchlist status in this lawsuit, nor do they allege that they have contested it elsewhere. But in any event, assuming for the purposes of this motion that Plaintiffs Kariye and Mouslli were on the watchlist when they were questioned, and accepting as true that none of Plaintiffs in fact has any ties to terrorism, CBP's asking of tailored questions during a few isolated border crossings was still a least restrictive means of furthering CBP's border security mission. Indeed, in *Tabbaa*, the Second Circuit found that CBP's decision to detain for several hours, pat down, search, fingerprint, photograph, and question all attendees of a particular religious conference, including "innocent U.S. citizens," was the least restrictive means of advancing its counterterrorism mission in the light

of specific reasons to scrutinize the individuals in question.  *See* 509 F.3d at 103–04.  Similarly, here, taking Plaintiffs' allegations to be true, reasons related to compelling governmental interests existed for each of Plaintiffs to be asked the questions they were alleged to have been asked at the border, and those questions were the least restrictive means of protecting those interests.  Thus, even if the Court were to find that Plaintiffs have alleged a substantial burden on their religious expression—which they have not—the government's actions would survive strict scrutiny.  Counts Two and Six should therefore be dismissed.

## C. Plaintiffs Do Not Plausibly Allege a Violation of the First Amendment Right to Freedom of Association.

Plaintiffs also repeat their claim that Defendants' alleged "questioning about their religious associations" violates their right to freedom of association under the First Amendment.  Am. Compl. ¶ 215.  They do so based on largely the same allegations as in the original complaint, but they now assert that Defendants' alleged questioning "does not help to protect the border or prevent terrorism" and that "Defendants have less restrictive alternatives at their disposal." *Id.* ¶ 221.  The Court has already considered and rejected similar allegations, and it need not accept as true Plaintiffs' legal conclusions. *See Iqbal,* 556 U.S. at 678.  It should therefore dismiss Plaintiffs' freedom of association claim.

There is "implicit in the right to engage in activities protected by the First Amendment a corresponding right to associate with others." *Ams. for Prosperity Found.*, 141 S. Ct. at 2382 (quoting *Roberts v. U.S. Jaycees*, 468 U.S. 609, 622 (1984)).  The Ninth Circuit has made clear that it "strongly disagree[s] with any inference that criminal investigation is somehow prohibited when it interferes with such First Amendment interests." *United States v. Rubio*, 727 F.2d 786, 791 (9th Cir. 1983).  It has also "refused to carve out a First Amendment exception" to the border search doctrine. *United States v. Arnold*, 533 F.3d 1003, 1010 (9th Cir. 2008).

Where a plaintiff demonstrates that disclosure in the context of an investigation imposed an unjustified burden, however, courts have sometimes found First Amendment violations. *See, e.g.*, *NAACP v. Alabama ex rel. Patterson*, 357 U.S. 449, 462–63 (1958) (compelled disclosure of membership lists violated the First Amendment where members faced violence and economic reprisal, and the state articulated no justifying offsetting interest); *see also Ams. for Prosperity Found.*, 141 S. Ct. at 2388 (disclosure of donor lists resulted in some being "subjected to bomb threats, protests, stalking, and physical violence"). But even where such a burden exists, "compelled disclosure of membership lists violates the Constitution *only* when the investigation would likely impose hardship on associational rights not justified by a compelling interest, or when the investigation lacks a substantial connection to a subject of overriding and compelling state interest." *United States v. Mayer*, 503 F.3d 740, 748 (9th Cir. 2007) (emphasis added). The Supreme Court more recently described this "exacting scrutiny" standard as requiring "a substantial relation between the disclosure requirement and a sufficiently important governmental interest," and "narrow[] tailor[ing] to the government's asserted interest." *Ams. for Prosperity Found.*, 141 S. Ct. at 2383 (quoting *Doe v. Reed*, 561 U.S. 186, 196 (2010)).

