Ashley Gorski (*pro hac vice*)
agorski@aclu.org
Sarah Taitz (*pro hac vice*)
staitz@aclu.org
American Civil Liberties Union Foundation
125 Broad Street, Floor 18
New York, NY 10004
Tel: (212) 549-2500

Mohammad Tajsar (SBN 280152)
mtajsar@aclusocal.org
ACLU Foundation of Southern California
1313 West 8th Street
Los Angeles, CA 90017
Tel: (213) 977-9500

(Additional counsel continued on next page)

# UNITED STATES DISTRICT COURT
## FOR THE CENTRAL DISTRICT OF CALIFORNIA

| | |
|---|---|
| ABDIRAHMAN ADEN KARIYE, *et al.*,<br><br>    *Plaintiffs*,<br><br>v.<br><br>ALEJANDRO MAYORKAS, Secretary of the U.S. Department of Homeland Security, in his official capacity, *et al.*,<br><br>    *Defendants*. | Case No. 2:22-cv-01916-FWS-GJS<br><br>**PLAINTIFFS' OPPOSITION TO DEFENDANTS' MOTION TO DISMISS THE AMENDED COMPLAINT**<br><br>**Hearing:**<br>Date: March 23, 2023<br>Time: 10:00 a.m.<br>Place: Santa Ana, Courtroom 10D<br><br>Honorable Fred W. Slaughter<br>**United States District Judge** |

Daniel Mach (*pro hac vice*)
dmach@aclu.org
Heather L. Weaver (SBN 226853)
hweaver@aclu.org
American Civil Liberties Union Foundation
915 15th St., NW Ste. 600
Washington, DC 20005
Tel: (202) 675-2330

Teresa Nelson (*pro hac vice*)
tnelson@aclu-mn.org
American Civil Liberties Union of Minnesota
P.O. Box 14720
Minneapolis, MN 55415
Tel: (651) 645-4097

John Hemann (SBN 165823)
jhemann@cooley.com
Hannah Pollack (SBN 336599)
hpollack@cooley.com
Liz Sanchez Santiago (SBN 333789)
lsanchezsantiago@cooley.com
Cooley LLP
3 Embarcadero Center, Floor 20
San Francisco, CA 94111
Tel: (415) 693-2000

Brett H. De Jarnette (SBN 292919)
bdejarnette@cooley.com
Cooley LLP
3175 Hanover Street
Palo Alto, California 94304
Tel: (650) 843-5000

*Counsel for Plaintiffs*

## <u>**TABLE OF CONTENTS**</u>

INTRODUCTION ...........................................................................................1

FACTUAL BACKGROUND ........................................................................2

LEGAL STANDARDS ................................................................................7

ARGUMENT ................................................................................................7

I.   Plaintiffs plausibly allege Establishment Clause violations. ............................7

    A.   Defendants' religious questioning plausibly violates the principle of denominational neutrality under *Larson*. .................................8

    B.   It is, at a minimum, plausible that Defendants' religious questioning fails strict scrutiny. ..........................................10

    C.   Defendants plausibly violate the *Kennedy* test ........................16

    D.   Defendants plausibly violate the coercion test. .........................19

II.   Plaintiffs plausibly allege RFRA and free-exercise violations ........................21

    A.   Plaintiffs plausibly allege a substantial burden. .......................21

    B.   Plaintiffs are not required to plead a substantial burden under the Free Exercise Clause because they plausibly allege conduct that is neither religiously neutral nor generally applicable. ...........................25

III.   Plaintiffs plausibly allege violations of their associational rights. .................28

IV.   Plaintiff Shah plausibly alleges a retaliation claim. ........................31

V.   Plaintiffs plausibly allege Fifth Amendment equal protection violations.......33

CONCLUSION ..........................................................................................35

# TABLE OF AUTHORITIES

## Cases

*Adair v. England*,
183 F. Supp. 2d 31 (D.D.C. 2002) ........................................................10

*Albino v. Baca*,
747 F.3d 1162 (9th Cir. 2014) ............................................................10

*Am. Fam. Ass'n v. City & County of San Francisco*,
277 F.3d 1114 (9th Cir. 2002) ...............................................24, 26, 27

*Ams. for Prosperity Found. v. Bonta*,
141 S. Ct. 2373 (2021) ............................................................28, 30, 31

*Apache Stronghold v. United States*,
38 F.4th 742 (9th Cir. 2022) ...............................................................22

*Apache Stronghold v. United States*,
56 F.4th 636 (9th Cir. 2022) ...............................................................22

*Arce v. Douglas*,
793 F.3d 968 (9th Cir. 2015) ...............................................................34

*Ariz. Students' Ass'n v. Ariz. Bd. of Regents*,
824 F.3d 858 (9th Cir. 2016) .................................................................7

*ASARCO, LLC v. Union Pac. R. Co.*,
765 F.3d 999 (9th Cir. 2014) ...............................................................10

*Ashcroft v. Iqbal*,
556 U.S. 662 (2009) ..........................................................7, 10, 29, 33

*Askins v. U.S. Dep't of Homeland Sec.*,
899 F.3d 1035 (9th Cir. 2018) ..................................................7, 11, 19

*Bacus v. Palo Verde Unified Sch. Dist.*,
No. 99-57020, 2002 WL 31724273, 52 F. App'x 355
(9th Cir. Dec. 3, 2002) .......................................................................10

*Ballew v. City of Pasadena*,
No. 18-cv-0712, 2022 WL 17974488
(C.D. Cal. Nov. 23, 2022) ...................................................................35

---

*Bd. of Educ. of Kiryas Joel Vill. Sch. Dist. v. Grumet,*
   512 U.S. 687 (1994) ................................................................................18

*Bell Atl. Corp. v. Twombly,*
   550 U.S. 544 (2007) ..........................................................................7, 10

*Boquist v. Courtney,*
   32 F.4th 764 (9th Cir. 2022) ..................................................................32

*Brown v. Borough of Mahaffey,*
   35 F.3d 846 (3d Cir. 1994) ....................................................................25

*Burlington N. R. Co. v. Ford,*
   504 U.S. 648 (1992) ..............................................................................33

*Bursey v. United States,*
   466 F.2d 1059 (9th Cir. 1972) ..............................................................30

*Cal. Parents for the Equalization of Educ. Materials v. Torlakson,*
   973 F.3d 1010 (9th Cir. 2020) ..............................................................27

*Carson v. Makin,*
   No. 20-1088, 2022 WL 2203333 (U.S. June 21, 2022) .........................26

*Cherri v. Mueller,*
   951 F. Supp. 2d 918 (E.D. Mich. 2013) .......................................5, 8, 34

*Church of the Lukumi Babalu Aye, Inc. v. City of Hialeah,*
   508 U.S. 520 (1993) .......................................................21, 25, 26, 27

*Clark v. Libr. of Cong.,*
   750 F.2d 89 (D.C. Cir. 1984) ................................................................30

*County of Allegheny v. ACLU Greater Pittsburgh Chapter,*
   492 U.S. 573 (1989) ................................................................................9

*Cross v. City & County of San Francisco,*
   386 F. Supp. 3d 1132 (N.D. Cal. 2019) ................................................35

*Davis v. United States,*
   811 F.3d 335 (9th Cir. 2016) ..................................................................9

*Dousa v. DHS,*
   2020 WL 434314 (S.D. Cal. Jan. 28, 2020) ...................................24, 25

*Duronslet v. County of Los Angeles*,
  266 F. Supp. 3d 1213 (C.D. Cal. 2017) ........................................10, 11

*El Ali v. Barr*,
  473 F. Supp. 3d 479 (D. Md. 2020) ........................................5, 8, 14, 34

*Emp. Div., Dep't of Hum. Res. of Or. v. Smith*,
  494 U.S. 872 (1990) ........................................25, 27

*Epperson v. Arkansas*,
  393 U.S. 97 (1968) ........................................9, 18

*Espinoza v. Mont. Dep't of Revenue*,
  140 S. Ct. 2246 (2020) ........................................26

*Everson v. Bd. of Ed. of Ewing Twp.*,
  330 U.S. 1 (1947) ........................................8, 17, 20

*Fazaga v. FBI*,
  965 F.3d 1015 (9th Cir. 2020) ........................................23

*Fazaga v. FBI*,
  142 S. Ct. 1051 (2022) ........................................23

*Fratus v. Cal. Dep't of Corr.*,
  No. 12-cv-00906, 2014 WL 1338903 (E.D. Cal. Apr. 2, 2014) ........................................33

*Frudden v. Pilling*,
  742 F.3d 1199 (9th Cir. 2014) ........................................11, 14

*Fulton v. City of Philadelphia*
  141 S. Ct. 1868 (2021) ........................................26

*Gonzales v. O Centro Espirita Beneficente Uniao do Vegetal*,
  546 U.S. 418 (2006) ........................................13

*Holt v. Hobbs*,
  574 U.S. 352 (2015) ........................................12

*House v. Napolitano*,
  No. 11-cv-10852, 2012 WL 1038816 (D. Mass. Mar. 28, 2012) ........................................19

*Humanitarian Law Project v. Reno*,
  205 F. 3d 1130 (9th Cir. 2000) ........................................30

*In re Navy Chaplaincy*,
   No. 19-5204, 2020 WL 11568892 (D.C. Cir. Nov. 6, 2020).............................10

*Janfeshan v. U.S. CBP*,
   No. 16-cv-6915, 2017 WL 3972461 (E.D.N.Y. Aug. 21, 2017) ............... 5, 8, 34

*Jones v. Slade*,
   23 F.4th 1124 (9th Cir. 2022) .........................................................................22

*Kennedy v. Bremerton Sch. Dist.*,
   142 S. Ct. 2407 (2022)............................................................... *passim*

*Khoja v. Orexigen Therapeutics*,
   899 F.3d 988 (9th Cir. 2018) .........................................................................6

*Laird v. Tatum*,
   408 U.S. 1 (1972)..........................................................................................24

*Larson v. Valente*,
   456 U.S. 228 (1982)................................................................. *passim*

*Lee v. Weisman*,
   505 U.S. 577 (1992).................................................... 8, 18, 19, 20

*Lynch v. Donnelly*,
   465 U.S. 668 (1984)......................................................................................9

*MacPherson v. I.R.S.*,
   803 F. 2d 479 (9th Cir. 1986) .................................................................30, 31

*Masterpiece Cakeshop v. Colo. Civ. Rts. Comm'n*,
   138 S. Ct. 1719 (2018).............................................................................26, 28

*McDaniel v. Paty*,
   435 U.S. 618 (1978).....................................................................................21

*McGowan v. Maryland*,
   366 U.S. 420, (1961).....................................................................................17

*Mellen v. Bunting*,
   327 F.3d 355 (4th Cir. 2003) .........................................................................20

*Mitchell v. Washington*,
   818 F.3d 436 (9th Cir. 2016) .........................................................................34

*NAACP of San Jose/Silicon Valley v. City of San Jose*,
  562 F. Supp. 3d 382 (N.D. Cal. 2021) ...................................................11

*Navajo Nation v. U.S. Forest Serv.*,
  535 F.3d 1058 (9th Cir. 2008) .....................................................21, 22

*O'Brien v. Welty*,
  818 F.3d 920 (9th Cir. 2016) ...............................................31, 32, 33

*Ohno v. Yasuma*,
  723 F.3d 984 (9th Cir. 2013) ....................................................22