The Court dismissed Plaintiffs' original freedom of association claim after concluding that there was "a plausible, substantial relation between Defendants' compelled disclosure—the religious questioning of Plaintiffs and collection of information—and the governmental interests of securing the border and preserving national security." *Kariye*, 2022 U.S. Dist. LEXIS 186915, at *81–82. It based this conclusion on the finding that "certain of Plaintiffs' allegations appear to provide an explanation for Defendants' questioning of Plaintiffs." *Id.* at *82. Specifically, the Court highlighted that Plaintiffs Kariye and Mouslli were alleged to have been on U.S. government watchlists and the questions of Plaintiff Kariye, as an imam, "could

plausibly be considered questions related to his occupation." *Id.* The Court further noted that questioning of Plaintiff Shah occurred following "a search of the contents of his journal," he had just returned from a trip to Serbia and Bosnia, and that the interview report was later labeled "Terrorist Related." *Id.* at *82–83. Comparing these allegations to the most "factually analogous" cases—*Tabbaa* and *Humanitarian Law Project v. Reno*, 205 F.3d 1130, 1133 (9th Cir. 2000)—led the Court to dismiss the freedom of association claim. *Kariye*, 2022 U.S. Dist. LEXIS 186915, at *85–86.

The Court's previous analysis applies squarely to the amended freedom of association claim because Plaintiffs' factual allegations remain materially the same. Here, as in the original complaint, Plaintiffs Kariye and Mouslli allege they were on U.S. government watchlists at the time of the alleged questioning. *Id.* ¶¶ 90, 129. Plaintiff Kariye alleges his occupation is religious in nature. *Id.* ¶ 8. Plaintiff Shah continues to allege that his questioning followed a search of a journal that allegedly contained certain religious writings. *See, e.g.*, *id.* ¶ 175. The search was later allegedly labeled "Terrorist Related." *Id.* For these reasons, just as the Court found a "substantial relation" between the disclosure of information and the government's interest in security at the border in its first opinion, the Could should find the same here.[6] Count Three should be dismissed.

**D.** **Plaintiff Shah Does Not Plausibly Allege Retaliation in Violation of His First Amendment Rights.**

Also for the same reasons the Court properly dismissed Plaintiff Shah's original claim of retaliation in violation of the First Amendment, Count Four of the

---

[6] The Court in fact concluded that Defendants' questioning satisfied the more exacting strict scrutiny standard, and properly reasoned that it "necessarily follows that the government satisfies the lower standard of 'exacting scrutiny'" applicable to freedom of association claims. *Kariye*, 2022 U.S. Dist. LEXIS 186915, at *83.

amended complaint must be dismissed.  *See Kariye*, 2022 U.S. Dist. LEXIS 186915, at \*86–96.  To survive a motion to dismiss a First Amendment retaliation claim, a plaintiff must plausibly allege that "(1) [they were] engaged in a constitutionally protected activity, (2) the defendant's actions would chill a person of ordinary firmness from continuing to engage in the protected activity and (3) the protected activity was a substantial or motivating factor in the defendant's conduct."  *Id.* at \*86 (quoting *O'Brien v. Welty*, 818 F.3d 920, 932 (9th Cir. 2016)).  As in the original complaint, Plaintiffs again fail to properly allege either the second or third of these required elements.

First, assuming *arguendo* that Shah's statements to officers and journal writing were constitutionally protected activities, *see, e.g.*, Am. Compl. ¶ 227, the inspection of Shah was not the type of activity that would "chill a person of ordinary firmness" from continuing to engage in these activities, *see Blair v. Bethel Sch. Dist.*, 608 F.3d 540, 543 (9th Cir. 2010).  This inquiry is "generic and objective."  *O'Brien*, 818 F.3d at 933.  The Court previously held that the circumstances of Shah's secondary inspection, "involving a search of his personal journal, phone, and laptop[;] being asked a series of questions about his religious beliefs, practices, and associations[;] and being in secondary inspection for approximately two hours"—would not chill a person of ordinary firmness from engaging in protected activity.  *Kariye*, 2022 U.S. Dist. LEXIS 186915, at \*93.  The Court based its sound conclusion on Supreme Court and Ninth Circuit case law demonstrating that Shah's secondary inspection did not differ materially from other secondary inspections that courts deem routine.  *See id.* at \*90–93.  The Court observed that the Ninth Circuit has "repeatedly" held, in the Fourth Amendment context, that "searches of electronic devices and personal documents such as letters are reasonable."  *Id.* at \*91 (citing *Cotterman*, 709 F.3d at 960; *Arnold*, 533 F.3d at 1009; *United States v. Seljan*, 547 F.3d 993, 1003 (9th Cir. 2008); *United States v. Abbouchi*, 502 F.3d 850, 856 (9th Cir. 2007); *United*