*Roemer v. Bd. of Pub. Works of Md.*,
  426 U.S. 736 (1976)...................................................................18

*Roman Cath. Diocese of Brooklyn v. Cuomo*,
  141 S. Ct. 63 (2020)...................................................................26

*Rouser v. White*,
  630 F. Supp. 2d 1165 (E.D. Cal. 2009) ............................................10

*Shelton v. Tucker*,
  364 U.S. 479 (1960)...................................................................30

*Sklar v. Comm'r*,
  282 F.3d 610 (9th Cir. 2002) .......................................................9

*Starr v. Baca*,
  652 F.3d 1202 (9th Cir. 2011) ..........................................7, 13, 30, 33

*Tabbaa v. Chertoff*,
  509 F.3d 89 (2d Cir. 2007)...............................................15, 30, 32

*Tandon v. Newsom*,
  141 S. Ct. 1294 (2021)................................................................26

*Tatum v. Laird*,
  444 F.2d 947 (D.C. Cir. 1971) ......................................................24

*Thomas v. Rev. Bd. of Ind. Emp. Sec. Div.*,
  450 U.S. 707 (1981)...................................................................21

*Town of Greece v. Galloway*,
  572 U.S. 565 (2014)...................................................................16

*Trinity Lutheran Church of Columbia, Inc. v. Comer*,
   137 S. Ct. 2012 (2017) ...................................................................................21, 26

*United States v. Arnold*,
   533 F.3d 1003 (9th Cir. 2008) ...............................................................................29

*United States v. Cano*,
   934 F.3d 1002 (9th Cir. 2019) .........................................................................18, 19

*United States v. Ramon*,
   86 F. Supp. 2d 665 (W.D. Tex. 2000) ...................................................................19

*United States v. Rubio*,
   727 F.2d 786 (9th Cir. 1983) .........................................................................28, 29

*Vernon v. City of Los Angeles*,
   27 F.3d 1385 (9th Cir. 1994) ...................................................................21, 24, 25

*Vill. of Arlington Heights v. Metro. Hous. Dev. Corp.*,
   429 U.S. 252 (1977) .........................................................................................34, 35

*Waln v. Dysart Sch. Dist.*,
   54 F.4th 1152 (9th Cir. 2022) .........................................................................26, 27

*Warrior v. Gonzalez*,
   No. 08-cv-00677, 2013 WL 6174788
   (E.D. Cal. Nov. 20, 2013) .........................................................................................9

*Whren v. United States*,
   517 U.S. 806 (1996) .................................................................................................35

*Wilwal v. Nielsen*,
   346 F. Supp. 3d 1290 (D. Minn. 2018) .................................................................14

*Witt v. Dep't of Air Force*,
   527 F.3d 806 (9th Cir. 2008) .........................................................................11, 12

*Wolfel v. Morris*,
   972 F.2d 712 (6th Cir. 1992) .................................................................................33

*Zorach v. Clauson*,
   343 U.S. 306 (1952) .................................................................................................18

**Statutes**

8 U.S.C. § 1101 ................................................................................................19

13 U.S.C. § 221 ................................................................................................17

42 U.S.C. § 1983 ................................................................................................5

42 U.S.C. § 2000bb ................................................................................... *passim*

42 U.S.C. § 2000cc ...........................................................................................23

**Rules**

Federal Rule of Civil Procedure 12(b)(6) .......................................................6

**Other Authorities**

CBP Standards of Conduct, CBP Directive 51735-013B (Dec. 9, 2020),
    https://perma.cc/83ZD-LE5P .....................................................................6

DHS CRCL, Compliance Branch Report for FY2020 Q1 and Q2 (2020),
    https://perma.cc/875B-GFKE ......................................................................5

Kevin M. Schultz, *Religion as Identity in Postwar America: The Last
    Serious Attempt to Put a Question on Religion in the U.S. Census*,
    93 J. of Am. History 359 (Sept. 2006) .......................................................17

Memo. from Kevin K. McAleenan to All DHS Employees,
    https://perma.cc/6ZN4-TAKB .....................................................................6

# **INTRODUCTION**

When Plaintiffs, who are U.S. citizens, return home to the United States from international travel, federal border officers stigmatize and penalize them simply because they are Muslim. During coercive, protracted encounters, border officers require Plaintiffs to answer deeply personal questions about their religion, such as "How many times a day do you pray?" "Do you attend mosque?" "Which mosque do you attend?" "Are you Sunni or Shi'a?" Border officers ask these questions pursuant to a broader policy and/or practice by Defendants of targeting Muslim American travelers for religious questioning, and retaining the answers in a law enforcement database for up to 75 years. This questioning, and the retention of Plaintiffs' responses, satisfies no legitimate—let alone compelling—government interest. It violates Plaintiffs' rights to practice their faith without undue government interference and to be treated equally with other Americans.

Following the Court's dismissal of the Complaint without prejudice, Plaintiffs filed an Amended Complaint ("FAC"), which addresses several issues identified by the Court's decision and provides further support for their claims. The Amended Complaint makes crystal clear that Plaintiffs have no connection whatsoever to terrorism; that Islam is not predictive of violence or terrorism; and that Plaintiffs Imam Abdirahman Kariye and Mohamad Mouslli were unjustly and improperly placed on the government's watchlist. *See* FAC ¶¶ 32–38, 81–88, 127–30, 176–78.

Nevertheless, Defendants once again urge the Court to reject Plaintiffs' well-pled allegations, to decide fact-intensive questions without the benefit of discovery, and to draw every inference in Defendants' favor. But at this early phase in the litigation, on a motion to dismiss under Rule 12(b)(6), the Court must do just the opposite. Each of Plaintiffs' claims is supported by concrete allegations regarding specific instances of religious questioning. Indeed, several of Plaintiffs' claims— under the Establishment Clause, Free Exercise Clause, and due process right to equal protection—trigger strict scrutiny, which requires that *the government* bear the heavy

burden of showing that its religious questioning is narrowly tailored to a compelling interest. Yet Defendants' brief again fails to explain how they will meet that standard—much less establish that a violation of strict scrutiny is *implausible*.

Although Defendants assert in sweeping terms that their questioning is justified by the government's interest in "protecting its borders" and "preventing the entry of terrorists," they fail to explain *how* religious questioning actually protects the border or prevents terrorism. What is the connection between how many times a Muslim person prays each day and any potential act of terrorism? Defendants do not say—because there is none. What bearing does a Muslim traveler's adherence to Sunni or Shi'a religious tenets have on border security? Again, Defendants do not say. To connect such questions to terrorism, Defendants would have to rely on false and offensive stereotypes about Muslims. Well over one billion people worldwide identify as Muslims, and many engage in religious practices such as praying and attending mosque. Suggesting that these practices render Muslims suspect is factually untenable, religiously discriminatory, and profoundly stigmatizing to Muslim Americans. And even if Defendants could somehow present evidence demonstrating otherwise, it would not be appropriate at this stage of litigation. Accepting Plaintiffs' well-pled allegations as true and drawing all reasonable inferences in their favor, Defendants' motion to dismiss should be denied.

## FACTUAL BACKGROUND

Plaintiffs Imam Abdirahman Aden Kariye ("Imam Kariye"), Mohamad Mouslli ("Mr. Mouslli"), and Hameem Shah ("Mr. Shah") are law-abiding Muslim U.S. citizens. FAC ¶¶ 81, 127, 176. Iman Kariye is a prominent member of the Minnesota Muslim and interfaith communities, as well as an active participant in civic life and charitable endeavors. *Id.* ¶ 54. Mr. Mouslli lives in Arizona with his wife and three children and works in commercial real estate. *Id.* ¶ 106. Mr. Shah lives in Texas and works in financial services. *Id.* ¶ 145. Plaintiffs do not have criminal records. *Id.* ¶¶ 81, 127, 176. They have never participated in nor advocated for violence or

terrorism, and have never been accused by any government agency of doing so. *Id.* ¶¶ 82, 128, 177. Like millions of other Muslim Americans, they participate in peaceful religious activities, which have no connection to terrorism or any other violent or criminal activity. *Id.* ¶¶ 32–37.[1]

Imam Kariye, Mr. Mouslli, and Mr. Shah have been questioned by Defendants' border officers about their religious beliefs, practices, and associations upon return to the United States from travel abroad on ten different occasions at six different ports of entry. *Id.* ¶¶ 55–80, 107–26, 146–74. This questioning pries into Plaintiffs' specific Islamic beliefs and practices, such as mosque attendance, prayer frequency, and adherence to Sunni or Shi'a religious tenets. *Id.* ¶¶ 70, 110, 114, 118, 123, 153, 156. Defendants retain records of Plaintiffs' responses in a Department of Homeland Security ("DHS") database called "TECS" for up to 75 years, where they are accessible to thousands of law enforcement officers across federal, state, and local agencies. *Id.* ¶¶ 29–31, 175.

The religious questioning of Plaintiffs takes place during secondary inspection, a procedure by which border officers detain, question, and search certain travelers before they are permitted to enter the country. *Id.* ¶¶ 26, 57, 61, 65, 69, 76, 108–09, 113, 117, 122, 146. When border officers select travelers for secondary inspection, the officers—typically armed and wearing government uniforms—detain the individuals in an area separate from the general inspection area and prohibit them from leaving without officers' express permission. *Id.* ¶ 27. During these inspections,

---

[1] At the time of the incidents described in the Amended Complaint, Imam Kariye and Mr. Mouslli were unjustly and improperly on the U.S. government's master watchlist. *Id.* ¶¶ 83, 129. Mr. Mouslli is still on the watchlist. *Id.* ¶ 131. In the watchlisting system, errors and reliance on unjustified suspicion are common because the standard for placement on the watchlist is remarkably low (and circular): suspicion that an individual might be suspicious. *Id.* ¶¶ 83–89. Under the government's watchlisting guidance, "concrete facts are not necessary" to satisfy the standard, and uncorroborated information of questionable or even doubtful reliability can serve as the basis for watchlisting an individual. *Id.* ¶ 85.

the officers take possession of the travelers' passports and conduct searches of their belongings, including their electronic devices. *Id.*

Because of the coercive nature of the secondary inspection environment, Plaintiffs have no meaningful choice but to disclose their religious beliefs, practices, and associations in response to officers' inquiries. *See, e.g.*, *id.* ¶¶ 26–28, 55, 59, 63, 67, 73, 78, 107, 111, 115, 119, 124, 150.

Border officers' religious questioning of Mr. Shah was part of a secondary inspection on May 7, 2019, at LAX, which also included retaliatory actions by the officers. *Id.* ¶¶ 146–75. During the encounter, Mr. Shah stated that he did not consent to being searched and otherwise attempted to assert his constitutional rights at least eight times. *Id.* ¶¶ 148, 152, 155, 157, 159, 161, 162 165. Over Mr. Shah's objections, border officers searched his personal journal. *Id.* ¶¶ 151–52. The journal contained notes about his religious beliefs and practices, which are entirely peaceful and nonviolent in nature. *Id.* ¶ 151. None of the contents of Mr. Shah's journal related to violence or terrorism. *Id.* ¶ 178. After reading the journal, officers nevertheless asked Mr. Shah invasive religious questions, and one officer informed Mr. Shah, "I'm asking because of what we found in your journal." *Id.* ¶¶ 153–57. The officers further retaliated against him for his possession of the journal and his verbal invocations of his rights by intensifying their search, asking additional invasive religious questions, and prolonging Mr. Shah's detention. *Id.* ¶¶ 153–73.