*States v. Tsai*, 282 F.3d 690, 696 (9th Cir. 2002)).   The Court also noted that the Supreme Court has held that "multi-hour delays at the border" are also reasonable," *id.* at *93 (citing *Flores-Montano*, 541 U.S. at 155 n.3), as are "[f]urther examination or questioning based on information uncovered in a search," *id.* at *93–94 (citing *Cotterman*, 709 F.3d at 967; *Bravo*, 295 F.3d at 1008; *Tabbaa*, 509 F.3d at 98–99).

The allegations in the amended complaint alter none of this.   Plaintiffs continue to allege that Shah was routed to secondary inspection during what appears to be a random stop, before CBP officers were aware of his protected activities.   Am. Compl. ¶ 147.   The amended complaint alleges that CBP officers read a journal that Shah was carrying while traveling, and that officers asked Shah follow-up questions based on what they read in the journal, including about Shah's religious beliefs, practices, and associations.   *Id.* ¶ 150, 153, 156–57, 167.   The amended complaint also alleges that CBP officers seized Shah's phone and laptop, and searched Shah's phone after Shah unlocked it.   *Id.* ¶¶ 155, 162–63, 170.   Like the original complaint, the amended complaint alleges that the entire inspection took approximately two hours, after which Shah left freely with his passport and devices.   *Id.* ¶ 169–70.   Thus, the amended complaint continues to allege circumstances that would not chill a person of ordinary firmness from engaging in protected activity.

The amended complaint also does not require the Court to modify its previous conclusion that CBP's actions towards Shah were not the result of his protected activities.   *See Kariye*, 2022 U.S. Dist. LEXIS 186915, at *94–96.   This element requires a Plaintiff to "establish a 'causal connection' between the government defendant's 'retaliatory animus' and the plaintiff's 'subsequent injury.'"   *Nieves v. Bartlett*, 139 S. Ct. 1715, 1722 (2019) (quoting *Hartman v. Moore*, 547 U.S. 250, 260 (2006)).   This means that "the adverse action against the plaintiff would not have been taken absent the retaliatory motive."   *Id.*   The Court originally found that Plaintiffs had not demonstrated but-for causation because "the allegations more

plausibly allege that the questions resulted from the *information* learned in the routine search rather than as retaliation for Plaintiff Shah maintaining a personal journal or speaking with border officers." *Kariye*, 2022 U.S. Dist. LEXIS 186915, at \*96. That remains the case in the amended complaint. And as the Court correctly observed, the Ninth Circuit has recognized that asking follow-up questions motivated by information learned during an inspection is a standard part of an examination by law enforcement. *See id.* at \*95–96 (citing *Cotterman*, 709 F.3d at 967 ("In practical terms . . . border officials will conduct further, forensic examinations where their suspicions are aroused by what they find or by other factors."); *see also Nieves*, 139 S. Ct. at 1723–24 (recognizing, in the context of an arrest, that "protected speech is often a 'wholly legitimate consideration' for officers").

Lastly, Shah continues to advance no allegation that the official-capacity Defendants here—DHS, CBP, ICE, and HSI—retaliated against him. The complaint alleges only that "[t]wo CBP officers and one HSI officer" committed these purportedly retaliatory actions, and they are not named defendants. *See* Am. Compl. ¶ 224; *see also id.* ¶¶ 225–26, 228 (describing "the officers'" actions). Shah's retaliation claim against the agency Defendants therefore cannot stand. *See Martinez v. City of Santa Rosa*, 499 F. Supp. 3d 748, 751 (N.D. Cal. 2020); *see also Urenia v. Public Storage*, 2015 WL 4885998, at \*4 (C.D. Cal. Aug. 14, 2015). For all of these reasons, Count Four must again be dismissed.