Plaintiffs are proud Muslims who object to the fact that, merely because they are Muslims, they are subjected to humiliating and invasive questioning when returning home from abroad. *See id.* ¶¶ 103–04, 141–42, 187–88. Defendants' religious questioning has coerced them into modifying their religious practices while traveling—contrary to their sincerely held religious beliefs. *Id.* ¶¶ 98–104, 140–43, 186–88. For example, while traveling through ports of entry, Imam Kariye and Mr. Mouslli refrain from physical acts of prayer; Imam Kariye avoids carrying religious texts and does not wear his kufi, a religious head covering that would immediately

identify him as Muslim; and Mr. Shah will no longer carry his religious journal. *Id.*

The religious questioning of Plaintiffs is conducted pursuant to a policy and/or practice by Defendants of targeting Muslim American travelers for religious questioning and retaining their responses for decades.[2] FAC ¶¶ 16–30; *see also* Opinion & Order 27–32, ECF No. 58 ("Op."). That policy and/or practice is longstanding. FAC ¶¶ 17–22. In 2011, DHS received "numerous" complaints from Muslim Americans about similar questioning regarding religious beliefs, practices, and associations. *Id.* ¶ 17. In the intervening years, several Muslim Americans have challenged such questioning in court. *See Cherri v. Mueller*, 951 F. Supp. 2d 918, 933–34 (E.D. Mich. 2013); *El Ali v. Barr*, 473 F. Supp. 3d 479, 524–26 (D. Md. 2020); *Janfeshan v. U.S. CBP*, No. 16-cv-6915, 2017 WL 3972461, at *4, *10 (E.D.N.Y. Aug. 21, 2017). As of 2020, the DHS Office for Civil Rights & Civil Liberties was reviewing multiple allegations that Customs and Border Protection ("CBP") officers at ports of entry have "inappropriately questioned travelers about their religious beliefs and practices." FAC ¶ 22; DHS CRCL, Compliance Branch Report for FY2020 Q1 and Q2 (2020), https://perma.cc/875B-GFKE.

Defendants' written policies expressly permit border officers to question Americans about their religion. FAC ¶ 24. For example, DHS policy allows officers to collect and retain information protected by the First Amendment in several

---

[2] Because Plaintiffs are not suing under 42 U.S.C. § 1983, they are not required to allege a policy or practice as an element of their claims. Nevertheless, because Defendants do have a policy and/or practice of targeting Muslims for religious questioning, Plaintiffs have pointed to it to underscore the likelihood of recurrence of the questioning, *see* Op. 27–32, and the Amended Complaint includes additional allegations supporting the existence of a policy and/or practice, FAC ¶¶ 21–22. Notably, Defendants have not contested the existence of a policy and/or practice of retaining records of answers to religious questioning.

Plaintiffs also allege, *in the alternative*, that Defendants have a policy and/or practice of (1) subjecting travelers of faith, including Plaintiffs, to religious questioning during secondary inspection, and (2) retaining records reflecting answers to such questioning for up to 75 years. *Id.* ¶¶ 31, 200, 209, 220.

circumstances. *See* Memo. from Kevin K. McAleenan to All DHS Employees at 2, https://perma.cc/6ZN4-TAKB ("McAleenan Memo").[3] U.S. Immigration and Customs Enforcement ("ICE") requires officers who work at ports of entry to carry a questionnaire to guide their interrogations of travelers, which includes intrusive questions about a traveler's religious beliefs, practices, and associations. FAC ¶ 24. The CBP Standards of Conduct prohibit officers from "improperly tak[ing] into consideration an individual's . . . religion," without identifying what circumstances allow officers to "properly" consider a traveler's religion. CBP Standards of Conduct, CBP Directive 51735-013B (Dec. 9, 2020), https://perma.cc/83ZD-LE5P.

CBP officers are required to create records of every secondary inspection at a border crossing, and officers routinely document Muslim travelers' responses, including Plaintiffs' responses, to questions about their religious beliefs, practices, and associations. *See* FAC ¶¶ 29–30, 60, 64, 68, 74, 79, 112, 116, 120, 125, 175. Officers then input those records into the TECS database. *Id.* ¶¶ 29–31; *see also id.* ¶ 175 (TECS record of Mr. Shah containing information about his religious practice).

On March 24, 2022, Plaintiffs filed this lawsuit. *See* Compl., ECF No. 1. Defendants moved to dismiss under Federal Rule of Civil Procedure 12(b)(6) for failure to state a claim, ECF No. 40, and the Court granted the motion with leave to amend, *see* Op. 71. On November 14, 2022, Plaintiffs filed an Amended Complaint, seeking: (1) a declaration that the religious questioning of Plaintiffs, and the policies and practices of DHS and CBP set forth in the Amended Complaint, are unlawful; (2) an injunction against further religious questioning of Plaintiffs; (3) expungement of all records collected through religious questioning of Plaintiffs; and (4) expungement of all records collected as a result of retaliatory action against Mr. Shah. *See* ECF

---

[3] Plaintiffs dispute the accuracy of the McAleenan Memo's vague, unverified, and self-serving assertion that "DHS does not profile, target, or discriminate against any individual for exercising his or her First Amendment rights." McAleenan Memo at 1. A court "cannot take judicial notice of disputed facts contained in [] public records." *Khoja v. Orexigen Therapeutics*, 899 F.3d 988, 998–1003 (9th Cir. 2018).

No. 61. Defendants again moved to dismiss. *See* ECF No. 68.

## LEGAL STANDARDS

Defendants' motion to dismiss must be denied if Plaintiffs have alleged "enough facts to state a claim to relief that is *plausible* on its face." *See Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007) (emphasis added); *see also Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009). This plausibility standard is not a "probability requirement." *Starr v. Baca*, 652 F.3d 1202, 1217 (9th Cir. 2011). Rather, it "'simply calls for enough fact to raise a reasonable expectation that discovery will reveal evidence' to support the allegations." *Id.* (quoting *Twombly*, 550 U.S. at 556). The Court is required to "accept the complaint's well-pleaded factual allegations as true and construe all inferences in the [Plaintiffs'] favor." *Ariz. Students' Ass'n v. Ariz. Bd. of Regents*, 824 F.3d 858, 864 (9th Cir. 2016). In the event that there are "two alternative explanations, one advanced by defendant and the other advanced by plaintiff, both of which are plausible, plaintiff's complaint survives a motion to dismiss under Rule 12(b)(6)." *Starr*, 652 F.3d at 1216.

In deciding a motion to dismiss an amended complaint, a court is not bound by any of the conclusions it reached regarding the plaintiff's initial complaint. *Askins v. U.S. Dep't of Homeland Sec.*, 899 F.3d 1035, 1043 (9th Cir. 2018). The amended complaint requires the court to make a "new determination," in which the court is "free to correct any errors or misunderstandings." *Id.*

## ARGUMENT

### I.    Plaintiffs plausibly allege Establishment Clause violations.

To state a claim under the Establishment Clause, Plaintiffs need only allege facts showing a plausible violation of any one of several doctrinal tests. Here, Plaintiffs have plausibly alleged that Defendants' discriminatory religious questioning does not withstand strict scrutiny under *Larson v. Valente*, 456 U.S. 228 (1982)—the controlling standard where a plaintiff alleges that the government has violated the principle of denominational neutrality. Plaintiffs have also plausibly

alleged violations of the "historical practices and understandings" test announced in *Kennedy v. Bremerton School District*, 142 S. Ct. 2407, 2411 (2022), as well as the coercion test in *Everson v. Board of Education*, 330 U.S. 1, 15–16 (1947), and *Lee v. Weisman*, 505 U.S. 577, 587–88 (1992).

> **A.     Defendants' religious questioning plausibly violates the principle of denominational neutrality under *Larson*.**

"The clearest command of the Establishment Clause is that one religious denomination cannot be officially preferred over another." *Larson*, 456 U.S. at 244. Thus, intentional and explicit religious discrimination, or the singling out of one faith for disfavor, violates the Establishment Clause unless it withstands strict scrutiny. *See id.* at 255. Accepting Plaintiffs' well-pled allegations as true, and considering the Court's prior holding that Plaintiffs sufficiently alleged an "official practice, policy or custom of targeting Muslim Americans for religious questioning," Op. 32, *Larson* governs the Establishment Clause analysis.

Plaintiffs allege that, across ten instances at several different ports of entry, numerous border officers subjected them to invasive questions regarding their Islamic faith. FAC ¶¶ 55–80, 107–26, 146–74. Plaintiffs further allege a long history of similar complaints made by other Muslim Americans, and that Americans of other faiths are not routinely subject to similar questioning. FAC ¶¶ 17–22, 25. Border officers ask Plaintiffs questions specific to Islam, reflecting their targeting of Muslims, as opposed to neutral questions that could apply to all faiths. *See, e.g.*, *id.* ¶¶ 70–71, 110, 114, 118, 123, 156 (describing questions regarding, *e.g.*, mosque attendance, views on a medieval Muslim scholar, and adherence to Sunni or Shi'a religious tenets). In the analogous context of equal protection claims, courts have held that allegations concerning border officers' questions about Islamic religious practice plausibly establish discrimination. *See, e.g.*, *Cherri*, 951 F. Supp. 2d at 937; *El Ali*, 473 F. Supp. 3d at 516–18; *Janfeshan*, 2017 WL 3972461, at *10.

Respectfully, the Court previously erred in concluding that *Larson* applies only where a *statute* grants a denominational preference. *See* Op. 33. Indeed, in the case cited by the Court, *Sklar v. Commissioner of Internal Revenue*, 282 F.3d 610, 619 (9th Cir. 2002), the Ninth Circuit applied *Larson* to an Internal Revenue Service tax closing agreement, which is not a statute. *See Davis v. United States*, 811 F.3d 335, 338–39 (9th Cir. 2016) ("Closing agreements are contracts, governed by federal common law." (internal citations omitted)). *Sklar*'s reference to a "statute" in dicta is simply inapposite. *See Sklar*, 282 F.3d at 618.

Although Defendants previously argued that *Larson* applies only in cases of a "written, facially discriminatory governmental policy," Def. Reply 7, ECF No. 47, that argument is belied by the text of *Larson* itself and the Supreme Court's discussion of *Larson* in other Establishment Clause cases. In *Larson*, the Court observed that the "principle of denominational neutrality has been restated on many occasions[,]" quoting its "unambiguous" holding in *Epperson v. Arkansas*, 393 U.S. 97 (1968), that "'[t]he State may not adopt programs or *practices* . . . which aid or oppose any religion.'" *Larson*, 456 U.S. at 246 (emphasis added). Less than two years later, in *Lynch v. Donnelly*, the Court explained: "It is correct that we require strict scrutiny of a statute *or practice* patently discriminatory on its face." 465 U.S. 668, 687 n.13 (1984) (plurality op.) (discussing *Larson*) (emphasis added). *Accord id.* at 689 n.1 (O'Connor, J., concurring) ("The Court has held that a statute *or practice* that plainly embodies an intentional discrimination among religions must be closely fitted to a compelling state purpose in order to survive constitutional challenge.") (emphasis added). And the Court reiterated this interpretation in *County of Allegheny v. ACLU Greater Pittsburgh Chapter*, describing *Larson* as "requir[ing] 'strict scrutiny' of *practices* suggesting a 'denominational preference.'" 492 U.S. 573, 608–09 (1989) (quoting *Larson*, 456 U.S. at 246) (emphasis added).