## E.   Plaintiffs Do Not Plausibly Allege an Equal Protection Violation.

Finally, in response to the dismissal of their Equal Protection Claim, Plaintiffs have re-pled that claim using nearly identical language. The only difference between Plaintiffs' current and initial Equal Protection claims is a new paragraph containing additional argument about why Plaintiffs believe Defendants cannot satisfy strict scrutiny analysis. *See* Am. Compl. ¶ 238. But as this Court made clear in its order,

strict scrutiny analysis is improper where Plaintiffs have failed to sufficiently allege at the outset the "necessary element" of discriminatory intent. *Kariye*, 2022 U.S. Dist. LEXIS 186915, at *99–100.

The Constitution's equal protection[7] guarantee essentially requires "that all persons similarly situated should be treated alike." *City of Cleburne v. Cleburne Living Ctr.,* 473 U.S. 432, 439 (1985). "The first step in equal protection analysis is to identify the state's classification of groups. . . . The next step in equal protection analysis would be to determine the level of scrutiny." *Country Classic Dairies, Inc. v. State of Mont., Dep't of Com. Milk Control Bureau*, 847 F.2d 593, 596 (9th Cir. 1988). "[D]iscriminatory intent is required to show that state action having a disparate impact violates the Equal Protection Clause." *McLean v. Crabtree*, 173 F.3d 1176, 1185 (9th Cir. 1999). The burden is on plaintiffs to show "that discriminatory purpose was a motivating factor" in the challenged government action. *Vil. of Arlington Heights v. Metro. Hous. Dev. Corp.,* 429 U.S. 252, 270 (1977). If a plaintiff makes such a showing, the court considers whether the governmental action in question "targets a suspect class or burdens the exercise of a fundamental right." *United States v. Hancock*, 231 F.3d 557, 565 (9th Cir. 2000). If not, the action is constitutional as long as it meets the "highly deferential" rational basis standard. *Id.* at 566. If so, strict scrutiny applies, which requires an action to be "narrowly tailored to serve a compelling governmental interest." *Honolulu Wkly., Inc. v. Harris*, 298 F.3d 1037, 1047 (9th Cir. 2002) (quoting *Ball v. Massanari*, 254 F.3d 817, 823 (9th Cir. 2001)).

---

[7] Although the equal protection rights upon which Plaintiffs rely arise from the Fifth Amendment's Due Process Clause, "the approach to Fifth Amendment equal protection claims has always been precisely the same as to equal protection claims under the Fourteenth Amendment." *Roy v. Barr*, 960 F.3d 1175, 1181 n.3 (9th Cir. 2020). This memorandum thus cites to cases analyzing both interchangeably.

Here, Plaintiffs have once again failed to sufficiently allege discriminatory intent.  Plaintiffs Kariye and Mouslli continue to allege that all alleged instances of secondary inspection and religious questioning occurred during the period when they each believe they were on a U.S. government watchlist.  *See* Am. Compl. ¶¶ 56–80, 91–92, 108–26, 132.  As in the original complaint, the amended complaint "links Plaintiff Kariye and Mouslli's [alleged] placement on government watchlists to their experiences during international travel."  *Kariye*, 2022 U.S. Dist. LEXIS 186915, at *101; *see* Am. Compl. ¶¶ 90, 131.  Thus, for the same reasons the Court previously identified, "Plaintiffs Kariye and Mouslli have not plausibly alleged that they experienced secondary inspection and religious questioning because of Defendants' discriminatory intent regarding their religion."  *Kariye*, 2022 U.S. Dist. LEXIS 186915, at *102.  Instead, the logical conclusion remains that Plaintiffs' alleged watchlist status was the primary cause of the secondary inspections and alleged religious questioning.  *See id.*  Because Plaintiffs Kariye and Mouslli have not adequately alleged "that discriminatory purpose was a motivating factor" in the challenged government action, *Vil. of Arlington Heights*, 429 U.S. at 270, the Court should again dismiss their Equal Protection claims.