Moreover, several lower courts have applied *Larson* to unwritten, religiously discriminatory practices. *See, e.g.*, *Warrior v. Gonzalez*, No. 08-cv-00677, 2013 WL

6174788, at *8 (E.D. Cal. Nov. 20, 2013) (applying *Larson* to correctional officers' practice of subjecting Muslim prisoners to body-cavity searches before and after Ramadan programming, but not subjecting prisoners of other faiths to such searches before and after comparable religious programming); *Rouser v. White*, 630 F. Supp. 2d 1165, 1196 (E.D. Cal. 2009) (applying *Larson* to several prison practices that disfavored Wiccan prisoners); *Adair v. England*, 183 F. Supp. 2d 31, 48 (D.D.C. 2002) (applying *Larson* where "the plaintiffs clearly allege[d] that the Navy, through its policies *and practices*, [was] favoring chaplains of liturgical Christian faiths" (emphasis added)), *aff'd sub nom. In re Navy Chaplaincy*, No. 19-5204, 2020 WL 11568892 (D.C. Cir. Nov. 6, 2020); *cf. Bacus v. Palo Verde Unified Sch. Dist.*, No. 99-57020, 2002 WL 31724273, 52 F. App'x 355, 357 (9th Cir. Dec. 3, 2002) (citing *Larson* in holding that school board's practice violated Establishment Clause). As these cases illustrate, there is no basis for applying *Larson* only to discriminatory written policies and not to discriminatory practices. Accordingly, *Larson* is the appropriate mode of analysis here because Defendants' practices (and/or policies) are plainly discriminatory.

> **B.     It is, at a minimum, plausible that Defendants' religious questioning fails strict scrutiny.**

Under strict scrutiny, the government bears the burden of showing that its religious questioning is justified by a compelling interest and closely fitted to that interest. *See Larson*, 456 U.S. 246–47. At the motion-to-dismiss phase, a plaintiff's allegations that the government cannot meet this high burden need only be "plausible." *See Iqbal*, 556 U.S. at 678 (quoting *Twombly*, 550 U.S. at 570). Furthermore, to survive a motion to dismiss, "a plaintiff need not allege facts negating issues on which the defendant carries the burden of proof." *Duronslet v. County of Los Angeles*, 266 F. Supp. 3d 1213, 1223 (C.D. Cal. 2017) (citing *ASARCO, LLC v. Union Pac. R. Co.*, 765 F.3d 999, 1004 (9th Cir. 2014), and *Albino v. Baca*, 747 F.3d 1162, 1169 (9th Cir. 2014)).

Thus, because the strict-scrutiny analysis is fact-intensive, and because the government bears the burden of proof, it is typically inappropriate at this early stage of litigation to hold that the government has satisfied strict scrutiny. For example, in *Askins*, the district court had granted a motion to dismiss a challenge to restrictions on photography at the border, reasoning that the restrictions survived heightened scrutiny because of the government's interest in "border security." 899 F.3d at 1044– 45. On appeal, however, the Ninth Circuit reversed, holding that the asserted national security interest was "too thin to justify judgment for the government on a motion to dismiss." *Id.*; *see also Frudden v. Pilling*, 742 F.3d 1199, 1207 (9th Cir. 2014) ("Whether Defendants' 'countervailing interest is sufficiently compelling' . . . is a question for summary judgment or trial." (citation omitted)); *Witt v. Dep't of Air Force*, 527 F.3d 806, 821 (9th Cir. 2008); *NAACP of San Jose/Silicon Valley v. City of San Jose*, 562 F. Supp. 3d 382, 400 (N.D. Cal. 2021); *Duronslet*, 266 F. Supp. 3d at 1223 (whether government action can survive heightened scrutiny is a "fact-dependent inquir[y] that [is] unsuitable for resolution at the pleading stage").

In its previous strict-scrutiny analysis, the Court noted that "the Complaint does not allege why Plaintiffs Kariye and Mouslli are on government watchlists or what was included in the contents of Plaintiff Shah's notebook—the key facts that appear to have precipitated the incidents of religious questioning." Op. 49. In their Amended Complaint, Plaintiffs have filled in those details.

The Amended Complaint plausibly alleges that Imam Kariye and Mr. Mouslli are law-abiding citizens with no criminal records who were unjustly and improperly placed on the U.S. government's watchlist. FAC ¶¶ 81–83, 127–29. The bar for placement on the watchlist is extraordinarily low—in essence, suspicion that an individual might be suspicious. *Id.* ¶ 84. Under the government's own rules, concrete facts are not necessary to meet this standard. *Id.* ¶ 85. Because the standard for placement on the watchlist is hollow and circular, government errors and reliance on unjustified suspicion are common. *Id.* ¶ 84. The fact that some courts have upheld the

legality of the watchlist in general, *see* Op. 48, does not undermine the plausibility of Plaintiffs' allegations that their specific placement was improper—and it is certainly not a basis for holding that the religious questioning of Plaintiffs satisfies strict scrutiny. *See Witt*, 527 F.3d at 821 (reversing dismissal because development of the record was necessary to resolve fact-intensive questions regarding defendants' ability to meet heightened scrutiny).

Likewise, Mr. Shah alleges that he is a law-abiding citizen with no criminal record and no connection to terrorism, and that the contents of his notebook had nothing to do with criminal activity or terrorism. FAC ¶¶ 151, 176–78. These new allegations make clear that there was nothing suspicious in Mr. Shah's journal that could have possibly justified questions about his religious beliefs, practices, and associations. *Cf.* Op. 59. Mr. Shah does not know why, or pursuant to what standards, his detention was labeled as "Terrorist Related," and it is more than plausible that this label was inappropriate and unjustified. FAC ¶ 181.

The Amended Complaint also describes at length how Islamic religious belief and practice are not any indication of criminal or other wrongdoing. *Id.* ¶¶ 32–38. Religiosity of any kind, including Muslim religiosity, is not predictive of violence or terrorism. *Id.* ¶ 36. Defendants do not explicitly dispute the accuracy of these assertions, and even if they did, the Court must assume the truth of Plaintiffs' well-pled allegations on a motion to dismiss.

Plaintiffs respectfully request that the Court revisit its strict-scrutiny analysis in light of these new allegations in the Amended Complaint, which make even clearer that Defendants' religious questioning fails this "rigorous standard." *See Holt v. Hobbs*, 574 U.S. 352, 364 (2015).

To meet their burden of proving a "compelling interest" for the purposes of strict scrutiny, Defendants must not only demonstrate an interest of the highest order, but they also must show that the challenged conduct "actually furthers" the asserted interest. *See id*. While the government undoubtedly has an interest in "protecting its

borders" and interdicting terrorists, Def. Br. 3, 22–23, the existence of that interest in the abstract does not suffice under this prong of strict scrutiny. *See Gonzales v. O Centro Espirita Beneficente Uniao do Vegetal*, 546 U.S. 418, 438 (2006). Yet Defendants have failed to explain how the religious questions asked of Plaintiffs *actually advance* their border-security objectives.

Defendants also fail to meet their burden of showing that the religious questioning of Plaintiffs is closely fitted to the government's interest. As the Ninth Circuit has explained, "[i]f there are two alternative explanations, one advanced by defendant and the other advanced by plaintiff, both of which are plausible, plaintiff's complaint survives"; a defendant's arguments must be "so convincing that plaintiff's explanation is *im*plausible." *See Starr*, 652 F.3d at 1216. Plaintiffs plausibly allege that Defendants' questions regarding religion are entirely irrelevant to border protection and the detection of actual terrorists. FAC ¶ 38; *see also id.* ¶¶ 32–37 (explaining lack of connection between Islamic beliefs and practices and terrorism). In response, Defendants have not provided *any* explanation as to how these questions are necessary to their interests, or why other, non-religious questions would not suffice. *See id.* ¶ 197.

Defendants' argument that their questions were narrowly tailored boils down to misdirection. *See* Def. Br. 23–24. They cherry-pick from the numerous questions asked of Plaintiffs and describe others at a high level of generality, stating that the inquiries "relate to, *among other things*, topics like their purpose of travel and individuals with whom they associated while abroad." *Id.* at 23 (emphasis added). Defendants neglect to mention that, *among other things*, Plaintiffs were asked:

- What type of Muslim are you?
- Are you Sunni or Shi'a?
- Do you attend mosque?
- How many times a day do you pray? and
- How religious do you consider yourself?

FAC ¶¶ 70, 110, 114, 118, 123. These questions have nothing to do with Plaintiffs' "purpose of travel," or any other conceivable governmental interest. *Cf.* Def. Br. 23. Defendants have not explained why they would possibly need to know, for instance, how often Mr. Mouslli prays, *see* FAC ¶¶ 114, 123, or Imam Kariye's religious views on music, *see id.* ¶ 70. Indeed, even the questions that Defendants characterize as "relate[d]" to Plaintiffs' purpose of travel were not narrowly tailored to avoid unnecessary intrusion on First Amendment rights. Def. Br. 23–24. For example, border officers could have simply asked Imam Kariye about the purpose of his September 2017 trip, without asking whether he had been on the Hajj previously. FAC ¶ 58. And even if Defendants could somehow present evidence establishing that questions about Plaintiffs' personal religious beliefs and practices are necessary and tailored to border security, such evidence is inappropriate at this stage of the litigation—which is why courts so rarely resolve the strict-scrutiny analysis in a defendant's favor on a motion to dismiss. *See Frudden*, 742 F.3d at 1207.

Defendants also err in arguing that the religious questioning of Imam Kariye and Mr. Mouslli is narrowly tailored because they were on a government watchlist. *See* Def. Br. 23–24. As Plaintiffs have plausibly alleged, the details about their religious practice are irrelevant to the detection of terrorism. FAC ¶¶ 33–38. Their watchlist status cannot transform sweeping questions about religiosity into tailored ones. More generally, it cannot be the case that, because a person is on a watchlist, the government has *carte blanche* to ask him any questions whatsoever about his religion—particularly where, as here, that person has no ties to terrorism. The fact that a person is on a watchlist does not end the inquiry into whether a border stop violated his constitutional rights. *See*, *e.g.*, *Wilwal v. Nielsen*, 346 F. Supp. 3d 1290, 1304–06 (D. Minn. 2018) (denying motion to dismiss constitutional claims relating to border search of a watchlisted person); *El Ali*, 473 F. Supp. 3d at 519–21 (similar).

Likewise, the fact that Mr. Shah's journal contained religious content is not a basis for intrusive questions about his protected beliefs and practice, which have no

connection to violence or terrorism. *Cf.* Def. Br. 23–24. And insofar as Mr. Shah was "cautious," it was a reasonable response to agents' questioning about sensitive and private beliefs in a coercive environment—not grounds for even more religious questioning. *See* FAC ¶¶ 148–61, 175. Nor does border officers' post-hoc application of a "Terrorist Related" label on their notes justify such questioning, particularly because Mr. Shah has no ties to terrorism. *Id.* ¶¶ 175–78.