Plaintiff Shah has also failed to remedy the deficiencies the Court identified in his initial Equal Protection claim.  First, the Court found that Shah had failed to sufficiently allege why he was "singled out for secondary inspection," *Kariye*, 2022 U.S. Dist. LEXIS 186915, at *106; Shah has added no additional factual allegations in this regard, *compare* Compl. ¶¶ 109–11 to Am. Compl. ¶¶ 147–49.  Second, the allegations regarding Shah continue to suggest that officers' "further inspection" of him was based not on religious discrimination, but rather "on information uncovered during a routine search."  *Kariye*, 2022 U.S. Dist. LEXIS 186915, at *107.  To that end, Shah continues to allege that "the officers involved only began asking questions about [his] religious practices after reviewing the contents of his personal journal."

*Id.* at \*106; *see* Am. Compl. ¶¶ 151, 153, 156.  He also continues to allege that his personal journal "contained notes about his religious beliefs and practices."  Am. Compl. ¶ 151.  Thus, just as the Court dismissed Plaintiff Shah's initial Equal Protection claim, it should dismiss the identical, renewed claim for failure to show discriminatory intent.  *See Kariye*, 2022 U.S. Dist. Lexis, at \*107–08.

Finally, even if the Court were to find any of the Plaintiffs had stated a prima facie case under the Equal Protection Clause, those claims nonetheless warrant dismissal because the alleged inspections and questioning would satisfy strict scrutiny.  *See supra* pp. 22–25.

## F.    Dismissal with Prejudice Is Appropriate Because Further Amendment Would Be Futile.

As the foregoing demonstrates, Plaintiffs' claims in the amended complaint are based on the same essential factual allegations that led to dismissal of the original complaint, and they require dismissal for the same reasons.  Because the events that comprise the core of Plaintiffs' allegations—the 10 alleged instances of religious questioning at the U.S. border—occurred in the past, Plaintiffs cannot logically amend the complaint to add new facts that would plausibly state a cause of action for any of their six claims.  Indeed, they have tried and failed.  The amended complaint includes few new allegations, and none that adequately addresses the deficiencies the Court previously identified or alters the conclusion that Plaintiffs have failed to state a claim.  Thus, although "dismissal with prejudice is appropriate only when 'further amendment would be futile," that standard is met here. *See Espinoza*, 562 F. Supp. 3d at 913 (quoting *Rutman Wine*, 829 F.2d at 738); *see also Cafasso*, 637 F.3d at 1058 ("district court's discretion to deny leave to amend is particularly broad where plaintiff has previously amended the complaint" (quoting *Ascon Props,* 866 F.2d at 1160)); *Gibler,* 111 F. App'x at 505 ("district court did not abuse its discretion when it dismissed Plaintiff's Second Amended

Complaint with prejudice, after giving Plaintiff two prior opportunities to focus and clarify his complaint"); *Azam*, 2015 WL 13918078, at *4–6.

## CONCLUSION

For the foregoing reasons, the amended complaint should be dismissed with prejudice.

Dated: December 27, 2022

Respectfully submitted,

BRIAN M. BOYNTON
Principal Deputy Assistant Attorney General
Civil Division

BRIGHAM J. BOWEN
Assistant Branch Director
Civil Division, Federal Programs Branch

  */s/ Leslie Cooper Vigen*
LESLIE   COOPER   VIGEN   (D.C.   Bar
No. 1019782)
LAUREL H. LUM (N.Y. Bar. No. 5729728)
SAMUEL A. REBO (D.C. Bar No. 1780665)
Trial Attorneys
Civil Division, Federal Programs Branch
United States Department of Justice
1100 L Street, NW, Washington, D.C. 20005
Telephone: (202) 305-0727
Email:  leslie.vigen@usdoj.gov

*Counsel for Defendants*

34