Finally, Defendants' reliance on *Tabbaa v. Chertoff*, 509 F.3d 89 (2d Cir. 2007), is misplaced. Def. Br. 23–25. First, *Tabbaa supports* Plaintiffs' position on the applicable legal framework: the Second Circuit emphasized that even if a border search is "routine" under the Fourth Amendment, it may still violate the First Amendment. 509 F.3d at 102 n.4. Second, *Tabbaa* was decided at summary judgment, with an evidentiary record—not on a motion to dismiss. The government presented evidence that it had received intelligence information raising "specific concerns" about a conference attended by the plaintiffs. *Id.* at 93. CBP officers detained conference attendees returning to the United States and subjected them to questioning about "their past travels, their relationship to other vehicle occupants, what occurred at the [] Conference, and why they had attended the conference." *Id.* at 94. Based on that record, the court held that the questioning was narrowly tailored to the government's interest in protecting against terrorism. *Id.* It concluded that the government's evidence established that its actions were "*necessary* to confirm the identities of conference attendees attempting to cross the border." *Id.* (emphasis added). By contrast, border officers' questions here—such as, "How many times a day do you pray?" and "How religious do you consider yourself?", FAC ¶¶ 114, 156—bear no relationship to the government's interest in protecting the border or detecting terrorists. And Defendants certainly have not proven, with evidence, that these questions are *necessary* to furthering those interests.

### C.   Defendants plausibly violate the *Kennedy* test.

In the Amended Complaint, Plaintiffs have incorporated new allegations in support of their claim that Defendants' religious questioning violates the Supreme Court's test in *Kennedy*, a decision issued the same day that Plaintiffs' opposition to Defendants' first motion to dismiss was due. *See* FAC ¶¶ 39–53. Plaintiffs respectfully request that the Court revisit its earlier analysis of the *Kennedy* test, which did not have the benefit of these new allegations or substantial briefing from Plaintiffs on the subject.

In *Kennedy*—a case that did not involve denominational targeting or the *Larson* test—the Supreme Court applied a "historical practices and understandings" analysis under the Establishment Clause. *Kennedy*, 142 S. Ct. at 2427 (quoting *Town of Greece v. Galloway*, 572 U.S. 565, 575 (2014)). This mode of analysis requires courts to look to "original meaning and history," *id.*, and to consider whether a challenged practice "fits within the tradition[s] long followed" in the United States. *Town of Greece*, 572 U.S. at 577. Defendants' religious questioning, including the discriminatory targeting of Muslims, fails this test because it does not fit within any American tradition; it simply does not "accord with history and faithfully reflect the understanding of the Founding Fathers." *See Kennedy*, 142 S. Ct. at 2428 (cleaned up).

First, there is no American history or tradition of routine questioning of U.S. citizens in a coercive environment about their religion, or of retaining that information for decades and sharing it widely. FAC ¶¶ 50–53. Quite the contrary—as the example of the mandatory decennial U.S. census makes clear. Responses to the decennial census are required by law, *id.* ¶¶ 51–53, and over the decades, it has included many granular and intrusive questions. But the U.S. Census Bureau has repeatedly refused to incorporate questions regarding individual religious beliefs, practices, and associations, out of concern that they would violate the First Amendment's religion

clauses. *Id.*[4] In 1976, Congress reinforced the U.S Census Bureau's decision not to compel Americans to share their religious beliefs with the government. It enacted a law, still applicable today, providing that "no person shall be compelled to disclose information relative to his religious beliefs or to membership in a religious body" as part of the census. *See* 13 U.S.C. § 221(c).

Second, Defendants' discriminatory questioning contravenes the Founders' commitment to denominational neutrality. The Framers intended the First Amendment's Religion Clauses to protect religious belief and exercise from unjustified government inference; to prohibit religious coercion; and to ensure that all religions, including minority faiths, are treated equally by the government, with no preference for one. FAC ¶¶ 39–49. Framers such as Thomas Jefferson and James Madison (the architect of the First Amendment) embraced these principles to steer America away from its early days of religious strife and persecution. *See Everson*, 330 U.S. at 10. Their vision of protection against religious persecution extended to "small, new, or unpopular denominations," *see Larson*, 456 U.S. at 245; FAC ¶¶ 39–49; and Jefferson's writings on religious liberty explicitly promoted respect for minority faiths, including Islam. *See* FAC ¶ 45. Moreover, the Supreme Court has, in a long line of cases, repeatedly recognized the principle of denominational neutrality and its roots in the Founding era. *See, e.g.*, *Everson*, 330 U.S. at 15 ("Madison's vision—freedom for all religion . . . naturally assumed that every denomination would be equally at liberty to exercise and propagate its beliefs. But such equality would be impossible in an atmosphere of official denominational preference."); *Larson*, 456 U.S. at 255 (referring to "the official denominational preference that the Framers of the First Amendment forbade"); *McGowan v. Maryland*, 366 U.S. 420,

---

[4] *See, e.g.*, Kevin M. Schultz, *Religion as Identity in Postwar America: The Last Serious Attempt to Put a Question on Religion in the U.S. Census*, 93 J. of Am. History 359, 362 & n.2 (Sept. 2006) (although the government has at times collected information about the size, property ownership, and finances of religious bodies, the mandatory decennial census has "never . . . asked about an individual's faith").

464 (1961) (Frankfurter, J., concurring) (noting the Framers' intent to protect "unpopular creeds" from the "persecutions and impositions of civil disability").[5]

Defendants attempt to cast this critical history aside as too "general" to be relevant, *see* Def. Br. 15, but *Kennedy* included historical analysis at a similar level of generality, *see* 142 S. Ct. at 2431. The *Kennedy* Court looked to "a long constitutional tradition under which learning how to tolerate diverse expressive activities has always been 'part of learning how to live in a pluralistic society,'" and stated that there is "no historically sound understanding of the Establishment Clause that begins to 'mak[e] it necessary for government to be hostile to religion.'" *Id.* (quoting *Lee*, 505 U.S. at 590, and *Zorach v. Clauson*, 343 U.S. 306, 314 (1952)). The Founding principles of denominational neutrality, endorsed by the Framers and recounted in the Supreme Court's jurisprudence, are thus directly relevant "historical practices and understandings" that go to the heart of Plaintiffs' claims here. *See id.*

Defendants observe that the government has long had power at the border to search people and things. Def. Br. 16. But the relevant question under *Kennedy* is about "historical practices and understandings" with respect to religion. And on that matter, Defendants have no argument. The "specific conduct at the international border" challenged here, *id.* at 15, is questioning U.S. citizens *about their religious beliefs and practices*—not all border questioning. Defendants provide no historical example of a government practice of subjecting U.S. citizens to coercive questioning about their religion at the border or elsewhere. While there is a narrow border-search exception to the Fourth Amendment's warrant requirement,[6] there is no comparable

---

[5] *See also, e.g.*, *Bd. of Educ. of Kiryas Joel Vill. Sch. Dist. v. Grumet*, 512 U.S. 687, 707 (1994) ("[I]t is clear that neutrality as among religions must be honored."); *Roemer v. Bd. of Pub. Works of Md.*, 426 U.S. 736, 745-46 (1976) ("The Court has enforced a scrupulous neutrality by the State, as among religions[.]"); *Epperson*, 393 U.S. at 103–04 (stating that government "may not be hostile to any religion").

[6] If anything, the narrowness of the Fourth Amendment border-search doctrine supports Plaintiffs' position. The Court's previous analysis did not mention *United States v. Cano*, 934 F.3d 1002, 1013, 1016–17 (9th Cir. 2019)—the most recent major

<span style="float:right">(cont'd)</span>

border exception to traditional First Amendment standards. *See Askins*, 899 F.3d at 1045 (applying First Amendment to challenges regarding conduct at the border); *Guan v. Mayorkas*, 530 F. Supp. 3d 237, 263 (E.D.N.Y. 2021) (same); *House v. Napolitano*, No. 11-cv-10852, 2012 WL 1038816, at *13 (D. Mass. Mar. 28, 2012) ("That the initial search and seizure occurred at the border does not strip [plaintiff] of his First Amendment rights[.]"); *cf. United States v. Ramon*, 86 F. Supp. 2d 665, 677 (W.D. Tex. 2000) (holding that Border Patrol's policy of stopping vehicles with religious symbols violated RFRA).

Defendants argue that Congress has implicitly approved questioning about the religion of non-citizens seeking a religious-worker visa or religious refugee status, Def. Br. 16 (citing 8 U.S.C. § 1101(a)(27)(C), (42)), but that is patently irrelevant. Plaintiffs here are U.S. citizens, entitled to the full protection of the First Amendment, and they will not be seeking religious-worker visas or religious refugee status in the United States. Because the U.S. government cannot determine eligibility for this visa or refugee status without asking questions about religion, such questions are far more likely to satisfy strict scrutiny. Here, however, as Plaintiffs have plausibly alleged, Defendants can detect terrorists without asking Plaintiffs how many times a day they pray or what mosque they attend.

### D. Defendants plausibly violate the coercion test.

Plaintiffs have also adequately alleged Establishment Clause violations under the coercion test. Religious coercion is one of "the foremost hallmarks of religious establishments the framers sought to prohibit when they adopted the First Amendment." *Kennedy*, 142 S. Ct. at 2429. Under this test, the government may not "coerce anyone to support or participate in religion." *Lee*, 505 U.S. at 587.

---

Ninth Circuit decision on border device searches. *Cf.* Op. 35, 57. In *Cano*, the Court emphasized that a border search may not be conducted for "general law enforcement purposes," and that all border searches—including suspicionless searches—must be "limited in both purpose and scope to searches for contraband." *See* 934 F.3d at 1013, 1016–17, 1021.

Conversely, the government may not coerce or "influence" a person into *not* practicing religious beliefs. *See Everson*, 330 U.S. at 15.

Here, when flagged for secondary inspection, Plaintiffs are required to go with a government officer, armed with a gun, to an area separated from other travelers— often a windowless room. FAC ¶¶ 26–27. There, they are subjected to additional searches and questioning by armed officers. *Id*. They may not leave without permission—and Plaintiffs reasonably believe that if they do not answer all questions, they will not be permitted to leave and will be subject to additional and lengthy scrutiny. *Id.* ¶¶ 27–28, 55, 59, 63, 67, 73, 78, 107, 111, 119, 124, 150, 151, 158, 168.

In this environment, Defendants' questioning constitutes religious coercion in at least three respects. First, Plaintiffs have no meaningful choice but to profess their religious beliefs in response to border officers' inquiries, in violation of the principle that the government cannot "force [a person] to profess a belief or disbelief in any religion." *See Everson*, 330 U.S. at 15. For instance, border officers ask questions such as, "I assume you're a Muslim, aren't you?", FAC ¶ 77, and "What religion are you?", *id.* ¶ 156; *see also id.* ¶¶ 58, 114, 118, 123, 156 (questions about mosque attendance); *id.* ¶¶ 70, 110, 118 (questions about Islamic denomination). This questioning is reasonably "experienced as obligatory" by Plaintiffs. *See Mellen v. Bunting*, 327 F.3d 355, 372 (4th Cir. 2003); *see also Lee*, 505 U.S. at 593. Second, by singling out Muslims for this type of questioning, border officers penalize Plaintiffs because they are Muslim, violating the principle that the government cannot "punish[]" a person for "entertaining or professing religious beliefs." *See Everson*, 330 U.S. at 15. Not only does the questioning stigmatize Plaintiffs for being Muslims, but it is intrusive, humiliating, and time-consuming. Finally, Defendants' religious questioning coerces Plaintiffs into *not* fully practicing their faith. Plaintiffs forgo physical acts of prayer and other external displays of religiosity, contrary to their sincerely held religious beliefs, in order to avoid further CBP scrutiny and questioning. FAC ¶¶ 98–103, 140–42, 186–87; *see infra* § II.A.

## II.   Plaintiffs plausibly allege RFRA and free-exercise violations.

The Religious Freedom Restoration Act of 1993 ("RFRA") applies strict scrutiny to any federal government action that "substantially burden[s] a person's exercise of religion even if the burden results from a rule of general applicability." 42 U.S.C. § 2000bb-1(a)–(b). Similarly, the Free Exercise Clause "protect[s] religious observers against unequal treatment" and against governmental action that imposes "special disabilities" based on religious status. *Trinity Lutheran Church of Columbia, Inc. v. Comer*, 137 S. Ct. 2012, 2019 (2017) (quoting *Church of the Lukumi Babalu Aye, Inc. v. City of Hialeah*, 508 U.S. 520, 533, 542 (1993)). Government conduct that treats individuals unequally because of their religious identity is subject to the "strictest scrutiny" and must be narrowly tailored to advance a government interest of the "highest order." *Id.* (quoting *McDaniel v. Paty*, 435 U.S. 618, 628 (1978)). Plaintiffs have plausibly alleged that Defendants' religious questioning violates RFRA because it substantially burdens their religious exercise and is not the least restrictive means of achieving a compelling interest. Similarly, Plaintiffs have plausibly alleged free-exercise violations by pleading facts showing that Defendants' religious questioning is not religiously neutral and is not narrowly tailored to a compelling interest.

### A.   Plaintiffs plausibly allege a substantial burden.

Under RFRA, the government substantially burdens religious exercise "when individuals are forced to choose between following the tenets of their religion and receiving a governmental benefit" or are "coerced to act contrary to their religious beliefs by the threat of civil or criminal sanctions." *Navajo Nation v. U.S. Forest Serv.*, 535 F.3d 1058, 1070 (9th Cir. 2008) (en banc). Even if such pressure is "indirect," "the infringement upon free exercise is nonetheless substantial." *Id.* at 1069 n.11 (quoting *Thomas v. Rev. Bd. of Ind. Emp. Sec. Div.*, 450 U.S. 707, 718 (1981)); *see also, e.g., Vernon v. City of Los Angeles*, 27 F.3d 1385, 1393 (9th Cir. 1994) (quoting *Thomas* for the same proposition). Plaintiffs have plausibly alleged a substantial

burden here.[7]

By persistently singling out Muslims for religious questioning and not routinely asking such intrusive questions of people of other faiths, Defendants force Plaintiffs into the untenable choice contemplated by *Navajo Nation*. The government's conduct forces Plaintiffs to choose between, on the one hand, being Muslim—and, on the other, being treated just like any other law-abiding citizen and receiving CBP's permission to reenter the country without undue scrutiny of their faith. As the Amended Complaint alleges, the relevant "benefit" is *not* the Plaintiffs' ability to reenter the United States, *cf.* Op. 44, but rather the ability to do so without protracted, unjustified, and humiliating questioning regarding their religious beliefs and practices, FAC ¶¶ 104, 143, 188. Plaintiffs are forced to make this choice because under Defendants' policy and/or practice, Muslims are targeted for detrimental treatment when returning to the United States, while other citizens are not. In short, Plaintiffs are punished for being Muslim.[8]

At the same time, Defendants force Plaintiffs to choose between outward

---

[7] Although Plaintiffs have plausibly alleged a substantial burden under *Navajo Nation*, that standard must be understood in light of *Ohno v. Yasuma*, 723 F.3d 984 (9th Cir. 2013), and *Jones v. Slade*, 23 F.4th 1124 (9th Cir. 2022), which post-date *Navajo Nation* and clarify what constitutes a substantial burden. Under *Ohno*, government conduct imposes a substantial burden where it has a "tendency" to "coerce individuals into acting contrary to their religious beliefs." 723 F.3d at 1011. Under *Jones*, so too does government conduct that "[m]ore subtly" and "indirectly" impacts religious exercise by "discouraging" a person "from doing that which he is religiously compelled or encouraged to do." 23 F.4th at 1140 (discussing statute that mirrors RFRA). Since the Ninth Circuit has vacated its decision in *Apache Stronghold v. United States*, 38 F.4th 742, 753–68 (9th Cir.), 56 F.4th 636 (9th Cir. 2022), both *Ohno* and *Jones* remain relevant. In any event, Plaintiffs have plausibly alleged a substantial burden under any understanding of the requirement.

[8] Contrary to Defendants' suggestion, *see* Def. Br. 22, the fact that border officers eventually told Mr. Shah he could leave secondary inspection without his cell phone—*after* he had already been detained, and *after* he had answered religious questions—is irrelevant to the reasonableness of Plaintiffs' belief that they were not free to leave secondary inspection unless they answered Defendants' questions.

displays of religiosity and avoiding *additional* religious questioning. Because Defendants' questions are aimed at detecting Plaintiffs' religiosity as Muslims, Plaintiffs are pressured to avoid or minimize central acts of faith that will further draw attention to their Muslim identity and risk an extended scope and duration of religious questioning.[9] Indeed, because of the coercive nature of Defendants' religious questioning, Imam Kariye and Mr. Mouslli both refrain from physical acts of prayer in airports and the border when returning from international travel. FAC ¶¶ 98, 101, 140–42. Imam Kariye also forgoes religious attire and avoids carrying religious texts when returning from international travel. *Id.* ¶¶ 98–99, 102.[10] And due to the pressure of religious questioning, Mr. Shah will no longer travel with his religious journal and will cease documenting his religious thoughts and expression during his travels abroad. *Id.* ¶¶ 186–87. These coerced changes in Plaintiffs' religious practices constitute a substantial burden.[11]

Respectfully, the Court and Defendants have erred in characterizing the burdens Plaintiffs experience as "subjective chilling effects." *See* Op. 38–42; Def.

---

[9] While these practices are central to Plaintiffs' faith, such centrality is not required under RFRA. "Religious exercise" includes "any exercise of religion, whether or not compelled by, or central to, a system of religious belief." *See* 42 U.S.C. § 2000cc–5(7)(A) (as incorporated into RFRA by 42 U.S.C. § 2000bb–2(4)).

[10] Defendants err in arguing that Imam Kariye is no longer compelled to alter his religious behavior because he is no longer watchlisted. Def. Br. 20 n.5. As Imam Kariye plausibly alleges, he could be watchlisted again at any time. FAC ¶ 90. Given the numerous incidents of religious questioning he has previously experienced, it is plausible that he is substantially likely to again be subjected to such questioning.

[11] Plaintiffs respectfully request that the Court reconsider its analysis of *Fazaga v. FBI*, 965 F.3d 1015 (9th Cir. 2020), *reversed on other grounds*, 142 S. Ct. 1051 (2022), which supports Plaintiffs' allegations of a substantial burden. *See* Op. 45. A burden need not occur for a prescribed length of time to be substantial, and a burden is not lessened because it occurs during international travel. As is the case here, the *Fazaga* plaintiffs changed their religious practices to avoid governmental scrutiny, and the Ninth Circuit held that "the complaint substantively state[d] a RFRA claim against the Government Defendants." *Fazaga*, 965 F.3d at 1061. The opinion was not vacated by the Supreme Court and that portion remains controlling law.

Br. 19–21. The phrase "subjective chill" has its origins in *Laird v. Tatum*, where the plaintiffs challenged an Army data-gathering program—the "principal sources" for which were "news media and publications in general circulation"—on the sole ground that they were chilled by it. 408 U.S. 1, 6, 10, 13 (1972). They did not allege that the data-collection was itself unlawful, and they "'complain[ed] of no specific action of the Army against them.'" *Id.* at 9 (quoting *Tatum v. Laird*, 444 F.2d 947, 953 (D.C. Cir. 1971)). By contrast, here, Defendants' questioning and collection of data about Plaintiffs' private religious beliefs and practices directly interferes with Plaintiffs' First Amendment rights. Plaintiffs are confronted, in person, by armed border officers who detain them in a coercive environment; are subjected to compulsory and stigmatizing questioning about their faith; and are penalized for being Muslim—a far cry from the subjective chilling effects in *Laird* and its progeny.

Moreover, as the Supreme Court and Ninth Circuit have repeatedly held, even chilling effects give rise to First Amendment violations where "'the challenged exercise of governmental power [i]s regulatory, proscriptive, or compulsory in nature.'" *Vernon,* 27 F.3d at 1394 (quoting *Laird*, 408 U.S. at 11); *see Am. Fam. Ass'n v. City & County of San Francisco*, 277 F.3d 1114, 1124 (9th Cir. 2002). Where government action is compulsory—like CBP's questioning here—the action itself creates the requisite burden and interference with Plaintiffs' rights.

The facts of *Vernon* and *Dousa v. DHS*, 19-cv-1255, 2020 WL 434314 (S.D. Cal. Jan. 28, 2020), are readily distinguishable. *Cf.* Def. Br. 19–20; Op. 38–41. In *Vernon*, "no specific inquiry was made into Vernon's religious beliefs," and his free-exercise claim was dismissed on *summary judgment* because he failed to produce evidence of an *actual* chill on his religious practice. 27 F.3d at 1390, 1395. In *Dousa*, the plaintiff's claim was dismissed because she failed to connect her decision to change her religious practices with a "threat of specific future harm." 2020 WL 434314, at *8 (quoting *Vernon*, 27 F.3d at 1395). Here, Plaintiffs plausibly allege that they are, in fact, making specific modifications to their religious practices—prayer,

religious dress, and the carrying of religious texts—because of the threat of the specific future harm of additional religious questioning. *See* FAC ¶¶ 98–102, 140–42, 186–87. Moreover, they allege that Defendants engage in a policy and/or practice of targeting Muslims because of their faith. *See* Op. 27–32. Neither *Vernon* nor *Dousa* involved similar allegations of harm or a widespread, discriminatory practice.

Because Plaintiffs have plausibly alleged a substantial burden on their religious practice, strict scrutiny applies. For the reasons above, *see supra* § I.B, Defendants fail to meet their burden under that exacting standard.[12]

> **B.** **Plaintiffs are not required to plead a substantial burden under the Free Exercise Clause because they plausibly allege conduct that is neither religiously neutral nor generally applicable.**

Plaintiffs respectfully request that the Court reconsider its holding that they are required to allege a substantial burden under the Free Exercise Clause. *See* Op. 38. "Under [Supreme Court] precedents, a plaintiff may carry the burden of proving a free exercise violation in various ways, including by showing that a government entity has burdened his sincere religious practice pursuant to a policy that is not 'neutral' or 'generally applicable.'" *Kennedy*, 142 S. Ct. at 2422 (quoting *Emp. Div., Dep't of Hum. Res. of Or. v. Smith*, 494 U.S. 872, 877 (1990)). Any governmental practice that is not neutral must be "justified by a compelling interest [that] is narrowly tailored to advance that interest." *Church of the Lukumi*, 508 U.S. at 533. It is simply not necessary to demonstrate a substantial burden in this form of free-exercise analysis. *See, e.g.*, *Kennedy*, 142 S. Ct. at 2422 (analyzing non-neutral school district directive without requiring a substantial burden); *Brown v. Borough of Mahaffey*, 35 F.3d 846, 849–50 (3d Cir. 1994) (explaining why a plaintiff need not show a substantial burden where government action is not neutral toward religion).

---

[12] Contrary to Defendants' assertions, the changes to the relevant allegations of burden in the Amended Complaint are neither "superficial" nor "conclusory." Def. Br. 19. What Plaintiffs experience at the border is coercion under the First Amendment, and the Amended Complaint more faithfully characterizes Plaintiffs' experience.

Over the last five years, the Supreme Court has evaluated free-exercise challenges to non-neutral governmental conduct eight times, and did not, in any of those cases, require a showing of a "substantial burden." *See Kennedy*, 142 S. Ct. 2407, 2421 (2022); *Carson v. Makin*, No. 20-1088, 2022 WL 2203333, at *7 (U.S. June 21, 2022); *Fulton v. City of Philadelphia*, 141 S. Ct. 1868, 1878 (2021); *Tandon v. Newsom*, 141 S. Ct. 1294, 1296 (2021); *Roman Cath. Diocese of Brooklyn v. Cuomo*, 141 S. Ct. 63, 66 (2020); *Espinoza v. Mont. Dep't of Revenue*, 140 S. Ct. 2246, 2255 (2020); *Trinity Lutheran,* 137 S. Ct. at 2021; *Masterpiece Cakeshop v. Colo. Civ. Rts. Comm'n*, 138 S. Ct. 1719, 1729 (2018). In the last two months, applying *Kennedy*, the Ninth Circuit has likewise decided a free-exercise case without imposing a substantial-burden requirement. *See Waln v. Dysart Sch. Dist.*, 54 F.4th 1152, 1161 (9th Cir. 2022) (requiring government to satisfy strict scrutiny where school district policy was "not generally applicable").[13]

This mode of analysis—applying strict scrutiny to governmental conduct that is not religiously neutral or generally applicable, in accordance with *Lukumi*—is not limited to laws and regulations. *Cf.* Def. Br. 18. The Supreme Court has applied this analysis to several types of official actions, including an anti-discrimination provision in a government contract, *Fulton*, 141 S. Ct. at 1876–81, a decision by a state civil-rights commission, *Masterpiece Cakeshop*, 138 S. Ct. at 1729–32, and most recently, a school district's directive issued to an employee, *Kennedy*, 142 S. Ct. at 2422–23. Moreover, the Ninth Circuit's recent ruling in *Waln* involved the selective enforcement of a school district policy. *See* 54 F.4th at 1161.

*American Family Association, Inc. v. City & County of San Francisco*, 277 F.3d 1114 (9th Cir. 2002), does not compel a different result. *Cf.* Def. Br. 18. In that

---

[13] Notably, after the school district in *Kennedy* conceded that its prayer directive was not neutral or generally applicable, the Ninth Circuit also applied strict scrutiny under the Free Exercise Clause. *Kennedy v. Bremerton Sch. Dist.*, 991 F.3d 1004, 1020 (9th Cir. 2021). Like the Supreme Court, the Ninth Circuit did not require or undertake a substantial-burden analysis. *See id.*

opinion, the court observed that "there does not appear to be any case in this circuit applying *Smith* or *Lukumi* to some non-regulatory or non-compulsory governmental action—in other words, to something other than an actual law." *Id.* at 1124. In context, it is evident that *American Family* required a substantial burden because the challenged government conduct consisted of nonbinding, symbolic resolutions and a letter issued by a board of supervisors. *See id.* at 1124. The resolutions and letter were not "compulsory" and had no material impact whatsoever on the plaintiffs. *Id.* By contrast, Plaintiffs here challenge direct, compulsory questioning about their religious beliefs and practices by government border officers in a coercive environment. Furthermore, in the 21 years since *American Family*, the Ninth Circuit's application of *Lukumi* has not been limited to challenges involving statutes and regulations. *See, e.g.*, *Waln*, 54 F.4th at 1161.

*California Parents for the Equalization of Educational Materials v. Torlakson*, 973 F.3d 1010 (9th Cir. 2020) likewise does not compel a different result. *Cf.* Def. Br. 18. Respectfully, the Court's prior opinion quoted from the Ninth Circuit's characterization of the district court's holding, not from the Ninth Circuit's actual analysis. *Compare* Op. 38, *with Cal. Parents*, 973 F.3d at 1016. The Ninth Circuit's own analysis does not mention a "substantial burden." *See id.* at 1019–20. Instead, the court simply required some "interference" and held that "[o]ffensive content that does not penalize, interfere with, or otherwise burden religious exercise does not violate Free Exercise rights." *Id.* at 1020. Here, Plaintiffs do not challenge merely offensive content, but rather, invasive religious questioning in a coercive environment.

As this Court previously held, "Plaintiffs have sufficiently alleged the existence of an official practice, policy or custom of targeting Muslim Americans for religious questioning[.]" Op. 32. Such a practice, policy, or custom is neither neutral nor generally applicable and must, therefore, overcome strict scrutiny under the Free Exercise Clause. Religious questioning fails that test. *See supra* § I.B.

Finally, Plaintiffs have plausibly alleged a free-exercise violation under the hostility principles set forth in *Masterpiece Cakeshop*. 138 S. Ct. at 1732. As the Supreme Court held there, official religious hostility in carrying out the law is "inconsistent with the First Amendment's guarantee that our laws be applied in a manner that is neutral toward religion." *See id.* at 1732. Here, while border officers are charged with enforcing various laws governing entry to United States, they may not do so with animus or suspicion toward certain travelers based on the travelers' faith. Officers' questioning of Plaintiffs regarding their Islamic beliefs and practices sends a clear message: the U.S. government views Islam as inherently suspicious and threatening to the United States. FAC ¶¶ 97, 139, 185. Such hostility to religion is inconsistent with the principles of religious freedom on which this country was founded, and it constitutes a plain violation of the Free Exercise Clause.

## III. Plaintiffs plausibly allege violations of their associational rights.

Where the government compels disclosure of protected associations, its actions are subject to exacting scrutiny, which requires "a substantial relation between the disclosure requirement and a sufficiently important governmental interest," and that the challenged requirement be "narrowly tailored." *Ams. for Prosperity Found. v. Bonta*, 141 S. Ct. 2373, 2383 (2021). Here, by compelling Plaintiffs to disclose sensitive associational information and retaining that information for decades, border officers do not further any valid government interest, and their questions are not narrowly tailored to the detection of terrorists. *See supra* § I.B. Defendants' arguments to the contrary are unavailing,

First, Defendants cite *United States v. Rubio*, 727 F.2d 786, 791 (9th Cir. 1983), for the unremarkable proposition that criminal investigation is not categorically "prohibited" when it interferes with First Amendment interests. Def. Br. 25. But that is beside the point. As Defendants themselves acknowledge, the First Amendment still applies in the context of criminal investigations. *See id.* at 26. And here, Plaintiffs allege First Amendment violations arising not from a factually predicated criminal

investigation, but from Defendants' use of the border as an information-gathering dragnet. In *Rubio*, the court held that the government's "narrowly drawn" warrant sufficiently protected the suspect's First Amendment interests. *Id.* at 790–92. In contrast, here, Defendants have no warrant, leaving Plaintiffs without that heightened degree of protection.

Defendants' reliance on *United States v. Arnold*, 533 F.3d 1003, 1010 (9th Cir. 2008), is also misplaced. In *Arnold*, the court applied Fourth Amendment doctrine to reject a sweeping rule that border officers must have "reasonable suspicion" to conduct a border search if there is a high risk that any expressive material will be exposed. 533 F.3d at 1006. The *Arnold* court reasoned that the plaintiff's proposed test would protect terrorist communications, be unworkable for government agents, and contravene precedent concerning the relationship between the Fourth and First Amendments. 533 F.3d at 1010. None of those factors are present in this case. Plaintiffs are not proposing a new Fourth Amendment standard for border searches. Nor do they seek to prohibit all questions related to associations. Rather, they seek the straightforward application of a bedrock First Amendment standard—exacting scrutiny—to the compelled disclosure of religious associations at the border.

Respectfully, the Court erred in its application of *Iqbal*'s plausibility standard to Plaintiffs' associational claims. *See* Op. 51. The relevant question is not whether Defendants have alleged a "plausible, substantial relation" between their compelled disclosure and governmental interests, or whether Defendants' questions about Imam Kariye's associations "could plausibly be considered questions related to his occupation."[14] Op. 51–52. Rather, the relevant question is whether *Plaintiffs'* allegations—that Defendants' questions are not narrowly tailored, and that there is no

---

[14] Even assuming that CBP has authority to ask a traveler to name his occupation for the purpose of verifying his identity, that does not give CBP free rein to interrogate U.S. citizens on any matter that might plausibly have some nexus to their occupation. And where, as here, border officers' questions intrude on First Amendment rights, exacting scrutiny applies. The questions asked of Plaintiffs fail that test.

"substantial relation" between the questions and a compelling interest—are plausible. *See Starr*, 652 F.3d at 1216–17 ("If there are two alternative explanations, one advanced by defendant and the other advanced by plaintiff, both of which are plausible, plaintiff's complaint survives a motion to dismiss[.]").

The Court further erred in brushing aside Plaintiffs' cited cases as irrelevant on the ground that they did not involve the border. *See* Op. 52–53. In particular, *Guan* involves both the border and the government's claimed interest in national security. *See Guan*, 530 F. Supp. 3d at 266, 273 & n.30 (plaintiffs stated associational claim where border questioning "exceeded the scope of questioning typically experienced by travelers in secondary inspection, as [it] did not relate to the admissibility of Plaintiffs or their belongings"). Plaintiffs' other cases are relevant for the proposition that compelled disclosure of associations can violate the First Amendment. *See* Op. 51–52 (citing *Ams. for Prosperity Found.*, 141 S. Ct. at 2379–89; *Shelton v. Tucker*, 364 U.S. 479, 488 (1960); *Bursey v. United States*, 466 F.2d 1059, 1085–88 (9th Cir. 1972); *Clark v. Libr. of Cong.*, 750 F.2d 89, 104 (D.C. Cir. 1984); *MacPherson v. I.R.S.*, 803 F. 2d 479, 484 (9th Cir. 1986)).

Finally, *Tabbaa*, 509 F.3d at 103, and *Humanitarian Law Project v. Reno*, 205 F. 3d 1130, 1133 (9th Cir. 2000), are distinguishable. *Cf.* Op. 53. In *Tabbaa*, on *summary judgment*, the defendants had submitted sufficient evidence that their interference with associational rights was "carefully circumscribed" and based on "specific intelligence," such that less restrictive measures would not have sufficed to serve the government's interests. 509 F. 3d at 103; *see supra* § I.B. Defendants here have made no similar showing, nor could they do so on a motion to dismiss. *Humanitarian Law Project* involved facts and legal claims entirely dissimilar to those here. 205 F.3d at 1133. There, the Ninth Circuit rejected the plaintiffs' claim that their associational rights were violated by a statute criminalizing the provision of material support to a terrorist group. *Id.* Plaintiffs here have no connection to terrorism, FAC ¶¶ 81–82, 127–28, 176–77, and present a compelled disclosure claim, a

fundamentally different type of associational freedom claim.

Just as Defendants have failed to provide evidence that religious questioning is the least restrictive means of intercepting terrorists at the border, *see supra* § I.B, Defendants have failed to satisfy the "substantial relation" and narrow-tailoring tests under *Americans for Prosperity Foundation*.[15] As Plaintiffs plausibly allege, Defendants have less restrictive alternatives at their disposal, FAC ¶ 221, including non-religious questions focused on whether a traveler's conduct has violated the law.

## IV.  Plaintiff Shah plausibly alleges a retaliation claim.

To state a First Amendment retaliation claim, a plaintiff must plausibly allege that "(1) he was engaged in a constitutionally protected activity, (2) the defendant's actions would chill a person of ordinary firmness from continuing to engage in the protected activity and (3) the protected activity was a substantial or motivating factor in the defendant's conduct." *O'Brien v. Welty*, 818 F.3d 920, 932 (9th Cir. 2016) (citation omitted). Here, Mr. Shah has plausibly alleged that (1) he engaged in constitutionally protected activity—documenting his religious expression and thoughts, and asserting his rights to border officers; (2) border officers subjected him to adverse actions, including religious and other intrusive questioning, extensive searches of his phone and journal, and longer detention, which would chill a person of ordinary firmness; and (3) his religious writing and statements invoking his rights were a substantial factor in the officers' conduct. FAC ¶¶ 146–175. In the Amended

---

[15] Contrary to Defendants' suggestion, Def. Br. 26, there is no requirement that a plaintiff establish that disclosure of his associations will subject him to violence. The Court in *Americans for Prosperity* rejected any such requirement by *facially* invalidating a regulation requiring charities to disclose to the state information about major donors. The Court held it "irrelevant . . . that some donors might not mind—or might even prefer—the disclosure of their identities," because "[t]he disclosure requirement 'creates an unnecessary risk of chilling' in violation of the First Amendment." *See* 141 S. Ct. at 2387–88 ("Exacting scrutiny is triggered by 'state action which may have the effect of curtailing the freedom to associate,' and by the '*possible* deterrent effect' of disclosure" (citation omitted)); *MacPherson*, 803 F.2d at 484 ("The mere compilation by the government of records describing the exercise of First Amendment freedoms . . . has a chilling effect on such exercise.").

Complaint, Mr. Shah has further alleged that the contents of his notebook had nothing to do with terrorism, and that he has no ties to terrorism. *Id.* ¶¶ 151, 175–78. Accordingly, Mr. Shah's retaliation claim should proceed.

Mr. Shah respectfully asks the Court to reconsider its conclusion that a person of ordinary firmness would not be chilled by the border officers' conduct because Mr. Shah's inspection was "routine." *See* Op. 55. As an initial matter, "routine" is a "term of art in Fourth Amendment jurisprudence," *Guan*, 530 F. Supp. 3d at 264, n.23, and it does not mean "inconsequential." The lengthy detention, search, and questioning of Mr. Shah was harrowing, as he has plausibly alleged. FAC ¶¶ 184, 189; *see, e.g.*, *Tabbaa*, 509 F.3d at 99, 102 & n.4 (border officers' conduct constituted "a significant penalty, or disability" on plaintiffs' First Amendment rights, even though the searches were "routine" for Fourth Amendment purposes).

Even more importantly, "[o]therwise lawful government action," such as a search that satisfies the Fourth Amendment, "may nonetheless be unlawful if motivated by retaliation for having engaged in activity protected under the First Amendment." *See O'Brien*, 818 F.3d at 932. For example, in *O'Brien*, the court held that a student who "was appropriately subject to discipline" for his harassment of university professors could nevertheless state a retaliation claim "if his allegations, taken as true, could plausibly show that the defendants' actions in disciplining him were substantially motivated by his protected speech or expressive conduct." *Id.*

Thus, even if the length and intrusiveness of Mr. Shah's inspection were within the scope of a typical secondary inspection, Mr. Shah has still plausibly alleged that border officers' actions were unlawful because they were taken in retaliation for his protected speech. The fact that some other lawful secondary inspections may last longer or be just as intrusive is irrelevant. *See Boquist v. Courtney*, 32 F.4th 764, 785 (9th Cir. 2022) (argument that retaliatory action against plaintiff was legal because it consisted of "a reasonable time, place, and manner restriction . . . misses the point"). A reasonable person would be chilled from engaging in First Amendment activity if

such activity is likely to result in a lengthier and more intrusive inspection than would otherwise occur. *See* FAC ¶¶ 172–73.

Mr. Shah further requests that the Court reevaluate its causation analysis. In its opinion, the Court considered whether Mr. Shah or Defendants presented a "more plausibl[e]" explanation of the motivation behind the officers' conduct. Op. 59. But under *Iqbal*, the question is simply whether Mr. Shah's claim is plausible, not whether it is "probable" or more plausible than an alternative explanation proffered by the government. *Starr*, 652 F.3d at 1216–17. Mr. Shah's claim that retaliation was a substantial or motivating factor is plausible because of the circumstances surrounding the officers' conduct and an officer's statement that he was asking intrusive questions "because of what we found in your journal." *See* FAC ¶¶ 147–75. The Amended Complaint clarifies that nothing in Mr. Shah's journal related to violence or terrorism. *See id.* ¶¶ 151, 178. Furthermore, even if non-retaliatory factors influenced the officers' decisions regarding the length and intrusiveness of his inspection, Mr. Shah need only allege that retaliatory animus was a "substantial" factor in the officers' conduct, not the sole factor. *See O'Brien*, 818 F.3d at 932.[16]

## V.  Plaintiffs plausibly allege Fifth Amendment equal protection violations.

Under the right to equal protection, government action discriminating "along suspect lines like . . . religion" is subject to strict scrutiny. *Burlington N. R. Co. v. Ford*, 504 U.S. 648, 651 (1992). In cases of express discrimination—"when a state actor explicitly treats an individual differently on the basis of" a protected class—the government action is "immediately suspect" and the plaintiff "need not make an

---

[16] Defendants are properly named in their official capacities because they are responsible for the storage of the unlawfully collected records in agency databases. *Cf.* Def. Br. 30. *See, e.g.*, *Wolfel v. Morris*, 972 F.2d 712, 719 (6th Cir. 1992); *Fratus v. Cal. Dep't of Corrs.*, No. 12-cv-00906, 2014 WL 1338903, at *4 (E.D. Cal. Apr. 2, 2014) ("If Plaintiff . . . is entitled to injunctive relief regarding expungement of the disciplinary report," the "Secretary [of the Department of Corrections], is in the position to effect relief[.]"). The cases Defendants cite are not analogous because they involve suits seeking monetary damages, not injunctive relief.

extrinsic showing of discriminatory animus or a discriminatory effect to trigger strict scrutiny." *Mitchell v. Washington*, 818 F.3d 436, 445–46 (9th Cir. 2016) (cleaned up). Here, Plaintiffs plausibly allege that border officers expressly target them for religious questioning because they are Muslim, *see supra* § I.A, triggering strict scrutiny.[17] This is consistent with the Court's prior holding that Plaintiffs had plausibly alleged "an official practice, policy or custom of targeting Muslim Americans for religious questioning." Op. 32. Plaintiffs respectfully ask the Court to incorporate that holding into its equal protection analysis. Because Defendants' policy and/or practice is expressly discriminatory, it is automatically subject to strict scrutiny.

Alternatively, a plaintiff may state an equal protection claim by plausibly alleging that discriminatory intent was a "motivating factor" behind the government's conduct. *Vill. of Arlington Heights v. Metro. Hous. Dev. Corp.*, 429 U.S. 252, 265–66 (1977); *Arce v. Douglas*, 793 F.3d 968, 977 (9th Cir. 2015). Plaintiffs respectfully ask the Court to reconsider its conclusion that Plaintiffs failed to do so. The number of incidents alleged, the long history of similar incidents, and the nature of the questions themselves make plain that discrimination was a motivating factor in the religious questioning of Plaintiffs. *See supra* § I.A. Several courts have allowed equal protection claims to proceed based on similar allegations of religious questioning. *See Cherri*, 951 F. Supp. 2d at 937; *El Ali*, 473 F. Supp. 3d at 516–18; *Janfeshan*, 2017 WL 3972461, at *10.

Defendants argue that Plaintiffs fail to make this alternative showing because Imam Kariye's and Mr. Mouslli's watchlist status was the "primary cause" of their religious questioning. Def. Br. 32. But this is flatly contradicted by Plaintiffs' well-pled allegations that border officers' religious questions bear no relationship to the detection of terrorism. FAC ¶¶ 32–38. In any event, under *Arlington Heights*, a

---

[17] Plaintiffs do not challenge their selection for secondary inspection, even though such inspection was unwarranted. *Cf.* Op. 65. Rather, Plaintiffs allege that, once selected, they were singled out for discriminatory questioning regarding their religious beliefs, practices, and associations.

plaintiff need not prove that discrimination was "the dominant or primary" purpose behind challenged conduct. 429 U.S. at 266. Plaintiffs have plausibly alleged that, at a minimum, discriminatory intent is *also* a motivating factor behind the religious questioning that they endure. FAC ¶¶ 25, 233–35. Furthermore, the Amended Complaint explains that Imam Kariye's and Mr. Mouslli's watchlist placement is unjustified, and that Mr. Shah's journal did not contain any suspicious material, *id.* ¶¶ 81–89, 127–30, 151, 176–78—facts that completely undermine the Defendants' explanation of the officers' motivations, *see* Def. Br. 32–33.

Placement on a watchlist or the contents of an innocuous journal cannot be the sole causes of religious questioning because neither fact explains why the officers asked *religious* questions. Defendants' questions regarding mosque attendance, frequency of prayer, and other aspects of protected religious belief and practice reflect their view of Islam as inherently suspicious, and their intent to treat Muslims differently from non-Muslims. FAC ¶¶ 25, 97, 139, 189.

The Court's prior rejection of Plaintiffs' equal protection claims rested in part on the notion that detention and questioning are "routine" under the Fourth Amendment. *See* Op. 66. But government conduct may satisfy the Fourth Amendment and still violate the right to equal protection. *See, e.g.*, *Whren v. United States*, 517 U.S. 806, 813 (1996); *Cross v. City & County of San Francisco*, 386 F. Supp. 3d 1132, 1149 (N.D. Cal. 2019); *Ballew v. City of Pasadena*, No. 18-cv-0712, 2022 WL 17974488, at *9 (C.D. Cal. Nov. 23, 2022) ("[A] traffic stop motivated, at least in part, by race still constitutes an equal protection violation, even if the officers also had a legitimate basis for the stop[.]").

For the reasons above, strict scrutiny applies to Defendants' questions about Plaintiffs' faith, and Plaintiffs have plausibly alleged that Defendants are unable to meet their burden to satisfy that test. *See supra* § I.B.

## CONCLUSION

Accordingly, Defendants' motion to dismiss should be denied.

Dated:  February 10, 2023          Respectfully submitted,

AMERICAN CIVIL LIBERTIES UNION
      FOUNDATION

AMERICAN CIVIL LIBERTIES UNION OF
      MINNESOTA

ACLU FOUNDATION OF SOUTHERN
      CALIFORNIA

COOLEY LLP


By:    */s/ Ashley Gorski*
      Ashley Gorski
      American Civil Liberties Union Foundation

*Counsel for Plaintiffs*

---

PLAINTIFFS' OPPOSITION TO DEFENDANTS' MOTION TO DISMISS